## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| P.B., by and through his next friend, Cassandra Berry; D.B., by and through his next friend, Leskisher Luckett; N.F., by and through his next friend, Kelly Fischer; A.J. by and through his next friend, Rosezina Jefferson; T.J., by and through his next friend, Jeanette Johnson; K.J., by and through his next friend, Kimberly Jones; M.M., by and through his next friend, Nancy McSween; L.M., by and through his next friend, Shelton Joseph; D.T., by and through his next friend, Chanell Thomas; and L.W., by and through his next friend, Cynthia Parker, on behalf of themselves and all similarly situated students, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) | Case No. |
| v. | ) ) ) |  |
| PAUL PASTOREK, Louisiana State Superintendent of Education in his official capacity; LOUISIANA DEPARTMENT OF EDUCATION; and LOUISIANA BOARD OF ELEMENTARY AND SECONDARY EDUCATION, | ) ) ) ) ) ) ) ) | COMPLAINT-CLASS ACTION |
| Defendants. | ) ) ) |  |

## COMPLAINT

1.     This is a class action to vindicate the rights of all New Orleans students with disabilities filed pursuant to the Individuals with Disabilities Education Improvement Act of 2004 ("IDEA"), 20 U.S.C. § 1400 *et seq.*; § 504 of the Rehabilitation Act of 1973 ("Section

504"), 29 U.S.C. § 794; and Title II of the Americans with Disabilities Act ("Title II"), 42 U.S.C. § 12101 *et seq.*[1]

2.      In 1975, Congress enacted what is now called the IDEA to protect the educational rights of the more than eight million students with disabilities in the United States whose educational needs were neglected. Section 1 of Act Nov. 29, 1975, P.L. 94-142, 89 Stat. 773. This statute focuses on correcting two evils: the exclusion of children with disabilities from public schooling and the provision of inadequate education to those children already admitted to the classroom. Pursuant to the IDEA, state educational agencies—like the Defendants— are required to ensure that schools and school districts have policies and practices in place to ensure the pro-active identification of students with disabilities. This is known as the "child find" mandate. State educational agencies must also ensure that each child with a disability receives an individualized education plan ("IEP") that is reasonably calculated to confer educational benefit. IEPs must include the provision of any related services necessary to ensure that a child makes academic progress. Related services include counseling, speech therapy and other similar supports. For some students, IEPs must provide for transitional services to help aide in the transition from student to productive adult. The IDEA also includes numerous procedural safeguards to protect children from school discipline practices that punish them for behaviors related to their disabilities.

---

[1] Section 504 of the Rehabilitation Act and Title II of the ADA prohibit entities from discriminating against individuals on the basis of their disabilities, and both laws' anti-discrimination mandates use nearly identical language. *See* Section 504 at 29 U.S.C. § 794(a) (1973) and Title II at 42 U.S.C. § 12132 (1990).  The only meaningful difference between Section 504 and Title II is that Section 504 applies only to federally-funded recipients. Hence, when applying both laws in the context of state actors receiving federal funding for the provision of elementary and secondary education, the Fifth Circuit has concluded that the rights and remedies under both statutes are the same, and that both statutes may be used interchangeably. *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 287-88 (5th Cir. 2005).

2

3.     Students with disabilities are also protected by Section 504 of the Rehabilitation Act which prohibits entities that receive federal funding—including state Departments of Education—from discriminating against people on the basis of their disabilities. Section 504 mandates that state educational agencies provide students with disabilities with access to the same educational opportunities that are provided to non-disabled students.

4.     Defendants State Superintendent of Education Paul Pastorek, the Louisiana Department of Education ("LDE") and the Louisiana Board of Elementary and Secondary Education ("BESE") bear ultimate responsibility for ensuring that every school district and every school within the state of Louisiana complies with these federal laws. The Defendants have abdicated this responsibility and as a result, the rights of New Orleans public school students with disabilities are violated in four general ways:

5.     First, students with disabilities are denied admission to public schools on the basis of their disabilities because the Defendants have failed to ensure that public schools offer disabled students the same variety of educational programs and services as are available to non-disabled children. These practices constitute nothing less than disability discrimination.

6.     Second, students with disabilities are denied the protections and services to which they are entitled under federal law because the Defendants have not promulgated and enforced a child find policy that would (1) apply uniformly throughout all New Orleans Public schools and (2) ensure that all students who are in need of special education services are identified, located and evaluated in a timely fashion.

7.     Third, students with disabilities are denied educational opportunities that confer a meaningful educational benefit because Defendants have failed to ensure that IEPs are

3

developed, reviewed and revised for each New Orleans public school student with a disability, and have failed to provide access to related and transition services.

8.    Fourth, students with disabilities are punished for manifestations of their disabilities and unlawfully excluded from educational programs and benefits because the Defendants have failed to implement policies, procedures and practices related to school discipline that protect these students' federal procedural safeguards and shield them from discrimination on the basis of their disability.

9.    The Plaintiffs are ten students who represent a class of approximately 4,500 New Orleans students with disabilities. On behalf of themselves and a class of all similarly situated New Orleans students with disabilities, Plaintiffs seek declaratory, preliminary and permanent injunctive relief requiring Superintendent Pastorek, LDE, and BESE to cease their unlawful policies, procedures, customs, patterns, and/or practices that deprive Plaintiffs and all similarly situated children with disabilities their statutory rights to (1) receive a free appropriate public education and (2) be free from discrimination on the basis of their disabilities.

## JURISDICTION

10.    Jurisdiction is conferred upon this Court by 20 U.S.C. § 1415(i)(3)(A) and 29 U.S.C. § 794 which provide the district courts of the United States with jurisdiction over any action pursuant to the above section(s) without regard to the amount in controversy, and 28 U.S.C. § 1331, based upon the federal questions raised herein.

11.    Plaintiffs and the class they represent have no adequate remedy at law and have suffered and will continue to suffer irreparable harm unless defendants, including their agents, representatives and/or employees, are restrained from continuing its unlawful practices.

**VENUE**

12.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a "substantial part of the events or omissions giving rise to the claim[s] occurred" in this district.  This Court is authorized to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202, and injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

**PARTIES**

A.     **REPRESENTATIVE PLAINTIFFS**

13.     Plaintiff P.B. is a 15-year-old resident of the city of New Orleans, who loves to play football, listen to music and spend time with his grandmother. He is not currently enrolled in school, but he began the 2010-11 school year enrolled in the seventh grade at Pierre A. Capdau Charter School, a charter school operating as an independent local education agency ("LEA").  P.B. has a diagnosis of bipolar disorder and attention deficit hyperactivity disorder (ADHD), and was identified as a student with a disability under Section 504. He brings this action by and through his mother, Cassandra Berry.

14.     Plaintiff D.B. is a nine-year-old resident of the city of New Orleans, who loves to draw, dance, and learn about history. He is currently enrolled in the fourth grade at Langston Hughes Academy Charter School, a charter school operating as an independent LEA. D.B. has been identified as a student with an emotional disability under IDEA. He brings this action by and through his mother, Leskisher Luckett.

15.     Plaintiff N.F. is a nine-year-old resident of New Orleans, currently enrolled in the fourth grade at Lafayette Academy Charter School, a charter school operating as an independent LEA. During the 2009-10 school year, he was enrolled at Mary D. Coghill Elementary School, a traditional public school in the state-run Recovery School District ("RSD"). N.F. loves Dr. Seuss

books and he likes to sing and swim. He has been identified as a student with multiple disabilities under IDEA: autism and total visual impairment/blindness. N.F. brings this action by and through his mother, Kelly Fischer.

16.     Plaintiff A.J. is a 10-year-old resident of New Orleans, who likes to swim, listen to music, play video games, and take care of his baby brother. He is currently enrolled in the fifth grade at Lagniappe Academy Charter School, a charter school operating as an independent LEA. During the 2009-10 school year, A.J. was enrolled at Albert Wicker Elementary School, a traditional public school in the RSD. A.J. has a diagnosis of ADHD, and was identified as a student with a disability under Section 504. He brings this action by and through his mother, Rosezina Jefferson.

17.     Plaintiff T.J. is a 13-year-old resident of New Orleans, who enjoys playing football and basketball and who loves spending time working around the house with his grandfather. He is currently not enrolled in school because his mother is unable to locate a school placement for him in New Orleans. During the 2009-10 school year, T.J. was enrolled in the fourth grade at Fannie C. Williams Elementary School, a traditional public school in the RSD. T.J. has a diagnosis of dyslexia and ADHD, but he has not yet been identified as a student with a disability. He brings this action by and through his mother, Jeanette Johnson.

18.     Plaintiff K.J. is a 14-year-old resident of New Orleans, currently enrolled in the eighth grade at Samuel J. Green Charter School, a charter school operating as an independent LEA. He loves sports, playing video games and spending time with his family. K.J. was identified as a student with a specific learning disability and ADHD under Section 504. He brings this action by and through his mother, Kimberly Jones.

6

19.     Plaintiff M.M. is a seven-year-old resident of New Orleans, currently enrolled in the second grade at Benjamin Banneker Elementary School, a traditional public school in the RSD. He has been identified as a student with multiple disabilities under IDEA, including acute cognitive delays and severe seizure disorder. M.M. is just learning to walk and enjoys accompanying his mother to their local fish market. He brings this action by and through his mother, Nancy McSween.

20.     Plaintiff L.M. is a 15-year-old resident of New Orleans, who likes to play basketball, use the computer, and help out around the house. He hopes to join the United States Army after high school. L.M. is currently enrolled in the ninth grade at Sci Academy Charter School, a charter school operating as an independent LEA. During the 2009-10 school year, he was enrolled at Joseph A. Craig Elementary School, Dr. Charles R. Drew Elementary School, Douglass Eighth Grade Academy, and Hope Academy, all state-run public schools in the RSD. L.M. has been identified as a student with an emotional disability under IDEA. He brings this action by and through his great uncle and legal guardian, Shelton Joseph.

21.     Plaintiff D.T. is a seven-year-old resident of New Orleans, currently enrolled in the second grade at Fannie C. Williams Elementary School, a traditional public school in the RSD. During the 2009-10 school year, he was enrolled at Langston Hughes Academy Charter School, a charter school operating as an independent LEA.  D.T. loves to take karate, play video games, and go to the park with his mother and grandmother. He has been identified as a student with an emotional and behavioral disability under Section 504. He brings this action by and through his mother, Chanell Thomas.

22.     Plaintiff L.W. is a 16-year-old resident of New Orleans, who likes to fix broken things and help his grandmother out around the house. He hopes to be a policeman after

7

completing school. L.W. is currently enrolled in the ninth grade at KIPP Renaissance High School, a charter school operating as an independent LEA. During the 2009-10 school year, he attended KIPP Believe College Prep, a charter school operating as an independent LEA, and Douglass Eighth Grade Academy, a traditional public school in the RSD. L.W. has been identified as a student with Other Health Impairments (OHI) under IDEA. He brings this action by and through his grandmother and legal guardian, Cynthia Parker.

**B.     DEFENDANTS**

23.     Defendant PAUL PASTOREK is the Louisiana State Superintendent of Education. As State Superintendent, Defendant Pastorek serves as the executive head and chief administrative officer of the Louisiana Department of Education, and has responsibility for implementing educational policies for the administration, control, and operation of the functions, programs, and affairs of the Department. La. R.S. § 36:644. The State Superintendent also executes and implements those educational policies and programs under the supervision and control of the Louisiana Board of Elementary and Secondary Education and the laws affecting schools under the jurisdiction of the Board. La. R.S. § 17:22. Defendant Pastorek is sued here in his official capacity.

24.     Defendant LOUISIANA DEPARTMENT OF EDUCATION ("LDE") is responsible for providing public education for the people of the state of Louisiana and is the agency through which the state administers the functions of the superintendent of education and the Board of Elementary and Secondary Education. La. R.S. § 36:642(B). LDE is also responsible for performing the state's responsibilities relating to the education of exceptional children, including the administration and distribution of all federal funds received, in accordance with the law. La. R.S. § 36:649. *See also* La. R.S. § 17:24. As the state educational

8

agency ("SEA"), LDE has the ultimate responsibility for ensuring that all public schools in the state of Louisiana comply with the IDEA.  20 U.S.C. § 1412(a)(11)(A). Pursuant to La. R.S. § 36:642, LDE has the authority to sue and be sued.  LDE is sued here in its official capacity.

25.    Defendant LOUISIANA BOARD OF ELEMENTARY AND SECONDARY EDUCATION ("BESE") is responsible for the oversight of the Louisiana Department of Education and the Louisiana Recovery School District. BESE oversight responsibilities include the approval and adoption of rules, by-laws, and regulations for the government of the public elementary and secondary schools and other public schools and programs under its jurisdiction, which shall not be inconsistent with state and federal law, pursuant to La. R.S. § 17:7. Pursuant to La. R.S. § 17:10.5, BESE functions as the local school board for the RSD's traditional public schools, promulgating and enforcing local policy and supervising the Superintendent. Pursuant to La. R.S. § 17.6, BESE has the authority to sue and be sued. BESE is sued here in its official capacity only.

## CLASS ACTION ALLEGATIONS

26.    Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2), the Plaintiffs bring this action on behalf of themselves and all other present and future New Orleans students who are identified or who should be identified as students with disabilities pursuant to the Individuals with Disabilities Education Improvement Act of 2004 ("IDEA"), 20 U.S.C. § 1400 *et seq.*; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and Title II of the Americans with Disabilities Act ("Title II"), 42 U.S.C. § 12101 *et seq.*

27.    The proposed class is so numerous that joinder of all members is impracticable. The class members include the approximately 4,500 New Orleans students with disabilities (both identified and unidentified) who are currently enrolled in public school and the countless

students with disabilities who will enroll in the future. Given the number of youth who are members of the proposed class, joinder is not just impracticable – it is impossible.

28. There are questions of law and fact common to the class. These common questions include whether the Defendants have violated the IDEA, Section 504, and Title II.

29. The claims of the Plaintiffs are typical of the claims of the proposed class in that the named Plaintiffs, like other members of the class, allege that LDE and BESE have failed to comply with their obligations pursuant to the IDEA, Section 504, and Title II. As a result, the Defendants fail to ensure that class members are properly evaluated and identified for special education services. Class members are also denied a free appropriate public education, meaning they do not receive individualized education plans (IEPs) that provide appropriate related and transitional services and that are reasonably calculated to confer educational benefit. Furthermore, the Defendants fail to protect class members with the required procedural safeguards related to school discipline. Finally, the Defendants fail to ensure class members are not discriminated against on the basis of disability and are provided access and accommodations to the same programs and services as equally as they are available to non-disabled students.

30. The Plaintiffs will fairly and adequately represent the interests of the class. The Plaintiffs possess a strong personal interest in the subject matter of the lawsuit, and are represented by experienced counsel with expertise in special education and disability law, class actions, and civil rights litigation.

31. Defendants have acted and refused to act on grounds generally applicable to the class. LDE and BESE have failed to comply with their general supervisory responsibilities by failing to appropriately monitor, identify, and compel the New Orleans public schools to eliminate the numerous systemic violations of IDEA, Section 504 and Title II. Defendants'

customs, policies, procedures, patterns and/or practices have a similar impact upon the plaintiffs and the class they seek to represent. Correction of these violations will benefit all class members. The relief sought herein applies to the class as a whole and not merely to any particular individual or group of individuals.

## NEW ORLEANS SCHOOL GOVERNANCE FRAMEWORK

32.     As a result of the unique structure of public education in New Orleans, students with disabilities face insurmountable challenges when attempting to access educational services. Under federal law, special education services are administered by a local education agency ("LEA")—traditionally a single school district which serves as the centralized point of authority and accountability for schools. As a result of the education reforms that occurred in the city during the aftermath of Hurricane Katrina, no such single entity exists in New Orleans.

33.     Immediately following Hurricane Katrina, the state-operated Recovery School District ("RSD"), a division of the LDE that is overseen by BESE, became responsible for operating low performing schools that were previously run by the Orleans Parish School Board ("OPSB"). Under this new structure, OPSB retained control of 16 schools including 12 charter schools. RSD gained control of all other schools. Once a public school is transferred to the RSD, it can be operated by a private entity known as a charter school.

34.     Currently, the RSD directly operates 23 schools and has overseen the chartering of 49 schools. Each of these 49 schools operates as its own LEA. There are 51 distinct LEAs that operate within the city of New Orleans. Over 70 percent of New Orleans public students attend charter schools—more than anywhere else in the country. Stacy Teicher Khadaroo, *After Katrina, How Charter Schools Helped Recast New Orleans Education*, Christian Science Monitor, August 29, 2010, *available at*

11

http://www.csmonitor.com/USA/Education/2010/0829/After-Katrina-how-charter-schools-helped-recast-New-Orleans-education.

35.     For purposes of administering special education services, each of these charter schools functions as an independent school district or LEA. By functioning as an LEA, a single charter school assumes the responsibility of an entire school district. Under federal law, the Defendants must ensure that each charter school has the appropriate resources, policies and procedures to provide the full panoply of special education services from evaluations to related services and supports.

## STATUTORY AND REGULATORY FRAMEWORK

**A.     IDEA REQUIREMENTS**

36.     The Individuals with Disabilities Education Improvement Act of 2004 (IDEA), requires that a state provide a free appropriate public education to all its students with disabilities including children with disabilities who have been suspended or expelled from school.  See 20 U.S.C. § 1412(a)(1)(A); 34 C.F.R. § 300.101.  The IDEA establishes a system of procedural and substantive requirements to which the state educational agency must adhere to ensure that each child with a disability receives a free appropriate public education. 20 U.S.C. § 1401 *et seq.*

37.     The state educational agency has the ultimate responsibility for ensuring that all public schools in the state of Louisiana comply with the IDEA. 20 U.S.C. § 1412(a)(11)(A). Accordingly, LDE and BESE are responsible for implementing policies and procedures to ensure that LEAs are monitored for implementation and compliance with the IDEA.  34 C.F.R. § 300.600.  If the state determines that an LEA is not in compliance, the IDEA requires the state to take necessary action to enforce compliance. 34 C.F.R. § 300.608.

12

38.     In addition to their general supervisory responsibilities, LDE and BESE have the responsibility to ensure implementation and compliance with specific provisions of the IDEA. First, they must ensure that each LEA take steps to make certain that its children with disabilities have available to them the variety of educational programs and services available to non-disabled children in the area served.  20 U.S.C. § 1412(a)(2); 34 C.F.R. § 300.110.  They must also have in effect policies and procedures to ensure that all children with disabilities, who are in need of special education and related services, are identified, located, and evaluated.  20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.111.  LDE and BESE must ensure that an individualized education program ("IEP") is developed, reviewed and revised for each child with a disability to enable the child to receive a free appropriate public education.  20 U.S.C. § 1412(a)(4); 34 C.F.R. § 300.112.  Finally, they must ensure that children with disabilities are afforded the procedural safeguards described by IDEA when disciplinary action is contemplated.  20 U.S.C. § 1412(a)(6); 34 C.F.R. § 300.150.  IDEA requires the state to examine LEA data to determine if significant discrepancies exist in the rates of suspensions and expulsions of children with disabilities.  If discrepancies exist, the state must review and revise its policies, procedures and practices relating to the development of IEPs, the use of positive behavioral interventions and supports, and procedural safeguards, to ensure that the state is in compliance with the IDEA.  20 U.S.C. § 1412(a)(22); 34 C.F.R. § 300.170.

39.     As the SEA, Defendants LDE and BESE are jointly responsible for overseeing, monitoring, and enforcing the coordination and provision of special education services in New Orleans.  This obligation applies to students who attend all public schools that operate in the city of New Orleans, including the 49 charter schools that function as 49 independent school districts,

the 23 schools operated by the state under the Recovery School District (RSD) and the 12 charter

schools and 4 publicly run schools operated by the Orleans Parish School Board.

**B.      SECTION 504 AND TITLE II REQUIREMENTS**

40.      Section 504 of the Rehabilitation Act and Title II of the Americans with

Disabilities Act prohibit public entities from discriminating against individuals with disabilities.

Pursuant to Section 504 and Title II, public schools are prohibited from excluding students with

disabilities from participating in or receiving the benefits of a school's programs, activities, and

benefits.   To the extent a student is excluded from programs, activities, and benefits, it

constitutes disability discrimination.  42 U.S.C. § 12132; 29 U.S.C. § 794(a).  Accordingly, each

student with a disability must be provided access to all programs provided to non-disabled

students.  42 U.S.C. § 12132; 29 U.S.C. § 794; 34 C.F.R. §§ 104.21.  Furthermore, Section 504

and Title II require that each disabled student be provided reasonable accommodations and

modifications designed to provide meaningful access to educational benefits, or as necessary to

avoid discrimination on the basis of disability 34 C.F.R. § 104.33; 28 C.F.R. § 35.130(b)(7).

41.      Section 504 and Title II's nearly identical anti-discrimination mandates apply to

qualified individuals with disabilities.  In the elementary and secondary education context, the

term "qualified individual" refers to

> a handicapped person (i) of an age during which nonhandicapped persons are provided
> [public preschool elementary, secondary, or adult educational services] (ii) of any age
> during which it is mandatory under state law to provide such services to handicapped
> persons, or (iii) to whom a state is required to provide a free appropriate public education
> under [the IDEA]. 34 C.F.R. § 104.3(*l*)(2) (1980).

42.      Furthermore, Section 504 and Title II define "disability" as "a physical or mental

impairment that substantially limits one or more of the major life activities." 42 U.S.C. §

12102(2) (2008); 29 U.S.C. § 705 (1973).  Qualified students with disabilities can demonstrate

that their state education agency discriminated against them pursuant to the following analysis:

1. The plaintiff-student is disabled, according to the common definition;
2. The plaintiff-student is otherwise qualified to participate in school activities;
3. State education agency receives federal financial assistance; and
4. The plaintiff-student was excluded from participation in, denied the benefits of, or subject to discrimination at the school.

43.     Section 504 also mandates that each child with a disability in New Orleans

receive a free appropriate public education including the provision of regular or special

education and supplementary aids and services to meet the needs of the student.  20 U.S.C. §

794; 34 C.F.R. § 104.33.

44.     The United States Department of Education's Office for Civil Rights (OCR) has

routinely determined that, as recipients of federal financial assistance, the state educational

agency is ultimately responsible for ensuring the provision of a free appropriate public education

to each qualified person in its jurisdiction under Section 504.  Individuals with Disabilities Educ.

L. Rep., 352:627-631, 628-29, OCR Ruling: *Complaint No. 03-88-1024 West Virginia*

*Department of Education.*

## C.     STATE REQUIREMENTS

45.     LDE and BESE's obligations to students with disabilities under IDEA, Section

504 and Title II are reinforced in Louisiana state law.  Pursuant to R.S. § 17:1941, the state

educational agency has a duty to

> … provide a free appropriate public education to every child with an exceptionality who is a resident therein.  Out of recognition that included within any population one will find some children who require special education and related services, it is the purpose of this Chapter to provide for a flexible and uniform system of special education for all children requiring such services; to provide a flexible and nondiscriminatory system for identifying and evaluating the individual needs of the child; to determine the appropriateness of the special education services; to conduct a periodic evaluation of the

15

services and their benefit to the child; to prevent denials of equal educational opportunities on the basis of national origin, sex, economic status, race, religion, and physical or mental disabilities/impairments or other exceptionalities in the provision of free appropriate public education; and to provide such special education services herein described and related services in the least restrictive educational placements.

## SYSTEMIC ALLEGATIONS AND EXHAUSTION OF ADMINISTRATIVE REMEDIES

46.     The Plaintiff class has detailed widespread systemic failures of IDEA compliance. As a result they are not required to exhaust their administrative remedies available under the IDEA. Given that the administrative system cannot provide the Plaintiff-class with the requested class-wide declaratory and injunctive relief, exhaustion would be futile.

## STATEMENT OF FACTS

47.     Defendants systemically deny New Orleans students with disabilities a free appropriate public education by failing to ensure that the educational programs provided to public school students in Orleans Parish meet the requirements of the IDEA, Section 504, and Title II.

48.     Since the New Orleans public schools were restructured over five years ago, the Defendants have conducted only two cursory monitoring visits. The Defendants assessed IDEA compliance in only 10 out of 59 local education agencies operating across the city. Despite the serious deficiencies in the scope of the Defendants' monitoring, these visits documented substantive IDEA violations.  Nevertheless, the Defendants have failed to compel New Orleans public schools to comply with federal law by promulgating and enforcing policies and practices that would ensure compliance.

49.     Defendants have further failed to provide sufficient oversight and monitoring of the special education services provided in New Orleans' 51 LEAs. As a result of Defendants'

16

failures, New Orleans students with disabilities suffer the following systemic violations of federal law: 1) discrimination on the basis of disability and denial of access to educational services; 2) failure to develop and implement child find procedures; 3) failure to provide a free and appropriate education that confers a meaningful educational benefit; and 4) failure to provide students with discipline-related procedural safeguards.

## A.  SYSTEMIC VIOLATION 1: DISCRIMINATION ON THE BASIS OF DISABILITY AND DENIAL OF ACCESS TO EDUCATIONAL SERVICES

50.    The New Orleans public school system is built around the concept of "school choice."  As stated on Defendant LDE's website "[A] basic belief inherent in public charter schools is that parents, students, and teachers would be more likely to achieve success when they choose where they go to school or where they work.  For parents and students, this allows them to choose schools that more appropriately met the needs of children."    (available at http://www.doe.state.la.us/lde/charter/2624.html).

51.    Defendants fail to provide students with disabilities with the same educational choices provided to non-disabled students.  Because the Defendants have failed to execute their general supervisory authority, many local education agencies are unable or unwilling to provide special education and related services. As a result, students with disabilities are unlawfully denied admission to schools solely on the basis of their disabilities.

52.    While non-disabled  students can choose from a wide variety of public schools, students with disabilities have significantly limited options and can only attend those schools that (1) are willing to accept students with disabilities and (2)  provide related services and necessary accommodations.

53.     The Defendants have failed to promulgate and enforce policies and practices that will ensure each local education agency operating in Orleans Parish offers students with disabilities the same educational programs and services available to non-disabled students. Because the Defendants have failed to provide local educations agencies with sufficient training, monitoring, and compliance oversight, students with disabilities are refused admission to public schools because of their disabilities. Some students with disabilities are admitted to public schools, but are counseled to leave once their disability begins to manifest. All students with disabilities have significantly fewer school choice options than their non-disabled peers.

54.     Children with disabilities are significantly underrepresented in many public schools in New Orleans.   Students with disabilities comprise 12.6 percent of the student population in the RSD-direct run schools.   Charter schools enroll significantly fewer students with disabilities—on average 7.8 percent of charter school students have disabilities. Louisiana Department of Education, *State Special Education Data Profile* (2008-2009), *available at* http://www.doe.state.la.us/lde/uploads/17133.pdf.   Eleven charter schools reported that five percent or less of their student population is comprised of students with a disability.

55.     When charter schools violate their contractual obligations and deny enrollment to children with disabilities, Defendant LDE fails to take appropriate action to remedy this violation.  For example, Pierre A. Capdau Charter School enrolled a student body comprised of just over three percent of students with disabilities. Instead of enforcing the federal obligations to ensure that a school provides equal access to disabled students, in 2010 LDE granted Capdau a three-year charter extension because it met academic performance standards.

56.     Had LDE investigated the exclusion of students with disabilities at Pierre A. Capdau Charter School it would have uncovered the plight of students like Plaintiff P.B., who is

18

identified as a student with a disability under Section 504. On October 3, 2010, a school administrator told his mother that P.B. was no longer welcome to return to school because of a manifestation of his disability. Since that time, P.B.'s mother has attempted to locate a New Orleans public school that will enroll him. Every school has turned her away and P.B. remains out of school to this day.

57.     Plaintiff T.J., a student with dyslexia and ADHD, has also been denied admission to a number of schools that post low enrollment rates for students with disabilities. T.J.'s mother attempted to enroll him in A.P. Tureaud Elementary School, Nelson Elementary School, Abramson Science and Technology Charter School, Sarah T. Reed Elementary School, and Gentilly Terrace Charter School. All five schools refused to enroll T.J. because of his disability. He is currently not attending school.

58.     Plaintiffs N.F., who has autism and a complete visual impairment, and M.M., who has acute cognitive delays and a severe seizure disorder, were informed by several public school officials that their schools could not accommodate students with severe disabilities.

59.     M.M., who is wheelchair-bound, wanted to apply to the Lafayette Academy Charter School. However, the school's facilities are not wheelchair accessible—so his application would have been futile.

**B.      SYSTEMIC VIOLATION 2: FAILURE TO DEVELOP AND IMPLEMENT CHILD FIND PROCEDURES**

60.     The Defendants have failed to promulgate and implement policies, practices and procedures to ensure that New Orleans students with disabilities are identified, located and evaluated. In an average Louisiana school district, 12.2 percent of all students are identified as having disabilities. Louisiana Department of Education, *Special Education Performance Profile*

19

(2008-09), *available at* http://www.doe.state.la.us/lde/eia/2115.html.  In contrast, only 8 percent of public school students in New Orleans are identified as eligible for special education services. Similar school districts across the country have identified almost twice the number of students with disabilities. As a result of the Defendants' failures, children with disabilities remain unidentified and they are denied the educational services and procedural safe guards to which they are entitled under federal law.

61.    A survey conducted by Educational Support Systems, Inc. ("ESS Survey") further documents systemic child find violations in New Orleans public schools. The survey evaluated the special education programs and services of 23 New Orleans charter schools.  The survey finds that "an astonishing number of 504 plans" have been developed in New Orleans in comparison to other urban jurisdictions, and special education coordinators at several schools "estimated that at least 30% of students with 504 plans would qualify for special education eligibility." Educational Support Systems, Inc., *The Special Education Project: A Study of 23 Charter Schools in the Recovery School District* (2008).  Local education agencies have fewer legal obligations to students who are only identified pursuant to Section 504. The ESS survey suggests that schools under-identify students with disabilities in a effort to escape their legal obligations under the IDEA.

62.    The report concludes that "the unusual application of 504 plans suggests a possible misinterpretation and use of Section 504 of the Rehabilitation Act and could make charter schools liable for failure to conduct Child Find and provide a Free Appropriate Public Education (FAPE) under IDEA as defined by special education regulations."

63.    In the absence of significant policy modifications, training, oversight and monitoring, Defendant LDE's child find policies cannot be implemented in the majority of the

local education agencies located in New Orleans. Pursuant to LDE policy each charter school must "regularly employ certified pupil appraisal personnel to conduct individual evaluations" and "retain full responsibility for the individual evaluation." Qualified pupil appraisal personnel includes: assessment teachers/educational consultants/educational diagnosticians, certified school psychologists, qualified school social workers, speech/language pathologists, adapted physical education teachers, audiologists, certified school nurses, and occupational therapists. The Defendants have failed to ensure that local education agencies have the resources and expertise to perform necessary evaluations. As a result, many charter schools refer students to the RSD for evaluations.

64.     Yet even at the RSD, which is directly run by Defendant LDE, Defendant BESE's child find procedures are unworkable. Students referred to the RSD for initial evaluations frequently must wait months before an evaluation occurs—losing valuable educational time during the wait.

65.     Defendant BESE's child find policy further charges a local education agency with the responsibility to document child find activities for students who are (1) enrolled in an educational program operated by or under the jurisdiction of a public agency; (2) enrolled in a private school program within the geographic jurisdiction of a public agency; and (3) not enrolled in school.

66.     The child find policy fails to recognize that New Orleans lacks a public agency that has jurisdiction over all students residing in the geographic area. New Orleans is the only geographical region in the state in which students cannot receive child find services until they are actually admitted and enrolled in a public school. The Defendants have further failed to appoint a public agency that is responsible for evaluating students who are homeless, migrant or who

21

attend private schools. As a result, many children with disabilities are unidentified because no appropriately-resourced local entity bears responsibility for ensuring compliance with the child find mandate.

67. . The Defendants' failure to comply with IDEA's child find mandate causes irreparable harm to a number of the named Plaintiffs. D.T. is a seven-year-old who has been denied access to educational services as a result of the Defendants' failure to comply with IDEA's child find mandate. While he was identified as a student with an emotional and behavioral disability under Section 504 of the Rehabilitation Act during the 2008-09 school year, Langston Hughes Academy Charter School ignored clear indications that he should be evaluated for eligibility for special education services under the IDEA. D.T.'s behavioral manifestations significantly affected his academic performance, and he has persistently failed to make educational progress. Because he is unidentified as a student eligible for IDEA services, D.T. was denied access to a regular classroom with special education supports, and instead attended school in the "in-school suspension" room where he was given "work packets" that were not calculated to confer meaningful education benefit.

68. Plaintiff P.B. is similarly identified as eligible for services under Section 504. A July 2010 evaluation diagnosed him with ADHD and bipolar disorder. He is currently repeating the seventh grade for the third time and struggles to control manifestations of his disabilities. Despite clear indications that he is eligible for special education and related services under the IDEA, he remains unidentified and unable to access the procedural protections to which he is entitled.

69. Plaintiff K.J. is identified as a student with a specific learning disability and ADHD under Section 504. Beginning in 2009, on numerous occasions, his mother requested that

22

he be evaluated for special education and related services under the IDEA, but no school has responded to her request and conducted an evaluation. K.J. has been held back in both the sixth and seventh grades and he is frequently disciplined for manifestations of his disability.

70.     Plaintiff A.J. is diagnosed with ADHD and is eligible as a student with a disability under Section 504. After A.J. was suspended for a total of 40 days, A.J.'s mother requested an evaluation for special education and related services. Well over one year later, the evaluation has not occurred. As a result, A.J., who is ten years old, is functioning on a first grade level in reading.

71.     In 2004, Plaintiff T.J. was evaluated by a private medical provider and found to have a specific learning disability. New Orleans public schools have wholly ignored this private evaluation and refused to conduct an educational evaluation to determine his eligibility for special education services. As a result he is several years behind his peers academically and is repeatedly punished for manifestations of his disability.

## C.     SYSTEMIC VIOLATION 3: FAILURE TO PROVIDE A FREE APPROPRIATE PUBLIC EDUCATION THAT CONFERS A MEANINGFUL EDUCATIONAL BENEFIT

72.     In order for a child with a disability to receive a free appropriate public education, the child must receive special education and related services designed to confer education benefit. Federal law requires the development of an individualized education plan (IEP) in order to ensure that students with disabilities received educational benefit.

73.     IEPs must include (1) a statement of the student's present levels of academic achievement and functional performance; (2) a statement of measurable annual academic and functional goals; (3) a description of how the student's progress will be measured, and when periodic progress reports will be provided; (4) a statement of the special education and related

services that will provided to the student; (5) an explanation of the extent, if any, to which the student will not participate in regular classes; (6) a statement of any individual appropriate accommodations necessary to measure the academic achievement and functional performance of the student; (7) the projected start date for any related services; and (8) transition services for students who have reached the age of 16.  20 U.S.C. § 1414(d)(3).

74.    An IEP is considered reasonably calculated to confer educational benefit if it is "likely to produce progress, not regression or trivial educational advancement." In short, the educational benefit that an IEP is designed to achieve must be "meaningful." *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 247-48 (5th Cir. 1997)

75.    Related services are also a fundamental aspect of a free appropriate public education.  Federal law mandates that related services, including transportation, developmental, corrective, and other supportive services such as speech language therapy, psychological services, physical and occupational therapy, social work services, counseling services, orientation and mobility services, and medical services be provided as needed to assist a child to benefit from special education. 20 U.S.C. § 1401(22). To the extent these services assist a child in receiving an appropriate education, schools are required to make these services available at no cost to the student.

76.    Students with disabilities aged 16 years and older are also entitled to receive transition services that will help them transition from school to adulthood, by focusing on developing skills needed for employment, post-secondary education, vocational training, or independent living.  20 U.S.C. § 1401(34); 34 C.F.R. § 300.43.  The student's IEP team is required to develop a transition services plan in the IEP.

77.    Because the Defendants have failed to promulgate and enforce policies that ensure the development and implementation of individualized education plans, related services, and transition services that confer meaningful benefit, New Orleans students with disabilities are denied a free appropriate public education.

78.    The abysmal graduation and school completion rates for students with disabilities who are enrolled in the RSD underscore the Defendants' failure to ensure that these students receive educational benefit. On average, across the state of Louisiana, 19.4 percent of all students with disabilities graduate with a diploma. In comparison, only 6.8 percent of RSD students with disabilities graduate with a high school diploma.  Almost 50 percent of RSD students with disabilities fail to complete school—a number much higher than the state average of 31.4 percent.  Louisiana Department of Education, *Special Education Performance Profile* (2008-09), *available at* http://www.doe.state.la.us/lde/eia/2115.html.

79.    The above-referenced ESS Survey documented numerous IDEA violations related to educational benefit.  Out of 60 relevant files, 37 percent indicated that the students were functioning "well below grade level."  An additional 49 percent of the files indicated student functioning in the "below grade level" range—clear evidence that many students eligible for special education are not making academic progress.  Despite low academic achievement, at least 60 percent of students with disabilities surveyed had the cognitive potential to achieve at grade level. Educational Support Systems, Inc., *The Special Education Project: A Study of 23 Charter Schools in the Recovery School District* (2008).

80.    The results of the eighth grade Louisiana Educational Assessment Program ("LEAP") also demonstrates the Defendants' failure to ensure that New Orleans public school students with disabilities are provided educational benefit. In 2007-08, 94.6 percent of all RSD

25

eighth grade students with disabilities failed the LEAP assessment. During the same year, 78.37 percent of all eighth grade charter school students with disabilities failed the test. LDE has documented that most of the students who failed the eighth grade LEAP were functioning anywhere from two to seven grade levels below the eighth grade in reading and in math.

81. Defendant LDE monitored the New Orleans public schools for IDEA compliance and discovered wide-spread, systemic inadequacies in IEP development. Despite this fact, LDE has taken no action to ensure that IEPs developed by New Orleans Public Schools are reasonably calculated to confer educational benefit.

82. The ESS Survey found that many schools failed to provide the appropriate related services to students with disabilities, specifically students with emotional disabilities. Each of the schools surveyed described the overwhelming need for mental health support for its students. Still, only 15 of the 23 schools provided social work or counseling as a related service, and one school reported providing no related services at all. Six schools surveyed rely on the RSD for the provision of related services. All six reported that RSD clinicians infrequently communicated and collaborated with them, sporadically attended IEP meetings, and failed to communicate with the teachers to ensure that service delivery related back to the classroom and learning. The survey further concluded that the number of special education students receiving counseling as a related service was substantially low, especially considering that many New Orleans students live with trauma caused or exacerbated by Hurricane Katrina. Educational Support Systems, Inc., *The Special Education Project: A Study of 23 Charter Schools in the Recovery School District* (2008).

83. The ESS Survey also documented that students with disabilities in New Orleans received very limited transition services as part of their IEPs. The report cites the overwhelming

26

lack of vocational programs, internships, and resources available in New Orleans to support special education students in need of transition services.

84.     When Defendant LDE conducted focused monitoring of the RSD and charter schools in February 2009, it reported similar findings.  The monitoring team reviewed 27 records of RSD students ages 16 years and older and discovered that only nine of the 27 were found to have coordinated, measurable, annual IEP goals and transition services that would reasonably enable the students to meet postsecondary goals.  For the charter schools, nine student records were reviewed and only two of the nine students had coordinated, measurable, annual IEP goals and transition services that would reasonably enable the students to meet postsecondary goals. When the monitoring team conducted their follow-up visit in March 2010, it again documented evidence of continuing noncompliance.

85.     Named Plaintiff N.F. arrived in New Orleans from Indiana with an IEP that specified that he required individualized paraprofessional support and related services including social work and counseling services as well as orientation and mobility services. N.F.'s New Orleans school had a copy of the IEP and understood its obligation to provide N.F. with these services. But the school informed N.F.'s mother that it was too short-staffed and could not provide him with related services. As a result, N.F.'s mother was forced to attend school with him each day to help him navigate his surroundings.

86.     Plaintiff D.B. is nine years old, yet he functions on first grade level in language arts and on kindergarten level in social studies.  D.B.'s IEPs reveal why he struggles to make any academic progress. For the past several years, his IEPs have lacked any discussion of his strengths and contained no description of his current level of academic achievement and functional performance. The goals contained in his IEPs are immeasurable, generic, and lack the

27

objectives that are required in order to evaluate his progress. The evaluation that determined D.B. was eligible for special education services clearly indicates his need for related services— including counseling. Yet, D.B. has been continuously denied sufficient levels of related services. Since he is not receiving the services he needs, his behavior has regressed. Consequently, D.B. fails to make meaningful academic progress.

87.    After Hurricane Katrina, Plaintiff L.M. moved to Georgia. While there, he was identified as a student with a specific learning disability and emotional disability and determined to be eligible for special education services under the IDEA. His Georgia IEP provided that he receive individualized instructions, behavior modifications and supplemental reading services. When L.M. eventually moved back to New Orleans, the schools here failed to either implement his existing IEP or convene an IEP team to develop a new IEP.  L.M. has attended numerous RSD direct run and charter school in New Orleans. Every school has failed to implement an IEP or provide him with related services. He has failed to make any academic progress. At fifteen years old, he functions on a second-to-third grade level.

88.    Plaintiff L.W. is 16 years old and functioning on a second grade level in reading and a fifth grade level in mathematics.  His lack of educational progress is directly related to his inadequate IEPS. L.W.'s 2009 IEP is a hand-written, illegible document that lacks a statement of measurable goals and objectives, a list of necessary accommodations, or a description of special education, related services, and supplementary aids and services to be provided.  His previous IEPs contain goals that are not tailored to his specific level of performance or his unique needs.  Despite exhibiting problem behavior that interfered with his academic progress, L.W. was never provided related services such as social work, counseling, or psychological services that would help him obtain some educational benefit.  As a result, L.W. has continued to

28

struggle academically and he has continued to experience problem behaviors that have prevented him from achieving his educational goals.

89.    Not one of the named Plaintiffs who is eligible for transition services has been provided with an IEP that contains adequate transition planning.

**D.    SYSTEMIC VIOLATION 4: FAILURE TO PROTECT STUDENTS' PROCEDURAL SAFEGUARDS IN THE DISCIPLINARY PROCESS**

90.    In order to ensure that each child with a disability is provided with a free appropriate public education, the IDEA has established a number of procedural safeguards that must be provided to a student with a disability who is subject to disciplinary removals.

91.    After a child is removed from his or her current placement for more than 10 cumulative school days in a school year, procedural protections and services must be provided to the student.  20 U.S.C. § 1415(k)(1)(B).  A school cannot impose a long-term suspension or expel a child if the behavior for which he or she is being disciplined was a "manifestation" of his or her disability.  20 U.S.C. § 1415(k)(1)(E).  If the child's behavior is determined to be a manifestation, the child must be permitted to return or remain at his current school placement and be provided with behavioral supports in including a functional behavior assessment (FBA) to determine the function or cause of the child's disability and a behavior intervention plan (BIP) to support and reinforce a child's positive behavior.  20 U.S.C. § 1415(k)(1)(F).

92.    There are certain behaviors for which a school can change a student's placement to an "interim alternative educational setting" for up to 45 days.  The behaviors subject to a possible 45 day change of placement are restricted to incidents of 1) carrying a dangerous weapon to school; 2) knowingly possessing, using or selling illegal drugs at school; or 3) inflicting serious bodily injury on another individual at school.  Nevertheless, the interim

alterative educational setting must still provide the child a free appropriate public education. The placement must also include services to address the behavior for which the student is being suspended. 20 U.S.C. § 1415(k)(1)(G).

93.     IDEA's disciplinary protections extend to students who the school knew or should have known are students with disabilities.  If a school is considered to have knowledge that a child has a disability, the child is entitled to assert the same disciplinary protections available to students who have been identified as students with disabilities under IDEA. 20 U.S.C. § 1415(k)(5).

94.     New Orleans public school students with disabilities are punished and excluded from the classroom at rates that are among the highest in the state. New Orleans students with disabilities are much more likely to be subject to out-of-school suspensions than their non-disabled peers. Despite the existence of these discrepancies, the Defendants' have failed to revise and enforce policies, procedures, and practices relating to the development and implementation of IEPs, the use of positive behavioral interventions and supports, and the protection of procedural safeguards in compliance with federal law.

95.     For the 2008-09 school year, the RSD suspended 26.8 percent of all students with disabilities—a rate 63 percent higher than the statewide average. Louisiana Department of Education, *Special Education Performance Profile* (2008-09), *available at* http://www.doe.state.la.us/lde/eia/2115.html.

96.     Sadly, many of the New Orleans charter schools posted some of the highest discipline rates for students with disabilities in the state.  Sojourner Truth Academy suspended 53.8 percent of all students with disabilities—a staggering 228 percent higher than the statewide

30

average, and New Orleans College Prep Charter School suspended 52.2 percent of all students with disabilities— 218 percent higher than the statewide average

97.     Some schools' numbers are even more alarming when they are compared with the out-of-school suspension rates for general education students.  For example, FirstLine Schools, operating Samuel J. Green Charter School and Arthur Ashe Charter School, reported an out-of-school suspension rate of 41.5 percent for students with disabilities – 153 percent higher than the state average, but an out-of-school suspension rate for regular education students of 30.6 percent. Similarly, McDonogh 42 Elementary Charter School suspends special education students at a rate of 38.5 percent, 135 percent higher than the statewide average, yet their out-of-school suspension rates for regular education students is remarkably less at 20.5 percent.  Langston Hughes Academy Charter School's out-of-school suspension rate for students with disabilities is 30.8 percent, 87 percent higher than the state average.  Yet, their out-of-school suspension rate for general education students is 12.3 percent.  Lafayette Academy Charter School suspends special education students at a rate of 22.7 percent, 38 percent higher than the state average, while regular education students are suspended at a rate of 16.7 percent.  The remarkably high and significantly disproportionate out-of-school suspension rates for New Orleans students with disabilities reflect pervasive noncompliance with IDEA's disciplinary provisions.  Louisiana Department of Education, *Special Education Performance Profile* (2008-09), *available at* http://www.doe.state.la.us/lde/eia/2115.html.

98.     The ESS Survey demonstrates the Defendants' failure to enforce policies and practices that would protect New Orleans students with disabilities from unlawful classroom exclusions.  The survey revealed that when students exhibited behavioral manifestations of their disabilities, schools frequently failed to intervene with behavior intervention plans.  Educational

Support Systems, Inc., *The Special Education Project: A Study of 23 Charter Schools in the Recovery School District* (2008).

99.     LDE monitored New Orleans public schools in March 2010 and discovered multiple violations and areas of noncompliance.  The monitoring team reviewed the records of 22 students with more than 10 days of out-of-school suspensions (OSS) and determined that each of the  22 students were denied continued educational and related services after the 10th day of suspension in violation of IDEA.  Of the 22 students reviewed, 17 of those students did not have an appropriate behavior intervention plan, and the monitoring team observed that schools were not implementing positive behavioral supports.

100.    The discipline policies in effect in New Orleans public schools demonstrate the Defendants' failure to ensure that local education agencies comply with federal law regarding the disciplinary procedural protections. For example, the discipline policy for Arise Academy Charter School states that if a child's individualized education program does not contain "disciplinary guidelines" then the child with a disability is subject to the same disciplinary removals as non-disabled children.  The discipline policy for Pride College Prep Charter School states that students with disabilities may be subject to the same discipline rules as non-disabled students. Neither policy makes any mention of a manifestation determination review or due process protections.  Similarly, Martin Luther King Jr. Charter School's discipline policy states that disciplinary action for a child with a disability may consist of the same consequences for regular education students, but if the child is expelled, the parent must sign a manifestation determination form.  These policies directly contradict federal law and demonstrate the schools' failure to understand and implement the procedural protections of IDEA related to manifestation determination reviews (MDRs).

32

101.    Andrew H. Wilson Charter School has a discipline policy that similarly violates critical components of the IDEA. The policy provides that students with disabilities can be removed from school for up to 45 days if a student "represents a safety concern." This policy is directly contrary to the IDEA which states that if a child is found to have carried or possessed a weapon, possessed or used drugs while on school grounds, or inflicted serious bodily injury upon another person, that child may be removed from school for 45 days or less.   20 U.S.C. § 1415(k)(1)(G); 34 C.F.R. § 300.530(g).   No child eligible for IDEA services can be removed from school without (1) due process and (2) a plan for providing educational services in an interim alternative educational setting during the 45 day removal.   34 C.F.R. § 300.530(g).

102.    Lafayette Academy Charter School's discipline policy states that a child with a disability may be suspended for up to 15 days.   However, once a child is suspended for more than 10 days, the IDEA requires a manifestation determination review to determine if the child's behavior is related to his disability.   20 U.S.C.   § 1415(k)(1)(E).   IDEA also deems any suspension in excess of 10 days as constituting a "change in placement" and requires that the child continue to receive special education services and have his IEP updated to include a new "functional behavioral assessment." 20 U.S.C.  § 1415(k)(1)(C)-(D).   Many charter schools, including Lusher Charter School, Milestone SABIS Charter School, Thurgood Marshall Charter School, International School of Louisiana, Einstein Charter School, Edward Hynes Charter School, Benjamin Franklin High School, New Orleans College Prep, and Warren Easton High School have school discipline polices that entirely omit the disciplinary protections afforded to students with disabilities.

103.    Plaintiff P.B. has experienced the devastating consequences of the state's failure to ensure that IDEA-compliant discipline polices are in place.  His school removed him from the

33

classroom permanently, telling his mother that he was no longer welcome.   The school never convened a manifestation determination review to determine whether the alleged behavior was a manifestation of P.B.'s disability, nor did they provide him with documentation regarding his removal or his basic due process rights to a hearing on the matter.  As a result, P.B. has now been out of school for over 15 days without educational services or a behavior support plan so that he may progress educationally.

104.    Plaintiff K.J. has been identified as a student with a disability under Section 504. During the 2009-10 school year, K.J. was removed from school for well over 10 school days. Despite these removals, the school never developed a functional behavior assessment or a behavior support plan to assist K.J. with his behavior problems.  The school also never conducted a manifestation determination review to determine if K.J.'s behaviors were related to his disability.

105.    During the 2009-10 school year, A.J. was suspended more than 10 times for a total of more than 40 school days.  His school never conducted a manifestation determination review and never developed a functional behavioral assessment or a behavior intervention plan in accordance with IDEA.  As a result, he cumulatively missed over two months of school with no procedural protections in place to ensure that he was receiving educational services.

106.    Plaintiff D.B. is a student identified with an emotional disability under IDEA. Whenever D.B. engaged in behaviors that were deemed inappropriate by the school but that were clear manifestations of his disability, D.B. was punished, sometimes physically, and removed from the school without the disciplinary protections afforded to him under IDEA.  During the 2009-10 school year, he was removed from school well over 10 days for behavior, yet a manifestation determination review was never conducted. On multiple occasions, the school

34

resorted to isolation and physical restraints in attempt to control D.B.'s behavior. These disciplinary practices left D.B. with permanent physical and psychological injuries.

107.    Similarly, Plaintiff D.T., a student with an emotional disability, was repeatedly suspended from school for behaviors which were manifestations of his disability. During the 2009-10 school year, he received approximately 22 days of out-of-school suspensions, including 10 days of undocumented removals where the school would simply demand that his mother pick him up from school. Instead of developing a behavior intervention plan based on the principles of positive behavioral interventions and supports, as required under IDEA, the school developed a "behavior plan" that required that D.T. spend 80 percent of the day in in-school-suspension and then slowly work his way out of this placement. The school never conducted a manifestation determination review to determine if his behaviors were related to his disability and never provided him with the behavior supports he needed to succeed in school.

108.    Finally, Plaintiff L.M., a student identified as a having an emotional disability, has been repeatedly suspended and removed from school for behaviors which are manifestations of his disability and without the procedural protections he is afforded under IDEA. During the 2009-10 school year, L.M. received over 30 days of out-of-school suspensions and was ultimately expelled, yet his schools never conducted manifestation determination reviews to determine if his behaviors were related to his emotional disability. Moreover, he never received a functional behavior assessment or behavior intervention plan to address his behavioral needs.

**NAMED PLAINTIFFS' INJURIES**

109.    Summarized below are the violations of federal law suffered by the named Plaintiffs as a result of the Defendants failure to comply with their general supervisory responsibilities by failing to appropriately monitor, identify, and compel the New Orleans public

schools to eliminate the numerous systemic violations of IDEA, Section 504, and Title II.  These violations illustrate the specific irreparable harm suffered the Plaintiff class as a result of the Defendants' failure to comply with federal law.

### Plaintiff P.B.

110.    P.B. is a 15-year-old seventh grade student, who has been identified as a student with bipolar disorder and ADHD under Section 504.  He began the 2010-11 school year enrolled at Pierre A. Capdau Charter School, but on Sunday, October 3, 2010, a school administrator told his mother, Ms. Berry, that P.B. was no longer welcome to attend school.  Since then, P.B. has been out of school despite his mother's effort to enroll him in another New Orleans public school.

111.    Pierre A. Capdau Charter School has had reason to suspect that P.B. is a student with a disability who also needs special education and related services under IDEA, but the school has failed to exercise its affirmative duty to evaluate and provide him with the appropriate special education services in accordance with federal law.  20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.111(a).

112.    In July 2010, P.B. was evaluated by a local psychologist who diagnosed P.B. with bipolar disorder and ADHD, and requested that his school conduct an educational evaluation to determine his eligibility for special education under IDEA.  P.B.'s mother and grandmother submitted this evaluation to school officials. P.B. has struggled to make academic progress. The school had clear indications that he needed special education services. Despite these indications and his mother's clear request for an evaluation, the school has failed to perform an evaluation.

113.   P.B. has also not been provided the free appropriate public education and necessary accommodations he is entitled to under Section 504. As a result, he continues to suffer severe academic deficits.

114.   P.B. was held back once in the fourth grade and he has been held back twice in the seventh grade. As a 15-year-old student in the seventh grade for the third time, it is clear that P.B. has experienced a multitude of academic setbacks. He is functioning significantly below grade level and he is failing most of his academic courses. Yet, the school has consistently failed to provide the necessary accommodations and supports so that P.B. would be able to receive a free appropriate public education.

115.   P.B. was permanently excluded from his school without due process for allegedly threatening a teacher. The school made no efforts to determine if the alleged misconduct was a manifestation of a P.B.'s disability. Nor did the school provide P.B. with his due process rights.

116.   On October 14, 2010, Ms. Berry went to the school to request P.B's academic records. School officials told her that unless she signed a "withdrawal form" she could not access her child's records. Ms. Berry made it clear to school officials that she did not wish to withdrawal her son from school, but she was informed that he was no longer allowed to attend the school. Desperate to get son enrolled in another school, she signed the withdrawal form so that she could access her son's records.

117.   Following these events, Ms. Berry and a parent advocate have attempted to identify and locate a school for P.B. to attend. Ms. Berry and the advocate have contacted approximately 20 charter schools and the RSD, informing them that P.B. is a student with a disability not enrolled in school. None of the schools have indicated that they have the capacity

37

or willingness to accept him, and the RSD has not returned Ms. Berry's phone calls. As a result, he remains out of school and without educational services in violation of federal law.

118.    P.B. has been out of school and denied educational instruction for over 15 days. He has been subject to discrimination on the basis of his disability by being excluded from attending Pierre A. Capdau Charter School, and he has been denied the benefits available to other non-disabled students in New Orleans to choose their educational program in violation of Section 504 and Title II.

### Plaintiff K.J.

119.    K.J. is a 14-year-old eighth grade student at Samuel J. Green Charter School. He was identified as a student with a specific learning disability and ADHD under Section 504 of the Rehabilitation Act. K.J. has been denied special education and related services in violation of IDEA's child find mandate, and he has been denied a free and appropriate public education under Section 504 and Title II.

120.    The school has had reason to suspect that K.J. is a student with a disability who also needs special education and related services under IDEA, but they failed to exercise their affirmative duty to evaluate him and provide him with the necessary special education services in accordance with federal law. See 20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.111(a).

121.    K.J.'s mother has, on numerous occasions during the 2009-10 school year and at the beginning of the 2010-11 school year, requested that K.J. be evaluated for special education services and related services under IDEA. An educational evaluation has still not been initiated in violation of the timelines and procedures of IDEA.

122.    Because K.J. has not been identified under IDEA as a child with a disability and because the school has failed to provide him with appropriate accommodations under Section 504 and Title II, K.J. continues to experience academic and behavioral difficulties.

123.    During the 2009-10 school year, K.J. received nine documented out of school suspensions and countless undocumented suspensions for behaviors that were manifestations of his disability, such as willful disobedience and treating authority with disrespect.  He received five suspensions because he had accumulated 15 or more behavior "marks" or referrals in the course of one week for minor school violations.  On a number of occasions, school officials simply demanded that K.J. leave the school campus after his disability manifested in behaviors that violated minor school rules.  On those occasions, K.J. was not provided any paperwork or a formal explanation for these removals.

124.    K.J.'s behavioral difficulties have continued to manifest during the 2010-11 school year.  His school has imposed on him four undocumented suspensions and countless referrals for behaviors directly related to his disability, such as talking in class and causing a classroom disturbance.

125.    The school's failure to appropriately identify and evaluate K.J. for a disability under IDEA and the school's failure to provide him with accommodations under Section 504 and Title II has also adversely affected his academic progress, ultimately resulting in a denial of a free appropriate public education.  He was held back in the sixth grade and seventh grade, scoring an unsatisfactory on his Louisiana Educational Assessment Program (LEAP) test in both English Language Arts (ELA) and Mathematics.  He receives failing grades and continues to exhibit difficulty reading and comprehending classroom material.  K.J.'s school offers an

academic enrichment program to assist students with their schoolwork – but the school threatened to bar him from the program because of behavioral manifestations of his disability.

126.   Despite clear evidence that K.J.'s disability prevents him from achieving academic gains, his school has failed to appropriately identify him and has left him without the accommodations, services, and protections that would help him achieve academic success.

### Plaintiff A.J.

127.   A.J. is a 10-year-old fifth grade student at Lagniappe Academy Charter School. He has a diagnosis of ADHD, and was identified as a student with a disability under Section 504 of the Rehabilitation Act during the 2008-09 school year. A.J. has been denied special education and related services in violation of IDEA's child find mandate, and he has been denied access to necessary educational accommodations and modifications under Section 504 and Title II.

128.   As a result of his disability, A.J. is easily distracted, has difficulty following directions, and becomes agitated when forced to sit still for extended periods of time. During the 2009-10 school year, A.J. was enrolled at Albert Wicker Elementary School, a traditional public school operated by the RSD. He was suspended more than 10 times for a total of more than 40 school days. All of his suspensions were for behaviors related to his disability, such as running in the halls, refusing to sit down, disrespect for authority, leaving the classroom without permission, and causing a class disturbance.

129.   A.J.'s disability has also contributed to his continuing academic struggles. In addition to receiving failing grades in almost all of his classes, A.J. is functioning well below grade level in all academic content areas.

40

130.    Despite his demonstrated need, A.J. has never been provided any behavioral interventions or accommodations such as a functional behavior assessment or a behavior intervention plan so that he may make educational progress.

131.    After observing her son's continued struggles in school, A.J.'s mother requested that the school evaluate him for special education services, and A.J.'s psychiatrist echoed this request. In December 2009, Ms. Jefferson signed a consent form authorizing an evaluation for special education services. IDEA requires that the initial evaluation be conducted within 60 days of receiving parental consent. The evaluation never occurred.

132.    When A.J. began at Lagniappe Academy Charter School in August 2010, Ms. Jefferson again requested an evaluation for special education services but was told that the school would not initiate any new evaluations until the school occupies its new building. A.J. remains unevaluated and unidentified for special education and related services under IDEA.

### Plaintiff T.J.

133.    T.J. is a 13-year-old fifth grade student, who has been denied access to public school because of his disability. T.J. is not currently enrolled or attending school. From the 2007-08 school year through the 2009-10 school year, T.J. was enrolled in Fannie C. Williams Elementary School.

134.    T.J. was evaluated by Daughters of Charity in 2004 and determined to have a specific learning disability. For the past four years, T.J. has also manifested behaviors typical of a child with ADHD and/or possibly an emotional disability. He has difficulty controlling his behavior and impulses as well as trouble communicating with peers and adults in an appropriate manner. Despite these ongoing symptoms and severe academic deficits, T.J. has never been evaluated to determine if he is a student with a disability under IDEA or Section 504.

135.    T.J. was retained twice in the second grade and once in the third grade.  He has demonstrated difficulty learning in school and he receives mostly failing grades.  In addition to his academic struggles, T.J.'s disability makes it difficult for him to control his impulsive and sometimes disruptive behavior.  This resulted in disciplinary removals from school related to his disability.  On April 1, 2010, he was expelled from Fannie C. Williams Elementary School, without ever being evaluated for a disability.  T.J. was not provided an opportunity to attend an alternative school, and therefore he went without educational instruction and services for the remainder of the 2009-10 school year.

136.    Beginning the 2010-11 school year, T.J.'s mother has unsuccessfully attempted to enroll him in a number of schools in New Orleans.  After speaking with personnel at the Recovery School District about available schools, Ms. Johnson, who lacks transportation, took the city bus or walked to five different schools: A.P. Tureaud Elementary School, Nelson Elementary School, Abramson Science and Technology Charter School, Sarah T. Reed Elementary School, and Gentilly Terrace Charter School.  All five schools told her that T.J. could not enroll in their school.  Ms. Johnson has left repeated messages for personnel at RSD about her inability to enroll T.J. in school. She has received no response.

### Plaintiff D.T.

137.    D.T. is a seven-year-old second grade student at Fannie C. Williams Elementary School.  He was first identified as a student with an emotional and behavioral disability under Section 504 of the Rehabilitation Act during the 2008-09 school year while attending Langston Hughes Academy Charter School.  D.T. has been denied special education and related services in violation of IDEA's child find mandate, and he has been denied access to necessary educational accommodations and modifications under Section 504 and Title II.

42

138.    As a result of his disability, D.T. is often impulsive and anxious.   He has difficulty following directions and frequently becomes agitated when he feels threatened by adults.   During the 2009-10 school year he received approximately 22 days of out-of-school suspension: 12 days of documented out-of-school suspensions, and approximately 10 additional days of undocumented suspensions. During the undocumented suspensions, school officials would request that his mother immediately remove him from the school campus without formal notice or documentation of the removal.   D.T. received these suspensions for behaviors directly related to his disability such as disruptive behavior, noncompliance, causing a class disturbance, leaving school without permission, and refusing to do assigned work.

139.    Based on D.T.'s known disability and behavioral manifestations, Langston Hughes Academy Charter School has reason to suspect that D.T. is a student with a disability who also needs special education and related services under IDEA, but the school has failed to exercise its affirmative duty to evaluate and provide him with the appropriate special education and related services in accordance with federal law.   20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.111(a).

140.    Despite frequent behavioral manifestations resulting in constant disciplinary removals from the classroom, D.T. was never provided with the supports and services to enable him to make educational progress.

141.    In fact, D.T.'s most recent behavior intervention plan, dated May 3, 2010, states that D.T. will remain in In-School-Suspension (ISS) for 80 percent of the day, where he will be given work packets without classroom instruction, and he will be required to slowly work his way back in to the regular classroom setting. The plan provides no counseling, mental health

services, or other effective behavioral interventions. Unsurprisingly, D.T.'s behavior intervention plan did little address D.T.'s unique educational and behavioral needs.

142.   As a result of the school's failure to provide D.T. with appropriate educational services, his behavior has regressed and his academic progress suffered.  Over the course of the 2009-10 school year, school staff brutally restrained D.T. approximately five times as a consequence for manifestations of his disability.  In December 2009, a teacher removed D.T. from the classroom and shoved him into a brick wall with such force that he sustained a head injury that required medical attention. His mother filed a report with the New Orleans Police Department and the Office of Community Services.  On three separate occasions, D.T. was physically removed from the classroom and dragged down the hallway to the band room where he was locked in a dark closet and kept there for approximately one hour on each occasion.

143.   These harmful restraint and seclusion techniques have caused D.T.'s behavior to regress.  He exhibits symptoms associated with trauma. He has developed an intense fear of school and has nightmares and wets the bed several times per week.   The school's abusive restraint and seclusion techniques violate specific provisions of IDEA that require the use of positive behavioral interventions and support strategies to address student behavior.  20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.324(a)(2)(i).

**Plaintiff N.F.**

144.   N.F. is a nine-year-old fourth grade student at Lafayette Academy Charter School. He has been identified as a student with multiple disabilities under IDEA: autism and total visual impairment/blindness.

145.   Prior to the 2009-10 school year, N.F. attended school in Indiana. His IEP there complied with IDEA and stated N.F. would receive the assistance of a  paraprofessional to provide him with individualized support in the classroom.

146.   Under IDEA, if a child with a disability transfers from another state, the new school must provide services comparable to those described in the child's IEP from the previous school, until a new IEP is developed and implemented. *See* 34 C.F.R. § 300.323(f). When N.F. began the 2009-10 school year at John Dibert Elementary School in New Orleans, his mother met with his IEP team, advised the team of N.F.'s disabilities and requested a child-specific paraprofessional. The school claimed that it was too short-staffed and denied this request. As a result, N.F.'s mother was forced to attend school with him on a daily basis to help him navigate the stairs at the school, and to provide one-on-one instruction assistance and support in the classroom.

147.   Frustrated with the lack of services provided to N.F., his mother sought a new placement. She ultimately settled on Coghill Elementary School, which had previous experience serving students with visual impairments. The IEP team there did in fact recognize the extent of N.F.'s needs. His January 13, 2010 IEP explains that N.F. requires full support throughout the day and it states that he needs individualized paraprofessional support. Despite the mandate of his IEP and his mother's numerous attempts to secure this service from the RSD, N.F. did not receive his one-one-one paraprofessional support he needed to make academic gains and to successfully navigate his physical environment.

148.   N.F.'s December 3, 2009 evaluation states that he needs related services to help him develop necessary social skills. However, he is not currently provided any social work or counseling related services – making his academic and behavioral goals and objectives

45

impossible to reach.  Similarly, N.F.'s total visual impairment reflects a need for orientation and mobility services, but N.F. went for over four months without receiving orientation and mobility services.

### Plaintiff N.F. and Plaintiff M.M.

149.    As described above, N.F. has autism and total visual impairment.  Plaintiff M.M. is a seven-year-old second grade student, who also lives with multiple disabilities, including acute cognitive delays and severe seizure disorder.  Because of his extensive disabilities, M.M. is non-communicative and has limited mobility.    He currently attends Benjamin Banneker Elementary School.  Both N.F. and M.M. have been denied access to educational programming because of their disabilities in violation of IDEA, Section 504, and Title II.

150.    In mid-March 2010, N.F.'s mother and M.M.'s mother together visited public schools throughout New Orleans to determine which schools could best accommodate their children.  Mrs. Fischer and Mrs. McSween quickly discovered that their sons did not have access to the variety of educational opportunities available to non-disabled students in New Orleans as required by federal law.

151.    First, Mrs. Fischer and Mrs. McSween visited Esperanza Charter School where they were informed that the school staff lacks the necessary training to serve children with severe disabilities and that the school staff could not accommodate N.F. or M.M. A school staff member encouraged the mothers to present their son's IEPs to the school's Board of Directors so the Board could consider N.F. and M.M.'s special needs and make an ultimate admissions decision. Both parents completed an application and attached their sons' IEPs.   Neither parent ever received a response from the school.

152.    Next, Mrs. Fischer and Mrs. McSween visited Samuel J. Green Charter School, operated by FirstLine Schools, which also operates Arthur Ashe Charter School.  They were informed that neither Samuel J. Green Charter School nor Arthur Ashe Charter School could accommodate children with severe disabilities.

153.    Finally, Mrs. Fischer and Mrs. McSween visited Andrew Wilson Charter School. They were told by school personnel that they would need to meet with the school's special education coordinator to determine whether the school could accommodate N.F.'s or M.M.'s special needs.  The special education coordinator was unavailable, but the mothers left detailed messages informing her about their sons' needs.  The school failed to respond to either parent.

154.    Mrs. McSween attempted to contact several other schools to discuss the educational programs and services that could be provided to M.M.  She telephoned Audubon Charter School twice and asked to speak with the special education coordinator or the faculty member in charge of coordinating special education programs.  She was told that there was no such faculty member at Audubon Charter School.  Mrs. McSween then visited Lafayette Academy Charter School.  There, she was welcomed by school personnel who appeared committed to serving children with disabilities, but the school's facilities are not wheelchair accessible – so M.M. was again barred from equal educational opportunities.

**Plaintiff D.B.**

155.    D.B. is a nine-year-old fourth grade student at Langston Hughes Academy Charter School.  He has an emotional disability under IDEA and has been eligible for special education and related services since the 2007-08 school year.

156.   D.B. has not received the individualized education plan (IEP) or related services that are necessary to ensure that he receives educational benefit. He has also been unlawfully removed from the classroom for manifestations of his disabilities.

157.   According to his recent IEP, D.B. is functioning well below grade level in all academic subjects. He functions on a first grade level in English Language Arts (ELA), mathematics, and science, and he is on a kindergarten level in social studies. He has clearly made little academic progress since he was identified as a student with a disability. This is in part due to the inadequacies of his IEPs, which have failed to comply with the mandates of federal law.

158.   His September 23, 2008 IEP contains no description of D.B.'s strengths, no discussion of parental concerns, no description of his academic, developmental, and functional needs, and no real description of his current level of academic achievement and functional performance. His 2008 and 2009 IEPs list goals that are immeasurable, generic, and that entirely ignore D.B.'s strengths and weaknesses.

159.   D.B.'s behavioral needs have been similarly neglected. His disability manifests itself in emotional "meltdowns" that occurred at school three to four times per week, increasing in frequency throughout the course of the 2009-10 school year. Despite his increased need for interventions, D.B.'s IEP did not change during this time period. The IEP team entirely failed to address the possible causes of his emotional responses and failed to make necessary adjustments to his behavior support plan. Even when adjustments were made to his behavior support plan at the beginning of the 2010-11 school year, the school has failed to implement the behavior support plan as written.

48

160.    As a result of the deficiencies in D.B.'s IEP, his behavior has regressed and his academic progress has suffered.  D.B. has not been provided with a free appropriate public education as defined by IDEA, largely because his IEPs are not reasonably calculated to confer meaningful educational benefit.

161.    D.B.'s evaluation clearly describes his critical need for related services – specifically social skills assistance and counseling.  Unfortunately, he has never received adequate related services.  During the 2008-09 school year, D.B. received no related services at all, and during the 2009-10 school year, D.B. received a mere 30 minutes once a week of counseling.  As behavioral manifestations of his disability increased during the 2009-10 school year, D.B.'s related service levels remained unchanged.  The lack of related services has effectively denied him an opportunity to avoid repeated disciplinary removals from school and cut short his changes of making any real educational gains.  20 U.S.C. § 1401(26)(A); 34 C.F.R. § 300.34.

162.    D.B. was subject to approximately 15 days of out-of-school removals during the 2009-10 school year as a consequence for behaviors that were manifestations of his disability.  Some of these suspensions were undocumented removals during which the school would call D.B.'s mother and ask her to pick him up from school for the day.  Although D.B. was removed from school for well over 10 cumulative school days, the school never conducted a manifestation determination review, nor did it provide him with any educational services during these unlawful removals, in violation of IDEA.  20 U.S.C. § 1415(k); 34 C.F.R. 300.530-36.

163.    D.B. was also brutally restrained and held against his will in an isolation room approximately 10 times throughout the course of the school year as a consequence for manifestations of his disability.  Each incident caused D.B. to decompensate.  On April 8, 2010,

49

D.B. was distressed – crying and mumbling unintelligibly – when the behavior interventionist at Langston Hughes approached him. D.B. initially calmed down, but when the behavior interventionist began escorting him to the in-school-suspension (ISS) room, D.B. began to panic. When he fell to the floor sobbing, the behavior interventionist grabbed him by his arms and dragged him six feet into the ISS room. This was done with such force that D.B.'s face and mouth slammed into the ground, chipping his tooth. After sustaining this injury, D.B. panicked further and the behavior interventionist physically restrained him for fifteen minutes before carrying him to a small, soundproof closet, where he was held for another 30 minutes.

164.   Similarly, on May 12, 2010, D.B. allegedly refused to follow directions. In response, the Dean of Students and a paraprofessional physically carried him to the isolation room. D.B. panicked upon entering the isolation room and the paraprofessional physically restrained him. The paraprofessional told D.B. that if he was unable to calm down, he would be handcuffed and tasered. The paraprofessional then sat on top of D.B. – constricting his breathing and eventually causing him to urinate on himself.

165.   These harmful restraint and seclusion techniques have continued during the 2010-11 school year causing D.B.'s behavior to regress, exacerbating his disability and causing him to fear school. The school's abusive restraint and seclusion techniques violate the explicit provisions of IDEA that require the use of positive behavioral intervention and support strategies to address student behavior. 20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.324(a)(2)(i).

**Plaintiff L.M.**

166.   L.M. is a 15-year-old ninth grade student currently enrolled at New Orleans Charter Science and Math Academy ("Sci Academy"). He is identified as a student with an emotional disability and he is eligible for special education services under IDEA.

167.   L.M. has failed to receive IEPs reasonably calculated to confer educational benefit, and he has not been provided with the types and levels of related services or the necessary and appropriate transition services to allow him to benefit from special education. In addition, L.M. has been subject to repeated illegal disciplinary removals without the procedural safeguards guaranteed by federal law.

168.   Following his evacuation from New Orleans after Hurricane Katrina, L.M. enrolled in an Augusta, Georgia school. There he was identified as a student with a Specific Learning Disability (SLD). His IEP specified that he was to receive individualized instruction, a variety of academic and behavioral modifications, and pullout reading services. The Georgia IEP team also developed a comprehensive behavior intervention plan (BIP).

169.   When L.M. returned to New Orleans for the 2008-09 school year, he enrolled in Joseph Craig Elementary School. His legal guardian, Mr. Joseph, provided the staff at Craig Elementary with a copy of the Georgia IEP and requested the convening of an IEP team. The staff failed to comply with these requests, and L.M.'s services and supports were interrupted. This interruption occurred in violation of the IDEA which requires the new public agency to provide comparable IEP services to those received from the out-of-state public agency until a new IEP can be developed, if necessary. *See* 34 C.F.R. § 300.323(f).

170.   As a result of the lack of services he received at Craig Elementary, L.M. began to experience substantial academic and behavioral difficulties. During the fall 2008 semester, L.M. failed all of his classes at Craig Elementary, he was recommended for expulsion twice, and he received over 40 days of out-of-school suspensions for behaviors that were a manifestation of his disability. 20 U.S.C. § 1415(k); 34 C.F.R. § 300.530-36.

171.    On December 17, 2008, L.M. was again recommended for expulsion for an alleged altercation with a teacher.  The student hearing officer expelled L.M., even though the school failed to complete a legally required manifestation determination review to determine if the behavior was a manifestation of his disability.  L.M. was assigned to attend Schwarz Alternative School for the spring 2009 semester.  He never attended Schwarz, but instead returned to Georgia in January 2009 to live with his grandmother until she died in April 2009.

172.    After his grandmother's death, L.M. returned to New Orleans to live with Mr. Joseph.  Shortly following his return in August 2009, L.M. sustained a gunshot wound while playing outside with his friends.  As a result, L.M. was hospitalized at Children's Hospital for approximately 30 days.  Children's Hospital staff conducted a detailed neuropsychological evaluation and determined that L.M. was in need of comprehensive special education and related services.  In September 2009, Children's Hospital provided a detailed report to the RSD and L.M.'s school with extensive recommendations for accommodations and behavior modification strategies to assist him in school.  The staff at Children's Hospital even scheduled a meeting with school personnel at Hope Academy to review the results of the evaluation and report.

173.    Despite the hospital's efforts, the school did not develop an updated IEP, and utterly failed to provide L.M. with special education and related services.  As a result of these failures, L.M. continued to suffer academic and behavioral setbacks.  In fact, he was bounced around to four different RSD schools during the 2009-10 school year before ending up at the RSD alternative school.   He received over 30 days of out-of-school suspension, a recommendation for expulsion, and multiple school-initiated arrests, yet he was never provided with the behavior supports and services needed for him to receive educational benefit.

174.    His records indicate that he has been functioning on the second grade level in reading and the third grade level in math for several years.  He has failed to make any academic progress while enrolled in school in New Orleans.

175.    It was not until May 21, 2010 that L.M. received a new evaluation and IEP. While the updated IEP included some provision of related services, consisting of 30 minutes once per week of counseling and social work and 30 minutes once per week of speech and language therapy, these levels are inadequate considering the nature of L.M.'s disability and the extent of his academic deficits and behavioral functioning.

176.    While L.M. was provided with a transition plan as part of his May 21, 2010 IEP, the plan fails to address his transition needs.  The services described on his transition plan are not specific to L.M.'s post-secondary school interest, nor are they specific to his unique strengths and abilities.  Instead, the transition plan is generic and fails to specify any concrete services to allow L.M. to succeed in a post-secondary setting.  Consequently, he has been denied appropriate educational services as a result of the school's failure to provide the necessary and appropriate transition services.

177.    Even following L.M.'s evaluation and subsequent IEP, he has continued to experience frequent and excessive out-of-school removals for behaviors that are manifestations of his disability.  For the 2010-11 school year, he has already been suspended from Sci Academy in excess of ten school days.  He is currently not being provided his speech and language therapy related services, and he has been excluded from participation in school events solely on the basis of his disability in violation of Section 504 and Title II.  L.M.'s school recently received recognition from Oprah Winfrey and the students were permitted to attend a screening of the presentation in a nearby auditorium.  L.M. was not permitted to attend because of his emotional

disability. School officials left him behind at the school while the other students were given the opportunity to participate in the event.

**Plaintiff L.W.**

178.   L.W. is a 16-year-old ninth grade student currently enrolled at KIPP Renaissance High School. He is diagnosed with ADHD and is identified as eligible for special education services under IDEA.

179.   L.W. has not been provided with IEPs reasonably calculated to confer educational benefit, nor has he been provided the appropriate related services or transitional services in violation of IDEA. In addition, the school has failed to conduct his reevaluation in accordance with the timelines and procedures mandated by IDEA.

180.   L.W. began the 2009-10 school year enrolled at KIPP Believe College Prep. When it came time for L.W. to undergo his triennial reevaluation, KIPP Believe failed to reevaluate L.W. in accordance with the timelines and procedures mandated by IDEA. 20 U.S.C. § 1414(a)(2); 34 C.F.R. § 300.303(b)(2).

181.   Although KIPP Believe received parental consent for a full evaluation in all areas of suspected disability on August 28, 2009, the evaluation had not been completed when L.W. withdrew from KIPP Believe in January 2010. In fact, L.W.'s educational records indicate that KIPP Believe failed to secure the necessary personnel to conduct L.W.'s evaluation.

182.   After L.W. left KIPP Believe and enrolled in Douglass Eighth Grade Academy, a traditional RSD-run school, on March 5, 2010, his grandmother and guardian gave written consent for a full evaluation. The evaluation was conducted and disseminated on June 4, 2010, and it changed L.W.'s eligibility ruling from Other Health Impaired (OHI) to Mild Mental Disability. Yet, the results of the evaluation were never reviewed with L.W.'s grandmother and

54

she was unaware of the change in eligibility until an IEP meeting that was recently held on October 18, 2010. The school's failure to review the results of the evaluation and the change in eligibility determination violate the evaluation procedures required in accordance with IDEA. *See* 34 C.F.R. § 300.306.

183.    L.W. has also not been provided with IEPs reasonably calculated to confer educational benefit. His October 2009 IEP from KIPP Believe is a handwritten, illegible document that fails to meet IDEA criteria. *See* 34 C.F.R. § 300.323. Specifically, the IEP does not include a statement of measurable annual goals and objectives, a list of any necessary accommodations, or a description of the special education, related services, and supplementary aids and services to be provided.

184.    His previous IEPs from KIPP Believe contain generic goals that were not tailored to L.W.'s level of performance or his unique needs. No accompanying objectives were listed for any of his goals. He never received a Functional Behavior Assessment (FBA) or Behavior Intervention Plan (BIP) despite the fact that behavior routinely interfered with his academic progress and is characteristic of his disability.

185.    L.W.'s educational program at KIPP Believe failed to confer meaningful educational benefit as required by IDEA. Since 2006, L.W. has made no progress in reading—he reads at the second grade level. He has made only moderate progress in mathematics. L.W. scored unsatisfactory on his LEAP exams, he received failing grades in almost all of his courses, and his teachers at KIPP reported that he was making unsatisfactory progress in all areas.

186.    Despite suffering from the symptoms associated with ADHD, including extreme impulsivity, distractibility, low frustration tolerance, and frequent off-task behavior, L.W. was not provided with any related services at KIPP Believe. School officials frequently disciplined

L.W. and told him that the behavioral manifestations of his disability were major contributors to his academic challenges. Nevertheless, L.W.'s IEP team at KIPP Believe never included related services such as social work, counseling, or psychological services that would help him obtain some educational benefit. Even now, L.W. is only receiving 30 minutes of counseling once a week. These levels are woefully inadequate given his constant behavioral manifestations. As a result, L.W. has continued to struggle academically, and he has continued to experience problem behaviors that have prevented him from achieving educational goals.

187. Finally, L.W. has been denied the necessary and appropriate transition services that will prepare him for employment, post-secondary education, vocational training, and independent living. L.W.'s IEPs have lacked a transition plan or transition services so that he may achieve his post secondary goals.

## CAUSES OF ACTION

188. Representative Plaintiffs and the proposed class incorporate by reference all of the above factual allegations to support the following claims:

### Count I

### DECLARATORY AND INJUNCTIVE RELIEF TO REMEDY VIOLATIONS OF THE INDIVIDUALS WITH DISABILITIES EDUCATION IMPROVEMENT ACT OF 2004

189. As set forth above, Defendants Pastorek, LDE, and BESE have failed to provide Plaintiffs and similarly situated children with a free appropriate public education, both procedurally and substantively, as mandated under the Individuals with Disabilities Education Improvement Act of 2004 (20 U.S.C. § 1400 *et seq.*, 34 C.F.R. § 300 *et seq.*).

190.    Defendants Pastorek, LDE, and BESE have also failed to comply with their general supervisory responsibilities by failing to appropriately monitor, identify, and compel the New Orleans public schools to eliminate the numerous systemic violations of IDEA

191.    Plaintiffs and the proposed class seek a declaratory judgment and a permanent injunction prohibiting the Defendants from engaging in the unlawful conduct described herein.

## Count II

### DECLARATORY AND INJUNCTIVE RELIEF TO REMEDY VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT OF 1973

192.    By their foregoing actions and inactions, Defendants Pastorek, LDE and BESE are liable pursuant to Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794 *et seq.*, 34 C.F.R. § 104 *et seq.*) for discriminating against Plaintiffs and the class they seek to represent by depriving them of appropriate accessibility to essential services and programming available to non-disabled students, by virtue of their status as individuals with disabilities.

193.    As set forth above, Defendants have also failed to provide Plaintiffs and similarly situated children with a free appropriate public education and/or reasonable accommodations pursuant to Section 504 of the Rehabilitation Act of 1973.

194.    Representative Plaintiffs and the proposed class seek a declaratory judgment and a permanent injunction prohibiting the Defendants from engaging in the unlawful conduct described herein.

### Count III

### DECLARATORY AND INJUNCTIVE RELIEF TO REMEDY VIOLATIONS OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT

195.    By their foregoing actions and inactions, Defendants Pastorek, LDE and BESE are liable pursuant to Title II of the Americans with Disabilities Act (42 U.S.C. § 12101 *et seq.*) for discriminating against Plaintiffs and the class they seek to represent by depriving them of appropriate accessibility to essential services and reasonable modifications necessary to avoid discrimination on the basis of their disabilities. 42 U.S.C. § 12132.

196.    Representative Plaintiffs and the proposed class seek a declaratory judgment and a permanent injunction prohibiting the Defendants from engaging in the unlawful conduct described herein.

### NECESSITY FOR INJUNCTIVE RELIEF

197.    The Defendants have acted and continue to act in violation of the law as explained above.  The named Plaintiffs and the class they seek to represent do not have an adequate remedy at law.  As a result of the policies, practices, actions and omissions of the Defendants, the named Plaintiffs and the class they seek to represent have suffered and will continue to suffer irreparable harm unless Defendants, including its agents, representatives and/or employees, are restrained from continuing its unlawful practices.

### PRAYER FOR RELIEF

WHEREFORE the Plaintiffs respectfully request that the Court:

1.    Assume jurisdiction over this matter;

2.    Certify this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2);

58

3.     Enter a judgment declaring that the polices, procedures, customs, patterns and/or practices of Defendants deprive Plaintiffs of their statutory rights, are illegal and/or invalid, and are in contravention of the Defendants' statutory duty to assure that Plaintiffs and similarly situated children receive a free appropriate public education.

4.     Issue preliminary and permanent injunctions requiring Defendants to (1) make its facilities, programs and services accessible to all students with disabilities; (2) timely and adequately identify and evaluate potentially disabled children; (3) implement appropriate education placements, services, and accommodations on their behalf; and (4) provide all students with disabilities a free appropriate public education;

5.     Issue an order directing Defendants to pay the costs and disbursements incurred by Plaintiffs in commencing and maintaining this action, and reasonable attorneys' fees pursuant to 29 U.S.C. § 794(a) and 20 U.S.C. § 1415(e)(4);

6.     Grant any other relief the Court shall deem just and proper.

Dated this 26th day of October, 2010.

Respectfully submitted,

s/Eden B. Heilman, La. Bar No. 30551

Sheila A. Bedi, Miss. Bar. No. 101652*
Southern Poverty Law Center
4431 Canal Street
New Orleans, Louisiana 70119
eden.heilman@splcenter.org
sheila.bedi@splcenter.org
504-486-8982 (phone)
504-486-8947 (fax)

James Comstock-Galagan, La. Bar. No. 05880
Southern Disability Law Center
4431 Canal Street
New Orleans, Louisiana 70119
jgalagan@sdlcenter.org
504-486-8982 (phone)
504-486-8982 (fax)

Davida Finger, La. Bar. No. 30889
Stuart H. Smith Law Clinic and Center for Social Justice
Loyola University New Orleans College of Law
7214 St. Charles Avenue, Box 902
New Orleans, Louisiana 70118
dfinger@loyno.edu
504-861-5596 (phone)
504-861-5440 (fax)

Jon Greenbaum, D.C. Bar No. 489887*
Brenda L. Shum, Or. Bar No. 961146 *
Jennifer M. Coco, Ill. Bar No. pending*
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue NW, Suite 400
Washington, District of Columbia 20005
jgreenbaum@lawyerscommittee.org
bshum@lawyerscommittee.org
jcoco@lawyerscommittee.org
202-662-8600 (phone)
202-783-0857 (fax)

* *Pro Hac Vice* Motions to be filed