**Office of the Independent Monitors**
**P.B., et al., v. John White, et al. (Civil Case No. 2:10-cv-04049)**
**Status Report**
**June 3, 2016**

Pursuant to Section V(8) of the Consent Judgment (CJ), the Independent Monitors shall file with the Court and provide the Parties with reports describing the steps taken by the State Defendants and the Defendant-Intervenor to implement the Agreement and evaluate the extent to which the State Defendants and the Defendant-Intervenor have complied with each substantive provision of the Agreement. Pursuant to Section V(8)(a), the Monitor shall issue an initial report every 120 days after the implementation of the Agreement, and then every 180 days thereafter. The reports shall be provided to the Parties in draft form for comment at least 14 days prior to their issuance. The Monitor shall consider the Parties' responses and make appropriate changes, if any, before issuing the report. These reports shall be written with due regard for the privacy interests of the students. Pursuant to Section V(8)(b) of the CJ, the Independent Monitors shall evaluate the state of compliance for each relevant provision of the Agreement using the following standards: (1) Substantial Compliance and (2) Noncompliance. In order to assess compliance, the Monitor shall review a sufficient number of pertinent documents to accurately assess compliance and interview any necessary staff or personnel. The Monitor shall be responsible for independently verifying representations from the State Defendants or Defendant-Intervenor regarding progress toward compliance, and examining supporting documentation. Each Monitor report shall describe the steps taken by the Monitor to assess compliance, including documents reviewed and individuals interviewed, and the factual basis for each of the Monitor's findings. Pursuant to Section V(9) of the CJ, reports issued by the Monitor

1

shall not be admissible against the State Defendants and the Defendant-Intervenor in any proceeding other than a proceeding related to the enforcement of this Agreement initiated and handled exclusively by the State Defendants, the Defendant-Intervenor, or the Plaintiff's counsel.

Mr. Mark Mlawer was initially appointed as the Independent Monitor (IM) and provided correspondence to all Parties on October 19, 2015 following a review of documents related to Sections IV(A)(1), IV(C)(1), and IV(D)(5) of the CJ. Fluency Plus, LLC personnel (Dr. Dale Bailey, Dr. Tony Doggett, Mr. Ken Swindol, and Mr. William Swindol) were appointed as Independent Monitors (IMs) in January 2016 following the resignation of Mr. Mlawer.

The draft status report is organized by each Substantive Provision section of the CJ and each section begins with the language taken directly from the Agreement identified in italics. Where appropriate, language from Addendum A (Monitoring Protocols) to the CJ was also incorporated into the status report. The IMs then provide a report of current findings based on a review of materials submitted by the LDOE, Recovery School District (RSD), OPSB, and each charter school association or charter school. The IMs also reviewed correspondence from the Plaintiff's counsel and the former IM, Mark Mlawer, when writing the status report.  A status of compliance section and a recommendations section follows each report of current findings in the status report. An appendix has also been provided with the status report which includes model templates provided for review by the LDOE during the spring 2016 school term.

**SECTION IV(A) CHILD FIND (pp. 6-8 of the CJ)**

1.     *The State Defendants, after conferring with the Defendant-Intervener, shall develop a schedule identifying the assignment of Child Find responsibilities within New Orleans (p. 6 of the CJ).*

a.     *The schedule shall allocate responsibility for identifying, locating, and evaluating individuals, aged 3 - 21, suspected of having a disability, including individuals who are: not currently enrolled in school; enrolled in a non-public school in New Orleans; detained in a juvenile detention center or adult correctional facility in New Orleans; and/or housed in a public or private hospital, institution, or other health care facility in New Orleans (p. 6 of the CJ).*

**Current Findings**

One of the components of the Initial Child Find Schedule (developed in the summer of 2015) was a table which outlined the responsibility for conducting child find activities for specific groups of children within Orleans Parish. The table was reviewed by the former IM, Mark Mlawer, on October 10, 2015 and Plaintiff's counsel on October 28, 2015. Recommendations were made by the former IM to provide more specific language concerning correctional facilities and other health care facilities under Section IV(A)(1)(a). All parties agreed to the changes and the updated table of responsibility was included as part of a document entitled "PB v White - Child Find Written Guidance." (See Appendix A for the model template). Plaintiff's counsel also requested that the IMs verify if the final template was disseminated to all LEAs (See memo dated February 2, 2016) and LDOE agreed to this request. The current IMs have verified all charter schools have attested to receiving the "PB v White - Child Find Written

Guidance" document as of April 4, 2016 (See details in Section 4 below).

**Status of Compliance**

Based on a review of the document entitled, "PB v White - Child Find Written Guidance" and verification of the receipt by the LEAs of the document (see Section 4), the LDOE is judged to be in **Substantial Compliance** with Section IV (A)(1)(a) of the CJ for the 2015-2016 school year.

**Recommendations**

The IMs recommend that each LEA (including future charters not currently in existence) continue to verify receipt of the "PB v White - Child Find Written Guidance" (or any future versions of the template) document through attestations each school year by July 1st in order to maintain Substantial Compliance with this section of the CJ.

*b.*        *The schedule shall include procedures for ensuring that an evaluation initiated at one New Orleans LEA is completed within applicable timelines, even where a child moves to another New Orleans LEA (p. 7 of the CJ).*

**Current Findings**

The procedures as outlined in Section IV(A)(1)(b) of the CJ, are included within the document entitled "PB v White - Child Find Written Guidance" under the title "Timely completion of Evaluation for Transferring Students." However, at this time, the procedures delineated in this document are under review by both LDOE and Plaintiff's

counsel. The revised version is to be submitted to the IMs upon completion. Specifically, the LDOE's pending edits to the document are to reflect the following substantive changes: (1) the technical aspects of handling transfer student evaluations in the Special Education Reporting System (SER), (2) the usual contents of a comprehensive student record, and (3) measures to facilitate student records transfers through the centralized enrollment structure. The language will be incorporated into the current Child Find Guidance Document, and it will be released to all charter LEAs prior to the start of the 2016-2017 school year based on Minutes of the February 18, 2016 meeting with all parties submitted by LDOE on February 19, 2016.

It is noted the LDOE submitted the initial document to all LEAs, and the IMs have verified that all charter schools have attested to receiving the initial version of "PB v White - Child Find Written Guidance" document as of April 4, 2016 (See additional details in Section 4 below).

**Status of Compliance**

The LDOE is judged to be in **Substantial Compliance** with Section IV(A)(1)(b) of the CJ based upon dissemination of the current version of "PB v White - Child Find Written Guidance" to all LEAs for the 2015-2016 school year.

**Recommendations**

The LDOE shall submit the final version of the "PB v White - Child Find Written Guidance" document to the IMs as soon as is practicable. The IM shall verify the dissemination of the updated version of the document for the 2016-2017 school year.

*c.    Within thirty (30) days of the assignment of an Independent Monitor, the State Defendants shall submit the schedule to the Independent Monitor for review and approval. The Independent Monitor will provide comments on the schedule to the Parties within twenty-one (21) days. The Parties may provide comments on the Independent Monitor's comments within seven (7) days. The Independent Monitor will consider the Parties' comments, mediate any disputes, and approve documents with any changes within fifteen (15) days (p. 7 of the CJ).*

**Current Findings**

The document entitled "PB v White - Child Find Written Guidance" was provided for review by the LDOE on January 15, 2016. Plaintiff's counsel requested edits to this model template in a letter dated February 1, 2016 and discussed the requested changes in a meeting with LDOE counsel, OPSB counsel, and the IMs at the LDOE on February 18, 2016. As of the date of this status report, the procedures delineated in this document are under review by both LDOE and Plaintiff's counsel and an updated version will be submitted to the IMs upon completion.

**Status of Compliance**

The LDOE is judged to be in **Substantial Compliance** with Section IV(A)(1)(c) of the CJ for the 2015-2016 school year. The timeline for commentary and revision of the schedule to the IMs and the periods for commentary included within "PB v White - Child Find Written Guidance," have been extended by mutual agreement of all parties.

**Recommendations**

The IM will review the final version of the "PB v White - Child Find Written Guidance" document as soon as is practicable and reinitiate the timeline established in IV(A)(1)(c) of the CJ. The IMs will provide an update regarding the revised document in the bi-annual report due to the Court on August 1, 2016.

2.  *The State Defendants shall require that the charter application and renewal processes for Type 2 and Type 5 charter schools in New Orleans require each organization seeking issuance or renewal of a charter to provide a description of the charter school staff and/or outside contractors who will provide pupil appraisal services, including a description of qualified pupil appraisal personnel designated to serve on each organization's School Building Level Committee (p. 7 of CJ).*

**Current Findings**

The IMs and all parties received a document entitled "Special Education Program Description Template" (See Appendix A for the model template) from LDOE on January 15, 2016 containing a copy of the template and an overview and instructions for use by school charter personnel to document the full array of pupil appraisal support services including appropriate Child Find activities. Specifically, the elements of interest in the template include each LEA's use of Response to Intervention, the role and function of the School Building Level Committee, and the role and function of the appraisal team.

Following a request from the IMs on May 9, 2016, we received a copy of the presentation

entitled "SPLC Settlement Workshop" provided by the LDOE on December 10-11, 2015 to each charter school association and related sign-in sheets on May 10, 2016. A review of this presentation revealed that the LDOE addressed appropriate completion of all sections of the template with charter school attendees during this workshop.

A copy of the "Special Education Program Description Template" used by charter school personnel during the 2015-2016 school year is located in the Appendix. A review of Section D of the template by the IMs during the spring 2016 school term revealed that the document satisfied the requirements listed in Sections IV. A(1)(a) of the CJ listed above. In relation, the Plaintiff's counsel reported in a letter to the LDOE dated February 1, 2016 that they had no additional concerns with the template document as related to these two sections of the Agreement. The LDOE required each Type 2 or Type 5 charter school in New Orleans to complete and submit the template to the department by January 29, 2016. As a result, fifty-nine (59) completed templates were provided for review to the IMs on April 22, 2016, by Recovery School District (RSD) personnel. A review of all completed templates by the IMs revealed that 59 of 59 (100%) charter schools completed the Appraisal Team component of Section D of the 2015-2106 school year version of the Special Education Program Description Template as directed in the accompanying LDOE overview and instructions document and as required by Section IV(A)(2) of the CJ. The IMs also evaluated the accuracy of the information contained within Section D of the template and provided specific feedback for each LEA to the LDOE on June 2, 2016 for dissemination to the charter schools during the summer 2016 term. A review of the sign-in sheets from the SPLC workshop held on December 10-11, 2015 by the LDOE or

attestation forms provided with the materials submitted for each charter received from the RSD on April 22, 2016 revealed that one or more representatives from all charter school associations participated in this professional development.

The IMs and all parties also received a schedule for charter school applications and renewals in correspondence from the LDOE dated January 25, 2016. According to this correspondence, all Type 2 and Type 5 charter schools in New Orleans were required to submit the completed Special Education Program Description Template including the ten charter schools that were scheduled for charter renewals during the 2015-2016 school year. As previously reported in this section, all Type 2 and Type 5 charter schools completed Section D of the template as directed by the LDOE and relevant sections of the CJ.

According to the correspondence received on January 25, 2016 from the LDOE, no new Type 2 or Type 5 charter schools are planned for the 2016-2017 school year in New Orleans and nine (9) charter schools are scheduled for renewal during the 2016-2017 school year. Applications for the 2017-2018 school year were due on March 4, 2016 for forwarding to third party evaluators. All schools scheduled to open during the 2017-2018 school year will be required to complete the "Special Education Program Description Template" as part of their application process. The Plaintiff's counsel requested in a letter dated February 1, 2016 to the IMs, LDOE, and OPSB that the IMs review all completed templates for the nine (9) schools up for renewal during the 2016-2017 school year prior to submission of LDOE's renewal recommendations in November/December 2016 and

9

those schools who submit applications for the 2017-2018 school year prior to the
LDOE's recommendations on July 30, 2016. The LDOE consented to this request in a
meeting held on February 18, 2016 at the LDOE with all parties and the IMs, which is
verified in the minutes for this meeting submitted to all parties by the LDOE on February
19, 2016.

**Status of Compliance**

The LDOE is judged to be in **Substantial Compliance** with Section IV(A)(2) for the
2015-2016 school year.

**Recommendations**

The LDOE and OPSB shall continue to require each charter school to submit a Special
Education Program Description Template by July 1st for the 2016-2017 and 2017-2018
school years. The IMs will continue to review all completed Special Education Program
Description templates for existing charter schools, new charter schools, or charter schools
scheduled for renewal during the 2016-2017 and 2017-2018 school years prior to the
LDOE's recommendations to BESE at the intervals designated above to ensure that the
template meets compliance with this section of the CJ.

3.      *The State Defendants shall annually calculate the rate at which each LEA in New*
        *Orleans identifies new students as eligible for services under the IDEA ("annual*
        *new identification rate"). Using this rate, the State Defendants shall annually*
        *select LEAs for targeted monitoring. As part of targeted monitoring, the State*
        *Defendants shall conduct file reviews of a random, representative sample of*

10

*students who: have Section 504 Plans; are in the RTI process; are under*

*consideration by a School Building Level Committee; failed two (2) or more*

*academic subjects in the prior school year; or are subject to more than ten (10)*

*days of disciplinary removal during the school year. LEA selection, student file*

*selection, file reviews, staff interviews, and school site visits shall be conducted*

*consistent with the processes detailed in Addendum A. If the State Defendants'*

*targeted monitoring results in the identification of noncompliance, the State*

*Defendants shall require each LEA with validated noncompliance to undertake*

*corrective actions sufficient to remedy the noncompliance and to reasonably*

*ensure that such noncompliance does not reoccur, as detailed in Addendum A (p. 7*

*of CJ).*

*a       The annual new identification rate for each LEA shall be calculated by*

*dividing the number of students each LEA identifies for initial eligibility under the IDEA*

*between July 1 and June 30 by the total number of students enrolled in the LEA on*

*October 1 (p. 7 of CJ).*

**Current Findings**

The IMs and Plaintiff's counsel received correspondence from the LDOE on January 20,

2016 providing a list of charter schools identified for targeted monitoring during the

spring 2016 term and confirmation that each charter was sent a notification email listing

the requirements for targeted monitoring pursuant to the CJ, the specific areas in which the

charter was being monitored, methods of monitoring (e.g., student file selection, staff

interviews, desk file reviews), LDOE contact personnel, the specific date of phone

interviews with staff, call in phone numbers and instructions, and copies of the staff interview questions and student file review protocols during January 2016. The IMs were provided a sample notification email for review. The LDOE also conducted planning calls with each identified charter during late January 2016 to assist them in preparing for the staff interviews, student file submission process in a secured format, and desk file review process. The IMs also received an excel file from the LDOE on April 26, 2016 that included a column listing all Type 2 and Type 5 charter schools. The "New Identification %" column used the formula specified in Addendum A of the CJ. A review of the spreadsheet and related materials from the LDOE by the IMs revealed that the following three charter schools were selected for targeted monitoring as required in this section of the CJ.

The three schools identified for targeted monitoring during the spring 2016 semester in the area of Child Find were:

1. Joseph A Craig Charter School

2. Lake Area New Tech Early College High School

3. Sophie B. Wright Charter School

**Status of Compliance**

Based on a review of the documents submitted by LDOE and verification of the calculations in the excel spreadsheet by the IMs, the LDOE is judged to be in **Substantial Compliance** with Section IV(A)(3)(a) of the CJ for the 2015-2016 school year.


**Recommendations**

The LDOE shall continue to follow the targeted monitoring procedures as outlined in this

section of the CJ and the Addendum of the CJ. IMs will continue to review charter

selection and verify LDOE calculations as required by this section of the CJ.


*b.*      *The targeted monitoring activities described above and in Addendum A shall*

*supplement, not supplant, the annual monitoring activities undertaken by LDOE*

*pursuant to its general supervisory responsibilities under the IDEA. The monitoring of*

*an LEA pursuant to the monitoring obligations identified in this Agreement shall not*

*influence LDOE's selection of that LEA for monitoring pursuant to LDOE's general*

*IDEA monitoring protocols (p. 7 of CJ).*


**Current Findings**

The LDOE provided the IMs with a list of identified students for each LEA during an

onsite visit to the Department on March 22-24, 2016. A total of ten (10) students were

selected by the LDOE for review from each of the schools selected for monitoring (e.g.,

Joseph A Craig Charter School, Lake Area New Tech Early College High School, and

Sophie B. Wright Charter School). However, contrary to Section A(2)(a) of the

Addendum to the CJ which required a random, representative sample of students, it should

be noted the sample provided consisted solely of students with Section 504 Plans. In

addition, only 32% (10 of 31) of students selected were classified as initial 504

evaluations and the remaining students were 504 re-evaluations.


Between March 22, 2016 and May 5, 2016 both LDOE monitoring personnel and the IMs

completed desk file reviews of each of the ten (10) student files selected for each of the

three (3) LEAs listed above using the Child Find protocol located in the Addendum of the CJ. In relation, the LDOE provided each charter with an additional document entitled "Child Find Monitoring Checklist" to assist them in the submission of required documents for the desk file review. Pursuant to Section A(4)(a) and A(4)(b) of Addendum A of the CJ, the LDOE was required to conduct interviews with at least one (1) general education teacher of students with disabilities, one (1) special education teacher, one (1) general education administrator, and one (1) special education administrator or coordinator at each LEA selected for targeted monitoring. The LDOE was required to conduct staff interviews using the Child Find portion of the monitoring instrument.

The LDOE submitted the phone interview schedule for all charter schools across all four areas of targeting monitoring to the IMs on February 4, 2016. The staff interview for Sophie B. Wright was conducted on February 16, 2016 via phone with LDOE monitoring personnel, IMs, and charter school staff. The staff interview for Lake Area New Tech Early College High School was conducted on February 18, 2016 via phone with LDOE monitoring personnel, IMs, and charter school staff. The staff interview for Joseph A. Craig School was conducted on February 24, 2016 via phone with LDOE monitoring personnel, IMs, and charter school staff. The results of the phone interviews were submitted by the LDOE to the IMs for review and verification on by March 4, 2016. In relation, the list of participants for each charter school was sent by the LDOE to the IMs for review and verification by May 10, 2016.

Pursuant to Section A(5)(a) of the Addendum to the CJ, the LDOE shall conduct on-site

compliance monitoring at the LEA selected for targeted monitoring in the event that LDOE's review of information gathered through the student file review and staff interview processes: (1) is insufficient to make determinations of legal compliance, or (2) indicates that on-site observations or visual inspection of school facilities is necessary to make determinations of legal compliance. LDOE monitoring personnel and IMs determined in an onsite meeting at the Department on April 28, 2016 that school visits would not be necessary for the identified charter schools to make determinations of legal compliance in the area of Child Find.

As agreed upon in the meeting with all parties in Judge Jay Zainey's chambers on January 6, 2016, aggregated data from the protocol reviews will be presented in the bi-annual report due to the Court on August 1, 2016.  However, a general overview of protocol findings will be presented here. Based on a review of student file reviews using the Child Find protocol, both the LDOE monitoring personnel and IMs observed concerns with SBLCs obtaining permission for initial evaluation with reasonable a time frame, participation in the RTI process, collecting sufficient data to evaluate interventions, obtaining parental consent, the use of a variety of assessment instruments to make decisions, and obtaining information from parents to assist in making decisions. Further, IMs were also concerned with SBLCs decisions in regard to determining from reviewing a student's educational records that he/she does not require specially designed instruction.

**Status of Compliance – Targeted Monitoring**

Based on a review of the documents submitted by each identified charter school and the

LDOE and completion of the student file reviews and staff interviews using the required

Child Find protocol, the LDOE is judged to be in **Noncompliance** with Section

IV(A)(3)(b) of the CJ for the 2015-2016 school year because the student files selected for

review during the spring 2016 term did not include a random, representative sample of

students who met the other potential requirements as outlined in Section A(2)(a) of

Addendum A of the CJ. In order to demonstrate Substantial Compliance with this section

of the CJ, the LDOE and IMs will need to review a random, representative sample of

students who meet all requirements as outlined in Section A(2)(a) on page 1 of the

Addendum A to the CJ (e.g., students who have 504 Plans, are in the RTI process, are

under consideration by a School Building Level Committee; failed two (2) or more

academic subjects in the prior school year; or are subject to more than ten (10) days of

disciplinary removal during the school year) during future file reviews for identified

LEAs. It is important to note that the LDOE agreed to follow the student selection process

required by the CJ during future protocol reviews during an on-site meeting with the IMs

held on April 28, 2016.


**Status of Compliance – Noncompliance Determinations and Corrective Action**

The LDOE informed the IMs during a phone conference held on June 2, 2016 that

monitoring reports for the charter schools identified for targeted monitoring during the

spring 2016 school term have been completed. The LDOE also reported that cover letters,

complete monitoring reports with recommendations for improvement, specific findings of

noncompliance in relation to IDEA violations, and corrective action plan templates will

be provided to each LEA and IMs on June 8, 2016 which is consistent with LDOE

16

timelines for issuing this information to the LEAs. The LDOE confirmed during the phone conference that areas of noncompliance identified by both LDOE personnel and the IMs during the protocol reviews and phone interviews were used in completing the monitoring reports, making determinations regarding noncompliance, and making recommendations for corrective action. LDOE personnel will be providing technical assistance directly to each LEA in developing the corrective action plans during the first two weeks of June 2016. In relation, the IMs shall receive each LEAs recommended corrective action plan by June 30, 2016 for review and comment. The IMs will provide an update regarding the monitoring reports and corrective action plans for each LEA in the report due to the Court on August 1, 2016. Specifically, the IMs will review if the LDOE required each LEA to "undertake corrective actions sufficient to remedy the noncompliance and to reasonably ensure that such noncompliance does not reoccur" (p. 9 of CJ). As such, the IMs will evaluate the status of compliance for LEA noncompliance determinations and corrective actions identified by the LDOE after reviewing the monitoring reports and corrective action plans.

**Recommendations**

The LDOE shall continue to perform student file reviews and staff interviews using the required Child Find protocol as outlined this section of the CJ and in the Addendum of the CJ. IMs will continue to participate in the protocol review and staff interview process and verify completion of required activities by the LDOE as outlined in the CJ.  The IMs will review monitoring reports and corrective action plans to ensure that the concerns identified during protocol reviews by LDOE monitoring personnel and IMs were

addressed in forthcoming monitoring reports for the three (3) identified LEAs targeted for monitoring in the area of Child Find during the spring 2016 term. In addition, the IMs recommend for consideration by all parties that staff interviews and student file reviews be conducted on site using the Child Find protocol for LEAs identified for future reviews to assist in the acquisition of materials required to complete the reviews and to have access to school personnel during the file review process.  This recommendation is being made to assist the IMs and LDOE personnel in completing the student file reviews in a timely and cost effective manner as the desk review process required approximately 6 weeks during the spring 2016 term. On-site visits will also allow the IMs and/or LDOE to have quick access to school personnel to assist in obtaining any additional information that may be needed to make determinations regarding compliance with this section of the CJ. The IMs recommends for consideration by all parties the staff interview process and student file reviews be completed onsite during the fall 2016 term by both LDOE personnel and IMs for LEAs identified for targeted reviews based on an analysis of 2015-2016 child find data.

4.    *The State Defendants shall annually disseminate written guidance to New Orleans LEAs explaining the Child Find responsibilities of Louisiana LEAs. The guidance shall be consistent with the schedule identified in Paragraph IV.A.1 (p. 8 of CJ).*

a.    *The guidance shall also explain that when a parent requests an evaluation for special education, the LEA must: (1) conduct an initial evaluation of the child; or (2) provide written reason(s) why a disability is not suspected. This guidance shall reference the general sixty (60) business day timelines for an initial evaluation in Louisiana Bulletin 1706, §*

18

302(C) and Louisiana Bulletin 1508. If the LEA does not suspect a disability, this guidance shall explain that the LEA must provide the parent written reasons for its decision within thirty (30) business days of the parent request for evaluation (p. 8 of CJ).

b.      The written guidance shall explain that an evaluation cannot be delayed because of the student's current or potential participation in a Response to Intervention (RTI) program (p. 8 of CJ).

c.      The guidance shall further explain that a Section 504 Plan is not a substitute for a child who is in need of an evaluation under the IDEA (p. 8 of CJ).

d.      The guidance shall be provided to the chief executive of each LEA in New Orleans annually by August 1 for the duration of this Agreement (p. 8 of CJ).

e.      The State Defendants shall provide the guidance to the Independent Monitor for review and approval annually by May 1 for the duration of this Agreement. The Independent Monitor will provide comments on the guidance to the Parties within twenty-one (21) days. The Parties may provide comments on the Independent Monitor's comments within seven (7) days. The Independent Monitor will consider the Parties' comments, mediate any disputes, and approve documents with any changes within fifteen (15) days (p. 8 of CJ).

**Current Findings**

The document entitled "PB v White - Child Find Written Guidance" was created and disseminated to all LEAs in accordance with 4(A)(1) and 4(A)(4) of the CJ. A

representative of each LEA was required to attest in writing to receipt of the document per request of Plaintiff's counsel using the form entitled "PB v White – Attestation of Review of Child Find Written Guidance." As of April 22, 2016, all LEAs submitted signed Attestations for the 2015-2016 school year.

As of the date of this status report, the procedures delineated in this document are under review by both LDOE and Plaintiff's counsel and an updated version is to be submitted to the IMs upon completion. Specifically, Plaintiff's counsel will propose language addressing their concerns about the Response to Intervention and Section 504 content in the existing "Child Find Written Guidance Document." Any language approved by the LDOE, OPSB, Plaintiff's counsel and IMs will be incorporated into the revised "Child Find Written Guidance Document" which will be released to all charter LEAs prior to the start of the 2016-2017 school year based agreements made by all Parties during a meeting held at the LDOE on February 18, 2016.

**Status of Compliance**

The LDOE is judged to be in **Substantial Compliance** with Section IV(A)(4) for the 2015-2016 school year based upon attestation of receipt of the current version of "PB v White - Child Find Written Guidance."

**Recommendations**

Following revision to the document entitled, "PB v White – Child Find Written Guidance" collaboratively by the LDOE and Plaintiff's counsel, the IMs will review the model

template and provide feedback to all parties. The status of compliance with Section
IV(A)(4) will be reassessed after the LDOE has submitted the revised model template to
all LEAs. The IMs will verify dissemination of the revised document through a review of
signed attestations from each LEA after the LDOE disseminates the updated "PB v White
– Child Find Written Guidance" document during the summer 2016 term. An update
regarding compliance with the activities required in this section of the CJ will be provided
in the bi-annual status report due to the Court on August 1, 2016.

**SECTION IV(B) RELATED SERVICES (pp. 8-9 of the CJ)**

1.   *The State Defendants shall require that the charter application and renewal processes for Type 2 and Type 5 charter schools in New Orleans require each organization seeking issuance or renewal of a charter to provide a description of:*

a.   *the organization's plans for offering the full array of related services to students with qualifying disabilities who are or may come to be enrolled at the charter school, including without limitation the following categories of related services: physical therapy, occupational therapy, counseling services, orientation and mobility services, speech-language pathology, audiology services, school health/nurse services, special transportation, and adaptive physical education; and*

b.   *the charter school staff and/or outside contractors who will provide such services (p. 8 of CJ).*

**Current Findings**

The IMs and all parties received a document entitled "Special Education Program Description Template" from The Louisiana Department of Education (LDOE) on January 15, 2016 containing a copy of the template and an overview and instructions for use by school charter personnel to document the full array of related services to students with qualifying disabilities and the charter school staff and/or outside contractors who will provide related services to identified students. Following a request from the IMs on May 9, 2016, we also received a copy of the presentation entitled "SPLC Settlement Workshop" provided by the LDOE on December 10-11, 2015 to each charter school

association and related sign-in sheets on May 10, 2016. A review of this presentation revealed that the LDOE addressed appropriate completion of all sections of the template with charter school attendees during this workshop.

A copy of the Special Education Program Description Template used by charter school personnel during the 2015-2016 school year is located in the Appendix for review by interested parties. A review of Section D of the template by the IMs during the spring 2016 school term revealed that the document satisfied the requirements listed in Sections IV.B(1)(a) and IV.B(1)(b) of the Consent Judgment listed above. In relation, the Plaintiff's counsel reported in a letter to the LDOE dated February 1, 2016 that they had no additional concerns with the template document as related to these two sections of the Agreement. The LDOE required each Type 2 or Type 5 charter schools in New Orleans to complete and submit the template to the department by January 29, 2016. As a result, fifty-nine (59) completed templates were provided for review to the IMs on April 22, 2016 by the Recovery School District (RSD). Specifically, completed templates were provided for five (5) Board of Elementary and Secondary Education (BESE) charter schools including International School of Louisiana, International High School, Lycee' Francais, Milestone Academy, New Orleans Military and Maritime High School and twelve (12) charter associations under the direction of RSD including Algiers Charter School Association (6 schools including Martin Behrman, Eisenhower, W.J. Fischer Accelerated, McDonogh #32, Algiers Tech, and Landry-Walker High School), ARISE Schools (2 schools including ARISE Academy and Mildred Osborne), Choice Foundation (3 schools including Esperanza, Lafayette Academy, and McDonogh #42),

Collegiate Academies (3 schools including Carver Collegiate, Carver Prep, and Sci-Academy), Crescent City Schools (3 schools including Akili Academy, Paul Habans, and Harriet Tubman), FirstLine Schools (5 schools including Arthur Ashe, Phillis Wheatley, Samuel J. Green, Langston Hughes, and J.S. Clark Prep), Friends of King (1 school including Joseph A. Craig), KIPP: New Orleans (9 schools including KIPP Believe Primary, KIPP Believe College Prep, KIPP Central City Primary, KIPP Central City Academy, KIPP East Community, KIPP McDonogh #15 Primary, KIPP McConogh #15 middle, KIPP New Orleans Leadership Academy, and KIPP Renaissance), New Beginnings (4 schools including Pierre A. Capdau, Gentilly Terrace, Medard H. Nelson, Lake Area New Tech), New Orleans College Prep (Lawrence D. Crocker, Sylvanie Williams, Cohen College Prep), ReNEW (6 schools including Cultural Arts Academy, Dolores T. Aaron, McDonogh City Park, Schaumburg, SciTech, and Accelerated), and nine (9) Non-Network Charters including Coghill Accelerated, Edgar P. Harney, Morris Jeff, James M. Singleton, Success Prep, Fannie C. Williams, Crescent Leadership, The NET Charter, and Sophie B. Wright.

A review of all completed templates by the IMs revealed that 59 of 59 (100%) charter schools completed the related service components of Section D of the 2015-2105 school year version of the Special Education Program Description Template as directed in the accompanying LDOE overview and instructions document and as required by Sections IV(B)(1)(a) and IV(B)(1)(b) of the CJ. The IMs also evaluated the accuracy of the information contained within Section D of the template and provided specific feedback for each LEA to the LDOE on June 2, 2016 for dissemination to the charter schools

during the summer 2016 term. A review of the sign-in sheets from the SPLC workshop held on December 10-11, 2015 by the LDOE or attestation forms provided with the materials submitted for each charter received from the RSD on April 22, 2016 revealed that one or more representatives from all charter school associations were exposed to this professional development.

In relation, Dr. Wayne Stewart, Attorney, Hammonds, Sills, Adkins & Guice, LLP and counsel for Orleans Parish School Board (OPSB) provided a completed copy of the Special Education Program Description Template on February 18, 2016 during a meeting with all parties and the IMs held at the LDOE. A review of this document by the IMs revealed that the related service components of Section D of the 2015-2016 school year version of the Special Education Program Description Template were completed as directed in the accompanying LDOE overview and instructions document and as required by Sections IV(B)(1)(a) and IV(B)(1)(b) of the CJ. The IMs also evaluated the accuracy of the information contained within Section D of the template and provided specific feedback to OPSB counsel on April 4, 2016.

The IMs and all parties also received a schedule for charter school applications and renewals in correspondence from the LDOE dated January 25, 2016. According to this correspondence, all Type 2 and Type 5 charter schools in New Orleans were required to submit the completed Special Education Program Description Template including the ten charter schools that were scheduled for charter renewals during the 2015-2016 school year. As previously reported in this section, all Type 2 and Type 5 charter schools

25

completed Section D of the template as directed by the LDOE and relevant sections of the CJ. According to the correspondence received on January 25, 2016 from the LDOE, no new Type 2 or Type 5 charter schools are planned for the 2016-2017 school year in New Orleans and nine (9) charter schools are scheduled for renewal during the 2016-2017 school year. Each of these schools will be required to complete the required template as part of their renewal process prior to submission of renewal recommendations to BESE in November/December 2016. Applications for the 2017-2018 school year were due on March 4, 2016 for forwarding to third party evaluators and LDOE recommendations will be sent to BESE by July 30, 2016. All schools scheduled to open during the 2017-2018 school year will be required to complete the Special Education Program Description Template as part of their pre-opening process. The Plaintiffs requested in a letter dated February 1, 2016 to the IMs, LDOE, and OPSB that the IMs review all completed templates for the nine (9) schools up for renewal during the 2016-2017 school year prior to submission of LDOE's renewal recommendations to BESE in November/December 2016 and those schools who submit applications for the 2017-2018 school year prior to the LDOE's recommendations to BESE on July 30, 2016. The LDOE consented to this request in a meeting held on February 18, 2016 at the LDOE with all parties and the IMs which is verified in the minutes for this meeting submitted to all parties by the LDOE on February 19, 2016.

**Status of Compliance**

Based on a review of the completed Special Education Program Description Templates and related materials, the LDOE and OPSB is judged to be in **Substantial Compliance**

with Section IV(B)(1)(a-b) of the CJ for the 2015-2016 school year.

**Recommendations**

The IMs and LDOE agreed during the phone conference held on June 2, 2016 that each LEA shall use the feedback to make any needed corrections and submit the revised templates to the LDOE before June 30, 2016.  The LDOE shall then submit the revised templates to the IMs for review prior to placement of the templates on each charter school's website. The LDOE also agreed to establish links to the complete Special Education Program Description templates from the RSD website and enrollnola (OneApp) website. As such, the LDOE and OPSB shall continue to require each charter school to submit a Special Education Program Description Template by the required timelines for the 2016-2017 and 2017-2018 school years. The IMs will continue to review all completed Special Education Program Description templates for existing charter schools, new charter schools, or charter schools scheduled for renewal during the 2016-2017 and 2017-2018 school years prior to the LDOE's recommendations to BESE at the intervals designated above to ensure that the templates meet compliance with this section of the CJ.

2.  *The State Defendants shall annually calculate the rate at which each LEA in New Orleans provides related services to students eligible for such services under the IDEA ("service provision rate"). Using this rate, the State Defendants shall annually select LEAs for targeted monitoring. As part of targeted monitoring, the State Defendants shall conduct file reviews of a random, representative sample of students with disabilities at the selected LEAs. LEA selection, student file selection, file reviews,*

*staff interviews, and school site visits shall be conducted consistent with the processes detailed in Addendum A. If the State Defendants' targeted monitoring results in the identification of noncompliance, the State Defendants shall require each LEA with validated noncompliance to undertake corrective actions sufficient to remedy the noncompliance and to reasonably ensure that such noncompliance does not reoccur, as detailed in Addendum A (p. 9 of CJ).*

*a.        The service provision rate shall be calculated by dividing the total number of minutes of related services per week identified in the IEPs of each student with a disability in an LEA on October 1 by the total number of students with disabilities enrolled in the LEA on October 1 (p. 9 of CJ).*

**Current Findings**

The IMs and Plaintiff's counsel received correspondence from the LDOE on January 20, 2016 providing a list of charter schools identified for targeted monitoring during the spring 2016 term and confirmation that each charter was sent a notification email listing the requirements of the related requirements for targeted monitoring pursuant to the CJ, the specific areas in which the charter was being monitored, methods of monitoring (e.g., student file selection, staff interviews, desk file reviews), LDOE contact personnel, the specific date of phone interviews with staff, call in phone numbers and instructions, and copies of the staff interview questions and student file review protocols during January 2016. The IMs were provided a sample notification email for review. The LDOE also conducted planning calls with each identified charter during January 2016 to assist them in preparing for the staff interviews, student file submission process in a secured format,

and desk file review process. The IMs also received an excel file from the LDOE on 4/26/16 that included a column listing all Type 2 and Type 5 charter schools along with three additional columns populating the Related Service Minutes per Week, October 2014 IDEA Student Count, and Related Service Minutes Per Week Per Student using the formula specified on page 3 in Addendum A of the CJ. A review of the database and related materials from the LDOE by the IMs revealed that the following three charter schools were selected for targeted monitoring as required in this section of the CJ.

The three schools identified for targeted monitoring during the spring 2016 semester in the area of Related Services were:

1.  Algiers Technology Academy (grades 9-12; Algiers Charter School Association)

2.  International High School of New Orleans (grades 9-12; BESE Charter)

3.  Landry-Walker High School (grades 9-12; Algiers Charter School Association)


**Status of Compliance**

Based on a review of the documents submitted by LDOE and verification of the calculations in the excel spreadsheet by the IMs, the LDOE is judged to be in **Substantial Compliance** with Section IV(B)(2)(a) of the CJ and Section B(1)(a-c) of the Addendum to the CJ for the 2015-2016 school year.


**Recommendations**

The LDOE shall continue to follow the targeted monitoring procedures as outlined in this section of the CJ and on pages 2-4 of the Addendum of the CJ. IMs will continue to review charter selection and verify LDOE calculations as required by this section of the

29

CJ.

*b.* *The targeted monitoring activities described above and in Addendum A shall*
*supplement, not supplant, the annual monitoring activities undertaken by LDOE pursuant*
*to its general supervisory responsibilities under the IDEA. The monitoring of an LEA*
*pursuant to the monitoring obligations identified in this Agreement shall not influence*
*LDOE's selection of that LEA for monitoring pursuant to LDOE's general IDEA*
*monitoring protocols (p. 9 of CJ).*

**Current Findings**

Pursuant to Section B(2)(a) on page 3 of the Addendum to the CJ, the LDOE was
required to review files of students with disabilities with particular emphasis on students
with low-incidence disabilities. For purposes of Related Services monitoring, a "student
with a low-incidence disability" was defined as a student who is eligible for special
education and related services under IDEA eligibility categories of deaf-blindness,
deafness, hearing impairment, intellectual disability, multiple disabilities, orthopedic
impairment, traumatic brain injury, autism spectrum disorders, or visual impairment
including blindness. Pursuant to Section B(2)(b) on page 3 of the Addendum to the CJ,
the LDOE was required to request a list of students with low-incidence disabilities from
each LEA targeted for monitoring and randomly select twenty (20) percent of the
students on that list for a file review. Pursuant to Section B(2)(b)(1), the LDOE was
required to review a minimum of ten (10) randomly selected files for student meeting the
above criteria at each LEA in the event that an LEA identified less than fifty (50)
students. Pursuant to Section B(2)(b)(2), the LDOE was required to review all files of

students with low incidence disabilities and supplement its review with additional randomly selected files of students with non-low-incidence disabilities in the event that an LEA identified less than ten (10) students with low incidence disabilities.

The LDOE provided the IMs with a list of identified students for each LEA during an onsite visit to the Department on March 22-24, 2016. Ten (10) students were selected by the LDOE for review from each LEA identified for targeted monitoring (e.g., Algiers Technology Academy, International High School of New Orleans, Landry-Walker High School). All 10 students from each LEA met the required criteria for selection. As such, all 30 students across the 3 charter schools targeted for monitoring met the required selection criteria outline in this section of the CJ.

Pursuant to Section B(3)(a) on page 3 of the Addendum to the CJ, the LDOE was required to review de-identified student record files for each of the students identified through the selection process described above. The LDOE was required to conduct the file review using the Related Services portion of the monitoring instrument and information sufficient to make all relevant determinations required by the monitoring tool.

Between March 22, 2016 and May 5, 2016 both LDOE monitoring personnel and the IMs completed desk file reviews of each of the ten (10) student files selected for each of the three (3) LEAs listed above using the Related Service protocol located on pages 10-11 of the Addendum of the CJ. In relation, the LDOE provided each charter with an additional

document entitled "Related Services and Enrollment Stability Monitoring Checklist" to assist them in the submission of required documents for the desk file review. This checklist was provided to the IMs for review on February 15, 2016 and included four items pertaining to related services documentation: 1) evidence of prior written notification, 2) IEP signature pages (first and last page), 3) documentation of related services including the method of measurement to achieve goal listed on the IEP (e.g., teacher logs, observational data, teacher checklists, student work samples, tally sheet, etc.) and 4) related services schedule for each student (include location of services, schedule of service delivery, student roster, and name and contact information of person responsible for providing services). At the request of the IMs, the LDOE provided each student's 2014-2015 and/or 2015-2016 IEP and related documentation (e.g., SER related service reports, SER eligibility reports, Related Services and Enrollment Stability Monitoring Checklists complete by the charter school personnel, all information submitted from each LEA for each student to the LDOE, LDOE Related Services protocols completed from March, 2016 through May, 2016) to assist in the completion of protocol reviews for the identified students in the identified charters. As such, the IMs also reviewed all thirty (30) student files selected from the three (3) charters schools (e.g., Algiers Technology Academy, International High School of New Orleans, Landry-Walker High School) for the spring 2016 school term.

Pursuant to Section 4(a) and 4(b) of Addendum A of the CJ, the LDOE was required to conduct interviews with at least one (1) general education teacher of students with disabilities, one (1) special education teacher, one (1) general education administrator,

and one (1) special education administrator or coordinator at each LEA selected for targeted monitoring. The LDOE was required to conduct staff interviews using the Related Services portion of the monitoring instrument.

The LDOE submitted the phone interview schedule for all charter schools across all four areas of targeting monitoring to the IMs on February 4, 2016. The staff interview for Algiers Technology Academy was conducted on February 25, 2016 via phone with LDOE monitoring personnel, IMs, and charter school staff (e.g., general education teacher, special education administrator/coordinator, special education teacher, ESS coordinator, exceptional support specialist, supervisor/speech therapist, speech pathologist assistant, social work supervisor, social worker, health services administrator, and APE teacher). The staff interview for International High School was conducted on February 25, 2016 via phone with LDOE monitoring personnel, IMs, and charter school staff (e.g., principal, general education teacher, special education administrator/coordinator, special education teacher/coordinator, and director of curriculum and instruction). The staff interview for Landry-Walker High School was conducted on February 16, 2016 via phone with LDOE monitoring personnel, IMs, and charter school staff (e.g., general education teacher, special education administrator/coordinator, special education teacher, ESS coordinator, exceptional support specialist, speech therapist, speech pathologist coordinator, social work supervisor, social worker, and health services administrator). The results of the phone interviews were submitted by the LDOE to the IMs for review and verification on February 19, 2016 and March 4, 2016. In relation, the list of participants for each charter

33

school was sent by the LDOE to the IMs for review and verification on March 4, 2016 and May 10, 2016.

Pursuant to Section B(5) of the Addendum to the CJ on page 4, the LDOE shall conduct on-site compliance monitoring at the LEA selected for targeted monitoring in the event that LDOE's review of information gathered through the student file review and staff interview processes: (1) is insufficient to make determinations of legal compliance, or (2) indicates that on-site observations or visual inspection of school facilities is necessary to make determinations of legal compliance.

LDOE monitoring personnel and IMs determined in an onsite meeting at the Department on April 28, 2016 that school visits would not be necessary for the identified charter schools to make determinations of legal compliance in the area of Related Services.

As agreed upon in the meeting with all parties in Judge Jay Zainey's chambers on January 6, 2016, aggregated data from the protocol reviews will be presented in the bi-annual report due to the Court on August 1, 2016.  However, a general overview of protocol findings will be presented here. Based on a review of student file reviews using the Related Services protocol, both the LDOE monitoring personnel and IMs observed concerns with the development of measurable, standards-based annual goals, including academic and functional goals (Item #5 on the protocol) on IEPs for students attending all three LEAs selected for targeted monitoring. The LDOE and IMs also observed concerns with the attendance of related service personnel at IEP meetings (Item #3) for some

students at International High School based on a review of signatures on the IEP and/or other documentation (e.g., written prior notice, excusal forms). The IMs observed concerns with the provision of related services in the type and frequency specified on the IEP (Item #9) for three (3) students at Algiers Technology Academy receiving counseling and/or social work services and three (3) students at International High School receiving adaptive PE and/or occupational therapy as a related service and one (1) student receiving social work services as a related service.

**Status of Compliance – Targeted Monitoring**

A review of the documents submitted by each identified charter school and the LDOE and completion of the student file reviews and staff interviews using the required Related Services protocol revealed that the LDOE completed the staff interviews and student file reviews during the spring 2016 term as designated in Section IV(B)(2)(b) of the CJ and Sections B(3)(a), B(4)(a), B(4)(b), B(5)(a) on pages 3-4 of the Addendum to the CJ for the 2015-2016 school year. As such, the LDOE is judged to be in **Substantial Compliance** with these sections of the CJ and Addendum of the CJ for the 2015-2016 school year based on the activities performed to date.

**Status of Compliance – Noncompliance Determinations and Corrective Action**

The LDOE informed the IMs during a phone conference held on June 2, 2016 that monitoring reports for the charter schools identified for targeted monitoring during the spring 2016 school term have been completed. The LDOE also reported that cover letters, complete monitoring reports with recommendations for improvement, specific findings of

noncompliance in relation to IDEA violations, and corrective action plan templates will be provided to each LEA and IMs on June 8, 2016 which is consistent with LDOE timelines for issuing this information to the LEAs. The LDOE confirmed during the phone conference that areas of noncompliance identified by both LDOE personnel and the IMs during the protocol reviews and phone interviews were used in completing the monitoring reports, making determinations regarding noncompliance, and making recommendations for corrective action. LDOE personnel will be providing technical assistance directly to each LEA in developing the corrective action plans during the first two weeks of June 2016. In relation, the IMs shall receive each LEAs recommended corrective action plan by June 30, 2016 for review and comment. The IMs will provide an update regarding the monitoring reports and corrective action plans for each LEA in the report due to the Court on August 1, 2016. Specifically, the IMs will review if the LDOE required each LEA to "undertake corrective actions sufficient to remedy the noncompliance and to reasonably ensure that such noncompliance does not reoccur" (p. 9 of CJ). As such, the IMs will evaluate the status of compliance for LEA noncompliance determinations and corrective actions identified by the LDOE after reviewing the monitoring reports and corrective action plans.

**Recommendations**

The LDOE shall continue to perform student file reviews and staff interviews using the required Related Services protocol as outlined this section of the CJ and on pages 2-4 of the Addendum of the CJ. IMs will continue to participate in the protocol review and staff interview process and verify completion of required activities by the LDOE as outlined in

the CJ.  The IMs will review monitoring reports and corrective action plans to ensure that the concerns identified during protocol reviews by LDOE monitoring personnel and IMs were addressed in forthcoming monitoring reports for the three (3) identified LEAs targeted for monitoring in the area of Related Services during the spring 2016 term. In addition, the IMs recommend for consideration by all parties that staff interviews and student file reviews for LEAs identified for future reviews be conducted on site. This recommendation is being made to assist the IMs and LDOE personnel in completing the student file reviews in a timely and cost effective manner as the desk review process required approximately 6 weeks during the spring 2016 term. On-site visits will also allow the IMs and/or LDOE to have quick access to school personnel to assist in obtaining any additional information that may be needed to make determinations regarding compliance with this section of the CJ. The IMs also recommend for consideration by all parties that the staff interview process and student file reviews be completed onsite during the fall 2016 term by both LDOE personnel and IMs for LEAs identified for targeted reviews based on an analysis of 2015-2016 related services provision data.

**SECTION IV(C) DISCIPLINE (pp. 9-11 of the CJ)**

I.     *The State Defendants shall, within 60 days of the implementation of this Agreement, review the code of conduct and/or discipline policy of each Type 2 or Type 5 charter school in New Orleans for compliance with the IDEA.  The State Defendants shall  require that the codes of conduct and/or discipline policies for each Type 2 or Type 5 charter school in New Orleans contain, at a minimum: (a) a written description of the IDEA's disciplinary procedural protections and procedural safeguards for students with disabilities, which should be written in plain language that parents/guardians, students, and the general public can understand; and (b) a plan for supporting school behavior and discipline in compliance with the requirements of La. Rev. Stat. § 17:251-252 (p. 9 of CJ).*

*a.          For the duration of this Agreement, the State Defendants shall, on the anniversary of the initial reviews described above:*

*i.     require each Type 2 or Type 5 charter school in New Orleans to submit a written assurance that the code of conduct and/or discipline policy for the school has not changed since the State Defendants last reviewed the code or policy; or,*

*ii.     review, for compliance with the IDEA, the code of conduct and/or discipline policy of each Type 2 or Type 5 charter school in New Orleans that is unable to provide such an assurance (p. 9 of CJ).*

**Current Findings**

A document entitled the "Procedural Safeguards Checklist - Disciplinary Removal of Students with Disabilities" was developed by LDOE to assist in the compliance review

of the code of conduct and/or discipline policies of each Type 2 or Type 5 charter school in New Orleans. The 19-item document covers the following discipline policies; 1) Overview of Procedural Safeguards & Change in Placement, 2) Determining Manifestation Determination & Services, 3) Weapons, Drugs or Serious Bodily Injury: Emergency Procedures. 4) Appeals, 5) Placement during Appeal of Discipline Decision, 6) Students Without IEPs or Section 504 Plans "Deemed to Have a Disability," and 7) La. R.S. 17:251-252 (Discipline Master Plan). The former IM, Mark Mlawer, reviewed the document on October 29, 2015 and made comments or recommended edits for five (5) items (i.e., 6, 7, 8, 16, and 19), however, he also indicated his review and/or revision of the items were not required according to CJ. The LDOE utilized the approved rubric to review the Codes of Conduct for each Type 2 or Type 5 charter school in New Orleans. After examining these results, the LDOE developed the model policy "Discipline Policy & Procedures of Students with Disabilities," disseminated the policy to all charters, and recommended that each LEA include all components of the required policy in their school's Code of Conduct. However, the charter schools were not required to place the specific language from the model policy in their Codes of Conduct. Each LEA was only instructed to ensure that the language in their Codes of Conduct were consistent with all components addressed in the model policy document. The LDOE noted in a phone conference with the IMs held on May 25, 2016 that they made this decision in order to afford the individual charter schools the flexibility to present the required information using language that their consumers would understand.

The LDOE provided the individual scores for each protocol to the "Procedural Safeguards Checklist - Disciplinary Removal of Students with Disabilities" to the IMs

on April 28, 2016. An appraisal by the IMs noted that one Code of Conduct was reviewed for the following charter groups; ReNEW, KIPP, Friends of King, and Algiers. Of the 43 total reviews, 23% (10 of 43 LEAs) of the charter LEAs obtained an affirmative score on all 19-items. These low scores supported the LDOEs development of model policy entitled "Discipline Policy & Procedures for Students with Disabilities" to assist the charter schools in addressing all required components in their respective Codes of Conduct. The IMs conducted a review of the Codes of Conduct submitted by 59 charter schools.  This review revealed that 38 charter schools adopted the specific language from the LDOE model policy document and included it in their Code of Conduct for the 2015-2016 school year. The IMs initial evaluation of the remaining 21 charter school's documents (6 schools from the Algiers Charter School Association, 3 schools from Crescent City Schools, 9 schools from KIPP: New Orleans, and 3 Non-Network Charters including Mary Coghill Accelerated, The NET Charter, and Sophie B. Wright) indicated the LEAs potentially had all or part of the required LDOE discipline polices in their respective Codes of Conduct. A more thorough review of the Codes of Conduct from the remaining charter schools not using the specific language from the LDOE model policy document will be conducted by the IMs during the summer 2016 term and an update will be provided in the IM bi-annual report due to the Court on August 1, 2016.

The IMs also reviewed the model policy template to determine if all the elements of the CJ for discipline were included. The policy contained all the components of Section IV (C) (1a) addressing IDEA's disciplinary procedural protections. However, in relation to

the requirements in Section IV (C) (1b), the IMs did not observe clear evidence of each

LEAs plan for supporting school behavior and discipline in compliance with the

requirements of La. Rev. Stat §17:251-252." The LDOE stated during a phone

conference held with the IMs on May 25, 2016 that they would have each charter submit

language regarding their PBIS policies and procedures and/or a signed attestation that

they will follow the requirements of La. Rev. Stat §17:251-252 for the coming school

year. The IMs will review these documents during the summer 2016 term and an update

will be provided in the IM bi-annual report due to the Court on August 1, 2016.


A copy of the "Procedural Safeguards Checklist Disciplinary Removal of Students with

Disabilities" and the "Discipline Policy & Procedures of Students with Disabilities" can

be found in Appendix A.


**Status of Compliance**

The IMs examination of the "Discipline Policy & Procedures of Students with

Disabilities" revealed the policy did not include language to address the LEAs plan for

supporting behavior and discipline pursuant to Section IV (C) (1b). Therefore, the

LDOE is judged to be in **Noncompliance** at this time. The IMs will review the

remaining 21 charter school's code of conduct for discussed above and provide an

update IMs in the bi-annual report due to the Court on August 1, 2016.


**Recommendations**

The IMs recommend all LEAs thoroughly review the LDOE model policy "Discipline

Policy & Procedures of Students with Disabilities" to ensure that all required components are included in their respective Codes of Conduct. In addition, all LEAs should submit written evidence to the LDOE that they have a plan for supporting school behavior and discipline in compliance with the requirements of La. Rev. Stat §17:251-252 by June 30, 2016. The IMs will review these policies and procedures once received from the LDOE. The IMs will also continue review each charter school's Code of Conduct policies and provide updated in future bi-annual reports.

2. *The Defendant-Intervenor shall, within 60 days of the implementation of this Agreement, review the code of conduct and/or discipline policy of each school under its jurisdiction for compliance with the IDEA. The Defendant-Intervenor shall require that the codes of conduct and/or discipline policies for each school under its jurisdiction contain, at a minimum: (a) a written description of the IDEA's disciplinary procedural protections and procedural safeguards for students with disabilities, which should be written in plain language that parents/guardians, students, and the general public can understand; and (b) a plan for supporting school behavior and discipline in compliance with the requirements of La. Rev. Stat. § 17:251-252 (p. 10 of CJ).*

a. *For the duration of this Agreement, the Defendant-Intervenor shall, on the anniversary of the initial reviews described above:*

i. *require each school under its jurisdiction to submit a written assurance that the code of conduct and/or discipline policy for the school has not changed since the Defendant-Intervenor last reviewed the code or policy; or,*

42

*ii.       review, for compliance with the IDEA, the code of conduct and/or discipline policy of each school under its jurisdiction that is unable to provide such an assurance (p. 10 of CJ).*

**Current Findings**

In a letter dated February 1, 2016, Plaintiff's counsel indicated they were not in receipt of the code of conduct reviews from OPSB schools. During a meeting of all parties on February 28, 2016, Wayne Stewart, counsel for OPSB, noted all schools in the district will adopt the "Discipline Policy & Procedures of Students with Disabilities" for the 2016-17 school year.

**Status of Compliance**

Compliance for Section IV (C) of the CJ cannot be evaluated until each charter LEA provides written descriptions of the IDEA's disciplinary procedural protections and procedural safeguards for students with disabilities, and their plan for supporting school behavior and discipline in compliance with the requirements of La. Rev. Stat. § 17:251-252 (p. 10 of CJ). Therefore, OPSB is judged to be in **Noncompliance** with Section IV (C) (2) at this time.

**Recommendations**

The IMs recommend that OPSB place the LDOE model policy entitled "Discipline Policy & Procedures of Students with Disabilities" in the 2016-2017 Code of Conduct using the precise format and language provided by the LDOE. This will allow for easy verification

by the IMs for Section IV (C) (1b) of the CJ.  In addition, OPSB should submit written evidence that the district has a plan for supporting school behavior and discipline in compliance with the requirements of La. Rev. Stat §17:251-252. OPSB shall submit this information to the IMs by June 30, 2016 for review and comment. The IMs will continue to review OPSB's Code of Conduct policies and provide updates in future bi-annual reports.

3.  *The State Defendants shall provide annual technical assistance to each Type 2 or Type 5 charter school in New Orleans regarding the prohibited practice of undocumented suspensions and shall develop and broadly disseminate information to parents of students at each Type 2 or Type 5 charter school in New Orleans about the prohibited practice of undocumented suspensions. Additionally, the State Defendants shall provide annual professional development to each Type 2 or Type 5 charter school in New Orleans on disciplinary procedures for students with disabilities and on best practices to reduce suspensions and expulsions for students with disabilities (p. 10 of CJ).*

a.  *The State Defendants shall provide the required technical assistance and professional development to each Type 2 or Type 5 charter school in New Orleans annually by October 31 for the duration of this Agreement (p. 10 of CJ).*

b.  *The State Defendants shall provide information detailing the methods and materials to be used to provide the required technical assistance and professional development to the Independent Monitor for review and approval annually by June 1 for the duration of this Agreement. The Independent Monitor will provide comments on the*

*materials to the Parties within twenty-one (21) days. The Parties may provide comments*

*on the Independent Monitor's comments within seven (7) days. The Independent*

*Monitor will consider the Parties' comments, mediate any disputes, and approve*

*documents with any changes within fifteen (15) days (p. 10 of CJ).*

**Current Findings**

***Technical Assistance***

The LDOE developed the document "PB v White – Undocumented Suspension

Guidance" to address the practice of undocumented suspensions. The LDOE presented

the guidance document in workshop on December 10-11, 2015. The Department

requested all LEAs provide assurance of receipt of technical assistance regarding

undocumented suspension and development of a plan for distributing the Department's

guidance to the parents of all students with disabilities by January 29, 2016. In a letter

dated February 1, 2016, Plaintiff's counsel indicated the received the document "PB v

White – Undocumented Suspension Guidance" and reported that they had "no …

concerns with the guidance document." In the same correspondence, the Plaintiff's

counsel also requested the IMs verify that guidance assistance was disseminated to every

LEA.

The LDOE also developed a document for parents to address undocumented suspensions

entitled "Parent FAQs: Special Education in Charter Schools." The document was

reviewed and accepted by the Plaintiff's counsel and IMs on February 28, 2016 during an

on-site meeting at the LDOE. Plaintiff's counsel also requested the IMs review and verify

the plans of each LEA to determine if the document was disseminated to all parents of student with disabilities. The IMs conducted a review of all fifty-nine (59) charter schools' statements of how they disseminated information to parents concerning undocumented suspensions. The assessment revealed all LEAs provided an example of at least one method of dissemination to consumers (e.g., scheduled parent conferences for progress reports, letter sent home to parents of students with disabilities, IEP or IAP meetings, parent newsletters, inclusion with registration documents).

The LDOE submitted verification of attendance documents from the December 10-11, 2015 workshop which included the "Undocumented Suspension Guidance," "Parent FAQs: Special Education in Charter Schools" document, PowerPoint, and sign-in sheets to the IMs on April 22, 2016. In addition, certification statements were obtained from five (5) LEAs who did not attend the workshop, but signed attestation statements that they reviewed and understood the PowerPoint and documents. This information was also provided to the IMs on April 22, 2016.

### Annual professional development

A PowerPoint presentation entitled "Discipline of Students with Disabilities" was presented by *Civil Rights Solutions* during the summer 2015 term. The workshop was conducted without a review by Plaintiff's counsel or the IMs. In relation, the Plaintiff's counsel expressed several concerns with the professional development in a letter dated February 1, 2016 (e.g., restatements of federal law with minimal practice guidelines for implementation, failure to address development of FBAs and BIPs, failure to address

46

multi-tiered use of PBIS strategies and interventions, failure to address support strategies for students with disabilities, failure to address procedural safeguards such as a prior written notice before a disciplinary change of placement, and failure to meaningfully address "best practices" to reduce suspensions and expulsions for students with disabilities).

During a meeting held on February 28, 2016 at the LDOE, the decision was made that additional professional development training will be developed by the IMs in coordination with all parties to address the aforementioned limitations of the previous professional development held during the summer 2015 term. In relation, the Parties and IMs will work collaboratively to establish a presentation schedule for professional development during the late summer or early fall 2016 term as LEA schedules for the 2016-2017 school year become available.

**Status of Compliance - Technical Assistance**

Based on a review of related technical assistance material including the "PB v White – Undocumented Suspension Guidance" template, the "Parent FAQs: Special Education in Charter Schools" template, and verification documents provided by each LEA, the LDOE is judged to be in **Substantial Compliance** with Technical Assistance provisions of Section IV (C) (3) for the CJ for the 2015-16 year.

**Status of Compliance - Annual Professional Development**

Given a number of concerns in relation to the presentation "Discipline of Students with Disabilities," and February 28, 2016 agreement for additional professional development

training to be developed by the IMs in coordination with all parties, the LDOE is judged to be in **Noncompliance** with regard to the annual professional development provisions of Section IV (C) (3) for the CJ for the 2015-16 year.

**Recommendations**

In terms of the Technical Assistance Findings, the IMs recommend that all charter schools use a variety methods (e.g., mail parents and/or legal guardians of students with disabilities a copy of the document via U.S. postal services; send a copy of the document to the residence in an envelope with the student; email a copy of the document to the parents of students with disabilities; include a copy of the document in the new school year packet of information or registration packets; provide a copy of the document to parents and/or legal guardians at annual IEP or IAP review meetings; include a copy of the document in the Parent Newsletter; have a copy of the document available across several school settings including, but not limited to, the front office, Principal's or Dean of Student's Office, Family Resource Center) in an effort to the "broadly" disseminate information to parents of students with disabilities regarding the prohibited practice of undocumented suspensions as required in Section IV (C) (3) of the CJ.

In relation to annual professional development, the IMs will collaborate with the Plaintiff's counsel, LDOE, and OPSB to develop and conduct the professional development for the LEAs as agreed upon by all parties during the meeting on February 28, 2016. The parties shall establish a presentation schedule as LEA schedules for the 2016-2017 school year are developed and made available to the parties.

48

4.      *The Defendant-Intervenor shall provide annual technical assistance to each school under its jurisdiction regarding the prohibited practice of undocumented suspensions and shall develop and broadly disseminate information to parents of students at each school under its jurisdiction about the prohibited practice of undocumented suspensions. Additionally, the Defendant-Intervenor shall provide annual professional development to each school under its jurisdiction on disciplinary procedures for students with disabilities and on best practices to reduce suspensions and expulsions for students with disabilities (pp. 10-11 of CJ).*

a.      *The Defendant-Intervenor shall provide the required technical assistance and professional development to each school under its jurisdiction annually by October 31 for the duration of this Agreement (p. 11 of CJ).*

b.      *The Defendant-Intervenor shall provide information detailing the methods and materials to be used to provide the required technical assistance and professional development to the Independent Monitor for review and approval annually by June 1 for the duration of this Agreement. The Independent Monitor will provide comments on the materials to the Parties within twenty-one (21) days. The Parties may provide comments on the Independent Monitor's comments within seven (7) days. The Independent Monitor will consider the Parties' comments, mediate any disputes, and approve documents with any changes within fifteen (15) days (p. 11 of CJ).*

**Current Findings**

***Technical Assistance Findings***

Wayne Stewart indicated that OPSB will adopt the approved LDOE "Undocumented

Suspension Guidance," and "Parent FAQs: Special Education in Charter Schools" model templates for the 2016-2017 school year. The documents have been approved by the Plaintiff's counsel and IMs.  A communication from Wayne Stewart on June 1, 2016, indicated OPSB will provide confirmation of any technical assistance activities performed in May and June 2016.

*Annual professional development*

On September 24, 2016 Wayne Stewart, counsel for OPSB, conducted a workshop entitled "Discipline of Students with Disabilities." The PowerPoint was approved by Plaintiff's counsel and IMs. IMs verified all 20 of OPSBs charter schools sent various school personnel to the discipline workshop. A communication from Wayne Stewart on June 1, 2016, indicated OPSB will provide confirmation of any additional professional development activities performed in May and June 2016.

During a meeting held on February 28, 2016 at the LDOE, the decision was made that additional professional development training will be developed by the IMs in coordination with all parties to address the aforementioned limitations of the previous training held during the summer 2015 term. The parties will then work to establish a presentation schedule as LEA schedules for the 2016-2017 school year.

**Status of Compliance – Technical Assistance**

Based on a review of current documentation, OPSB is judged to be in **Noncompliance** with the Technical Assistance provisions of Section IV (C) (4) for the CJ for the 2015-16

year.

**Status of Compliance – Annual Professional Development**

Based on a review of the workshop conducted on "Discipline of Students with Disabilities" and verification all 20 LEAs attended the workshop, OPSB is judged to be in **Substantial Compliance** with the professional development provisions of Section IV (C) (4) for the CJ for the 2015-16 year.

**Recommendations**

To address Section IV (C) (4) regarding undocumented suspensions and parent information the OPSD should submit to the IMs verification their charters disseminated to parents the LDOE the document "Parent FAQs: Special Education in Charter Schools."  In addition, the IMs recommend that all OPSB charter schools use a variety methods (e.g., mail parents and/or legal guardians of students with disabilities a copy of the document via U.S. postal services; send a copy of the document to the residence in an envelope with the student; email a copy of the document to the parents of students with disabilities; include a copy of the document in the new school year packet of information or registration packets; provide a copy of the document to parents and/or legal guardians at annual IEP or IAP review meetings; include a copy of the document in the Parent Newsletter; have a copy of the document available across several school settings including, but not limited to, the front office, Principal's or Dean of Student's Office, Family Resource Center) in an effort to the "broadly" disseminate the information to parents of students with disabilities regarding the prohibited practice of undocumented

suspensions as required in this section of the CJ. As mentioned previously, the IMs will collaborate with the Plaintiff's counsel, LDOE, and OPSB to develop and conduct the professional development for the LEAs as agreed upon by all parties during the meeting on February 28, 2016. The parties shall establish a presentation schedule as LEA schedules for the 2016-2017 school year are developed and made available to the parties.

5. *The State Defendants shall annually calculate the rate at which each LEA in New Orleans removes students with disabilities for disciplinary purposes for more than ten (10) cumulative days in an academic year ("extended disciplinary removal rate"). Using this rate, the State Defendants shall annually select LEAs for targeted monitoring. As part of targeted monitoring, the State Defendants shall conduct file reviews of a random, representative sample of students with disabilities who received six (6) or more Office Discipline Referrals or three (3) or more suspensions (in- or out-of-school) in a school year. LEA selection, student file selection, file reviews, staff interviews, and school site visits shall be conducted consistent with the processes detailed in Addendum A. If the State Defendants' targeted monitoring results in the identification of noncompliance, the State Defendants shall require each LEA with validated noncompliance to undertake corrective actions sufficient to remedy the noncompliance and to reasonably ensure that such noncompliance does not reoccur, as detailed in Addendum A (p. 11 of CJ).*

a. *The extended disciplinary removal rate shall be calculated by dividing the total number of students with disabilities who experienced disciplinary removals for more than ten (10) cumulative days between July 1 and June 30 by the total number of*

*students with disabilities enrolled in the LEA on October 1 (p. 11 of CJ).*

**Current Findings**

The IMs and Plaintiff's counsel received correspondence from the LDOE on January 20, 2016 providing a list of charter schools identified for targeted monitoring during the spring 2016 term and confirmation that each charter was sent a notification email listing the requirements of the discipline requirements for targeted monitoring pursuant to the CJ, the specific areas in which the charter was being monitored, methods of monitoring (e.g., student file selection, staff interviews, desk file reviews), LDOE contact personnel, the specific date of phone interviews with staff, call in phone numbers and instructions, and copies of the staff interview questions and student file review protocols during January 2016. The IMs were provided a sample notification email for review. The LDOE also conducted planning calls with each identified charter during January 2016 to assist them in preparing for the staff interviews, student file submission process in a secured format, and desk file review process. The IMs also received an excel file from the LDOE on April 4, 2016 that included a column listing all Type 2 and Type 5 charter schools along with three additional columns populating SWD Suspended/Expelled >10 Days, School IDEA Count, and % SWD Suspended/ Expelled >10 Days using the formula specified in Addendum A of the CJ. A review of the spreadsheet and related materials from the LDOE by the IMs revealed that the following three charter schools were selected for targeted monitoring as required in Section (C) (1) of the CJ:

1.      Cohen College Prep

2.      Crescent Leadership Academy

3.      International High School of New Orleans

Although Crescent Leadership Academy (CLA) was selected for monitoring during the spring 2016 school term, the LDOE elected not to complete desk file reviews for CLA based on a recent monitoring visit conducted the previous school year on March 3, 2015. A letter from LDOE to CLA dated April 4, 2015, indicated there were no findings which required resolution. Staff interviews were completed with CLA personnel on the discipline protocol as part of the spring 2016 phone interview process on February 17, 2016, and staff were able to provide appropriate answers to all questions on the monitoring protocol.


**Status of Compliance**

The LDOE followed the selection criteria as outlined in Section IV (C) (5) and identified three (3) schools for targeted monitoring, and completed phone interviews for all three schools. However, the LDOE excluded Crescent Leadership Academy (CLA) from the desk reviews, which reduced to the number of LEAs monitored during the spring 2016 term to two (2) schools instead of the required three (3) schools as outlined in this section of the CJ. Therefore, the LDOE is judged to be in **Noncompliance** for the 2015-2016 school year as a result of not completing the targeted monitoring for three (3) LEAs as required in Section C (1a) of the CJ Addendum.

**Recommendations**

In the future, the LDOE shall complete the targeted monitoring process (i.e., student file reviews, phone interviews with designated staff members) for all selected charter schools for discipline monitoring. Selection of three (3) LEAs and review of all required materials during student file reviews and completion of required staff interviews will provide the opportunity for the LDOE to achieve compliance for this section of the CJ in future school years.

b.      *The targeted monitoring activities described above and in Addendum A shall supplement, not supplant, the annual monitoring activities undertaken by LDOE pursuant to its general supervisory responsibilities under the IDEA. The monitoring of an LEA pursuant to the monitoring obligations identified in this Agreement shall not influence LDOE's selection of that LEA for monitoring pursuant to LDOE's general IDEA monitoring protocols (p. 11 of CJ).*

**Current Findings**

Pursuant to Section C(2)(a) of the Addendum to the CJ, the LDOE was required to review files of a random, representative sample of students with disabilities who received six (6) or more Office Discipline Referrals or three (3) or more suspensions (in- or out-of-school) in a school year. Pursuant to Section C(2)(b) of the Addendum to the CJ, the LDOE was required to request a list of de-identified students meeting the criteria for C (2) from each LEA targeted for monitoring and randomly select twenty (20) percent of the students on that list for a file review. Pursuant to Section C(2)(b)(1), the LDOE was

55

required to review a minimum of ten (10) randomly selected files for student meeting the

above criteria at each LEA in the event that an LEA identified less than fifty (50)

students. Pursuant to Section C(2)(b)(2), the LDOE was required to review all files of

students meeting the above criteria and supplement its review with additional randomly

selected files of students identified under the disability categories of Emotional

Disturbance or Other Health Impairment in the event that an LEA identified less than ten

(10) students meeting the above criteria.

The LDOE provided the IMs with a list of identified students for each LEA during an

onsite visit to the Department on March 22-24, 2016. A total of ten (10) students were

selected by the LDOE for review from two (2) of the schools selected for monitoring

(e.g., Cohen College Prep and International High School of New Orleans).

Pursuant to Section C(3)(a) of the Addendum to the CJ, the LDOE was required to

review de-identified student record files for each of the students identified through the

selection process described above. The LDOE was required to conduct the file review

using the discipline portion of the monitoring instrument and information sufficient to

make all relevant determinations required by the monitoring tool.

Between March 22, 2016 and May 5, 2016 both LDOE monitoring personnel and the IMs

completed desk file reviews of each of the ten (10) student files selected for two (2) of

the three (3) LEAs listed above using the discipline protocol located in the Addendum of

the CJ. In relation, the LDOE provided each charter with an additional document entitled

"Discipline Monitoring Checklist" to assist them in the submission of required documents for the desk file review.

Pursuant to Section C(4)(a) and C(4)(b) of Addendum A of the CJ, the LDOE was required to conduct interviews with at least one (1) general education teacher of students with disabilities, one (1) special education teacher, one (1) general education administrator, and one (1) special education administrator or coordinator at each LEA selected for targeted monitoring. The LDOE was required to conduct staff interviews using the discipline portion of the monitoring instrument.

The LDOE submitted the phone interview schedule for all charter schools across all four areas of targeting monitoring to the IMs on February 4, 2016. The staff interview for International High School was conducted on February 25, 2016 via phone with LDOE monitoring personnel, IMs, and charter school staff. The staff interview for Cohen College Prep was conducted on February 16, 2016 via phone with LDOE monitoring personnel, IMs, and charter school staff. The staff interview for Crescent Leadership Academy was conducted on February 17, 2016 via phone with LDOE monitoring personnel, IMs, and charter school staff. The results of the phone interviews were submitted by the LDOE to the IMs for review and verification on by March 4, 2016. In relation, the list of participants for each charter school was sent by the LDOE to the IMs for review and verification by May 10, 2016.

Pursuant to Section C(5)(a) of the Addendum to the CJ, the LDOE shall conduct on-site

compliance monitoring at the LEA selected for targeted monitoring in the event that LDOE's review of information gathered through the student file review and staff interview processes: (1) is insufficient to make determinations of legal compliance, or (2) indicates that on-site observations or visual inspection of school facilities is necessary to make determinations of legal compliance. LDOE monitoring personnel and IMs determined in an onsite meeting at the Department on April 28, 2016 that school visits would not be necessary for the identified charter schools to make determinations of legal compliance in the area of Discipline.

As agreed upon in the meeting with all parties in Judge Jay Zainey's chambers on January 6, 2016, aggregated data from the protocol reviews will be presented in the bi-annual report due to the Court on August 1, 2016.  However, a general overview of protocol findings will be presented here. The discipline data in 11 of the 20 student's files were collected from the 2015-16 school year. Therefore, discipline data were not collected for an entire school year for more than half of the student cases reviewed as required in Addendum A (C) (1b) of the CJ. In addition, only four (4) of the 20 students selected for the review met the criteria for experiencing greater than 10 days of removal. Despite the small sample size of four students, file reviews using the Discipline protocol revealed the following concerns: failure to conduct required MDRs as required by federal and state law, failure to provide timely parent notification for removals which constituted a change in placement, and failure to use relevant information to determine if behavior was a manifestation of the student's disability.

**Status of Compliance** - **Targeted Monitoring**

Based on a review of targeted monitoring documents submitted by each identified charter school and the LDOE, and completion of the student file reviews and staff interviews using the required Child Find protocol, the LDOE is judged to be in **Noncompliance** with Section IV(C)(5)(b) of the CJ and Section C (2) (a) of the CJ Addendum for the 2015-2016 school year because the student files selected for review during the spring 2016 term did not include a full year of discipline data as required as outlined in Section C(2)(a) of Addendum A of the CJ.

**Status of Compliance – Noncompliance Determinations and Corrective Action**

The LDOE informed the IMs during a phone conference held on June 2, 2016 that monitoring reports for the charter schools identified for targeted monitoring during the spring 2016 school term have been completed. The LDOE also reported that cover letters, complete monitoring reports with recommendations for improvement, specific findings of noncompliance in relation to IDEA violations, and corrective action plan templates will be provided to each LEA and IMs on June 8, 2016 which is consistent with LDOE timelines for issuing this information to the LEAs. The LDOE stated that areas of noncompliance identified by both LDOE personnel and the IMs during the protocol reviews and phone interviews were used in completing the monitoring reports, making determinations regarding noncompliance, and making recommendations for corrective action. LDOE personnel will be providing technical assistance directly to each LEA in developing the corrective action plans during the first two weeks of June 2016. In relation, the IMs shall receive each LEAs recommended corrective action plan by June

30, 2016 for review and comment. The IMs will provide an update regarding the monitoring reports and corrective action plans for each LEA in the report due to the Court on August 1, 2016. Specifically, the IMs will review if the LDOE required each LEA to "undertake corrective actions sufficient to remedy the noncompliance and to reasonably ensure that such noncompliance does not reoccur" (p. 11 of CJ). As such, the IMs will evaluate the status of compliance for noncompliance determinations and corrective actions for each LEA identified by the LDOE after reviewing the monitoring reports and corrective action plans.

**Recommendations**

The LDOE shall continue to perform student file reviews and staff interviews using the required Discipline protocol as outlined this section of the CJ and in the Addendum of the CJ. IMs will continue to participate in the protocol review and staff interview process and verify completion of required activities by the LDOE as outlined in the CJ.  The LDOE is strongly encouraged to address the concerns identified during the student selection process in the area of Discipline. In addition, appropriate corrective actions should be recommended by the LDOE to address identified areas of noncompliance for the targeted LEAs. The IMs will review the monitoring reports submitted by the LDOE and shall collaboratively participate with the LDOE in the development of corrective action plans to address identified areas of noncompliance. In addition, the IMs recommend for consideration by all parties that staff interviews and student file reviews for identified LEAs identified be conducted onsite to assist in the acquisition of materials required to complete the reviews and to have access to school personnel during the file review process.  This recommendation is being made to assist the IMs and LDOE personnel in

completing the student file reviews in a timely and cost effective manner as the desk review process required approximately 6 weeks during the spring 2016 term. On-site visits will also allow the IMs and/or LDOE to have quick access to school personnel to assist in obtaining any additional information that may be needed to make determinations regarding compliance with this section of the CJ. The IMs also recommend for consideration by all parties that the staff interview process and student file reviews be completed onsite during the fall 2016 term by both LDOE personnel and IMs for LEAs identified for targeted reviews based on an analysis of 2015-2016 discipline data. Finally, based on the small number of reviewable records, the IMs recommend all parties consider modifications to the student selection criteria outlined in this section and in Section C (1a) (page 2) and Section C (2a) (page 3) of the CJ Addendum A to in order to obtain a more representative sample of students for future targeted monitoring reviews.

**SECTION IV(D) ENROLLMENT (pp. 11-15 of the CJ)**

*1.       The State Defendants shall annually disseminate to each Type 2 and Type 5 charter school in New Orleans policy guidance describing the legal obligations of each Type 2 and Type 5 charter school in New Orleans to enroll and serve students with disabilities pursuant to federal law. The State Defendants will request that the principal of each Type 2 and Type 5 charter school acknowledge receipt of this guidance. The guidance will, at a minimum, contain: (a) a summary of the legal obligations of the school to provide necessary services and accommodations to students with disabilities; (b) a statement describing the obligations of the school to enroll students with disabilities without regard to their disabilities; (c) a statement advising the school that its staff is prohibited from informing or suggesting to parents of students with disabilities that the parents should not enroll their child in the school because the school does not provide the services or placement necessary for the child or because the child's disability would be better served at another school; and (d) a statement notifying the principal that he or she can incur personal monetary damages for intentional discrimination and operating in bad faith due to noncompliance with Section 504 (pp. 11-12 of CJ).*

*a.       The State Defendants shall disseminate the required policy guidance to each Type 2 or Type 5 charter school in New Orleans annually by March 1 for the duration of this Agreement (p. 12 of CJ).*

*b.       The State Defendants shall provide the policy guidance to the Independent Monitor for review and approval annually by December 1 for the duration of this Agreement. The Independent Monitor will provide comments on the guidance to the Parties within twenty-one (21) days. The Parties may provide comments on the*

*Independent Monitor's comments within seven (7) days. The Independent Monitor will consider the Parties' comments, mediate any disputes, and approve documents with any changes within fifteen (15) days (p. 12 of CJ).*

## Current Findings

Ty Manieri, LDOE counsel, submitted the LDOE document entitled "PB v White – Enrollment Discrimination Policy Guidance" (see Appendix A for the model template) to Plaintiff's counsel, Eden Heilman and Jennifer Coco, and the IMs on January 15, 2016 for review. Plaintiff's counsel reviewed the proposed LDOE "Enrollment Discrimination Policy Guidance" document and indicated approval of this policy document in a written correspondence dated February 1, 2016. Additionally, the LDOE Enrollment Discrimination Policy Guidance" document was discussed and approved by all parties on February 18, 2016 during a meeting with Ty Manieri, LDOE counsel, Wayne Stewart, OPSB counsel, Plaintiff's counsel, Eden Heilman and Jennifer Coco, and the IMs.

Ty Manieri, LDOE counsel, provided professional development for NOLA Charter School Organizations on December 10-11, 2015 to review the P.B. v White CJ.  All NOLA Charter Organizations not attending the December 10-11, 2015 professional development training were directed by the LDOE to submit an "Attestation of Review of Enrollment Discrimination Guidance" document to the LDOE by January 29, 2016.

Sign-in sheets completed by NOLA Charter representatives attending the December 10-

11, 2015 professional development training to address the CJ and all completed "Attestation of Review of Enrollment Discrimination Policy Guidance" documents were submitted to the IMs by RSD personnel on April 22, 2016 and LDOE counsel, Kathe Zolman, on May 10, 2016.

NOLA Charter Organizations and/or individual LEAs participating in this professional development included BESE Charters (International School of Louisiana (K-8) and Lycee' Francais (PK-8), Algiers, ARISE, Collegiate Academies (Sci Academy), Crescent City Schools, First Line Schools, Friends of Kings, KIPP-New Orleans (KIPP NOLA Leadership Academy (K-8), New Beginnings, NOLA College Prep, ReNew and Non-Network Charters (Edgar P. Harny (K-8), Morris Jeff (PK-7),  Success Prep Academy (K-8), Fannie C. Williams (PK-8), Crescent Leadership (7-12) and Sophia B. Wright (7-12).

Collectively, 100% of NOLA Charter School organizations were represented at the December 10-11, 2015 professional development training to review the PB v White CJ. However, only thirty-nine (39) representatives from individual charter LEAs attended this professional development training and a total of only three "Attestation of Review of Enrollment Discrimination Guidance" documents were provided by principals of NOLA Type 2 and Type 5 Charter LEAs.

**Status of Compliance**

Based on the agreement between all parties, including both Defendant's and Plaintiff's

counsel, the IMs agree the LDOE "Enrollment Discrimination Policy Guidance" document is consistent with the required guidelines outlined in Section IV.D.1 of the PB v White CJ.

However, Section IV.D.1 of the CJ also specifically requires the State Defendants to disseminate "Enrollment Discrimination Policy Guidance" to each principal of NOLA Type 2 and Type 5 charter schools by March 1 annually and request written receipt (i.e. Attestations) of this guidance. This dissemination of the "Enrollment Discrimination Guidance" and receipt of attestation documents from school principals is required annually for the duration of the CJ. As mentioned previously, although there is evidence that representatives from each NOLA Type 2 and Type 5 Charter Organization received professional development reviewing enrollment discrimination guidance, there is, however, limited evidence that each principal of Type 2 and Type 5 Charter LEAs received training and/or completed an "Attestation of Review of Enrollment Discrimination Guidance" document. As such, the LDOE is judged to be in **Noncompliance** with the completion of this implementation activity as required under Section IV.D.1 of the CJ. The IMs will review evidence of compliance once submitted by the LDOE and make determinations regarding Substantial Compliance or Noncompliance. An update regarding this section of the CJ will be provided by the IMs in the bi-annual report due to the Court on August 1, 2016.

**Recommendations**

It is recommended that the LDOE disseminate the approved "LDOE Enrollment

Discrimination Policy Guidance" document to <u>all principals</u> in NOLA Type 2 and Type 5 Charter LEAs and document receipt through signed attestations prior to the beginning of the 2016-2017 school year and by March 1, and annually, thereafter. Additionally, it is recommended the "LDOE Enrollment Discrimination Policy Guidance" be specifically incorporated into all required annual trainings to address the CJ.

*2.      The Defendant-Intervenor shall annually disseminate to each school under its jurisdiction policy guidance describing the legal obligations of each school under its jurisdiction to enroll and serve students with disabilities pursuant to federal law. The Defendant- Intervenor will require the principal of each school under its jurisdiction to acknowledge receipt of this guidance. The guidance will, at a minimum, contain: (a) a summary of the legal obligations of the school to provide all necessary services and accommodations to students with disabilities; (b) a statement describing the obligations of the school to enroll students with disabilities without regard to their disabilities; (c) a statement advising the school that its staff is prohibited from informing or suggesting to parents of students with disabilities that the parents should not enroll their child in the school because the school does not provide the services or placement necessary for the child or because the child's disability would be better served at another school; and (d) a statement notifying the principal that he or she can incur personal monetary damages for intentional discrimination and operating in bad faith due to noncompliance with Section 504 (p. 12 of CJ).*

*a.  The Defendant-Intervenor shall disseminate the required policy guidance to each school*

*under its jurisdiction annually by March 1 for the duration of this Agreement (p. 12 of CJ).*

b.  *The Defendant-Intervenor shall provide the policy guidance to the Independent Monitor for review and approval annually by December 1 for the duration of this Agreement. The Independent Monitor will provide comments on the guidance to the Parties within twenty-one (21) days. The Parties may provide comments on the Independent Monitor's comments within seven (7) days. The Independent Monitor will consider the Parties' comments, mediate any disputes, and approve documents with any changes within fifteen (15) days (pp. 12-13 of CJ).*

### Current Findings

Wayne Stewart, Legal Counsel for the Defendant-Intervenor (OPSB), provided the IMs with the OPSB's policy entitled "Enrollment Discrimination Policy Guidance" (See Appendix A for the model template document) for review on February 28, 2016. It is important to note that the Defendant-Intervenor (OPSB) adopted the agreed upon LDOE "Enrollment Discrimination Policy Guidance" for the 2016-2017 school year. The IMs reviewed and provided him with feedback regarding this document on April 4, 2016.

### Status of Compliance

Based on the agreement between all parties, including both Defendant-Intervenor (OSPB counsel) and Plaintiff's counsel, the IMs agree the OPSB "Enrollment Discrimination Policy Guidance" document is consistent with the required guidelines

outlined in Section IV.D. 2 of the PB v White CJ.

As noted previously, Section IV.D.2 of the CJ also requires the Defendant-Intervenor to disseminate policy guidance related to enrollment discrimination policies to each school under its jurisdiction and require the principal of each school under its jurisdiction to acknowledge receipt of this guidance. Currently, no evidence has been submitted by the OPSB to indicate this implementation activity was completed during the 2015-2016 school term. As such, the OPSB is judged to be in **Noncompliance** with this required IA under Section IV.D.2 of the CJ. It should be reported that in a June 1, 2016 correspondence from Wayne Stewart, OPSB counsel, indicated that evidence of OPSB's implementation activities required under Section IV.D.2 of the CJ is forthcoming. Once received, the IMs will evaluate the status of compliance for this requirement of the CJ and these findings will be reported in the bi-annual report due to the Court on August 1, 0216.

**Recommendations**

It is recommended the Defendant-Intervenor (OPSB) disseminate the approved "Enrollment Discrimination Policy Guidance" document to all principals under OPSB jurisdiction and document receipt (e.g., completed attestations) by June 30, 2016 for the 2016-2017 school year and by March 1, annually, thereafter. Additionally, it is recommended the OSPD Enrollment Discrimination Policy be specifically incorporated into all required annual trainings to address the PB v White CJ.

3.      *The State Defendants shall require that each Type 2 and Type 5 charter school in New Orleans annually develops a written description of its special education program, including, at a minimum: (a) the name and contact information of the special education coordinator for the school; (b) a description of how pupil appraisal, special education, and related services are provided by the school; (c) a description of how the school plans to provide the continuum of special education placements for students whose IEP placement is outside of the regular education setting; (d) the current enrollment rate of students with disabilities served by the school; (e) the current suspension rate of students with disabilities served by the school; (f) the number of students with disabilities who are removed for disciplinary reasons for more than 10 school days in one academic year; and (g) an indication of the school's accessibility to individuals with mobility impairments. The State Defendants shall require that the program descriptions for all Type 2 and Type 5 charter schools in New Orleans are made available to parents of students with disabilities at each school site and on each school's website. RSD's website will provide a link to the descriptions available on each school website, and parents who express an interest will be guided to this portion of RSD's website when completing enrollment at an RSD Family Resource Center (p. 13 of CJ).*

**Current Findings**

Ty Manieri, LDOE counsel, submitted the LDOE document entitled "PB v White – Special Education Program Description Template" (See Appendix A for model template) to Plaintiff's counsel, Eden Heilman and Jennifer Coco, and the IMs on 1/15/2016 for review. Plaintiff's counsel reviewed the proposed LDOE "Special Education Program

Description" document and on February 1, 2016 and recommended two additions to the draft "Program Description" document submitted by the LDOE.  Specifically, as required under Section IV.D.3.c. of the CJ, Plaintiff's counsel recommended revising the draft "Special Education Program Description Template" document to provide an opportunity for LEAs to specifically describe how the school will provide a continuum of special education supports for students whose placement requires a special school, detention center, therapeutic placement, hospital or homebound setting. Additionally, the Plaintiff's counsel recommended revising the draft "Special Education Program Description Template" document to provide an opportunity for LEAs to describe accessibility to individuals with mobility impairments and/or accommodations for individuals with mobility impairments as required by Section IV.D.3.g. of the CJ. The concerns expressed by Plaintiff's counsel regarding the "PB v White – Special Education Program Description Template" document were discussed and recommended edits were approved by all parties on 2/18/2016 during a meeting with LDOE counsel, Ty Manieri, OPSD counsel, Wayne Stewart, Plaintiff's counsel, Eden Heilman and Jennifer Coco, and the IMs.

Kathe Zolman, counsel for the LDOE, submitted the revised "PB v White – Special Education Program Description Template" to the IMs on May 11, 2016 for review. The IMs collaborated with LDOE to make one additional revision to the draft "Program Description Template" and Kathe Zolman, LDOE counsel, forwarded the final revised draft "Program Description" template document to Eden Heilman, Plaintiff's counsel, on May 12, 2016 for review. See Appendix A for the revised Special Education

Program Description Template proposed for use during the 2016-2017 school year with edits by the LDOE and IMs highlighted within the document. The "PB v White – Special Education Program Description Template" for each NOLA Type 2 and Type 5 Charter School was submitted by RSD personnel on April 22, 2016.

A review of these documents indicated that 100% of the NOLA Charter LEAs completed the Special Education Program Description Template during the 2015-2016 school year.

**Status of Compliance**

The "PB v White – Special Education Program Description Template" revised by the LDOE and IMs on May 11, 2016 is judged to include the required components as outlined in Section IV. D.3. in the CJ.

Due to the fact that an IM was not secured until after December, 2015, the LDOE made the decision to move forward and required each NOLA Type 2 and Type 5 Charter LEA to complete the draft "PB v White – Special Education Program Description Template" by January 29, 2016. Although this document had not received final approval from all parties, 100% of NOLA Type 2 and Type 5 Charter Schools completed and submitted to the LDOE the "Special Education Program Description Template" within the required timeline. As such, the LDOE is judged to be in **Substantial Compliance** with the Special Education Program Description completion requirements as outlined in Section IV.D.3. of the CJ for the 2015-2016 school year. As noted previously, the IMs have completed a detailed review of each NOLA Charter Schools' "Special Education

Program Description Template" and provided specific feedback and recommendations directly to Kathe Zolman, LDOE Attorney, on June 2, 2016.

Section IV.D.3 of the CJ also requires that each NOLA Charter LEA disseminate its' Special Education Program Description to all parents of students with disabilities, post the program description on the LEAs website and post a link to all NOLA LEAs "Special Education Program Description" templates on the RSD's website. Currently, there is no evidence the abovementioned implementation activities as required under Section IV.D.3 of the CJ were completed by during the 2015-2016 school term. As such, the LDOE is judged to be in **Noncompliance** the dissemination requirements of this section of the CJ. However, as noted previously, the IMs held a phone conference with LDOE officials on June 2, 2016 and were informed the abovementioned dissemination requirements would be completed prior to June 30, 2016.

**Recommendations**

It is recommended that each NOLA Charter LEA update their current "Special Education Program Description" templates, incorporate the IMs suggested recommendations and submit updated templates to the LDOE and IMs for review prior by July 1, 2016. Once approved by the LDOE and IMs, it is also recommended that each NOLA Charter LEAs Special Education Program Description template be made available to parents of students with disabilities, be posted on each LEA's website, posted on the RSD's website, and at the Family Resource Center as outlined in Section IV.D.3 of the CJ.  Evidence of all dissemination requirements should be provided to the

IMs by June 30, 2016. Once received, the IMs will evaluate the status of compliance for this requirement of the CJ and these findings will be reported in the bi-

annual report due to the Court on August 1, 2016.

4.      *The Defendant-Intervenor shall annually develop a written description of OPSB's special education program, including, at a minimum: (a) the name and contact information of special education contacts at the district level and at the school level; (b) a description of how pupil appraisal, special education, and related services are provided; (c) a description of how the OPSB plans to provide the continuum of special education placements for students whose IEP placement is outside of the regular education setting; (d) the current enrollment rate of students with disabilities served by each OPSB school; (e) the current suspension rate of students with disabilities served by each OPSB school; (f) the number of students with disabilities who are removed for disciplinary reasons for more than 10 school days in one academic year; and (g) an indication of the OPSB schools' accessibility to individuals with mobility impairments. The Defendant-Intervenor shall require that the OPSB special education program description is made available to parents of students with disabilities at each school site, on each school's website under its jurisdiction, and on OPSB's website (p. 13 of CJ).*

**Current Findings**

Wayne Stewart, counsel for the Defendant-Intervenor (OPSB), provided the IMs with the OPSB's policy entitled "OPSB Special Education Program Description" for review on February 28, 2016. The IMs reviewed and provided feedback on this document on April 4, 2016. It should be noted that Wayne Stewart, OPSB Counsel, requested the

OPSB be allowed to complete a single, parish-wide "Special Education Program Description" template. This request was agreed upon by Plaintiff's counsel, Eden Heilman and Jennifer Coco and the IMs during a meeting at the LDOE on February 18, 2016.

**Status of Compliance**

It should be noted that OPSB adopted the LDOE draft "Special Education Program Description" template. As mentioned previously, the IMs have reviewed the final draft of this "Special Education Program Description" template and believe it includes the required components as outlined in Section IV. D.4 of the CJ.  Although the "Special Education Program Description" template had not received final approval from all parties, OPSB submitted a completed "Special Education Program Description" template for the 2015-2016 school term. As such, OPSB is judged to be in **Substantial Compliance** with the completion requirements outlined in Section IV.D.4. of the CJ, for the 2015-2016 school year.

Section IV.D. 4 of the CJ also requires that each OPSB LEA disseminate the OPSB "Special Education Program Description" template to all parents of students with disabilities, post the program description on the LEAs website and post on the OPSB website. Currently, the OPSB has provided no evidence the abovementioned implementation activities as required under Section IV.D. 4 of the CJ were completed during the 2015-2016 school term. As such, the OPSB is judged to be in **Noncompliance** with the dissemination requirements outlined in the CJ. When received,

the IMs will review evidence for this IA and will report the status of compliance for this requirement of the CJ in the bi-annual due to the Court on August 1, 2016.

**Recommendations**

It is recommended OPSB update their current "Special Education Program Description" and incorporate the IMs suggested recommendations. These revisions should be submitted to the IMs for review by June 30, 2016. Once reviewed by the IMs, it is also recommended that OPSB ensure the "OPSB Special Education Program Description" template is posted on each OPSB LEA's website and the OPSB website as required in Section IV.D.4 of the CJ. Evidence of these dissemination requirements should be provided to the IMs on or before June 30, 2016.

*5.      The State Defendants shall require each Type 2 and Type 5 charter school in New Orleans to develop a written complaint investigation protocol describing the school's process for investigating allegations of discrimination on the basis of disability. The protocol shall include the contact information of the individual at the school responsible for investigating complaints of alleged discrimination; a process by which parents may make complaints; a timeline for the school to conduct an investigation; the steps to be taken or the process by which the school will conduct the investigation; the process by which the school will disseminate the outcome of the investigation; and corrective action that may be undertaken as a result of noncompliance. A summary description of the protocol shall be widely disseminated to parents of students with disabilities enrolled at the school.  The complaint investigation protocols shall be*

75

*developed for the sole purpose of investigating allegations of enrollment discrimination arising under Section 504 of the Rehabilitation Act or Title II of the ADA and shall not supplant the complaint management system or due process complaint procedures pursuant to the IDEA (pp. 13-14 of CJ).*

*a.       The State shall develop a model written complaint investigation protocol that meets the requirements identified in this section. This model will be available to any school upon request, and will be provided to each Type 2 and Type 5 charter school by March 1, 2015 and every school year thereafter (p. 14 of CJ).*

*b.       Upon receipt of a complaint related to the enrollment practices of Type 2 and Type 5 charter schools, the State will: (i) provide the complainant in writing, either via electronic or U.S. Mail, with the contact information for the Office of Civil Rights and low cost legal services providers; and (ii) where required under IDEA, initiate an investigation of the complaint (p. 14 of CJ).*

**Current Findings**

Ty Manieri, LDOE counsel, submitted the LDOE document entitled "LEA Disability Discrimination Complaint Procedures" template (see Appendix A for Model template) to Plaintiff's counsel, Eden Heilman and Jennifer Coco, and the IMs on January 15,2016 for review. Additionally, this "Compliant Procedures" policy was discussed and approved by all parties on February 18, 2016 during a meeting with Ty Manieri, LDOE counsel, Wayne Stewart, OPSB counsel, Plaintiff's counsel, Eden Heilman and Jennifer Coco, and the IMs.

The LDOE disseminated the approved "LEA Disability Discrimination Compliant Procedures" template to all NOLA Type 2 and Type 5 Charter Schools and recommended formal adoption by April 22, 2016. RSD personnel submitted completed templates from each LEA to the IMs on April 22, 2016. A review of documents provided by the NOLA charter schools indicated that 100% of the LEAs adopted the "LEA Disability Discrimination Complaint Procedures" template as directed by the LDOE.

**Status of Compliance – Adoption of Complaint Procedures**

All NOLA Type 2 and Type 5 Charter schools have adopted the approved "LEA Disability Discrimination Complaint Procedures" template as required in Section IV.D.5a of the CJ. As such, the LDOE is judged to be in **Substantial Compliance** with LEA adoption of the complaint procedures as required in this section of the CJ for the 2015-2016 school year.

**Status of Compliance – Widely Disseminated Summary Description**

However, it is important to note that Section IV.D.5 of the CJ also requires that a summary description of the complaint protocol be widely disseminated to parents of students with disabilities enrolled in each NOLA Charter LEA. In relation, during a review of each NOLA Charter LEA's complaint procedures, it was difficult to determine whether each LEA has developed a written plan for disseminating the complaint protocol and/or whether these adopted complaint policies were disseminated

77

to parents. As such, the LDOE is judged to be in **Noncompliance** with regard to this IA as required in Section IV.D. 5. of the CJ until such time each NOLA Charter LEA provides evidence of how the LEAs adopted discrimination compliant policies and how these procedures are routinely communicated to parents, as well as, evidence verifying the complaint protocol was disseminated to parents of students with disabilities enrolled in NOLA Charter LEAs during the 2015-2016 school year.

Finally, Section IV.D.5.b of the CJ also requires the LDOE to provide complainants, in writing, with contact information for the Office of Civil Rights and low cost legal service providers; and where required under the IDEA, initiate an investigation. Currently, the LDOE has provided no evidence for the completion of this activity as required by the CJ. As such, the LDOE is currently judged to be in **Noncompliance** with this section of the CJ. The IMs will evaluate any evidence submitted for this requirement of the CJ during June, 2016 and report findings in the IMs bi-annual report due to the Court on August 1, 2016.

**Recommendations**

It is recommended that each NOLA Type 2 and Type 5 Charter LEA provide a written plan for disseminating the LEA's adopted "Disability Discrimination Complaint Procedures" template to parents of students with disabilities along with evidence of dissemination to parents as required under Section IV.D.5 of the CJ. This evidence should be submitted to the LDOE and IMs for review by June 30, 2016. In relation, it is also recommended the LDOE provide evidence of compliance with requirements in

78

Section IV.D.5.b (i.e. providing complainants with OCR contact information, etc.) of the CJ by June 30, 2016. Once received from the LDOE, a compliance review for these CJ requirements will conducted and these findings will be reported in the bi-annual report due to the Court on August 1, 2016.

6.      *The Defendant-Intervenor shall develop a written complaint investigation protocol describing the Defendant-Intervenor's process for investigating allegations of discrimination on the basis of disability for all schools within its jurisdiction. The protocol shall include the contact information of the division of OPSB responsible for investigating complaints of alleged discrimination; a process by which parents may make complaints; a timeline for the Defendant-Intervenor to conduct an investigation; the steps to be taken or the process by which the Defendant-Intervenor will conduct the investigation; the process by which the Defendant-Intervenor will disseminate the outcome of the investigation; and corrective action that may be undertaken as a result of noncompliance. A summary description of the protocol shall be widely disseminated to parents of students with disabilities enrolled in schools under the jurisdiction of the Defendant-Intervenor. This complaint investigation protocol shall be developed for the sole purpose of investigating allegations of enrollment discrimination pursuant to Section 504 of the Rehabilitation Act and Title II of the ADA, and shall not supplant the complaint management system or due process complaint procedures pursuant to the IDEA (p. 14 of CJ).*

**Current Findings**

Wayne Stewart, counsel for the Defendant-Intervenor, indicated that OPSB would adopt the approved LDOE " LEA-Disability Discrimination Complaint  Procedures" template for the 2016-2017 school year in a meeting at the LDOE with all parties on February 18, 2016.

**Status of Compliance**

Currently, the OPSB has provided no evidence to indicate that OPSB has (a) formally adopted an approved complaint protocol, (b) provided a plan for dissemination and /or (c) verified the adopted complaint procedures have been disseminated to parents of students with disabilities. As such, the OPSB is currently judged to be in **Noncompliance** with fulfilling these required implementation activities as outlined in Section IV.D.6 of the CJ.

**Recommendations**

It is recommended that OPSB disseminate the adopted "Disability Discrimination Complaint Procedures" template to school principals of each OPSB LEA and secure written verification of review (e.g., signed attestation form). Additionally, it is recommended that each OPSB LEA submit a written plan for disseminating the adopted "Disability Discrimination Complaint Procedures" to parents of students with disabilities along with evidence of dissemination to the IMs for review by June 30, 2016. Upon receipt, the IMs will review this documentation and the compliance status for this IA will be reported in the bi-annual report due to the Court on August 1, 2016.

80

7.      *The State Defendants shall annually calculate the rate at which students with disabilities choose not to reenroll at each LEA in New Orleans each school year ("mobility rate"). Using this rate, the State Defendants shall annually select LEAs for targeted monitoring. LEA selection, student file selection, file reviews, staff interviews, and school site visits shall be conducted consistent with the processes detailed in in Addendum A. If the State Defendants' targeted monitoring results in the identification of noncompliance, the State Defendants shall require each LEA with validated noncompliance to undertake corrective actions sufficient to remedy the noncompliance and to reasonably ensure that such noncompliance does not reoccur, as detailed in Addendum A (p. 14 of CJ).*

a.      *The mobility rate shall be calculated by dividing the total number of students with disabilities who are enrolled in a nonterminal grade at an LEA in New Orleans between September 1 and May 31 and are not enrolled at the LEA on October 1 of the following school year by the total number of students with disabilities enrolled in the LEA on October 1 (p. 14 of CJ).*

b.      *The targeted monitoring activities described above and in Addendum A shall supplement, not supplant, the annual monitoring activities undertaken by LDOE pursuant to its general supervisory responsibilities under the IDEA. The monitoring of an LEA pursuant to the monitoring obligations identified in this Agreement shall not influence*

*LDOE's selection of that LEA for monitoring pursuant to LDOE's general IDEA monitoring protocols (p. 15 of CJ).*

**Current Findings**

The LDOE provided the IMs and Plaintiff's counsel with a list of charter schools identified for targeted monitoring during the spring 2016 term, the specific areas in which the selected LEA was being monitored, methods for LEA selection and methods of monitoring (e.g., staff interviews, desk file reviews using monitoring instrument described in Addendum A of the CJ) in correspondence dated on January 25, 2016. It is also important to note that the targeted LEAs received formal notification of monitoring from LDOE and participated in planning calls with LDOE monitoring staff in late January, 2016.

A student enrollment spreadsheet entitled "*Rate at Which Students with Disabilities (SWD) Choose Not to Reenroll Between 2013-14 to Oct. 1, 2014: OPSB & Charter Schools in Orleans Parish*" was submitted to the IMs on April 26, 2016. This spreadsheet was used to select LEAs for targeted monitoring in the area of Enrollment Stability by calculating the total number of students with disabilities who were enrolled in a nonterminal grade in each LEA from September 1, 2013 to May 31, 2014 and who were not enrolled in the same LEA on October 1, 2014 divided by enrollment of students with disabilities enrolled on October 1, 2014. This method of determining mobility rate was verified by the IMs and determined to be consistent with the guidelines required under Section IV(D)(7) of the CJ and Section D(1)(a) and D(1)(b) on page 6 of Addendum A. As required by the CJ, three schools were identified for targeted monitoring during the

spring 2016 semester in the area of Enrollment Stability.

Selected LEAs included:

      1.  G.W. Carver Preparatory Academy (46.7% annual mobility)

      2.  Joseph A. Craig (61.8% annual mobility)

      3.   Mildred Osborne (46.3% annual mobility)

As required under Section 4.a and 4.b specified in Addendum A of the CJ, the LDOE is required to conduct interviews with at least one (1) general education teacher of students with disabilities, one (1) special education teacher, one (1) general education administrator, and one (1) special education administrator or coordinator at each LEA selected for targeted monitoring. The LDOE selected to conduct staff interviews using the Related Services section of the monitoring instrument to assess the area of Enrollment Stability.

The LDOE submitted the phone conference interview schedule for all selected charter LEAs across all four areas of targeting monitoring to the IMs on February 4, 2016. Staff interviews for G.W. Carver Preparatory Academy, Joseph A. Craig and Mildred Osborne were conducted by LDOE Monitoring Staff and IMs via phone conference on February 16-18, 2016. Summaries of phone interviews with school staff were submitted by the LDOE to the IMs for review and verification on February 19, 2016 and March 4, 2016. In relation, the list of school staff from each charter school who participated in phone interviews was submitted by the LDOE to the IMs for review and verification on March 4, 2016 and May 10, 2016. To further evaluate Enrollment Stability, the LDOE and IMs

also conducted desk reviews for selected student files enrolled in each targeted LEA using the Related Service provisions section of the monitoring protocol based on guidance from Section D(2)(b) of Addendum A of the CJ (p. 6).

The LDOE provided the IMs with a list of identified students for each targeted LEA during an onsite visit to the Department on March 22-24, 2016. A total of ten (10) students were selected by the LDOE for review from G.W. Carver Preparatory Academy. All 10 students who met the required criteria for selection received speech/language services, social work services and/or counseling as a related service during the 2014-2015 school year.  Joseph A. Craig also submitted to the LDOE a roster of ten (10) students. With the exception of two (2) students submitted, all other selected students received speech/language services, social work services, occupational therapy, adaptive PE and/or physical therapy as a related service during the 2014-2015 school year. Finally, Mildred Osborne submitted a roster of ten (10) students. With the exception of three (3) students submitted, all other selected students received speech/language services and/or psychological services as a Related Services during the 2014-2015 school year.

Prior to formal review, the LDOE monitoring staff provided each charter with an additional document entitled "Related Services and Enrollment Stability Monitoring Checklist" to assist LEAs in the submission of required documents for the desk file review. This checklist was provided to the IMs for review on February 15, 2016 and included four items pertaining to related services documentation: 1) evidence of prior written notification, 2) IEP signature pages (first and last page), 3) documentation of

related services including the method of measurement to achieve goal listed on the IEP (e.g., teacher logs, observational data, teacher checklists, student work samples, tally sheet, etc.) and 4) related services schedule for each student (include location of services, schedule of service delivery, student roster, and name and contact information of person responsible for providing services).

At the request of the IMs, the LDOE also provided each student's 2014-2015 and/or 2015-2016 IEP and related documentation (e.g., SER related service reports, SER eligibility reports, Related Services and Enrollment Stability Monitoring Checklists complete by the charter school personnel, all information submitted from each LEA for each student to the LDOE to assist in the completion of protocol reviews for the identified students in the identified charters.

To evaluate Enrollment Stability, LDOE monitoring personnel and the IMs completed desk file reviews between March, 22, 2016 and May 5, 2016 for each of the ten (10) student files selected from each of the three (3) LEAs targeted for Enrollment Stability (G.W. Carver, Joseph A. Craig and Mildred Osborne) using the Related Services section of the Monitoring Instrument based on guidance from Section D(2)(b) of Addendum A of the CJ (p. 6). The completed LDOE desk file reviews were submitted to the IMs from April 26, 2016 through May 5, 2016 to assist the IMs with completing a comprehensive analysis of protocol findings.

As agreed upon in the meeting with all parties in Judge Jay Zainey's chambers on

January 6, 2016, a detailed review of aggregated data from the protocol reviews conducted during the spring 2016 school term will be presented in the bi-annual report due to the Court on August 1, 2016. A preliminary review of protocol findings indicated consistent agreement between the LDOE monitoring staff and the IMs that acceptable practices were observed in the majority of areas assessed with regard to Related Services provisions. However, both the LDOE monitoring staff and the IMs also identified varying degrees of concern with regard to the development of (a) meaningful PLAAFP statements, (b) measureable goals and short-term objectives and (c) documentation of related service provisions, including documentation specifying the types and frequency of services provided, as well as, data gathered to evaluate student progress as required by the IEP. A detailed review of these protocol findings will be presented in the IMs bi-annual report due to the Court on August 1, 2016.

**Status of Compliance-Targeted Monitoring**

Based on the IMs review of the documents submitted by LDOE and verification of the calculations provided in the LDOE Enrollment Stability database and appropriate LEA selections, the LDOE is judged to be in **Substantial Compliance** with completing these IA's as required under Section IV (D) (7) of the CJ and Section D (1) (a), D (1) (b) and D (1) (c) of the Addendum to the CJ for the 2015-2016 school year.

Based on a review of the documents submitted by each identified charter school and LDOE's completion of the student file reviews and staff interviews using the required Related Services protocol, the LDOE is judged to be in **Substantial Compliance** with

fulfilling the requirements designated in Section IV(D)(7) of the CJ and Section D(2)(a), D(2)(b), and D(2)(c) on page 6 the Addendum to the CJ for the 2015-2016 school year.

**Status of Compliance – Noncompliance Determinations and Corrective Action**

As noted previously, the LDOE will issue monitoring reports to all LEAs monitored in the area of Enrollment Stability and issue directives for corrective actions, where appropriate, on June 8, 2016.  The completion of required Corrective Action Plans (CAP) for identified LEAs is scheduled to occur by June 30, 2016. Upon completion, a review to verify LDOE's compliance status with Sections G(1)(a), G(1)(b), G(1)(c) and G(2)(a), G(2)(b), G(2)(c), G(2)(d) and G(2)(e) on page 8 of the Addendum will be conducted and these findings will reported in the bi-annual report due to the Court on August 1, 2016.


**Recommendations**

The LDOE shall continue to follow the requirements under Section (D)(IV)(7) of the CJ and targeted monitoring procedures as outlined Sections D(1) and D(2) on page 6 of the Addendum of the CJ for the 2016-2017 and 2017-2018 school years. The IMs will continue to review charter selection and verify LDOE calculations as required by the CJ for each targeted monitoring during the 2016-2017 and 2016-2017 school years. The LDOE shall also continue to perform student file reviews and staff interviews to address Enrollment Stability using the required Related Services or Discipline protocol as outlined in Addendum A of the CJ. IMs will continue to participate in the protocol review and staff interview process and verify the completion of activities required by the LDOE as outlined in the CJ and Addendum A to the CJ. The LDOE is strongly encouraged to address the concerns identified during protocol reviews conducted by

monitoring personnel and IMs in forthcoming monitoring reports to three (3) identified LEAs targeted for monitoring in the area of Enrollment Stability. In addition, specific corrective actions should be recommended by the LDOE to address all identified areas of noncompliance and/or areas with identified weakness. The IMs shall review the monitoring reports submitted by the LDOE and shall collaboratively participate with the LDOE in the development of corrective action plans to address identified areas of noncompliance. As noted previously, the IMs also recommend for consideration by all parties that the staff interview process and student file reviews to address Enrollment Stability be completed on-site at selected LEAs by both the IMs and LDOE personnel during the fall 2016 term for LEAs identified for targeted reviews based on an analysis of 2015-2016 enrollment stability data.