**Office of the Independent Monitors**
**P.B., et al., v. John White, et al.**
**(Civil Case No. 2:10-cv-04049)**
**Status Report to the Court**
**May 18, 2017**

## A.  INTRODUCTION

Pursuant to Section V(9) on page 16 of the Consent Judgment (CJ) filed with the Court on March 25, 2015, the Independent Monitors shall file with the Court and provide the Parties with reports describing the steps taken by the State Defendants and the Defendant-Intervenor to implement the Agreement and evaluate the extent to which the State Defendants and the Defendant-Intervenor have complied with each substantive provision of the Agreement. Pursuant to Section V(9)(a), the Monitor shall issue a status report every 120 days after the first year of implementation of the Agreement.  The reports shall be provided to the Parties in draft form for comment at least 14 days prior to their issuance. The Monitor shall consider the Parties' responses and make appropriate changes, if any, before issuing the report. These reports shall be written with due regard for the privacy interests of the students. Pursuant to Section V(9)(b) of the CJ, the Independent Monitors shall evaluate the state of compliance for each relevant provision of the Agreement using the following standards: (1) Substantial Compliance and (2) Noncompliance. In order to assess compliance, the Monitor shall review a sufficient number of pertinent documents to accurately assess compliance and interview any necessary staff or personnel. The Monitor shall be responsible for independently verifying representations from the State Defendants or Defendant-Intervenor regarding progress toward compliance, and examining supporting documentation. Each Monitor report shall describe the steps taken by the Monitor to assess compliance, including documents reviewed and individuals interviewed, and the factual basis for each of the Monitor's findings. Pursuant to

Section V(10) of the CJ, reports issued by the Monitor shall not be admissible against the State Defendants and the Defendant-Intervenor in any proceeding other than a proceeding related to the enforcement of this Agreement initiated and handled exclusively by the State Defendants, the Defendant- Intervenor, or the Plaintiff's counsel. The State Defendants shall be released from the terms of the CJ when they have 1) achieved Substantial Compliance with each provision of the Agreement for which they are assigned responsibility; 2) maintained Substantial Compliance for a period of two years; and 3) subject to Court approval (p. 18 of the CJ).

The IM bi-annual status report addresses several activities completed by the State Defendants or Defendant-Intervenor during the 2016-2017 school year as required by the CJ. First, the IMs provide a review and update regarding decisions of "Substantial Compliance" or "Noncompliance" as related the development and dissemination of model documents consistent with the requirements of the CJ. Second, the IMs provide a review and update regarding compliance determinations as related to the targeted monitoring activities for the 2015-2016 school year. Finally, the IMs provide a review of the targeted monitoring activities completed during the fall 2016 semester along with an update regarding decisions of "Substantial Compliance" or "Noncompliance" as related to specific monitoring activities undertaken by the LDOE (e.g., appropriate selection of schools, completion of staff interviews and student file reviews, development and dissemination of LEA targeted monitoring reports, development and dissemination of corrective action plans). The sequence of information in this IM status report follows the general structure of the CJ. Language from each substantive provision of the Agreement or Addendum A (i.e., monitoring protocols) of the CJ is incorporated into the IM status report when appropriate.

## B. DEVELOPMENT AND DISSEMINATION OF MODEL DOCUMENTS

The LDOE and/or OPSB developed several model documents designed to meet the specific requirements of the CJ (e.g., *Child Find Written Guidance* model template, *Special Education Program Description* model template, *Procedural Safeguards Checklist – Disciplinary Removal of Students with Disabilities* model template, model *Discipline Policy for Students with Disabilities*, *Undocumented Suspension Guidance* model template, *Parent FAQs: Special Education in Charter Schools* model template, *Enrollment Discrimination Policy Guidance* model template, *Disability Discrimination Complaint Procedures* model template). As previously stated in the IM status report to the Court dated June 3, 2016, the parties have approved the content contained within each of these documents. In relation, these model documents were presented to the Court in Appendix A attached to the June 3, 2016 IM Status Report. In addition, related documents (e.g., revised *Child Find Written Guidance Model* document for RSD and OPSB LEAs for the 2016-2017 school year, Office of Civil Rights *Complaint and Investigation* document for the 2016-2017 school year, school links to *Special Education Program Descriptions* documents for LDOE and OPSB LEAs) were presented to the Court in Appendix A attached to the IM Status Report dated November 7, 2016.  The CJ requires that charter LEAs provide evidence that they have reviewed or, when relevant, disseminated this information each school year. As such, the IMs provided an update regarding the status of the model documents, additional documents (e.g., Student Codes of Conduct, LEA Handbooks, Model PBIS documents, etc.), and related activities for the 2016- 2017 school year in each relevant section of the IM Status Report submitted to the Court on November 7, 2016. The following sections provide a status review or update for the State Defendants (LDOE) and Defendant-Intervenor (OPSB).

1.  <u>Status Review or Update for the State Defendants</u>

    a.  *Child Find Provisions (pp. 6-8 of the CJ)*

As reported on pages 4-6 of the IM status report submitted to the Court on June 3, 2016, the LDOE was judged to be in **Substantial Compliance** with Section IV (A)(1) (a-c) of the CJ for the 2015-2016 school year based on a review of the template entitled, *PB v White - Child Find Written Guidance* and verification of the receipt of the document by the LEAs. In relation, the LDOE was judged to be in **Substantial Compliance** with Section IV (A) (1) (a-c) of the CJ for the 2016-2017 school year as reported on page 8 of the IM status report submitted to the Court on November 7, 2016 based on a review of the revised *PB v White – Child Find Written Guidance* template and receipt of signed attestations from each LEA school principal or school leader.

As reported on page 10 of the IM status report submitted to the Court on June 3, 2016, the LDOE was judged to be in **Substantial Compliance** with Section IV(A)(2) for the 2015-2016 school year as all LEAs provided descriptions, through the *Special Education Program Description* template, of the school's staff and/or outside contractors providing pupil appraisal services.  Based on completion of the 2016-2017 version of the S*pecial Education Program Description* template by LEAs under the jurisdiction of RSD and placement of the completed template on each LEA website, LDOE website, and link established from the enrollnola website, the LDOE was judged to be in **Substantial Compliance** with Section IV (A) (2) of the CJ for the 2016-2017 school year as reported on pages 11-12 of the IM status reported submitted to the Court on November 7, 2016.

As reported on page 20 the IM status report submitted to the Court on June 3, 2016, the LDOE was judged to be in **Substantial Compliance** with Section IV(A)(4)(a-e) for the 2015-

2016 school year based upon attestation of receipt of the 2015-2016 version of *PB v White - Child Find Written Guidance* document.  In relation, the LDOE was judged to be in **Substantial Compliance** with Section IV(A)(4)(a-e) for the 2016-2017 school year based on the receipt of documentation from the LDOE revealing that the 2016-2017 version of the *PB v White – Child Find Written Guidance* document was disseminated to all charter schools under LDOE jurisdiction and a review of signed attestations from each LEA as reported on page 30 of the IM status report submitted to the Court on November 7, 2016.

      *b.   Related Services Provisions (pp. 8-9 of the CJ)*

The LDOE was judged to be in **Substantial Compliance** with Section IV(B)(1)(a-b) of the CJ for the 2015-2016 school year as reported on page 26 of the IM status report dated June 3, 2016. Based on the submission of *Special Education Program Description* templates to the IMs during the summer 2016 term and placement of the templates on the required websites, the LDOE was judged to be in **Substantial Compliance** with Section IV(B)(1)(a-b) of the CJ for the 2016-2017 school year as reported on page 33 of the IM status report submitted to the Court on November 7, 2016.

      *c.   Discipline Provisions (pp. 9-11 of the CJ)*

The LDOE was judged to be in **Noncompliance** with Section IV(C)(1)(a)(i-ii) of the CJ for the 2015-2016 school year as reported on page 41 of the IM status report dated June 3, 2016. The LDOE was judged to be in noncompliance because the IMs examination of the *Discipline Policy & Procedures of Students with Disabilities* document revealed the policy did not include language to address the LEAs plan for supporting behavior and discipline pursuant to this section of the CJ. Subsequently, based on the submission of the required documentation related to

discipline regulations and safeguards for students with disabilities, the LDOE was judged to be in **Substantial Compliance** with Section IV(C)(1)(a)(i-ii) of the CJ for the 2016-2017 school year as reported on page 49 of the IM status report submitted to the Court on November 7, 2016.

As reported on page 47 of the IM status report submitted to the Court on June 3, 2016, the LDOE was judged to be in **Substantial Compliance** with Technical Assistance provisions of Section IV (C)(3)(a-b) for the CJ for the 2015-16 year based on a review of related technical assistance material including the *PB v White – Undocumented Suspension Guidance* template, the *Parent FAQs: Special Education in Charter Schools* template, and verification documents (e.g., signed attestations of dissemination of these documents) provided by each LEA. However, the LDOE was judged to be in **Noncompliance** regarding the annual professional development provisions of Section IV(C)(3) for the CJ for the 2015-16 year, given a number of concerns expressed by the Plaintiff's counsel in relation to the presentation "Discipline of Students with Disabilities". As such, during a meeting with the parties and IMs on February 28, 2016, it was agreed upon by all parties the IMs would develop and provide additional professional development to school staff regarding discipline policies and procedures for students with disabilities during the fall semester of the 2016-2017 school year. Based on the evidence submitted to the IMs verifying signed attestations from all school principals or school leaders of NOLA Type 2 and Type 5 Charter Schools for the *PB v White – Undocumented Suspension Guidance* and *Parent FAQs: Special Education in Charter Schools* and verification that representatives from each NOLA Type 2 and Type 5 Charter LEA attended a half-day professional development workshop entitled "Discipline of Students with Disabilities" on September 28-29, 2016, the LDOE is judged to be in **Substantial Compliance** with the technical assistance and annual professional development activities required in Section IV(C)(3)(a-b) of

the CJ for the 2016-2017 school year.

>    d.   *Enrollment Provisions (pp. 11-15 of the CJ)*

As reported in the IM Status Report dated June 3, 2016, the LDOE policy document

entitled, *Enrollment Discrimination Policy Guidance*, has been approved by all parties and fully

meets the required guidelines as outlined in Section IV(D)(1)(a-b) of the CJ. However, as

previously reported on page 65 of the June 3, 2016 IM status report, the LDOE was judged to be

in **Noncompliance** with this requirement of the CJ for the 2015-2016 school year. Specifically,

the LDOE failed to comply with all provisions of Section IV(D)(1) of the CJ which requires the

State Defendants to disseminate the *Enrollment Discrimination Policy Guidance* document to

each principal of NOLA Type 2 and Type 5 charter schools by March 1 annually and request

written receipt (i.e., signed attestations) of this guidance (page 12 of CJ). Subsequently, based on

submission of the signed attestations (e.g., *Attestation of Review of Enrollment Discrimination*

*Policy Guidance*), the LDOE was judged to be in **Substantial Compliance** with the completion

of this implementation activity as required under Section IV (D)(1)(a-b) of the CJ for the 2016-

2017 school year as reported on page 73 of the IM status report submitted to the Court on

November 7, 2016.

The LDOE was judged to be in **Substantial Compliance** with the requirements of

Section IV(D)(3) for the 2015-2016 school year for submitting the revised *PB v White – Special*

*Education Program Description* template for review and ensuring that all NOLA Type 2 and

Type 5 charter LEAs submitted completed program descriptions as reported on page 71 of the

IM status report submitted to the Court on June 3, 2016. However, the LDOE was found in

**Noncompliance** for the 2015-2016 school year for failure to comply with the dissemination

requirements outlined in Section IV(D)(3) of the CJ. Specifically, the LDOE was found to be in

**Noncompliance** for (a) failing to provide evidence that all NOLA Type 2 and Type 5 Charter LEAs made their respective Special Education Program Description template available for parents at each charter school site, (b) failing to ensure that program descriptions were posted on each LEA's website and (c) failing to post a link of the program descriptions developed for all NOLA Type 2 and Type 5 Charter schools online on the LDOE website and enrollnola website. A thorough review of *Special Education Program Description* templates for the 2016-2017 school term revealed that all (100%) of the NOLA Charter Type 2 and Type 5 LEAs revised their program descriptions to include appropriate documentation and descriptions of service provisions as required in Section IV(D)(3) of the CJ. As such, the LDOE was judged to be in **Substantial Compliance** with this provision of the CJ for the 2016-2017 school year as reported on page 78 of the IM status report submitted to the Court on November 7, 2016. In relation, LDOE was also judged to be in **Substantial Compliance** with the dissemination requirements of Section IV(D)(3) of the CJ for the 2016-2017 school year as reported on page 79 on the IM status report submitted to the Court on November 7, 2016.

As reported on pages 77-78 of the IM Status Report dated June 3, 2016, all NOLA Type 2 and Type 5 Charter schools have adopted the approved *[LEA] Disability Discrimination Complaint Procedures* template and summary description as required in Section IV(D)(5) and of the CJ. As such, the LDOE was judged to be in **Substantial Compliance** with LEA adoption of the complaint procedures as required Section IV(D)(5)(a) of the CJ for the 2015-2016 school year. However, the LDOE was judged to be in **Noncompliance** with the requirements outlined in Section IV(D)(5)(b) of the CJ in the June 3, 2016 IM status report. Specifically, this provision of the CJ requires the LDOE's to provide evidence that complainants were provided, in writing, with contact information for the Office of Civil Rights and low cost legal service providers; and

where required under the IDEA, initiate an investigation. In response to this finding of

noncompliance, LDOE legal counsel provided correspondence revealing that the LDOE did not

receive any formal or informal IDEA and/or discrimination complaints during the 2015-2016

school year. As such, the IMs judged the LDOE to be in **Substantial Compliance** with this

provision of the CJ for the 2015-2016 school year as reported on pages 84-85 of the IM status

report dated November 7, 2016. In addition, the LDOE submitted evidence to the IMs

demonstrating that all (100%) of the LEAs adopted the approved *[LEA] Disability*

*Discrimination Complaint Procedures* template and summary description for the 2016-2017

school year and a written plan for distributing the document to parents of students with

disabilities on July 27, 2016. As such, the LDOE was judged to be in **Substantial Compliance**

with all requirements of Section IV(D)(5)(a-b) for the 2016-2017 school year as reported on

pages 84-85 of the IM status report submitted to the Court on November 7, 2016. In relation,

LDOE legal counsel submitted a signed attestation to the IMs on February 1, 2017 certifying that

the LDOE has received no allegations of enrollment discrimination arising under Section 504 of

the Rehabilitation Act of Title II of the Americans with Disabilities Act. Additionally, on

February 22, 2017 LDOE legal counsel also submitted signed attestations of the review of the

*Enrollment Discrimination Policy Guidance* document from fifty-seven charter school leaders

under the jurisdiction of the LDOE Recovery School District for the 2017-2018 school year.

Summary of the Status of Compliance Determinations

　　　　Overall, the LDOE was judged to be in Substantial Compliance with nine of fourteen

(64%) substantive provisions of the CJ regarding the development, adoption, and dissemination

of model documents for the 2015-2016 school year. A review of status determinations for the

2015-2016 school year by the IMs is presented in the Summary of Compliance Status document

located in Appendix A.

In relation, the LDOE maintained **Substantial Compliance** with the aforementioned provisions of the CJ for the 2016-2017 school which represents the initial year of the required two consecutive years of maintenance as outlined in Section VIII(2) on page 18 of the CJ. The LDOE achieved Substantial Compliance with fourteen of fourteen (100%) of the substantive provisions in the CJ for the 2016-2017 school year.  Specifically, the LDOE achieved initial **Substantial Compliance** for Sections IV(C)(1)(a)(i-ii) Review of the Code of Conduct, Disciplinary Policies, and Plan for Supporting Positive Behavior (LA Stat 17:251-252); IV(C)(3)(a-b) Professional Development; IV(D)(1)(a-b) Legal Requirements to Serve Students with Disabilities, and IV(D)(3) Dissemination of the Special Education Program during the fall semester of 2016-2017 school year. This represents the initial year of **Substantial Compliance** for these provisions with the CJ. As such, the LDOE shall be required to maintain compliance for two consecutive school years to meet the requirements outlined in Section VIII(2) on page 18 of the CJ.  A review of status determinations for the 2016-2017 school year by the IMs is also presented in the Summary of Compliance Status document located in Appendix A. Finally, LDOE legal counsel submitted model documents for adoption and/or dissemination during the 2017-2018 school year to the IMs for review on February 16, 2017, and indicated that the content of each document has not changed from the 2016-2017 school year. A review of the model documents by the IMs on February 16, 2017 verified that the content remained the same for the upcoming school year. Once required revisions are made to the model documents (e.g., updates to the *Special Education Program Description* document for the 2017-2018 school year) and signed attestations confirming review and/or dissemination of required documents for the 2017-2018 school year are received, the IMs will provide an update in future IM status reports.

2.  <u>Status Review or Update for the Defendant-Intervenor</u>

    a.  *Child Find Provisions (pp. 6-8 of the CJ)*

      The OPSB initially adopted the *PB v White – Child Find Written Guidance* document for the 2016-2017 school year. As such, the IMs did not provide a judgment of compliance for the 2015-2016 school year in previous IM status reports. Based on a review of the revised *PB v White - Child Find Written Guidance* document and receipt of signed attestations from each LEA school principal or school leader, the OPSB was judged to be in **Substantial Compliance** with Section IV (A) (1) (a-c) of the CJ for the 2016-2017 school year as reported on page 9 of the IM status reported submitted to the Court on November 7, 2016.

      OPSB and Friends of King adopted the revised *Special Education Program Description* document for the 2016-2017 school year during the summer 2016 school term and the IMs verified that a total of 24 of 28 (86%) LEAs successfully provided a link to the OPSB *Special Education Program Description* template on their respective websites by October 14, 2016. However, four OPSB LEAs were not observed to have a link established from their individual websites to the OPSB document and were in the process of developing their school-based websites during the fall 2016 school semester. As such, the IMs recommended that all LEAs under OPSB's jurisdiction have the link established to the OPSB *Special Education Program Description* by December 15, 2016. OPSB counsel provided correspondence with website links on December 13, 2016 to the IMs demonstrating compliance with this requirement of the CJ. The IMs also verified that the school websites did link directly to the OPSB Special Education Program Description template on the same date. As such, OPSB is judged to be in **Substantial Compliance** with IV(A)(2) of the CJ for the 2016-2017 school year.

      Based on dissemination of the 2016-2017 school year version of the *PB v White Child*

*Find Written Guidance* document and submission of signed attestations from LEAs, OPSB was judged to be in **Substantial Compliance** with Section IV (A) (4) (a-e) of the CJ for the 2016-2017 school year as reported on page 30 of the IM status report submitted to the Court on November 7, 2016.

        b.   *Related Services Provisions (pp. 8-9 of the CJ)*

OPSB was judged by the IMs to be in **Substantial Compliance** with Section IV(B)(1)(a-b) of the CJ for the 2015-2016 school year as reported on pages 26-27 of the IM status report dated June 3, 2016. In relation, OPSB counsel provided a revised copy of the OPSB *Special Education Program Description* template on June 30, 2016 and the Type 3b Charter School Association, Friends of King, on July 13, 2016. A review of these documents by the IMs revealed that the related service components of Section D of the 2016-2017 school year versions of the *Special Education Program Description* templates were completed as required by Sections IV(B)(1)(a) and IV(B)(1)(b) of the CJ.  The IMs verified that the 2016-2017 school year version of the *Special Education Program Description* templates for both OPSB and the Friends of King School District were located online on the OPSB district website on August 10, 2016. However, four OPSB schools still needed to establish the link to the revised OPSB Special Education Program Description template by December 15, 2016 for OPSB to obtain compliance with this provision of the CJ. As mentioned previously in this report, OPSB counsel provided evidence of compliance with this requirement and the IMs verified the school-based links on December 13, 2016. As such, OPSB is judged to be in **Substantial Compliance** with Section IV(B)(1)(a-b) of the CJ for the 2016-2017 school year.

        c.   *Discipline Provisions (pp. 9-11 of the CJ)*

As reported on page 43 of the IM status report submitted to the Court on June 3, 2016,

compliance for Section IV (C) (2)(a)(i-ii) of the CJ could not be evaluated until each charter LEA provided written descriptions of the IDEA's disciplinary procedural protections and procedural safeguards for students with disabilities, and their plan for supporting school behavior and discipline in compliance with the requirements of La. Rev. Stat. § 17:251- 252 (p. 10 of CJ). Therefore, OPSB was judged to be in **Noncompliance** with Section IV (C) (2) for the 2015-2016 school year. Based on adoption of the 2016-2017 school year version of the LDOE *Discipline Policy & Procedures of Students with Disabilities* document, receipt of signed attestations from all (100%) of LEA school principals under OPSB's jurisdiction and the submission of the Student Assistant Team (SAT) Handbook, the OPSB was judged to be in **Substantial Compliance** with Section IV(C)(2)(a)(i-ii) for the 2016- 2017 school year as reported on page 51 of the IM status report submitted to the Court on November 7, 2016.

As reported on page 50 of the IM status report submitted to the Court on June 3, 2016, OPSB was judged to be in **Noncompliance** with the technical assistance provisions of Section IV (C) (4)(a-b) for the CJ for the 2015-2016 school year based on a review of submitted documentation. In relation, OPSB was judged to be in **Substantial Compliance** with the professional development provisions of Section IV (C) (4)(a-b) for the CJ for the 2015-16 year based on a review of the workshop conducted on "Discipline of Students with Disabilities" and verification that representatives from 100% of OPSB LEAs attended the training. OPSB reported that the Annual Professional Development was conducted September 12, 2016 as reported on page 51 of the IM status report submitted to the Court on June 3, 2016. Based on receipt of signed attestations regarding the dissemination of the *Parent FAQs: Special Education in Charter Schools* document and review of the *PB v White – Undocumented Suspension Guidance* document and documentation from OPSB counsel verifying that representatives from all (100%)

of OPSB LEAs attended the required professional development sessions, the OPSB was judged

to be in **Substantial Compliance** with the technical assistance and professional development

activities required in Section IV(C)(4)(a-b) of the CJ  for the 2016-2017 school year as reported

on page 57 of the IM status report submitted to the Court on November 7, 2016.

>    d.   *Enrollment Provisions (pp. 11-15 of the CJ)*

As reported on page 68 of the IM status report dated June 3, 2016, OPSB formally

adopted the LDOE *Enrollment Discrimination Policy Guidance* document. However, as noted in

the June 3, 2016, IM status report, the OPSB was judged to be in **Noncompliance** with this

requirement of the CJ for the 2015-2016 school year. Specifically, the OPSB failed to comply

with all provisions of Section IV(D)(2)(a-b) of the CJ which requires the Defendants-Intervenor

(OPSB) to disseminate the *Enrollment Discrimination Policy Guidance* document to each

principal of all LEAs under its jurisdiction by March 1 annually and request written receipt (i.e.,

signed attestations) of this guidance (page 12 of CJ). In relation, based on receipt of signed

attestations from all (100%) of OPSB school principals verifying review of the 2016-2017 school

year version of the *Enrollment Discrimination Policy Guidance* document, OPSB was judged to

be in **Substantial Compliance** with the provisions required under Section IV(D)(2)(a-b) for the

2016-2017 school year as reported on page 76 of the IM status report submitted to the Court on

November 7, 2016.

As reported on pages 74-75 of the IM status report dated June 3, 2016, the OPSB adopted

the LDOE *Special Education Program Description* template and submitted a completed program

description template for OPSB for the 2015-2016 school year. As such, OPSB was found to be in

**Substantial Compliance** with the requirements outlined in Section IV (D) (4) of the CJ for

the 2015-2016 school year. However, as a result of OPSB's failure to comply with the

dissemination requirements of this Section of the CJ, OPSB was judged to be in

**Noncompliance** for the 2015-2016 school year. Specifically, the OPSB was judged to be in

noncompliance for (a) failing to provide evidence that all OPSB LEAs made the OPSB

Special Education Program Description template available to parents at each OPSB school

site, (b) failing to post the OPSB Special Education Program Description" on the OPSB

district website and (c) failing to ensure a link to the OPSB Special Education Program

Description template was posted on each LEA's website. After thorough review, the IMs verified

that the OPSB *Special Education Program Description* template included all required

components and appropriate documentation and descriptions of service provisions for students

with disabilities as required in Section IV(D)(4) of the CJ on July 30, 2016. As such, the OPSB

was judged to be in **Substantial Compliance** with this provision of the CJ for the 2016-2017

school year as reported on page 81 of the IM status report dated November 7, 2016. Regarding

the Special Education dissemination requirements outlined in this section of the CJ, the IMs

observed that a majority (i.e., 24 of 28 LEAs) successfully established the required link to the

OPSB *Special Education Program Description* for the 2016-2017 school year. In relation, the

IMs verified on December 13, 2016 that the remaining four OPSB schools successfully

established the required link to the 2016-2017 school year version of the OPSB *Special

Education Program Description*. As such, OPSB is judged to be in **Substantial Compliance** for

the 2016-2017 school year as OPSB counsel provided evidence of compliance with this

provision prior to the December 15, 2016 deadline.

As reported on page 80 of the IM Status Report dated June 3, 2016, the OPSB was

judged to be in **Noncompliance** with fulfilling the required implementation activities as outlined

in Section IV(D)(6) of the CJ for the 2015-2016 school term. Specifically, the OPSB failed to

provide written evidence the OPSB had adopted an approved complaint protocol, (b) provided a plan for dissemination or (c) verified the adopted complaint procedures have been disseminated to parents of students with disabilities. OPSB counsel and the OPSB Executive Director of Exceptional Student Services reported to the IMs in a correspondence dated August 9, 2016, that the OPSB *Disability Discrimination Complaint Procedures* policy document has been uploaded on the OPSB website along with an optional online complaint procedure that allows complainants to complete the entire complaint process on the website. All complaints are submitted directly to the OSPB IDEA Specialist. The IMs accessed and reviewed the OPSB district website in the Exceptional Children's Services link and reviewed the OPSB *Disability Discrimination Complaint Procedures* document, as well as, the on-line complaint application. In addition, OPSB officials also provided the IMs with each OPSB LEA's written plan for disseminating complaint procedures to parents of students with disabilities for the 2016-2017 school year. The IMs conducted a thorough review of these documents and observed that all (100%) of the LEAs under OPSB's jurisdiction have developed written plans that include a wide range of methods for disseminating complaint procedures to parents, as well as, signed attestations by each LEA administrator indicating their intention to fully comply with adopted discrimination complaint procedures and dissemination requirements. After verifying required complaint policies and procedures, as well as, complaint dissemination requirements, OPSB was judged to be in **Substantial Compliance** with the requirements outlined in Section IV(D)(6) of the CJ for the 2016-2017 school year as reported on pages 88-89 of the IM status report submitted to the Court on November 7, 2016.

Summary of the Status of Compliance Determinations

Overall, the OPSB was judged to be in **Substantial Compliance** with four of fourteen

(29%) CJ provisions of the CJ regarding the development, adoption, and dissemination of model documents for the 2015-2016 school year. As such, the OPSB achieved initial **Substantial Compliance** with the following provisions in the CJ for the 2015-2016 school year: IV(A)(2) Charter renewal and Application Process and Description of Pupil Appraisal Services in the OPSB *Special Education Program Description* document; IV(B)(1)(a-b) Full array of Related Services and personnel providing services in the OPSB *Special Education Program Description* document; IV(C)(4)(a-b) Professional Development; and IV(D)(4) Written Description of the Special Education Program in the OPSB *Special Education Program Description* document. A review of compliance determinations by the IMs for the 2015-2016 school year is presented in the Summary of Compliance Status document in Appendix A.

In relation, the OPSB has maintained **Substantial Compliance** with the aforementioned provisions of the CJ for the 2016-2017 school year which represents initial year of the required two consecutive years of maintenance as outlined in Section VIII(3) on page 18 of the CJ. The OPSB achieved **Substantial Compliance** with fourteen of fourteen (100%) of the substantive provisions in the CJ for the 2016-2017 school year. This represents the initial year of **Substantial Compliance** for ten of the fourteen substantive provisions with the CJ. As such, the OPSB shall be required to maintain compliance for two consecutive school years to meet the requirements outlined in Section VIII(3) on page 18 of the CJ. A review of compliance determinations by the IMs for the 2016-2017 school year is presented in the Summary of Compliance Status document in Appendix A.

### C. TARGETED MONITORING ACTIVITIES FOR THE 2015-2016 SCHOOL YEAR

1. Child Find Provisions (pp. 6-8 of the CJ) for the 2015-2016 School Year

    Three charter schools were selected for targeted monitoring during the spring 2016

school semester based on a review of child find data for the 2014-2015 school year. These
targeted schools included Joseph A. Craig Charter School, Lake Area New Technology Early
College High School, and Sophie B. Wright Charter School. As previously reported on page 12
of the IM status report submitted to the Court on June 3, 2016, the LDOE was judged to be in
**Substantial Compliance** with Section IV(A)(3)(a) of the CJ for the 2015-2016 school year
based on a review of the documents submitted by LDOE and verification of the calculations in
the excel spreadsheet by the IMs. In contrast, the LDOE was judged to be in **Noncompliance**
with Section IV(A)(3)(b) and Section A(2)(a) of Addendum A of the CJ for the 2015-2016
school year as a result of the targeted LEA's failure to submit the required random,
representative sample of students as reported on page 16 of the June 3, 2016 IM status report.
Finally, the LDOE was judged to be in **Substantial Compliance** with the targeted monitoring
activities and corrective actions requirement this section of the CJ for the 2015-2016 school year
based on a review of the required documents (e.g., LDOE Monitoring Reports, IDEA Monitoring
Results Summary, and Corrective Action Plans) as reported on page 15 of the IM status report
submitted to the Court on November 7, 2016.

2. Related Services Provisions (pp. 8-9 of the CJ) for the 2015-2016 School Year

Three charter schools were selected for targeted monitoring during the spring 2016
school term based on a review of related services data for the 2014-2015 school year. These
targeted schools included Algiers Technology Academy, International High School of New
Orleans, and Landry-Walker High School. As previously reported on page 29 of the IM status
report submitted to the Court on June 3, 2016, the LDOE was judged to be in **Substantial
Compliance** with Section IV(B)(2)(a) of the CJ and Section B(1)(a-c) of the Addendum to the
CJ for the 2015-2016 school year based on a review of the documents submitted by LDOE and

verification of the calculations in the excel spreadsheet by the IMs. In relation, the LDOE was judged to be in **Substantial Compliance** with the targeted monitoring sections of the CJ and Addendum of the CJ for the 2015-2016 school year as reported on page 35 of the IM status report dated June 3, 2016. Specifically, the LDOE completed the staff interviews and student file reviews using the Related Services protocol during the spring 2016 term as designated in Section IV(B)(2)(b) of the CJ and Sections B(3)(a), B(4)(a), B(4)(b), B(5)(a) on pages 3-4 of the Addendum to the CJ for the 2015-2016 school year. After reviewing the required documentation (e.g., LDOE monitoring reports, IDEA Monitoring Results Summary, Corrective Action Plans or Recommendation Plan, the LDOE was judged to be in **Substantial Compliance** with Section IV(B)(2)(b) of the CJ and Sections B(3)(a), B(4)(a), B(4)(b), B(5)(a) on pages 3-4 of the Addendum to the CJ for the 2015-2016 school year as reported on page 36 of the IM status report submitted to the Court on November 7, 2016.

    3.  Discipline Provisions (pp. 9-11 of the CJ) for the 2015-2016 School Year

        Three schools were selected for targeted monitoring during the spring 2016 school semester based on a review of discipline data for the 2014-2015 school year.  These schools included International High School of New Orleans, Cohen College Preparatory Charter School, and Crescent Leadership Academy. As previously reported in the IM status report submitted to the Court on November 7, 2016, the LDOE was judged to be in **Substantial Compliance** with Section IV (C) (5a) of the CJ for the 2015-2016 school year as a result of properly calculating the extended disciplinary removal rate as required by the CJ. However, as previously reported on page 54 of the IM status report submitted to the Court on June 3, 2016, the LDOE was judged to be in **Noncompliance** with Section IV(C)(5b) of the CJ and Sections C(1)(c) and C (2) (a) of the CJ Addendum for the 2015-2016 based on a review of targeted monitoring documents submitted

by each identified charter school, and completion of the student file reviews and staff interviews using the required Discipline protocol. Specifically, the determination of noncompliance was based on the fact the selection of students in discipline failed to include a full year of discipline data as outlined in Section C(2)(a) of Addendum A of the CJ. Furthermore, noncompliance was judged and the result of Crescent Leadership Academy (CLA) being excluded from undergoing targeted desk reviews during the spring 2015-2016 school year. Based on a review of the targeted monitoring provisions outlined in this section of the CJ and related documentation submitted by the LDOE (e.g., LDOE monitoring reports, IDEA Monitoring Results Summary, Corrective Action Plans), the LDOE was judged to be in **Substantial Compliance** with Section IV(C)(5)(b) of the CJ for the 2015-2016 school year as reported on page 60 of the IM status report dated November 7, 2016.

4.   Enrollment Provisions (pp. 11-15 of the CJ) for the 2015-2016 School Year

Three schools were selected for targeted monitoring during the spring 2016 school term based on a review of enrollment data for the 2014-2015 school year. These schools included Joseph A. Craig, Mildred Osborne, and G.W. Carver Preparatory Academy.  As previously reported on page 86 of the IM status report submitted to the Court on June 3, 2016, the LDOE was judged to be in **Substantial Compliance** with Section IV (D) (7) of the CJ and Section D (1) (a), D (1) (b) and D (1) (c) of the Addendum to the CJ for the 2015-2016 school year based on a review of the documents submitted by the LDOE and verification of the calculations in the excel spreadsheet by the IMs. Similarly, based on a review of the documents submitted by each identified NOLA Charter school and the LDOE's completion of the staff interviews and case file reviews using the required Related Services protocol, the LDOE was also judged to be in **Substantial Compliance** with fulfilling the required provisions designated in Section IV(D)(7)

of the CJ and Section D(2)(a), D(2)(b), and D(2)(c) on page 6 the Addendum to the CJ for the

2015-2016 school year as reported on pages 86-87 of the IM status report dated June 3, 2016.

Based on a review of targeted monitoring activities and related documents (e.g., LDOE

monitoring reports, IDEA Monitoring Results Summary, Corrective Action Plans) for the three

LEAs selected for targeted monitoring, the LDOE was judged to be in **Substantial Compliance**

with the selection, monitoring and corrective remedy provisions as required under Sections

IV(D)(7), Section D(2)(a), D(2)(b), and D(2)(c) on page 6 the Addendum, Sections G(1)(a),

G(1)(b), G(1)(c) and G(2)(a), G(2)(b), G(2)(c), G(2)(d) and G(2)(e) on page 8 of the Addendum

of the CJ for the 2015-2016 school year as reported on page 91 of the IM status report submitted

to the Court on November 7, 2016.

### D.  TARGETED MONITORING ACTIVITIES FOR THE FALL 2016 SEMESTER OF THE 2016-2017 SCHOOL YEAR

<u>Overview of Targeted Monitoring Activities for the Fall 2016 Semester</u>

The CJ requires that the LDOE engage in specific monitoring activities for LEAs selected

for targeted monitoring annually. As such, the IMs report the activities and decisions made by

the LDOE as related to the required monitoring activities for schools identified for targeted

monitoring during the fall 2016 school term for each relevant provision of the CJ. However, an

overview of the monitoring procedures used by the LDOE is provided here to assist readers in

understanding the process that was used to complete targeted monitoring as required by the CJ.

Additional information is also included in each relevant section of the status report. School

selection for each area of targeted monitoring was completed by LDOE monitoring personnel

using calculation rates outlined in Addendum A of the CJ (p. 1 for Child Find, p. 3 for Related

Services, p. 4 for Discipline, p. 6 for Enrollment Stability) in August 2016. Each LEA selected

for targeted monitoring from an analysis of relevant data (i.e., initial IDEA evaluations, rates of

related service provisions, discipline outcomes, and enrollment stability rates) for the 2015-2016 school year was sent a notification email from LDOE Director of State-wide Monitoring on September 15, 2016 (see Appendix B for a copy of each email). This notification provided an overview of the requirements for targeted monitoring pursuant to the CJ, the specific areas in which the charter was being monitored, methods of monitoring (e.g., student file selection, staff interviews, student file reviews), LDOE contact personnel, the specific date of interviews with staff, instructions for the on-site monitoring visit, and copies of the staff interview questions and student file review protocols. Planning phone calls were conducted by LDOE monitoring personnel on September 21, 2016 with personnel from each LEA to assist the school personnel in understanding the CJ requirements for targeted monitoring and to answer any questions or address any concerns. The protocols along with the relevant IDEA or Bulletin 1508 legal citation are provided in Appendix B for review.

LDOE monitoring personnel submitted the targeted monitoring schedule for the fall 2016 school term to the IMs on October 21, 2016.  LDOE monitoring personnel and IMs conducted on-site staff interviews and student file reviews across two weeks during the fall 2016 school term from November 9-17, 2016 using documents required by the CJ (see staff interview questionnaires and student file review protocols in Appendix B). The IMs and LDOE monitoring personnel scored student file review protocols independently during the on-site visits and reconciled any scoring differences during the on-site monitoring visits or during conference calls held on December 5-6, 2016 and December 12, 2016. Based on agreements among all parties during a meeting held on September 22, 2016, compliance determinations for individual students shall be consistent with the 100% compliance standard outlined in the IDEA. That is, during all targeted monitoring activities, any single finding of noncompliance for any specific IDEA

22

regulation being assessed for an individual student was judged to reflect noncompliance and required immediate individual corrective action (i.e., student-specific areas of noncompliance outlined in the IDEA Monitoring Summary and individual corrective actions as part of the LEA Corrective Action Plan). Similarly, all parties agreed that systemic noncompliance would be determined when less than 80% of the student sample failed to meet the 100% individual student compliance standard for any IDEA requirement evaluated on the CJ protocol and would result in mandatory systemic corrective actions (i.e., Corrective Action Plan) for the LEA.

The LDOE monitoring personnel completed the monitoring reports for each targeted LEA during the months of December 2016 and January 2017. The IMs reviewed the monitoring reports and provided feedback regarding specific findings of noncompliance in relation to IDEA regulations and student-specific findings of noncompliance during the months of January 2017 and February 2017. In relation, the LDOE monitoring personnel developed the Corrective Action Plans (CAPs) for each LEA during March 2017 and the IMs provided feedback regarding the CAPs on March 15, 2017. The IMs review and feedback focused on ensuring the corrective strategies outlined in the CAPS were reasonably sufficient, presuming adequate levels of implementation fidelity, to lead to overall sustained improvements and compliance for IDEA and/or Bulletin 1508 practices in the areas of Child Find, Related Services, Discipline and Enrollment across targeted LEAs. Specifically, the IMs reviewed all submitted CAPs to ensure that the professional development and technical assistance activities strategically addressed each finding of systemic or student-specific noncompliance. In relation, the IMs evaluated the CAPs to ensure that on-going corrective and supportive feedback would be provided by LDOE monitoring personnel to assist in promoting skill development of faculty in a developmental nature across time. Finally, the IMs reviewed

23

the CAPs to ensure that the LEAs would be providing appropriate documentation to assist LDOE monitoring personnel in evaluating both the compliance and quality of their practices in relation to federal and state regulations as well as requirements outlined in the CJ.

The LDOE submitted cover letters, final monitoring reports with recommendations for improvement, specific findings of noncompliance in relation to IDEA violations, and CAP templates to each LEA and the IMs on March 22, 2017. These documents are in Appendix B for review by all parties. Finally, LDOE monitoring personnel held technical assistance meetings or phone calls with the targeted LEAs to review the findings of systemic noncompliance and student-specific noncompliance and discuss the structure and activities of the CAPs on from March 20-23, 2017. These notifications were submitted to the IMs for review on April 20, 2017 and are also located in Appendix B for review by the parties.

The IMs review of compliance with the targeted monitoring provisions of the CJ for the fall semester of the 2016-2017 school year consisted of an evaluation of three components of the LDOE's monitoring activities. Specifically, the components being assessed for compliance included: (1) Correct identification of the charter schools selected for targeted monitoring (e.g., determination of the annual new identification rate for each LEA, and evaluation of the LDOE calculations); (2) Completion of targeted monitoring activities by the LDOE as required by the CJ and Addendum A to the CJ (e.g., completion of appropriate monitoring activities by the LDOE, completion of staff interviews, appropriate selection of student files, appropriate completion of the monitoring protocols, and correct identification of systemic or individual compliance and/or noncompliance) and (3) Development of appropriate corrective actions "sufficient to remedy the noncompliance and to reasonably ensure that such noncompliance does not reoccur." (pp. 7, 9, 11, 14 of CJ). As such, the IM status report provides a review of

these monitoring activities for each LEA selected for targeted monitoring under each area of the CJ (e.g., Child Find, Related Services, Discipline, Enrollment) along with IM determinations regarding compliance with the monitoring provisions of the CJ. An overall summary regarding targeted monitoring activities and professional recommendations are provided at the conclusion of the report in addition to a brief update regarding targeted monitoring activities that occurred during the spring 2017 semester.

### A.  CHILD FIND

1.  <u>Targeted Monitoring Activities for the Child Find Provisions</u>

Three schools were selected for targeted monitoring during the fall 2016 school semester based on an analysis of 2015-2016 child find data. The IMs reviewed the documentation and calculations performed by LDOE monitoring personnel and confirmed that the schools were selected for targeted monitoring in a manner consistent with the requirements outlined on page 7 of the CJ and page 1 of Addendum A of the CJ. The schools selected for targeted monitoring during the fall 2016 semester included Joseph S. Clark High School, Mildred Osborne Charter School, and William J. Fischer Accelerated Academy. A review of findings for each school is presented below.

*a.  Joseph S. Clark High School*

The on-site targeted monitoring visit occurred on November 15, 2016. One LDOE representative and two IMs were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections 4(a) and 4(b) on page 2 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. Faculty at Joseph S.

Clark High School clearly articulated their responses regarding the Child Find process and provided satisfactory answers to all interview questions. A detailed summary of staff responses is presented on pages 3-4 of the LDOE monitoring report located in Appendix B.

A representative sample of thirty-five student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 2(a) on page 1 of Addendum A of the CJ. Specifically, the sample consisted of eight students (23% of the sample) who failed two or more academic subjects the prior year, six students (17% of the sample) who had Section 504 plans, eight students (23% of the sample) who were under consideration by the School Building Level Committee (SBLC), five students (14% of the sample) who were subject to ten or more days of disciplinary removal, and eight students (23% of the sample) who were participating in the Response to Intervention (RTI process). Student file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 3(a) on page 2 of Addendum A of the CJ using the required Child Find protocol. Please refer to page 4 of the LDOE monitoring report for Joseph S. Clark High School in Appendix B for a list of items that were reviewed to complete the Child Find protocol for the sample of students. A review of student records revealed that thirty-five of thirty-five student files (100% of the sample) were judged to be in noncompliance regarding Child Find activities. Specific IDEA, Bulletin 1508 and/or Section 504 systemic violations are reported on pages 5-6 of the LDOE monitoring report and pages 2-4 of the 2016-2017 IDEA monitoring results summary located in Appendix B. In relation, student-specific findings of noncompliance are listed on pages 5-13 of the 2016-2017 IDEA monitoring results summary. Overall, systemic noncompliance was identified for this LEA under IDEA, Part B program using Bulletin 1508 (*Pupil Appraisal Handbook*) in five areas.

Specifically, eighteen of eighteen applicable student files (100% of the sample) were found to be in noncompliance with the requirement that the school fully implemented the three tiers of instruction and intervention with measured levels of integrity, used standard protocols and/or problem solving methods, and used an integrated data collection or assessment system to inform decisions about student response to intervention at each tier of instruction or intervention (*Bulletin 1508*-§301 Response to Intervention; *IDEA*-§300.306(a)(1) and §300.308). Thirty-five of thirty-five applicable files (100% of the sample) were found to be in noncompliance with the requirement that the School Building Level Committee (SBLC) consisted of documented, required standing committee members and invited participants who review and analyze all screening data, including RTI results, to determine the most beneficial option for the student (*Bulletin 1508*-§303 School Building Level Committee). Thirty-two of thirty-three applicable student files (97% of the sample) were judged to reflect noncompliance with the requirement that the SBLC coordinated and documented the results of all required screening activities completed by general education personnel with the assistance from other school personnel (*Bulletin 1508*-§305 Screening Activities).  Eighteen of eighteen applicable student files (100% of the sample) were found to be in noncompliance with the requirement that the student be referred to the SBLC for consideration of an initial evaluation within a reasonable amount of time if the student did not maintain expected progress while participating in the RTI process (*Bulletin 1508*-§307 Referral Process; *IDEA*-§300.309(c). Finally, six of six applicable Section 504 student files (100% of the sample) were judged to reflect noncompliance with the requirement that the student receive specially designed instruction if indicated by the student's educational records (*Section 504*-§104.35(b).

b.  *Mildred Osborne Charter School*

The on-site targeted monitoring visit occurred on November 10, 2016. Two LDOE representatives and two IMs were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections 4(a) and 4(b) on page 2 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. Faculty at Mildred Osborne Charter School clearly articulated their responses regarding the Child Find process and provided satisfactory answers to all interview questions.  A detailed summary of staff responses is presented on pages 3-4 of the LDOE monitoring report located in Appendix B.

A representative sample of twenty-five student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 2(a) on page 1 of Addendum A of the CJ. Specifically, the sample consisted of four students (16% of the sample) who had Section 504 plans, thirteen students (52% of the sample) who were participating in the Response to Intervention (RTI process), and eight students (32% of the sample) who were under consideration by the School Building Level Committee (SBLC). Student file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 3(a) on page 2 of Addendum A of the CJ using the required Child Find protocol. Please refer to page 4 of the LDOE monitoring report for Mildred Osborne Charter School in Appendix B for a list of items that were reviewed to complete the Child Find protocol for the sample of students. A review of student records revealed that twenty-five of twenty-five student files (100% of the sample) were judged to be in noncompliance regarding Child Find activities. Specific IDEA, Bulletin 1508 and/or

Section 504 systemic violations are reported on pages 5-6 of the LDOE monitoring report and pages 2-4 of the 2016-2017 IDEA monitoring results summary located in Appendix B. In relation, student-specific findings of noncompliance are listed on pages 5-10 of the 2016-2017 IDEA monitoring results summary. Overall, systemic noncompliance was identified for this LEA under IDEA, Part B program using Bulletin 1508 (Pupil Appraisal Handbook) in five areas. Specifically, eight of twenty-five applicable student files (32% of the sample) were found to be in noncompliance with the requirement that the school fully implemented the three tiers of instruction and intervention with measured levels of integrity, used standard protocols and/or problem solving methods, and used an integrated data collection or assessment system to inform decisions about student response to intervention at each tier of instruction or intervention (*Bulletin 1508*-§301 Response to Intervention; *IDEA*-§300.306(a)(1) and §300.308). Twenty-five of twenty-five applicable files (100% of the sample) were found to be in noncompliance with the requirement that the School Building Level Committee (SBLC) consisted of documented, required standing committee members and invited participants who review and analyze all screening data, including RTI results, to determine the most beneficial option for the student (*Bulletin 1508*-§303 School Building Level Committee). Eighteen of twenty-five applicable student files (72% of the sample) were judged to reflect noncompliance with the requirement that the SBLC coordinated and documented the results of all required screening activities completed by general education personnel with the assistance from other school personnel (*Bulletin 1508*-§305 Screening Activities).  Eleven of twenty-three applicable student files (48% of the sample) were found to be in noncompliance with the requirement that the student be referred to the SBLC for consideration of an initial evaluation within a reasonable amount of time if the student did not maintain expected progress while

participating in the RTI process (*Bulletin 1508*-§307 Referral Process; *IDEA*-§300.309(c).

Finally, four of four applicable Section 504 student files (100% of the sample) were judged to

reflect noncompliance with the requirement that the student receive specially designed

instruction if indicated by the student's educational records (*Section 504*-§104.35(b).

    c. *William J. Fischer Accelerated Academy*

       The on-site targeted monitoring visit occurred on November 9, 2016. One LDOE

representative and two IMs were present during the entire on-site visit to conduct staff interviews

and review student files. The staff interviews were conducted on November 9, 2016, as opposed

to February 10, 2016 as indicated in the LDOE monitoring report. The interviews were

conducted using a standard bank of questions with staff members consistent with requirements

outlined in sections 4(a) and 4(b) on page 2 of Addendum A of the CJ. The specific staff

members who participated in the interview process are reported on page 3 of the LDOE

monitoring report. A review of the LDOE monitoring report revealed that Faculty at William J.

Fischer Accelerated Academy "provided general descriptions of required Student Assistance

Team (SAT) collaboration, student referrals, parental involvement, intervention procedures, and

evaluation processes" (p. 3). However, the faculty failed to provide a sufficient response

regarding how the monitoring process is documented by faulty and school-based teams and a

review of student records confirmation this finding.  In relation, the monitoring team observed a

discrepancy between the procedures described by faculty during the interview and availability of

documentation to objectively demonstrate documentation of data-based decision making

procedures by school-based team members. Overall, the results of the interview process revealed

noncompliance in Child Find in relation to identifying, locating, and evaluating students

suspected of having a disability. A detailed summary of staff responses is presented on pages 3-4

of the LDOE monitoring report located in Appendix B.

A representative sample of twenty-one student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 2(a) on page 1 of Addendum A of the CJ. Specifically, the sample consisted of two students (10% of the sample) who had Section 504 plans, ten students (48% of the sample) who were participating in the Response to Intervention (RTI process), five students (24% of the sample) who were under consideration by the School Building Level Committee (SBLC), one student (5% of the sample) with ten or more days of removal, and three students (14% of the sample) who failed two more academic subjects. Student file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 3(a) on page 2 of Addendum A of the CJ using the required Child Find protocol. Please refer to page 4 of the LDOE monitoring report for William J. Fischer Accelerated Academy in Appendix B for a list of items that were reviewed to complete the Child Find protocol for the sample of students. A review of student records revealed that twenty-one of twenty-one student files (100% of the sample) were judged to be in noncompliance regarding Child Find activities. Specific IDEA, Bulletin 1508 and/or Section 504 systemic violations are reported on page 5 of the LDOE monitoring report and pages 2-5 of the 2016-2017 IDEA monitoring results summary located in Appendix B. In relation, student-specific findings of noncompliance are listed on pages 6-10 of the 2016-2017 IDEA monitoring results summary. Overall, systemic noncompliance was identified for this LEA under IDEA, Part B program using Bulletin 1508 (Pupil Appraisal Handbook) in six areas.  Specifically, fifteen of fifteen applicable student files (100% of the sample) were found to be in noncompliance with the requirement that the school fully implemented the three tiers of instruction and intervention

with measured levels of integrity, used standard protocols and/or problem solving methods, and used an integrated data collection or assessment system to inform decisions about student response to intervention at each tier of instruction or intervention (*Bulletin 1508*-§301 Response to Intervention; *IDEA*-§300.306(a)(1) and §300.308). Twenty-one of twenty-one applicable files (100% of the sample) were found to be in noncompliance with the requirement that the School Building Level Committee (SBLC) consisted of documented, required standing committee members and invited participants who review and analyze all screening data, including RTI results, to determine the most beneficial option for the student (*Bulletin 1508*-§303 School Building Level Committee). Sixteen of seventeen applicable student files (94% of the sample) were judged to reflect noncompliance with the requirement that the SBLC coordinated and documented the results of all required screening activities completed by general education personnel with the assistance from other school personnel (*Bulletin 1508*-§305 Screening Activities). Fifteen of fifteen applicable student files (100% of the sample) were found to be in noncompliance with the requirement that the student be referred to the SBLC for consideration of an initial evaluation within a reasonable amount of time if the student did not maintain expected progress while participating in the RTI process (*Bulletin 1508*-§307 Referral Process; *IDEA*-§300.309(c). Four of four applicable Section 504 student files (100% of the sample) were judged to reflect noncompliance with the requirement that the student receive specially designed instruction if indicated by the student's educational records (*Section 504*-§104.35(b). Finally, one of three applicable student files (33% of the sample) was found to be in noncompliance with the requirement that the LEA conduct an evaluation for any student who needs or is believed to need special education or related services before taking action with respect to initial placement, draw upon a variety of assessment data, ensure

that information obtained for all sources is carefully considered and documented, and ensure that the placement decision is made by a group of required persons (*Section 504-§104.35(a)(c)*).

   2.  <u>Corrective Actions to Address Identified Areas of Noncompliance</u>

   Overall, systemic noncompliance was identified across five areas (e.g., Response to Intervention, School Building Level Committee, Screening Activities, Referral Process, Specially Designed Instruction) for all three charter schools targeted for monitoring during the fall 2016 semester. In addition, systemic noncompliance was also identified regarding evaluation activities for William J. Fischer Accelerated Academy. In relation, common themes regarding student-specific findings of noncompliance included: (a) failure to list the names and titles of the participants that attended school-based meetings, (b) lack of sufficient screening data, (c) failure to provide sufficient descriptions of the research-based interventions used to address student referral concerns, (d) lack of progress monitoring data, (e) failure to document follow-up school-based meetings to evaluate student response to intervention, and (f) lack of evidence to document attainment of parental consent for intervention implementation or evaluation. Given the identified systemic and student-specific findings of noncompliance under IDEA, Part B, and Bulletin 1508, all three charter schools (100% of the sample) required a formal CAP. As required by the CJ, the LDOE developed a CAP to address each area of identified systemic noncompliance or student-specific noncompliance listed in the LDOE monitoring report and 2016-2017 IDEA monitoring summary for each LEA. Specifically, the CAP includes sixteen activities of corrective action (e.g., correction of student-specific findings of noncompliance; professional development provided by the LDOE regarding federal and state Child Find requirements and requirements outlined in the *PB v White Child Find Written Guidance*

document, Section 504 eligibility requirements, and data-based decision making within the RTI process; appropriate monitoring of students in the RTI process; development of a Child Find log; appropriate referral activities and documentation; appropriate completion and documentation of SBLC activities using LDOE forms; progress monitoring of students in the RTI process and evaluation of data by school-based teams; review of LDOE professional development on Section 504 requirements; school-based training on Section 504 requirements; school-based training of the RTI process across each tier to appropriately address academic and/or behavioral referral concerns). A copy of the CAP for each charter school is in Appendix B for review by the parties. A review of the CAPs by the IMs revealed that the documents include "corrective actions sufficient to remedy the noncompliance and to reasonably ensure that such noncompliance does not reoccur" for Joseph S. Clark Preparatory High School, Mildred Osborne Charter School, and William J. Fischer Accelerated Academy as outlined in section IV(A)(3) on page 7 of the CJ.

3.  Status of Compliance

After participating in the on-site monitoring visits for the charter schools selected for targeted monitoring and reviewing documentation submitted by the LDOE monitoring personnel (e.g., monitoring notifications, LDOE monitoring reports, 2016-2017 IDEA monitoring results summaries, corrective action plans, technical assistance notifications) and discussing the targeted monitoring activities with LDOE legal counsel and monitoring personnel during conference calls and on-site meetings during throughout the fall 2016 semester and spring 2017 semester, the LDOE is judged to be in **Substantial Compliance** with Section IV(A)(3)(a-b) and Sections A(1)(a-c) through 5(a) of Addendum A of the CJ for the fall 2016 semester of the 2016-2017 school year. An evaluation of compliance will be made again in the next IM status report which will discuss the follow-up, on-site targeted monitoring activities for charter schools who received

initial monitoring reviews during the spring 2016 semester.

**B. RELATED SERVICES**

1.  <u>Targeted Monitoring Activities for the Enrollment Stability Provisions</u>

Three schools were selected for targeted monitoring during the fall 2016 semester based on an analysis of 2015-2016 enrollment rates for NOLA Type 2 and Type 5 Charter schools and OPSB LEAs. The IMs reviewed the documentation and calculations performed by LDOE monitoring personnel and confirmed that the schools were selected for targeted monitoring in a manner consistent with the requirements outlined on page 8-9 of the CJ and pages 2-3 of Addendum A of the CJ.  The schools selected for targeted monitoring during the fall 2016 semester included New Orleans Military and Maritime Academy (NOMMA), International School of Louisiana Charter School, and Joseph S. Clark High School. A review of findings for each school is presented below.

a.   *New Orleans Military and Maritime Academy*

The on-site targeted monitoring visit occurred on November 17, 2016. Two LDOE representatives and two IMs were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections B(4)(a) and B (4)(b) on page 3-4 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. Faculty at New Orleans Military and Maritime Academy clearly communicated their responses regarding the required IDEA mandates for provision of Related Services and provided satisfactory responses to the interview questions.  However, the interview revealed that key special education personnel did not have access to the Special Education Reporting (SER) System, the LDOE managed statewide special education student database from which records and reports

for students with disabilities can be reviewed. A detailed summary of staff responses is presented on pages 3-4 of the LDOE monitoring report.

A representative sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(2)(a) and B(2)(b) on page 3 of Addendum A of the CJ. It should be noted that two students selected for review did not attend New Orleans Military and Maritime Academy during the 2015-2016 school term. As such, these files were omitted from formal review. The sample of eight students reviewed included the following exceptionalities: three students with an exceptionality of Autism, one student with an exceptionality of Emotional Disturbance, two students with an exceptionality of Other Health Impairment, and two students with an exceptionality of Specific Learning Disability. Regarding related services provisions, three students received counseling services and five students received speech/language therapy.

Student file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(3)(a) on page 3 of Addendum A of the CJ using the required Related Service protocol. Refer to page 4 of the LDOE monitoring report for New Orleans Military and Maritime Academy in Appendix B for a list of items that were reviewed to complete the Related Service protocol for the sample of students. A review of student records revealed that eight of eight student files (100% of the sample) were judged to be in noncompliance regarding Related Service provisions. Specific IDEA systemic violations are reported on pages 5 of the LDOE monitoring report and pages 2-3 of the 2016-2017 IDEA monitoring results summary located in Appendix B. In relation, student-specific findings of noncompliance are listed on pages 4-8 of the 2016-2017 IDEA monitoring results summary. Overall, systemic noncompliance was identified for this LEA

under IDEA, Part B in seven areas. Specifically, eight of eight applicable student files (100% of the sample receiving related services) were found to be in noncompliance with the requirement that the student receive a Free Appropriate Public Education (FAPE) as outlined in federal legislation (*IDEA*-§300.17(a.-d.). Eight of eight applicable student files (100% of the sample receiving related services) were judged to be in noncompliance with the requirement that the student's Individualized Education Program (IEP) include measurable annual goals, including academic and functional goals designed to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and meet each of the child's other educational needs that result from the child's disability (*IDEA*-§300.320(a)(2)(i) (A-B). Eight of eight applicable student files (100% of the sample receiving related services) were found to be in noncompliance with the requirement that the IEP include the date for beginning of services, modifications, and anticipated frequency, location, and duration of services and modifications (*IDEA*-§300.320(7). Six of eight applicable student files (75% of the sample receiving related services) were found to be in noncompliance with the requirement that the IEP include a statement of special education and related services, supplementary aids and services, and a statement of program modifications or supports for school personnel (*IDEA*-§300.320(a)(4). Seven of eight applicable student files (88% of the sample receiving related services) were judged to be in noncompliance with the requirement that the IEP include a statement of the child's present levels of academic achievement and functional performance, including how the child's disability affects the child's involvement and progress in the general education curriculum (*IDEA*-§300.320(a)(1)(i). Four of eight applicable student files (50% of the sample) were found to be in noncompliance with the requirement that the student's IEP team

must include not less than one special education teacher or special education provider of the child (*IDEA-*§300.321(a)(3). Finally, four of eight applicable student files (50% of the sample) were judged to be in noncompliance with the requirement that the IEP include a description of how the child's progress toward meeting the annual goals will be measured and when periodic reports on progress will be provided (*IDEA-*§300.320(a)(3)(i-ii).

   *b.  International School of Louisiana Charter School*

The on-site targeted monitoring visit occurred on November 14, 2016. One LDOE representative and two IMs were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in section B(4)(a) and B(4)(b) of page 3 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3-4 of the LDOE monitoring report. The primary concern identified during the interview process was related to the LEAs not having a clearly defined process in place for scheduling special education students for related services to prevent missed instructional time. A summary of staff responses in presented on pages 3 of the LDOE monitoring report.

A sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(2)(a) and B(2)(b) on page 3 of Addendum A of the CJ. It should be noted here that International School of Louisiana Charter School is a French language-based academic program and does not typically receive enrollment applications from students with low-incidence disabilities as described in section B(2)(a) in Addendum A of the CJ. Therefore, the student sample was selected in accordance with section B(2)(b)(2) on page 3 in Addendum A of the CJ.

The sample of ten students reviewed included the following exceptionalities: two students with an exceptionality of Autism, one student with an exceptionality of Specific Learning Disability, one student with an exceptionality of Developmentally Delayed, and six students with a primary exceptionality of Language/Speech-Articulation. It should be reported here that in the charter's 2016-17 IDEA Monitoring Results summary (Appendix B) an error occurred on page one under the "Description of Findings" Section. The second paragraph should have indicated six of ten students (60% of the sample) received language/speech supports to address their primary disability rather than four of ten files (40% of the sample). Related Service provisions at this LEA were limited to Language/Speech Therapy services to address articulation referral concerns.

Targeted file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(3)(a) on page 3 of Addendum A of the CJ using the required Related Service protocol. Please refer to page 4 of the LDOE monitoring report for International School of Louisiana Charter School in Appendix B for a list of items that were reviewed to complete the Related Service protocol for the sample of students. A review of student records revealed that nine of ten student files reviewed (90% of the sample) were judged to be in noncompliance regarding Related Service provisions. Specific IDEA systemic violations are reported on pages 4-5 of the LDOE monitoring report and pages 2-4 of the 2016-2017 IDEA monitoring results summary located in Appendix B. In relation, student-specific findings of noncompliance are listed on pages 5-7 of the 2016-2017 IDEA monitoring results summary. Overall, systemic noncompliance was identified for this LEA under IDEA, Part B in three areas. Specifically, nine of ten applicable student files (90% of the sample receiving related services) were found to be in noncompliance with the

39

requirement that the student receive a Free Appropriate Public Education (FAPE) as outlined in federal legislation (*IDEA*-§300.17(a.-d.). Nine of ten applicable student files (90% of the sample receiving related services) were judged to be in noncompliance with the requirement that the IEP include a statement of the child's present levels of academic achievement and functional performance, including how the child's disability affects the child's involvement and progress in the general education curriculum (*IDEA*-§300.320(a)(1)(i). Two of six applicable student files (33% of the sample receiving related services) were found to be in noncompliance with the requirement that the IEP include the projected date for beginning services, modifications, and anticipated frequency, location, and duration of services and modifications (IDEA--§300.320(a)(3)(-ii). In relation, student-specific areas of noncompliance were identified in three additional areas. One of ten applicable student files (10% of the sample receiving related services) was judged to be in noncompliance with the requirement that the student's IEP include measurable annual goals, including academic and functional goals designed to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and meet each of the child's other educational needs that result from the child's disability (*IDEA*-§300.320(a)(2)(i) (A-B). Two of ten applicable student files (20% of the sample) were found to be in noncompliance with the requirement that the IEP include a description of how the child's progress toward meeting annual goals will be measured and when periodic reports on the progress the child is making toward meeting annual goals will be provided (*IDEA*-§300.320(a)(B)(3)(i-ii). Finally, two of ten applicable student files (20% of the sample) were judged to reflect noncompliance with the requirement that the IEP include a statement of any individual appropriate accommodations that are necessary to measure academic achievement

and functional performance of the child on state and districtwide assessments (*IDEA-*§300.320(a)(6)(i).

  c. *Joseph S. Clark Charter School*

  The on-site targeted monitoring visit occurred on November 14, 2016. Two LDOE representatives and two IMs were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections B(4)(a) and B(4)(b) on page 4-5 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. Faculty at the Joseph S. Clark High School clearly articulated their responses regarding the required IDEA mandates for provision of Related Services and provided satisfactory responses to all interview questions.  A detailed summary of staff responses is presented on pages 3-4 of the LDOE monitoring report.

  A representative sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(2)(a) and B(2)(b) on page 3 of Addendum A of the CJ. The sample of ten students reviewed included the following exceptionalities: two students with an exceptionality of Intellectual Disability-Mild, three students with an exceptionality of Intellectual Disability-Moderate, one student with an exceptionality of Intellectual Disability-Severe, three students with an exceptionality of Autism, and one student with an exceptionality of Multiple Disabilities. Related Service provisions reviewed included Adaptive Physical Educations for 6 students, Speech Therapy for nine students, Counseling services for one student and Social Work Services in Schools for one student.

Targeted file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(3)(a) on page 3 of Addendum A of the CJ using the required Related Service protocol. Please refer to page 4 of the LDOE monitoring report for the Joseph S. Clark High School in Appendix B for a list of items that were reviewed to complete the Related Service protocol for the sample of students. A review of student records revealed that ten of ten student files reviewed (100% of the sample) were judged to be in noncompliance regarding Related Service provisions. Specific IDEA systemic violations are reported on pages 5-6 of the LDOE monitoring report and pages 2-4 of the 2016-2017 IDEA monitoring results summary located in Appendix B. In relation, student-specific findings of noncompliance are listed on pages 5-11 of the 2016-2017 IDEA monitoring results summary. Overall, systemic noncompliance was identified for this LEA under IDEA, Part B in six areas. Specifically, ten of ten applicable student files (100% of the sample receiving related services) were found to be in noncompliance with the requirement that the student receive a Free Appropriate Public Education (FAPE) as outlined in federal legislation (*IDEA*-§300.17(a.-d.). Eight of ten applicable student files (80% of the sample receiving related services) were judged to be in noncompliance with the requirement that the student's IEP include measurable annual goals, including academic and functional goals designed to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and meet each of the child's other educational needs that result from the child's disability (*IDEA*-§300.320(a)(2)(i) (A-B). Eight of ten applicable student files (80% of the sample receiving related services) were found to be in noncompliance with the requirement that the IEP include a description of how the child's progress toward meeting the annual goals will be measured and when periodic

reports on progress will be provided (*IDEA*-§300.320(a)(3)(i-ii). Eight of ten applicable student files (80% of the sample receiving related services) were found to be in noncompliance with the requirement that the IEP team include not less than one special education teacher or special education provider of the child and not less than one regular education teacher of the child (*IDEA*-§300.321(a)(2)(3).  Nine of ten applicable student files (90% of the sample receiving related services) were judged to be in noncompliance with the requirement that the IEP include a statement of the child's present levels of academic achievement and functional performance, including how the child's disability affects the child's involvement and progress in the general education curriculum (*IDEA*-§300.320(a)(1)(i). Nine of ten applicable student files (90% of the sample receiving related services) were found to be in noncompliance with the requirement that the IEP include the date for beginning of services, modifications, and anticipated frequency, location, and duration of services and modifications (*IDEA*-§300.320(7).

   2.  <u>Corrective Actions to Address Identified Areas of Noncompliance</u>

   Overall, systemic noncompliance was identified in across two areas (i.e., development of measurable and meaningful PLAAFP statements and appropriate documentation of Related Service provisions) for all three charter schools targeted for monitoring in Related Services during the fall 2016 semester. J.S. Clark Preparatory High School also demonstrated additional systemic noncompliance for IDEA mandates in the following areas: (a) demonstrating reasonable attempts to ensure parent participation when parents are unable to attend scheduled IEP meetings, (b) ensuring that all appropriate team members attend IEP meetings, and (c) development of measurable IEP goals and objectives. Additional systemic noncompliance was also demonstrated by International School of Louisiana with the IDEA

mandate requiring an explanation of nonparticipation with nondisabled peers in the general education curriculum and evidence the LEA ensured that students with disabilities are educated with nondisabled students to the maximum extent possible. Finally, additional systemic noncompliance was observed for New Orleans Military and Maritime Academy in the following areas: (a) demonstrating reasonable attempts to ensure parent participation when parents are unable to attend scheduled IEP meetings, (b) ensuring that all appropriate team members attend IEP meetings, (c) development of measurable IEP goals and objectives (d) ensuring that IEP's Related Services that are reasonably calculated to enable students to attain annual goals and (e) providing an explanation of nonparticipation with nondisabled peers in the general education curriculum and evidence the LEA ensured  that students with disabilities are educated with nondisabled students to the maximum extent possible.

Given the identified systemic and student-specific findings of noncompliance under IDEA, Part B, all three charter schools (100% of the sample) required a formal CAP. As required by the CJ, the LDOE developed a CAP to address each area of identified systemic noncompliance or student-specific noncompliance listed in the LDOE monitoring reports and 2016-2017 IDEA monitoring summaries for New Orleans Military and Maritime Academy, International School of Louisiana Charter School, and Joseph S. Clark High School. Specifically, the CAPs each include the following nine activities for corrective remedy: (a) immediate correction of all student specific IDEA citations, (b) mandated training for special education staff (sped teachers and related service providers) on writing compliant IEPs, (c) training for related service providers on how to properly document the provision of services to students, (d) ongoing training conducted by LEA in the following areas: IEP writing, provision and documentation of accommodations, documenting special education services and

progress monitoring of student data, (e) mandated monthly consistency checks to ensure IEP fidelity, (f), mandated monthly consistency checks to ensure related service provider logs are completed with fidelity, (g) mandated completion of LDOE IEP Training Modules with particular focus on Module 2 (Data-Driven Present Levels of Performance) and Module 3 (Measurable Goals), (h) quarterly review of progress reports for SPED students enrolled at the school to ensure special education teachers and related service providers are completing progress reports accurately and (i) ensuring the provision of compensatory education to all students whose files did not include documentation verifying they received related services).

A copy of the CAPs to address areas of noncompliance for Related Service provisions for New Orleans Military Maritime Academy, International School of Louisiana Charter School, and Joseph S. Clark Charter School are in Appendix B for review by the parties. A review of the CAPs by the IMs revealed that the documents include "corrective actions sufficient to remedy the noncompliance and to reasonably ensure that such noncompliance does not reoccur" as outlined in section IV(B)(2) on page 8-9 of the CJ.

3. <u>Status of Compliance</u>

After participating in the on-site monitoring visits for the charter schools selected for targeted monitoring and reviewing documentation submitted by the LDOE monitoring personnel (e.g., monitoring notifications, LDOE monitoring reports, 2016-2017 IDEA monitoring results summaries, corrective action plans, technical assistance notifications) and discussing the targeted monitoring activities with LDOE legal counsel and monitoring personnel during conference calls and on-site meetings during throughout the fall 2016 semester and spring 2017 semester, the LDOE is judged to be in **Substantial Compliance** with Section IV(B)(2)(a-b) of the CJ and Sections B(1)(a-c) through 5(a) of Addendum A of the CJ for the fall semester of the 2016-2017

school year. An evaluation of compliance will be made again in the next IM status report which will discuss the follow-up targeted monitoring activities for charter schools who received initial monitoring reviews during the spring 2016 semester.

### 3. DISCIPLINE

1. <u>Targeted Monitoring Activities for the Discipline Provisions</u>

Three schools were selected for targeted monitoring during the fall 2016 school semester based on an analysis of 2015-2016 discipline data. The IMs reviewed the documentation and calculations performed by LDOE monitoring personnel and confirmed that the schools were selected for targeted monitoring in a manner consistent with the requirements outlined on page 11 of the CJ and pages 4-5 of Addendum A of the CJ. The schools selected for targeted monitoring during the fall 2016 semester included Arise Academy, G.W. Carver Collegiate Academy, and Eleanor McMain Secondary School (Orleans Parish School Board). A review of findings for each school is presented below.

a. *Arise Academy*

The on-site targeted monitoring visit occurred on November 9, 2016. Two LDOE representatives and two IMs were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections 4(a) and 4(b) on pages 4-5 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. Faculty at Arise Academy clearly articulated their responses regarding the policies, procedures, and practices related to the provision of tiered behavioral supports and disciplinary actions for students and provided satisfactory answers to all interview questions.  In relation, the faculty identified

areas of concern prior to the on-site monitoring visit and started taking corrective measures to address some of the areas of noncompliance for the 2016-2017 school year. These actions included updating the disciplinary procedures in the Parent Handbook, using more formal data collection procedures to evaluate trends in discipline data and student response to intervention, and providing professional development for faculty regarding special education requirements. A detailed summary of staff responses is presented on pages 3-4 of the LDOE monitoring report located in Appendix B.

A representative sample of eleven student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 5 (a-b) on page 11 of the CJ and section 2(a-b) on page 5 of Addendum A of the CJ. Specifically, the sample consisted of six students diagnosed with Emotional Disturbance and five students diagnosed with Other Health Impairment. Two of the eleven students (18% of the sample) required a Manifestation Determination Review (MDR) as the result of a change in placement. Student file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 3(a) on page 5 of Addendum A of the CJ using the required Discipline protocol. Please refer to pages 4-5 of the LDOE monitoring report for Arise Academy in Appendix B for a list of items that were reviewed to complete the Discipline protocol for the sample of students. A review of student records revealed that five of eleven student files (45% of the sample) were judged to be in noncompliance regarding the provision of disciplinary procedures and/or other IDEA requirements. Specific IDEA systemic violations are reported on page 5 of the LDOE monitoring report and pages 2-3 of the 2016-2017 IDEA monitoring results summary located in Appendix B. In relation, student specific findings of noncompliance are listed on page 4 of

the 2016-2017 IDEA monitoring results summary. Overall, systemic noncompliance was identified for this LEA under IDEA, Part B program in five areas. Specifically, two of two applicable student files (100% of the sample experiencing a change in placement) were found to be in noncompliance with the requirement that the LEA, the parent, and relevant IEP team members conduct a Manifestation Determination Review (MDR) within 10 school days of any decision to change the placement of a child with a disability because of a violation of the code of conduct (*IDEA*-§300.530E). Two of two applicable student files (100% of the sample receiving a change in placement) were judged to be in noncompliance with the requirement that the LEA notify the parents of the decision to make a removal that constitutes a change of placement of a child with a disability because of a violation of the code of conduct on the date of the removal (*IDEA*-§300.530H). Two of two applicable student files (100% of the sample experiencing a change in placement) were found to be in noncompliance with the requirement that the IEP team conduct an FBA, unless the LEA had conducted an FBA before the behavior that resulted in a change of placement occurred, and implemented a BIP; or if the BIP already has been developed, review and modify the BIP, as necessary, to address the behavior (*IDEA*-§300.530.F.1(i-ii). Two of two applicable student files (100% of the sample receiving a change in placement) were judged to be in noncompliance with the requirement that the IEP consider the use of positive behavior interventions, supports and other strategies for a child whose behavior impedes their learning or the learning of others (*IDEA*-§530.324(2)(i). Two additional student files (100% of the sample) were judged to reflect noncompliance with the requirement that the IEP include the projected date for the beginning of services, modification, and anticipated frequency, location, and duration of services and modifications (*IDEA*-§300.320(7).

48

b. *G.W. Carver Collegiate Academy*

The on-site targeted monitoring visit occurred on November 10, 2016. Two LDOE representatives and two IMs were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections 4(a) and 4(b) on pages 4-5 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. Faculty at G.W. Carver Collegiate Academy clearly articulated their responses regarding the policies, procedures, and practices related to the provision of tiered behavioral supports and disciplinary actions for students. In relation, the staff provided thorough and detailed answers to all interview questions particularly in the areas of team-based decision making, use of tiered behavioral supports and related initiatives (e.g., restorative practices, relationship building strategies), partnerships with community agencies, various methods of data collection, and use of data to evaluate school-wide and classroom level discipline trends as well as student response to the provision of tiered interventions. One area of concern identified during the interview process was that school personnel did not indicate that parents are provided a copy of the school's procedural safeguards when parents are notified that a student's behavior may warrant a change in placement. A detailed summary of staff responses is presented on pages 3-4 of the LDOE monitoring report located in Appendix B.

A representative sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 5 (a-b) on page 11 of the CJ and section 2(a-b) on page 5 of Addendum A of the CJ. Specifically, the sample consisted of seven students diagnosed with Emotional Disturbance and three students

diagnosed with Other Health Impairment. Two of the ten students (20% of the sample) required a Manifestation Determination Review (MDR) as the result of a change in placement. Student file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 3(a) on page 5 of Addendum A of the CJ using the required Discipline protocol. Please refer to pages 4-5 of the LDOE monitoring report for G.W. Carver Collegiate Academy in Appendix B for a list of items that were reviewed to complete the Discipline protocol for the sample of students. A review of student records revealed that two of two applicable student files (100% of the sample experiencing a change in placement) were judged to be in noncompliance regarding the provision of disciplinary procedures and/or other IDEA requirements. Specific IDEA systemic violations are reported on pages 5-6 of the LDOE monitoring report and pages 2-3 of the 2016-2017 IDEA monitoring results summary located in Appendix B. In relation, student specific findings of noncompliance are listed on pages 4-6 of the 2016-2017 IDEA monitoring results summary. Overall, systemic noncompliance was identified for this LEA under IDEA, Part B program in four areas. Specifically, two of two applicable student files (100% of the sample experiencing a change in placement) were found to be in noncompliance with the requirement that the LEA, the parent, and relevant IEP team members conduct a Manifestation Determination Review (MDR) within 10 school days of any decision to change the placement of a child with a disability because of a violation of the code of conduct (*IDEA*-§300.530E). Two of two applicable student files (100% of the sample receiving a change in placement) were judged to be in noncompliance with the requirement that the LEA notify the parents of the decision to make a removal that constitutes a change of placement of a child with a disability because of a violation of the code of conduct and provide the parents with the

procedural safeguards notice on the date of the removal (*IDEA*-§300.530H). Two of two applicable student files (100% of the sample experiencing a change in placement) were found to be in noncompliance with the requirement that the IEP team conduct an FBA, unless the LEA had conducted an FBA before the behavior that resulted in a change of placement occurred, and implemented a BIP; or if the BIP already has been developed, review and modify the BIP, as necessary, to address the behavior (*IDEA*-§300.530.F.1.(i-ii). Finally, one of two applicable student files (50% of the sample receiving a change in placement) was judged to be in noncompliance with the requirement that the student continue to receive services to enable the student to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals and objectives set out in the IEP if the IEP team determines that the behavior was not a manifestation of the student's disability and the suspension or expulsion was applied (*IDEA*-§300.530(d).

### c. *Eleanor McMain Secondary School (Orleans Parish School Board)*

The on-site targeted monitoring visit occurred on November 16, 2016. One LDOE representative and two IMs were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections 4(a) and 4(b) on pages 4-5 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. Faculty at Eleanor McMain Secondary School (OPSB) provided a general overview of their SW-PBIS programs (e.g., incentive programs, reinforcers, consequences) as well as methods of collecting and reviewing discipline data. They also reported that their SW-PBIS program was being revised for the 2016-2017 school year and that faculty were receiving additional

professional development and consultation from the OPSB Office of Exceptional Services regarding the provision of tiered supports within the Multi-Tiered Systems of Support (MTSS) model. One area of concern identified during the interview process was that parents are not provided a copy of their procedural safeguards on the same date the decision is made for a potential change in placement. A detailed summary of staff responses is presented on pages 3-4 of the LDOE monitoring report located in Appendix B.

A representative sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 5(a-b) on page 11 of the CJ and section 2(a-b) on page 5 of Addendum A of the CJ. Specifically, the sample consisted of four students diagnosed with Emotional Disturbance, three students diagnosed with Other Health Impairment, and three students diagnosed with Specific Learning Disability. Four of the ten students (40% of the sample) required a Manifestation Determination Review (MDR) as the result of a change in placement. Student file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 3(a) on page 5 of Addendum A of the CJ using the required Discipline protocol. Please refer to pages 4-5 of the LDOE monitoring report for Arise Academy in Appendix B for a list of items that were reviewed to complete the Discipline protocol for the sample of students. A review of student records revealed that four of four applicable student files (100% of the sample experiencing a change in placement) were judged to be in noncompliance regarding the provision of disciplinary procedures and/or other IDEA requirements. Specific IDEA systemic violations are reported on page 5 of the LDOE monitoring report and pages 2-3 of the 2016-2017 IDEA monitoring results summary located in Appendix B. In relation, student specific findings of noncompliance are listed on pages 4-5

of the 2016-2017 IDEA monitoring results summary. Overall, systemic noncompliance was identified for this LEA under IDEA, Part B program in four areas. Specifically, three of four applicable student files (75% of the sample experiencing a change in placement) were found to be in noncompliance with the requirement that the LEA, the parent, and relevant IEP team members conduct a Manifestation Determination Review (MDR) within 10 school days of any decision to change the placement of a child with a disability because of a violation of the code of conduct (*IDEA*-§300.530E). Four of four applicable student files (100% of the sample receiving a change in placement) were judged to be in noncompliance with the requirement that the LEA notify the parents of the decision to make a removal that constitutes a change of placement of a child with a disability because of a violation of the code of conduct on the date of the removal (*IDEA*-§300.530H). Four of four applicable student files (100% of the sample experiencing a change in placement) were found to be in noncompliance with the requirement that the IEP team conduct an FBA, unless the LEA had conducted an FBA before the behavior that resulted in a change of placement occurred, and implemented a BIP; or if the BIP already has been developed, review and modify the BIP, as necessary, to address the behavior (*IDEA*-§300.530.F.1(i-ii). Four of four applicable student files (100% of the sample receiving a change in placement) were judged to be in noncompliance with the requirement that the IEP consider the use of positive behavior interventions, supports and other strategies for a child whose behavior impedes their learning or the learning of others (*IDEA*-§530.324(2)(i).

    2.  <u>Corrective Actions to Address Identified Areas of Noncompliance</u>

Overall, systemic noncompliance was identified across three common areas (e.g., Manifestation Determination Reviews, Notification and Provision of Procedural Safeguards, development of a Functional Behavior Assessment and Behavior Intervention Plan or revision of

the BIP) for all three charter schools targeted for monitoring during the fall semester. In relation,

failure to consider the use of positive behavior interventions, supports, and other strategies as

part of the development, review and revision of the IEP was identified for Arise Academy and

Eleanor McMain Secondary School (OPSB). Systemic concerns were also identified at Arise

Academy in relation to inclusion of the projected date for beginning of services, modifications,

and anticipated frequency, location and duration of services as part of the definition of an IEP.

Systemic concerns were also identified at G.W. Carver Collegiate Academy regarding the

continued provision of services to enable the student to continue to participate in the general

education curriculum, although in another setting, and to progress toward meeting the goals set

out in the student's IEP. Given the identified systemic and student-specific findings of

noncompliance under IDEA, Part B, all three charter schools (100% of the sample) required a

formal CAP.  As required by the CJ, the LDOE developed a CAP to address each area of

identified systemic noncompliance and student-specific noncompliance listed in the LDOE

monitoring report and 2016-2017 IDEA monitoring summary for each LEA. Specifically, the

CAP for all three charter schools includes eight activities of corrective action (e.g., correction of

student-specific findings of noncompliance; provision of professional development on the

completion of FBAs; provision of professional development on the completion of BIPs, progress

monitoring methods, and graphing of student data; professional development on the MDR

process and MDR checklist provided by the LDOE; internal monitoring of FBAs and BIPs using

the checklists provided by the LDOE; internal monitoring of MDRs using the LDOE checklist;

development of formal, written procedures regarding FBAs, BIPs, MDRs, and evaluation of

student data and fidelity; monthly tracking of students with suspensions or expulsions). In

addition, the CAPs for Arise Academy and G.W. Carver Collegiate Academy have an additional

activity to address student-specific findings of noncompliance (e.g., provision of compensatory education to student with more than 10 days who did not receive educational services and/or to students who did not receive related services per the time and frequency listed on the IEP). A copy of the CAP for each charter school is in Appendix B for review by the parties. A review of the CAPs by the IMs revealed that the documents include "corrective actions sufficient to remedy the noncompliance and to reasonably ensure that such noncompliance does not reoccur" for Arise Academy, G.W. Carver Collegiate Academy, and Eleanor McMain Secondary School (OPSB) as outlined in section IV(C)(5) on page 11 of the CJ.

      3.  <u>Status of Compliance</u>

After participating in the on-site monitoring visits for the charter schools selected for targeted monitoring and reviewing documentation submitted by the LDOE monitoring personnel (e.g., monitoring notifications, LDOE monitoring reports, 2016-2017 IDEA monitoring results summaries, corrective action plans, technical assistance notifications) and discussing the targeted monitoring activities with LDOE legal counsel and monitoring personnel during conference calls and on-site meetings during throughout the fall 2016 semester and spring 2017 semester, the LDOE is judged to be in **Substantial Compliance** with Section IV(C)(5)(a-b) and Sections C(1)(a-c) through 5(a) of Addendum A of the CJ for the fall 2016 semester of the 2016-2017 school year. An evaluation of compliance will be made again in the next IM status report which will discuss the follow-up targeted monitoring activities for charter schools who received initial monitoring reviews during the spring 2016 semester.

**D. ENROLLMENT**

      1.  <u>Targeted Monitoring Activities for the Enrollment Stability Provisions</u>

Three schools were selected for targeted monitoring during the fall 2016 semester based on an analysis of 2015-2016 enrollment rates for NOLA Type 2 and Type 5 Charter

schools and OPSB LEAs. The IMs reviewed the documentation and calculations performed by

LDOE monitoring personnel and confirmed that the schools were selected for targeted

monitoring in a manner consistent with the requirements outlined on page 14-15 of the CJ and

page 6 of Addendum A of the CJ.  The schools selected for targeted monitoring during the fall

2016 semester included McDonogh 42 Charter School, Sophie B. Wright Charter School, and

the NET Charter School.  A review of findings for each school is presented below.

    a.  *McDonogh 42 Charter School*

    The on-site targeted monitoring visit occurred on November 17, 2016. Two LDOE

representatives and two IMs were present during the entire on-site visit to conduct staff

interviews and review student files. The staff interviews were conducted using a standard bank

of questions with staff members consistent with requirements outlined in sections B(4)(a) and

B(4)(b) on pages 3-4 of Addendum A of the CJ. The specific staff members who participated

in the interview process are reported on page 3 of the LDOE monitoring report. Faculty at

McDonogh 42 Charter School clearly articulated their responses regarding the required IDEA

mandates for provision of Related Services and provided satisfactory responses to all

interview questions.  A detailed summary of staff responses is presented on pages 3-4 of the

LDOE monitoring report located in Appendix B.

    A representative sample of ten student files were reviewed by the LDOE monitoring

personnel and IMs in a manner consistent with the requirements outlined in section B(2)(a) on

and B(2)(b) on page 3 of Addendum A of the CJ. It should be noted here that one student

selected for review did not attend McDonogh 42 Charter School during the 2015-2016 school

term. As such, data gathered from this student's file was omitted when making determinations

regarding the LEAs compliance with IDEA Related Service provision mandates. However,

when student-specific noncompliance was observed, immediate corrective remedies were mandated. The sample of students reviewed included the following exceptionalities: two students with an exceptionality of Autism, one student with an exceptionality of Developmental Delay, three students with an exceptionality of  Emotional Disturbance, one student with an exceptionality of Intellectual Disability, one student with an exceptionality of Other Health Impairment, one student with an exceptionality of Orthopedic Impairment and one student with an exceptionality of Specific Learning Disability. A wide range of Related Service provisions were reviewed including Physical Therapy for one student, Counseling services for one student, Social Work Services in Schools for four students, Adaptive Physical Education for three students, Occupational Therapy for three students and Speech/Language Therapy for six students.

Student file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(3)(a) on page 3 of Addendum A and section D(2)(a-c) on page 6 of Addendum A using the required Related Service protocol. Please refer to page 4 of the LDOE monitoring report for McDonogh 42 Charter School in Appendix B for a list of items that were reviewed to complete the Related Service protocol for the sample of students. A review of student records revealed that nine of nine applicable student files reviewed (100% of the sample) were judged to be in noncompliance regarding Related Service provisions. Specific IDEA systemic violations are reported on pages 5-6 of the LDOE monitoring report and pages 2-5 of the 2016-2017 IDEA monitoring results summary located in Appendix B. In relation, student-specific findings of noncompliance are listed on pages 6-10 of the 2016-2017 IDEA monitoring results summary. Overall, systemic noncompliance was identified for this LEA under IDEA, Part B in nine areas. Specifically,

nine of nine applicable student files (100% of the sample receiving related services) were found to be in noncompliance with the requirement that the student receive a Free Appropriate Public Education (FAPE) as outlined in federal legislation (*IDEA*-§300.17(a.-d.). Nine of nine applicable student files (100% of the sample receiving related services) were judged to be in noncompliance with the requirement that the IEP include a statement of the child's present levels of academic achievement and functional performance, including how the child's disability affects the child's involvement and progress in the general education curriculum (*IDEA*-§300.320(a)(1)(i). Four of nine applicable student files (44% of the sample) were judged to be in noncompliance with the requirement that the IEP include a description of how the child's progress toward meeting the annual goals will be measured and when periodic reports on progress will be provided (*IDEA*-§300.320(a)(3)(i-ii). Six of nine applicable student files (67% of the sample receiving related services) were found to be in noncompliance with the requirement that the IEP include the date for beginning of services, modifications, and anticipated frequency, location, and duration of services and modifications (*IDEA*-§300.320(7). Five of nine applicable student files (56% of the sample) were found to be in noncompliance with the requirement that the student's IEP team must include not less than one special education teacher or special education provider of the child (*IDEA*-§300.321(a)(3). Four of nine applicable student files (44% of the sample receiving related services) were judged to be in noncompliance with the requirement that the IEP include a statement of special education and related services, supplementary aids and services, and a statement of program modifications or supports for school personnel (*IDEA*-§300.320(a)(4). Nine of nine applicable student files (100% of the sample receiving related services) were judged to be in noncompliance with the requirement that the student's IEP include measurable annual goals,

including academic and functional goals designed to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and meet each of the child's other educational needs that result from the child's disability (*IDEA*-§300.320(a)(2)(i)(A-B). Two of nine applicable student files (22% of the sample receiving related services) were found to be in noncompliance with the requirement that the parents be invited to the IEP meeting (*IDEA*-§300.322(a). Two of three applicable student files (67% of the sample receiving related services) were judged to be in noncompliance with the requirement that the LEA documents attempts to ensure parental participation if neither parent was able to attend the IEP meeting (*IDEA*-§300.322(a) and §300.501(b). Finally, one of nine applicable student files (11% of the sample receiving related services) was found to be in noncompliance with the requirement that the parent be included in the IEP team membership (IDEA-§300.321(a)(1).

   b.  *Sophie B. Wright Charter School*

The on-site targeted monitoring visit occurred on November 17, 2016. One LDOE representative and two IMs were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections B4(a) and B4(b) on page 3-4 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3-4 of the LDOE monitoring report. In general, faculty at Sophie B. Wright Charter School clearly articulated their responses regarding the required IDEA mandates for provision of Related Services and provided satisfactory responses to many interview questions.  However, school staff did not clearly articulate the LEAs process used for determining whether a student may initially require Related Services to

ensure satisfactory progress in school (e.g., referral concerns, academic, medical, attendance or behavioral data, parental concerns). A detailed summary of staff responses is presented on pages 3-4 of the LDOE monitoring report located in Appendix B.

A representative sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(2)(a) and B(2)(b) on page 3 of Addendum A of the CJ. It should be noted here that one student selected for review did not attend Sophie B. Wright Charter School during the 2015-2016 school year. As such, data gathered from this student's file was omitted when making determinations regarding the LEAs compliance with IDEA Related Service provision mandates. However, when student-specific noncompliance was observed, immediate corrective remedies were mandated.

The sample of ten students reviewed included the following exceptionalities: one student with an exceptionality of Autism, one student with an exceptionality of Intellectual Disability-Mild, one student with an exceptionality of Intellectual Disability-Moderate, four students with an exceptionality of Other Health Impairment, one student with an exceptionality of Specific Learning Disability and one student with an exceptionality of Visual Impairment. A wide range of Related Service provisions were reviewed including Counseling services for one student, Social Work Services in Schools for one student, Adaptive Physical Education for three students, Occupational Therapy for two students, and Speech/Language Therapy for eight students.  Assistive Technology services were also provided for one student.

Targeted file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B3(a) on page 3 of Addendum A of the CJ and section D(2)(a-c) on page 6 of Addendum A using the required Related Service

protocol. Please refer to page 4 of the LDOE monitoring report for Sophie B. Wright Charter

School in Appendix B for a list of items that were reviewed to complete the Related Services

protocol for the sample of students. A review of student records revealed that nine of nine

student files reviewed (100% of the sample) were judged to be in noncompliance regarding

Related Service provisions. Specific IDEA systemic violations are reported on pages 5-6 of

the LDOE monitoring report and pages 2-4 of the 2016-2017 IDEA monitoring results

summary located in Appendix B. In relation, student-specific findings of noncompliance are

listed on pages 5-10 of the 2016-2017 IDEA monitoring results summary. Overall, systemic

noncompliance was identified for this LEA under IDEA, Part B in seven areas. Specifically,

nine of nine applicable student files (100% of the sample receiving related services) were

found to be in noncompliance with the requirement that the student receive a Free Appropriate

Public Education (FAPE) as outlined in federal legislation (*IDEA*-§300.17(a.-d.). Five of nine

applicable student files (56% of the sample receiving related services) were judged to be in

noncompliance with the requirement that the IEP team include not less than one special

education teacher or special education provider of the child (*IDEA*-§300.321(a)(3). Nine of

nine applicable student files (100% of the sample receiving related services) were judged to be

in noncompliance with the requirement that the IEP include a statement of the child's present

levels of academic achievement and functional performance, including how the child's

disability affects the child's involvement and progress in the general education curriculum

(*IDEA*-§300.320(a)(1)(i). Six of nine applicable student files (67% of the sample receiving

related services) were judged to be in noncompliance with the requirement that the student's

IEP include measurable annual goals, including academic and functional goals designed to

meet the child's needs that result from the child's disability to enable the child to be involved

in and make progress in the general education curriculum; and meet each of the child's other educational needs that result from the child's disability (*IDEA*-§300.320(a)(2)(i)(A-B). Three of nine applicable student files (33% of the sample receiving related services) were judged to be in noncompliance with the requirement that the IEP include a statement of special education and related services, supplementary aids and services, and a statement of program modifications or supports for school personnel (*IDEA*-§300.320(a)(4). Five of eight applicable student files (63% of the sample receiving related services) were found to be in noncompliance with the requirement that the IEP include the date for beginning of services, modifications, and anticipated frequency, location, and duration of services and modifications (*IDEA*-§300.320(7). Finally, five of nine applicable student files (56% of the sample) were judged to be in noncompliance with the requirement that the IEP include a description of how the child's progress toward meeting the annual goals will be measured and when periodic reports on progress will be provided (*IDEA*-§300.320(a)(3)(i-ii).

### c. The NET Charter School

The on-site targeted monitoring visit occurred on November 16, 2016. Two LDOE representatives and two IMs were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections B(4)(a) and B(4)(b) on pages 3-4 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. Faculty at the NET Charter School clearly articulated their responses regarding the required IDEA mandates for provision of Related Services and provided satisfactory responses to all interview questions.  A detailed summary of staff responses is presented on pages 3-4 of the LDOE

monitoring report located in Appendix B.

A representative sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(2)(a) and B(2)b on page 3 of Addendum A of the CJ. It should be noted here that the NET Charter School primarily serves students who have previously dropped out of school and/or who have been expelled from other LEAs as the result of behavioral concerns. As such, this LEA does not typically receive enrollment applications from students with low-incidence disabilities as described in section B(2)(a) in Addendum A of the CJ. Therefore, the student sample was selected in accordance with section 2(b)(2) in Addendum A. It should also be reported here that one student selected for review did not attend the NET Charter School during the 2015-2016 school year. As such, data gathered from this student's file was omitted when making determinations regarding the LEAs compliance with IDEA Related Service provision mandates. However, when student-specific noncompliance was observed, immediate corrective remedies were mandated. The sample of ten students reviewed included the following exceptionalities: one student with an exceptionality of Intellectual Disability-Mild, one student with an exceptionality of Intellectual Disability-Moderate, three students with an exceptionality of Other Health Impairment, two students with an exceptionality of Emotional Disturbance and three students with an exceptionality of Specific Learning Disability. Related Service provisions reviewed included Counseling services for eight students and Speech/Language Therapy for five students.

Targeted file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(3)(a) on page 3 of Addendum A and section D(2)(a-c) on page 6 of Addendum A of the CJ using the required Related Service

protocol. Please refer to page 4 of the LDOE monitoring report for the NET Charter School in

Appendix B for a list of items that were reviewed to complete the Related Service protocol for

the sample of students. A review of student records revealed that nine of nine applicable

student files reviewed (100% of the sample) were judged to be in noncompliance regarding

Related Service provisions. Specific IDEA systemic violations are reported on pages 5-6 of

the LDOE monitoring report and pages 2-5 of the 2016-2017 IDEA monitoring results

summary located in Appendix B. In relation, student-specific findings of noncompliance are

listed on pages 6-9 of the 2016-2017 IDEA monitoring results summary. Overall, systemic

noncompliance was identified for this LEA under IDEA, Part B in six areas and student-

specific noncompliance was identified in two areas. Specifically, nine of nine applicable

student files (100% of the sample receiving related services) were found to be in

noncompliance with the requirement that the student receive a Free Appropriate Public

Education (FAPE) as outlined in federal legislation (*IDEA*-§300.17(a.-d.). One of one student

applicable student files (100% of the relevant sample) was judged to be in noncompliance

with the requirement that the IEP include a statement of informing the child of his or her rights

and the rights being transferred on the age of majority at least one year before the child

reaches the age of majority (*IDEA*-§300.320(7)(c). Two of nine applicable student files (22%

of the sample) were found to be in noncompliance with the requirement that the student's IEP

team must include not less than one special education teacher or special education provider of

the child (*IDEA*-§300.321(a)(3).  Nine of nine applicable student files (100% of the sample

receiving related services) were judged to be in noncompliance with the requirement that the

student's IEP include measurable annual goals, including academic and functional goals

designed to meet the child's needs that result from the child's disability to enable the child to

be involved in and make progress in the general education curriculum; and meet each of the child's other educational needs that result from the child's disability (*IDEA-*§300.320(a)(2)(i)(A-B). Nine of nine applicable student files (100% of the sample receiving related services) were judged to be in noncompliance with the requirement that the IEP include a statement of the child's present levels of academic achievement and functional performance, including how the child's disability affects the child's involvement and progress in the general education curriculum (*IDEA-*§300.320(a)(1)(i). Three of nine applicable student files (33% of the sample receiving related services) were found to be in noncompliance with the requirement that the IEP include the date for beginning of services, modifications, and anticipated frequency, location, and duration of services and modifications (*IDEA-*§300.320(7). Finally, two student-specific findings of noncompliance were also addressed in the LDOE monitoring report. Specifically, one of nine applicable student files (11% of the sample receiving related services) was found to be in noncompliance with the requirement that the IEP team include the parents of the child (*IDEA-*§300.321(a)(1). One of nine applicable student files (11% of the sample) were judged to be in noncompliance with the requirement that the IEP include a description of how the child's progress toward meeting the annual goals will be measured and when periodic reports on progress will be provided (*IDEA-*§300.320(a)(3)(i-ii).

    2.  <u>Corrective Actions to Address Identified Areas of Noncompliance</u>

    Overall, systemic noncompliance for IDEA mandates was identified across the following areas: (a) ensuring that appropriate IEP team members attend IEP meetings, (b) writing measurable and meaningful PLAAFP statements, (c) writing measurable and meaningful goals and objectives, (d) providing an explanation of nonparticipation with

nondisabled peers in the general education curriculum and evidence the LEA ensured that students with disabilities are educated with nondisabled students to the maximum extent possible, and (e) appropriate documentation of Related Service provisions for all three charter schools targeted for monitoring in the area of Enrollment Stability during the fall 2016 semester. Additional systemic noncompliance was also identified for McDonogh 42 Charter School and the NET Charter School in relation to (a) appropriately describing in the student's IEP how progress toward annual goals will be measured and (b) consistently providing parents with regular progress reports. Finally, McDonogh 42 Charter School also demonstrated additional systemic noncompliance for mandated IDEA Related Service provisions relative to ensuring that parents are consistently invited to all IEP meetings and/or appropriately documenting reasonable attempts to ensure parental participation when parents were unable to attend scheduled IEP meetings.

Given the identified systemic and student-specific findings of noncompliance under IDEA, Part B, all three charter schools (100% of the sample) required a formal CAP. As required by the CJ, the LDOE developed a CAP to address each area of identified systemic noncompliance or student-specific noncompliance listed in the LDOE monitoring reports and 2016-2017 IDEA monitoring summaries for McDonogh 42 Charter School, Sophie B. Wright Charter School, and the NET Charter School. Specifically, the CAPs each include the following nine activities of corrective action: (a) immediate correction of all student specific IDEA citations, (b) mandated training for special education staff (sped teachers and related service providers) on writing compliant IEPs, (c) training for related service providers on how to properly document the provision of services to students, (d) ongoing training conducted by LEA in the following areas: IEP writing, provision and documentation of accommodations,

documenting special education services and progress monitoring of student data, (e) mandated monthly consistency checks to ensure IEP fidelity, (f), mandated monthly consistency checks to ensure related service provider logs are completed with fidelity, (g) mandated completion of LDOE IEP Training Modules with particular focus on Module 2 (Data-Driven Present Levels of Performance) and Module 3 (Measurable Goals), (h) quarterly review of progress reports for SPED students enrolled at the school to ensure special education teachers and related service providers are completing progress reports accurately, and (i) ensuring the provision of compensatory education to all students whose files did not include documentation verifying they received related services.

A copy of the CAPs to address areas of noncompliance for Related Service provisions for McDonogh 42 Charter School, Sophie B. Wright and the NET Charter School are in Appendix B for review by the parties.  A review of the CAPs by the IMs revealed that the documents include "corrective actions sufficient to remedy the noncompliance and to reasonably ensure that such noncompliance does not reoccur" as outlined in section IV(D)(7) on page 14 of the CJ.

3.  <u>Status of Compliance</u>

After participating in the on-site monitoring visits for the charter schools selected for targeted monitoring and reviewing documentation submitted by the LDOE monitoring personnel (e.g., monitoring notifications, LDOE monitoring reports, 2016-2017 IDEA monitoring results summaries, corrective action plans, technical assistance notifications) and discussing the targeted monitoring activities with LDOE legal counsel and monitoring personnel during conference calls and on-site meetings during throughout the fall 2016 semester and spring 2017 semester, the LDOE is judged to be in **Substantial Compliance** with Section IV(D)(7)(a-b) of the CJ and

Sections D(1)(a-c) and D(2)(a-c) of Addendum A of the CJ for the fall semester of the 2016-2017 school year. An evaluation of compliance will be made again in the next IM status report which will discuss the follow-up targeted monitoring activities for charter schools who received initial monitoring reviews during the spring 2016 semester.

<u>Summary of the Status of Compliance Determinations</u>

Overall, the LDOE was judged to be in **Substantial Compliance** with ten of twelve (83%) substantive provisions of the CJ regarding the targeted monitoring activities and corrective actions for the 2015-2016 school year. A review of status determinations for the 2015-2016 school year by the IMs is presented in the Summary of Compliance Status document located in Appendix A.

In relation, the LDOE maintained **Substantial Compliance** with the aforementioned provisions of the CJ for the 2016-2017 school year which represents first year of the required two consecutive years of maintenance as outlined in Section VIII(2) on page 18 of the CJ. The LDOE achieved Substantial Compliance with twelve of twelve (100%) of the substantive provisions in the CJ for the 2016-2017 school year.  Specifically, the LDOE achieved initial Substantial Compliance for Sections IV(A)(3)(b) Targeted Monitoring: Student Sample Selection in the area of Child Find and IV(C)(5)(b) Targeted Monitoring: Student Sample Selection in the area of Discipline during the fall semester of 2016-2017 school year. This represents the initial year of **Substantial Compliance** for these provisions with the CJ. As such, the LDOE shall be required to maintain compliance for two consecutive school years to meet the requirements outlined in Section VIII(2) on page 18 of the CJ.  A review of status determinations for the 2016-2017 school year by the IMs is also presented in the Summary of Compliance Status document located in Appendix A.

Recommendations for Addressing Areas of Corrective Action for LEAs selected for
Targeted Monitoring

The LDOE shall continue to follow the targeted monitoring procedures as outlined in

each substantive section of the CJ and on pages 1-12 of Addendum A of the CJ. IMs will

continue to review charter school selection and verify LDOE calculations as required by the CJ.

The LDOE shall also continue to select LEAs for targeted monitoring and perform staff

interviews and student file reviews using the protocols as outlined in the CJ and Addendum A of

the CJ during future initial and follow-up on-site visits. In relation, the LDOE shall continue to

conduct initial and follow-up on-site targeted monitoring visits collaboratively with the IMs to

obtain information from faculty and review student files to make compliance determinations in

this area of the CJ. LDOE monitoring personnel shall provide relevant, ongoing technical

assistance and professional development to ensure that the LEAs are able to engage in the

activities listed on the CAPs with adequate levels of fidelity to correct the identified areas of

systemic and student-specific noncompliance. If LDOE monitoring personnel identify a pattern

of noncompliance for specific Bulletin 1508 requirements, IDEA regulations or Section 504

regulations based on the submission of required documents from the LEAs, then additional

strategic professional development provided directly by LDOE monitoring personnel or other

approved service providers (e.g., LSU Health Sciences Center TIERS Group) beyond the

professional development or technical assistance delineated in each CAP should be provided to

school personnel (including contractual service providers) to address the identified areas of

concern. In relation, all training materials used by each LEA or approved contracted

professionals to provide professional development to staff members on topics identified in the

CAPs shall be approved by the LDOE prior to delivery of the training. Furthermore, training on

targeted topics outlined in the CAPs may be required on multiple occasions throughout the

school year to address potential concerns with faculty attrition and turnover. Additionally, LDOE monitoring personnel may find it necessary to provide corrective feedback and technical assistance more frequently than the timelines outlined in the CAPs to some LEAs based on formative review of their practices and submitted documentation. Finally, LDOE monitoring personnel shall continue to review the CAPs for the LEAs selected for targeted monitoring at the designated times outlined on these documents and provide regular updates to the IMs regarding each LEAs status in complying with the CAPs. It is recommended that the LDOE provide the IMs with written updates quarterly each school year so an evaluation of the status of compliance with the CAPs can be conducted in a formative manner for these LEAs prior to the formal, follow-up onsite monitoring visits performed during the upcoming 2017-2018 school year.

Additional Targeted Monitoring Activities for the 2016-2017 School Year

LDOE monitoring representatives and IMs collaboratively completed follow-up, on-site monitoring visits from February 6-10, 2017 for LEAs initially selected for targeted monitoring last school year during the spring 2016 term. LDOE monitoring personnel and IMs completed monitoring reports during the March 2017, and these reports have been submitted to the LEAs. The IMs received the final LDOE monitoring reports on May 3, 2017 and the intensive corrective action plans (I-CAPs) for the charter schools that continued to demonstrate continued noncompliance based on the completion of staff interviews and student file reviews during the spring 2017 term on May 9, 2017. The IMs also received the email notifications from LDOE monitoring personnel notifying the LEAs of mandatory technical assistance meetings to address the findings from the monitoring reports and to review the activities contained within the ICAPs on May 9, 2017. Given the receipt of these targeted monitoring materials, the IMs will submit a status report documenting the targeted monitoring activities that occurred during the spring 2017

semester to the Parties for review by July 15, 2017. The tentative date for submission of the final

IM status report discussing the spring 2017 targeted monitoring activities to the Court is August

15, 2017.