**Office of the Independent Monitors**
**P.B., et al., v. John White, et al.**
**(Civil Case No. 2:10-cv-04049)**
**Final Status Report to the Court**
**July 3, 2018**

### A. INTRODUCTION

Pursuant to Section V(9) on page 16 of the Consent Judgment (CJ) filed with the Court on March 25, 2015, the Independent Monitors shall file with the Court and provide the Parties with reports describing the steps taken by the State Defendants and the Defendant-Intervenor to implement the Agreement and evaluate the extent to which the State Defendants and the Defendant-Intervenor have complied with each substantive provision of the Agreement. In relation, these reports shall be written with due regard for the privacy interests of the students. Pursuant to Section V(9)(a), the Monitor shall issue a status report every 120 days after the first year of implementation of the Agreement. The reports shall be provided to the Parties in draft form for comment at least 14 days prior to their issuance. The Monitor shall consider the Parties' responses and make appropriate changes, if any, before issuing the report. Therefore, a summary of the feedback from each party is provided. The Independent Monitors received feedback from the Counsel for the Plaintiff Class on May 21, 2018 as well as feedback from the Defendant-Intervenor on June 1, 2018 and the State Defendants on June 4, 2018. Overall, the Plaintiffs expressed concern with the "continued pattern of systemic noncompliance at LEAs selected for targeted monitoring in fall 2017." Counsel for the Plaintiff Class also renewed their objection to the IM's determination that the LDOE has achieved an initial year of "substantial compliance" in relation to targeted monitoring activities and provision of corrective actions for identified LEAs and maintained that compliance for one year. Specifically, the Plaintiffs' Counsel

argued that the "Supreme Court recently clarified that IDEA required more than *de minimus* compliance, i.e., more than a paper Corrective Action Plan (CAP)" (e.g., *Endrew F. ex rel. Joseph F. v. Douglas Cty Sch Dist. RE-1*, 137 S. Ct. 988, 1001, 197 L. Ed. 2d 335 (2017), and they asserted that the Consent Judgment "clearly requires the LEAs to *actually remedy* noncompliance before a finding of 'substantial compliance' can be made." Therefore, Plaintiffs' Counsel encouraged the IMs "to wait until compliance is verified in follow-up monitoring before finding the LDOE in substantial compliance" for targeted monitoring activities and corrective actions. Finally, the Counsel for the Plaintiff Class expressed strong concerns regarding the content of the CAPs for the LEAs identified for on-site targeted monitoring during the fall 2017 school term (e.g., facially insufficient to meet the requirements of the Consent Judgment, omit important information such as personnel responsible for implementation of CAP activities and timelines, do not incorporate recommendations from IM status reports dated February 22, 2018 and February 23, 2018). The Defendant-Intervenor responded on June 1, 2018 that "OPSB does not concur with many of SPLC's arguments in their feedback letter on the draft IM report, including the relevance to *Endrew F.* and especially the recommendation to alter the IM's conclusions regarding "substantial compliance." The State Defendants responded on June 4, 2018 that they had no feedback on the substance of the draft IM status report but continued to lodge their objections to the recommendations in the draft status report. Specifically, the LDOE responded that "the report again suggests that sufficient compliance to exit the Consent Judgment is one year plus 2 years of consecutive compliance. State Defendants disagree and assert that the standard has always been 2 years of consecutive compliance, not 3." In addition, the State Defendants also asserted that OPSB will be required to provide some of

the technical assistance outlined in the Consent Judgment given that the LDOE will no longer be the authorizer of the Recovery School District LEAs after July 1, 2018. Finally, the State Defendants suggested that "clarity from the Court" is still needed regarding the transition of responsibilities of the State Education Agency to OPSB under the terms of the Consent Judgment. The Independent Monitors have thoroughly reviewed and carefully considered the responses provided by each party and made relevant revisions to the final IM status report submitted to the Court and Counsel for the Plaintiff Class, State Defendants, and Defendant-Intervenor.

Pursuant to Section V(9)(b) of the CJ, the Independent Monitors shall evaluate the state of compliance for each relevant provision of the Agreement using the following standards: (1) Substantial Compliance and (2) Noncompliance. To assess compliance, the Monitor shall review a sufficient number of pertinent documents to accurately assess compliance and interview any necessary staff or personnel. The Monitor shall also be responsible for independently verifying representations from the State Defendants or Defendant-Intervenor regarding progress toward compliance and examining supporting documentation. Each Monitor report shall describe the steps taken by the Monitor to assess compliance, including documents reviewed and individuals interviewed, and the factual basis for each of the Monitor's findings. Pursuant to Section V(10) of the CJ, reports issued by the Monitor shall not be admissible against the State Defendants and the Defendant-Intervenor in any proceeding other than a proceeding related to the enforcement of this Agreement initiated and handled exclusively by the State Defendants, the Defendant-Intervenor, or the Plaintiff's counsel. The State Defendants shall be released from the terms of the CJ when they have 1) achieved Substantial Compliance with each provision of the

Agreement for which they are assigned responsibility; 2) maintained Substantial

Compliance for a period of two years; and 3) subject to Court approval (p. 18 of the CJ).

The current IM status report addresses activities completed by the State Defendants

during the 2017-2018 school year as required by the CJ. The IMs provide a summary of the

targeted monitoring activities completed during the fall 2017 semester along with an

overview of the specific findings observed across LEAs selected for targeted monitoring in

the areas of Child Find, Related Services, Discipline and Enrollment with regard to specific

areas of IDEA compliance. In addition, the IMs also provide a summary "Substantial

Compliance" or "Noncompliance" decisions as related to specific monitoring activities

undertaken by the LDOE (e.g., appropriate selection of schools, completion of staff

interviews and student file reviews, development and dissemination of LEA targeted

monitoring reports, development, and dissemination of corrective action plans). The

sequence of information in this IM status report follows the general structure of the CJ.

Language from each substantive provision of the Agreement or Addendum A (i.e.,

monitoring protocols) outlined in the CJ is incorporated into the IM status report, when

appropriate.

## TARGETED MONITORING ACTIVITIES FOR THE FALL 2017 SEMESTER OF THE 2017-2018 SCHOOL YEAR

<u>Overview of Targeted Monitoring Activities for the Fall 2017 Semester</u>

The CJ requires that the LDOE engage in specific monitoring activities for LEAs

selected for targeted monitoring annually. As such, the IMs report the activities and decisions

made by the LDOE as related to the required monitoring activities for schools identified for

targeted monitoring during the fall 2017 school term for each relevant provision of the CJ.

However, an overview of the monitoring procedures used by the LDOE is provided here to

assist readers in understanding the process that was used to complete targeted monitoring as required by the CJ. Additional information is also included in each relevant section of the status report.

School selection for each area of targeted monitoring was completed by LDOE monitoring personnel using calculation rates outlined in Addendum A of the CJ (p. 1 for Child Find, p. 3 for Related Services, p. 4 for Discipline, p. 6 for Enrollment Stability) in August 2017. Each LEA was elected for targeted monitoring by the LDOE from an analysis of relevant data (i.e., initial IDEA evaluations, rates of related service provisions, discipline outcomes, and enrollment stability rates) for the 2016-2017 school year. These LEAs were sent a notification email from LDOE Director of State-wide Monitoring on October 10, 2017 (see the Appendix for a copy of each email). This notification provided an overview of the requirements for targeted monitoring pursuant to the CJ, the specific areas in which the charter was being monitored, methods of monitoring (e.g., student file selection, staff interviews, student file reviews), LDOE contact personnel, the specific date of interviews with staff, instructions for the on-site monitoring visit, and copies of the staff interview questions and student file review protocols. In addition, on October 12, 2017 the LDOE notified selected LEAs via email reminding school leaders of the upcoming monitoring activities and provided all LEAs with a power point presentation that covered all LDOE monitoring activities. Planning phone calls were conducted by LDOE monitoring personnel on October 17, 2017 for eleven of twelve charter LEAs and one LEA on November 29, 2017 with school leaders from each LEA to assist school personnel in understanding the CJ requirements for targeted monitoring and to answer any questions or address any concerns. The protocols along with the relevant IDEA or Bulletin 1508 legal citation are provided in the Appendix for review.

LDOE monitoring personnel submitted the targeted monitoring schedule for the fall 2017 school term to the IMs on September 27, 2017 and a revised schedule was submitted on October 3. 2017. The LDOE also submitted contact information for LEAs selected for targeted monitoring on November 1, 2017. In addition, the LDOE also submitted the rosters of randomly-selected students from each LEA targeted for monitoring on November 20, 2017 and November 27, 2017.

LDOE monitoring personnel and the IMs conducted on-site staff interviews and student file reviews from December 4-17, 2017 using documents required by the CJ (see staff interview questionnaires and student file review protocols in the Appendix). The IMs and LDOE monitoring personnel scored student file review protocols independently during the on-site visits and reconciled any scoring differences during the on-site monitoring visits or during conference calls held on December 20, 2017.  Based on agreements among all parties during a meeting held on September 22, 2016, compliance determinations for individual students shall be consistent with the 100% compliance standard outlined in the IDEA. That is, during all targeted monitoring activities, any single finding of noncompliance for any specific IDEA regulation being assessed for an individual student was judged to reflect noncompliance and required immediate individual corrective action (i.e., student-specific areas of noncompliance outlined in the IDEA Monitoring Summary and individual corrective actions as part of the LEA Corrective Action Plan). Similarly, all parties agreed that systemic noncompliance would be determined when less than 80% of the student sample failed to meet the 100% individual student compliance standard for any IDEA requirement evaluated on the CJ protocol and would result in mandatory systemic corrective actions (i.e., Corrective Action Plan or Intensive Corrective Action Plan) for the LEA.

The LDOE monitoring personnel completed the monitoring reports for each targeted LEA during the months of December 2017 and January 2018 and submitted draft reports to the IMs on January 23, 2018 and January 26, 2018. The IMs reviewed the monitoring reports and provided feedback regarding specific findings of noncompliance in relation to IDEA regulations and student-specific findings of noncompliance on February 2, 2018. In relation, the LDOE monitoring personnel developed the Corrective Action Plans (CAPs) for each LEA during January-February 2018 and submitted to the IMs on February 9, 2018. The IMs provided feedback regarding the CAPs on February 20, 2018. The IMs and LDOE monitoring personnel participated in a conference call to discuss the IMs edits to the CAPs on February 27, 2018.

The IMs review and feedback focused on ensuring the corrective strategies outlined in the CAPS were reasonably sufficient, presuming adequate levels of implementation fidelity, to lead to overall sustained improvements and compliance for IDEA and/or Bulletin 1508 practices in the areas of Child Find, Related Services, Discipline and Enrollment across targeted LEAs. Specifically, the IMs reviewed all submitted CAPs to ensure that the professional development and technical assistance activities strategically addressed each finding of systemic or student-specific noncompliance. In relation, the IMs evaluated the CAPs to ensure that on-going corrective and supportive feedback would be provided by LDOE monitoring personnel to assist in promoting skill development of faculty in a developmental nature across time. Finally, the IMs reviewed the CAPs to ensure that the LEAs would be providing appropriate documentation to assist LDOE monitoring personnel in evaluating both the compliance and quality of their practices in relation to federal and state regulations as well as requirements outlined in the CJ.

The LDOE submitted cover letters, final monitoring reports with recommendations for improvement, specific findings of noncompliance in relation to IDEA violations, and CAPs to the IMs on April 16, 2018. These documents are in the Appendix for review by all parties. The LDOE submitted notification emails for technical assistance meetings with the LEAs to review the results of the monitoring reports, results summaries, and corrective action plans on April 26, 2018. Finally, LDOE monitoring personnel held on-site technical assistance meetings with the targeted LEAs to review the findings of systemic noncompliance and student-specific noncompliance and to discuss the structure and activities of the CAPs from May 8-10, 2018 and May 17, 2018. These notifications were submitted to the IMs for review on April 26, 2018 and are also located in the Appendix for review by the parties. Revisions were made to the CAPs following these required meetings to identify the persons responsible for completing the CAP activities and action steps for compliance, specify the required documentation to be submitted to statewide monitoring personnel, documentation due dates, and revision to corrective activities and/or action steps, if appropriate. The revised CAPs were submitted to the IMs by statewide monitoring personnel on May 24, 2018 and are included in the Appendix for review by the parties.

The IMs review of compliance with the targeted monitoring provisions of the CJ for the fall semester of the 2017-2018 school year consisted of an evaluation of three components of the LDOE's monitoring activities. Specifically, the components being assessed for compliance included: (1) Correct identification of the charter schools selected for targeted monitoring (e.g., determination of the annual new identification rate for each LEA, and evaluation of the LDOE calculations); (2) Completion of targeted monitoring activities by the LDOE as required by the CJ and Addendum A to the CJ (e.g., completion of

appropriate monitoring activities by the LDOE, completion of staff interviews, appropriate selection of student files, appropriate completion of the monitoring protocols, and correct identification of systemic or individual compliance and/or noncompliance) and (3) Development of appropriate corrective actions "sufficient to remedy the noncompliance and to reasonably ensure that such noncompliance does not reoccur." (pp. 7, 9, 11, 14 of CJ). As such, the IM status report provides a review of these monitoring activities for each LEA selected for targeted monitoring under each area of the CJ (e.g., Child Find, Related Services, Discipline, and Enrollment) along with IM determinations regarding compliance with the monitoring provisions of the CJ. An overall summary regarding targeted monitoring activities and professional recommendations are provided at the conclusion of this report in addition to a brief update regarding targeted monitoring activities that occurred during the spring 2018 semester.

**A. CHILD FIND**

1. Targeted Monitoring Activities for the Child Find Provisions

Three schools were selected for targeted monitoring during the fall 2017 school semester based on an analysis of 2016-2017 child find data. The IMs reviewed the documentation and calculations performed by LDOE monitoring personnel and confirmed that the schools were selected for targeted monitoring in a manner consistent with the requirements outlined on page 7 of the CJ and page 1 of Addendum A of the CJ. The schools selected for targeted monitoring during the fall 2017 semester included Audubon Elementary School, Mary Bethune Elementary School and Warren Easton Senior High School. A review of findings for each school is presented below.

9

a. *Audubon Charter School*

The on-site targeted monitoring visit occurred on December 4, 2017. Two LDOE representative and two IMs were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections 4(a) and 4(b) on page 2 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. Faculty at Audubon Charter School clearly articulated their responses regarding the Child Find process and provided satisfactory answers to all interview questions. No specific areas of concern were identified from the interview as school staff demonstrated comprehensive knowledge of state policies and procedures. A detailed summary of staff responses is presented on pages 3 of the LDOE monitoring report located in the Appendix.

A representative sample of eleven student files for students enrolled in sixth-eighth grade were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 2(a) on page 1 of Addendum A of the CJ. Specifically, the sample consisted of five students (45% of the sample) who had Section 504 plans, five students (45% of the sample) who were participating in the Response to Intervention (RTI process) and one student (9% of the sample) who was under consideration by the School Building Level Committee (SBLC). Student file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 3(a) on page 2 of Addendum A of the CJ using the required Child Find protocol. Please refer to page 4 of the LDOE monitoring report for Audubon Elementary School in the Appendix for a list of items that were reviewed to complete the Child Find protocol for

the sample of students. A review of student records revealed that one of eleven student files (9% of the sample) was judged to be in noncompliance regarding Child Find activities. In relation, the student-specific findings of noncompliance are listed on page 2 of the 2017-2018 IDEA monitoring results summary. Overall, no areas of systemic noncompliance were identified for this LEA under IDEA, Part B program during the fall 2017 on-site targeted monitoring visit.

> b.  *Mary McLeod Bethune Elementary School of Literature and Technology*

The on-site targeted monitoring visit occurred on December 5, 2018. Two LDOE representatives and two IMs were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections 4(a) and 4(b) on page 2 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. Faculty at Mary Bethune Elementary School clearly articulated their responses regarding the Child Find process and provided satisfactory answers to all interview questions. No specific areas of concern were identified from the interview as school staff demonstrated thorough awareness of state policies and policies and procedures. A detailed summary of staff responses is presented on pages 3-4 of the LDOE monitoring report located in the Appendix.

A representative sample of twenty-six student files for students enrolled in Kindergarten-Fifth grade were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 2(a) on page 1 of Addendum A of the CJ. Specifically, the sample consisted of nine students (35% of the sample) who had

Section 504 plans, ten students (38% of the sample) who were participating in the Response

to Intervention (RTI process), three students (12% of the sample) who were under

consideration by the School Building Level Committee (SBLC), and four students (15% of

the sample) who experienced course failures and had a Section 504 plan (2 students) or were

participating in the RTI process (2 students). Student file reviews were conducted by LDOE

monitoring personnel and IMs in a manner consistent with the requirements outlined in

section 3(a) on page 2 of Addendum A of the CJ using the required Child Find protocol.

Please refer to page 4 of the LDOE monitoring report for Mary McLeod Bethune

Elementary School of Literature and Technology in the Appendix for a list of items that

were reviewed to complete the Child Find protocol for the sample of students. A review of

student records revealed that eight of twenty-six student files (31% of the sample) were

judged to be in noncompliance regarding Child Find activities. Specific IDEA, Bulletin

1508 and/or Section 504 systemic violations are reported on page 4 of the LDOE monitoring

report and page 2 of the 2017-2018 IDEA monitoring results summary located in the

Appendix. In relation, student-specific findings of noncompliance are listed on page 3 of the

2017-2018 IDEA monitoring results summary. Overall, systemic noncompliance was

identified for this LEA under IDEA, Part B program using Bulletin 1508 (Pupil Appraisal

Handbook) in one area. Specifically, four of twelve applicable Section 504 student files

(33% of the sample) were judged to reflect noncompliance with the requirement that the

student receive specially designed instruction if indicated by the student's educational

records (*Section 504*-§104.35(b).

 *c.  Warren Easton Senior High School*

  The on-site targeted monitoring visit occurred on December 6, 2017.  Two LDOE

representative and two IMs were present during the entire on-site visit to conduct staff

interviews and review student files. The interviews were conducted using a standard bank of

questions with staff members consistent with requirements outlined in sections 4(a) and 4(b)

on page 2 of Addendum A of the CJ. The specific staff members who participated in the

interview process are reported on page 3 of the LDOE monitoring report. A review of the

LDOE monitoring report revealed systemic and student-specific non-compliance an in the area

of Child Find.  Specifically, "team members described the school's School Building Level

Committee (SBLC) process in a vague and inconsistent manner that reflected a lack of

implementation of state policies and those established in the school's SBLC policies and

procedures manual." In relation, the "lack of routine practices to document team problem-

solving based on the review of quality data and the evaluation of intervention efforts through

SBLC and/or Response to Intervention (RTI) processes was of particular concern." Finally,

academic and behavioral interventions did not "appear to be provided based on an established

team-based decision-making process or defined multi-tiered system of support." A detailed

summary of staff responses is presented on pages 3-4 of the LDOE monitoring report located

in the Appendix.

A representative sample of twenty-nine student files were reviewed by the LDOE

monitoring personnel and IMs in a manner consistent with the requirements outlined in

section 2(a) on page 1 of Addendum A of the CJ. Specifically, the sample consisted of

twenty-three students (79% of the sample) who had Section 504 plans, five students (17%

of the sample) who experienced course failures and had a Section 504 plan and/or were

participating in the RTI process, and one student (3% of the sample) who had a Section 504

plan who was also participating in the RTI process. Student file reviews were conducted by

LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined

in section 3(a) on page 2 of Addendum A of the CJ using the required Child Find protocol.

Please refer to page 4 of the LDOE monitoring report for Warren Easton Senior High

School in the Appendix for a list of items that were reviewed to complete the Child Find

protocol for the sample of students. A review of student records revealed that twenty-seven

of twenty-eight student files (96% of the sample) were judged to be in noncompliance

regarding Child Find activities. Specific IDEA, Bulletin 1508 and/or Section 504 systemic

violations are reported on pages 4-5 of the LDOE monitoring report and pages 1-3 of the

2017-2018 IDEA monitoring results summary located in the Appendix. In relation, student-

specific findings of noncompliance are listed on pages 4-10 of the 2017-2018 IDEA

monitoring results summary. Overall, systemic noncompliance was identified for this LEA

under IDEA, Part B program using Bulletin 1508 (Pupil Appraisal Handbook) in five areas.

Specifically, sixteen of sixteen applicable student files (100% of the sample) were found to

be in noncompliance with the requirement that the school fully implemented the three tiers

of instruction and intervention with measured levels of integrity, used standard protocols

and/or problem solving methods, and used an integrated data collection or assessment

system to inform decisions about student response to intervention at each tier of instruction

or intervention (*Bulletin 1508*-§301 Response to Intervention; *IDEA*-§300.306(a)(1) and

§300.308). Five of eleven applicable files (45% of the sample) were found to be in

noncompliance with the requirement that the School Building Level Committee (SBLC)

consisted of documented, required standing committee members and invited participants

who review and analyze all screening data, including RTI results, to determine the most

beneficial option for the student (*Bulletin 1508*-§303 School Building Level Committee).

Twenty-six of twenty-seven applicable student files (96% of the sample) were judged to reflect noncompliance with the requirement that the SBLC coordinated and documented the results of all required screening activities completed by general education personnel with the assistance from other school personnel (*Bulletin 1508*-§305 Screening Activities). Fifteen of fifteen applicable student files (100% of the sample) were found to be in noncompliance with the requirement that the student be referred to the SBLC for consideration of an initial evaluation within a reasonable amount of time if the student did not maintain expected progress while participating in the RTI process (Bulletin 1508-§303 SBLC Referral Process; IDEA-§300.309(c). Fifteen of twenty-seven applicable Section 504 student files (56% of the sample) were judged to reflect noncompliance with the requirement that the student receive specially designed instruction if indicated by the student's educational records (*Section 504*-§104.35(b).

  2. Corrective Actions to Address Identified Areas of Noncompliance

Overall, systemic noncompliance was identified in one area (e.g., Specially Designed Instruction) for two of three charter schools targeted for monitoring during the fall 2017 semester (e.g., Mary McLeod Bethune Elementary School of Literature and Technology; Warren Easton Senior High School). In addition, systemic noncompliance was also identified in four additional areas for Warren Easton Senior High School (e.g., SBLC Representation, Response to Intervention Activities, Screening Activities, and Evaluation Activities). Given the identified systemic and student-specific findings of noncompliance under IDEA, Part B, and Bulletin 1508, two of three charter schools (66% of the sample) required a formal CAP. As required by the CJ, the LDOE developed a CAP to address each area of identified systemic noncompliance or student-specific noncompliance listed in the LDOE monitoring report and

2017-2018 IDEA monitoring summary for each LEA. Specifically, the revised CAPs for Mary McLeod Bethune Elementary School of Literature and Technology and Warren Easton Senior High School included fifteen activities of corrective action (e.g., 1.0 correction of student-specific findings of noncompliance; 1.1 professional development provided by the LDOE regarding federal and state Child Find requirements and requirements outlined in the *PB v White Child Find Written Guidance* document, Section 504 eligibility requirements, and data-based decision making within the RTI process; 1.2 monitor regular education students meeting various academic, attendance, discipline and/or medical concerns; 1.3 development of a Child Find Log; 1.4 appropriate referral activities and documentation; 1.5 appropriate completion and documentation of SBLC activities using LDOE forms; 1.6 provide training to school staff on RTI procedures following the provision of training from the LDOE; 1.7 appropriate monitoring of students in the RTI process; 1.8 evaluation of student progress by SBLC team after specified intervention periods to determine student response to intervention; 1.9 development of progress monitoring form and/or use of progress monitoring program to evaluate student progress during intervention cycles; 1.10 provision of training to school staff on Section 504 procedures following the provision of training by the LDOE; 1.11 develop and follow eligibility criteria to determine if the identified student qualifies for Section 504 services; 1.12 develop and follow Section 504 procedures and guidelines consistent with federal and state policies; 1.13 use of universal forms by school personnel to document the Section 504 process; 1.14 SBLC/Section 504 Coordinator will monitor grades of all Section 504 students AND students in RTI each grading period; 1.15 SBLC and/or Section 504 Coordinator will monitor behavior data for student in the RTI process, Section 504 students with behavior concerns, and students identified through the universal behavior screening

16

process at Tier 1). A copy of the revised CAP for each charter school is in the Appendix for review by the parties. A review of the revised CAPs by the IMs revealed that the documents include corrective actions consistent with requirements outlined on page 2 of *Bulletin 1922 (Louisiana Administrative Code March 2017 Part XCI. Compliance Monitoring Procedures)* and in section IV(A)(3) on page 7 of the CJ.

3. <u>Status of Compliance</u>

After participating in the on-site monitoring visits for the charter schools selected for targeted monitoring and reviewing documentation submitted by the LDOE monitoring personnel (e.g., monitoring notifications, LDOE monitoring reports, 2017-2018 IDEA monitoring results summaries, corrective action plans, technical assistance notifications) and discussing the targeted monitoring activities with LDOE legal counsel and monitoring personnel during conference calls and on-site meetings during throughout the fall 2017 semester and spring 2018 semester, the LDOE is judged to be in **Substantial Compliance** with Section IV(A)(3)(a-b) and Sections A(1)(a-c) through 5(a) of Addendum A of the CJ for the fall 2017 semester of the 2017-2018 school year. Additional evaluations of compliance in the area of Child Find will be summarized again in forthcoming IM status reports. These updates will specifically discuss the follow-up, on-site targeted monitoring activities and findings for charter schools who have been undergoing corrective actions and/or intensive corrective actions during the 2016-2017 and 2017-2018 school years.

**B.  RELATED SERVICES**

1. <u>Targeted Monitoring Activities for the Enrollment Stability Provisions</u>

Three schools were selected for targeted monitoring during the fall 2017 semester based on an analysis of 2016-2017 related service provision rates for NOLA Type 2 and Type 5 Charter schools and OPSB LEAs. The IMs reviewed the documentation and

calculations performed by LDOE monitoring personnel and confirmed that the schools were selected for targeted monitoring in a manner consistent with the requirements outlined on page 8-9 of the CJ and pages 2-3 of Addendum A of the CJ. The schools selected for targeted monitoring during the fall 2017 semester included Cypress Academy, Livingston Collegiate Academy and James M. Singleton Charter School.  A review of findings for each school is presented below.

   *a. Cypress Academy*

   The on-site targeted monitoring visit occurred on December 4, 2017. One LDOE representative and one IM were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections B(4)(a) and B (4)(b) on page 3-4 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. Faculty at Cypress Academy reported the use of a "whole-child approach" to addressing the educational needs of their students.  Referral concerns from teachers, parents, and service providers are considered during the evaluation process.  Furthermore, faculty reported that a "push-in, pull-out" model is used to provide related services to students.  In relation, related service providers are responsible for keeping logs to document the full provision of services for students.  Additionally, most of the service providers for Cypress Academy are employed by OPSB Exceptional Children's Services (ECS). In relation, OPSB coordinates the procurement of providers and assigns them to individual schools based on student population and specific referral concerns. Finally, school personnel reported that data from assessments such as MAP, LEAP, and the Brigance Inventory of Early

Development are used to identify specific skills for instruction and remediation. In general, Cypress Academy faculty clearly communicated their responses regarding the required IDEA mandates for provision of Related Services and provided satisfactory responses to the interview questions. A summary of staff responses is presented on pages 3-4 of the LDOE monitoring report.

A representative sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(2)(a) and B(2)(b) on page 3 of Addendum A of the CJ. The sample of ten students reviewed included the following exceptionalities: nine students with an exceptionality of Autism and one student with an exceptionality of Other Health Impaired.  Related Service provisions included Speech Therapy (9 students), Counseling Services (3 students), Adaptive PE (4 students) and Occupational Therapy (3 students).

Student file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(3)(a) on page 3 of Addendum A of the CJ using the required Related Service protocol. Refer to page 4 of the LDOE monitoring report for Cypress Academy in the Appendix for a list of items that were reviewed to complete the Related Service protocol for the sample of students. A review of student records revealed that ten of ten student files (100% of the sample) were judged to be in noncompliance regarding Related Service provisions. Specific IDEA systemic violations are reported on pages 4-5 of the LDOE monitoring report and pages 2-4 of the 2017-2018 IDEA monitoring results summary located in the Appendix. In relation, student-specific findings of noncompliance are listed on pages 5-9 of the 2017-2018 IDEA monitoring results summary. Overall, systemic noncompliance was identified for this LEA

under IDEA, Part B in five areas. Specifically, ten of ten applicable student files (100% of the sample receiving related services) were found to be in noncompliance with the requirement that the student receive a Free Appropriate Public Education (FAPE) as outlined in federal legislation *(IDEA-§300.17(a.-d.).* Similarly, ten (10) of ten (10) applicable student files reviewed (100% of the sample) reflected systemic noncompliance regarding appropriate and meaningful statements of students' present levels of academic achievement and functional performance as required under *IDEA §300.320(a)(1)(i)(2)(i)- Definition of Individualized Education Program.* In relation, ten (10) of ten (10) applicable student files reviewed (100% of the sample) lacked required components of a standards- based IEP also indicating systemic noncompliance regarding standards-based IEP goals as required under *IDEA §300.320(a)(2) Definition of Individualized Education Program.* Finally, five (5) of eight (8) applicable student files reviewed (62 % of the sample) indicated that students did not participate with non-disabled peers to the maximum extent appropriate. This reflects systemic noncompliance regarding LRE for *§300.320(a)(5). IDEA – Definition of an Individualized Education Program.* Finally, one (1) of ten (10) applicable student files reviewed (10% of the sample) indicated that appropriate staff were not directly involved in IEP decisions. This reflects student-specific noncompliance rather than systemic concerns for this LEA regarding staff participation requirements *under IDEA §300.321(a)-(b)-IEP Team.*

> *b. Livingston Collegiate Academy*

The on-site targeted monitoring visit occurred on December 6, 2017. One LDOE representative and one IM were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions

with staff members consistent with requirements outlined in section B(4)(a) and B(4)(b) of page 3 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. Faculty at Livingston Collegiate Academy articulated how related services are provided to students to ensure the provision of a free appropriate public education (FAPE). Reportedly, a variety of sources including diagnostic assessments, MAP and ELA assessments as well as teacher screenings are currently used to determine if a student requires related services.  Faculty and staff reported taking steps to ensure that students are not pulled from core curriculum subjects by creating a tutorial block during the school day.   Students are reportedly progress monitored every nine (9) weeks to evaluate academic growth.  These data are placed in student files and later by faculty used to "drive decisions" regarding student performance and/or need for interventions or related service provisions. A summary of staff responses in presented on page 3 of the LDOE monitoring report.

A sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(2)(a) and B(2)(b) on page 3 of Addendum A of the CJ. The sample of ten students reviewed included four students with an exceptionality of Autism, three students with an exceptionality of Intellectually Disabled, one student with an exceptionality of Multiple Disabilities and two students with an exceptionality of Other Health Impaired. Related Services provided included Adaptive PE (4 students), Occupational Therapy (4 students), Speech Therapy (8 students) and Social Work Services (10 students).

Targeted file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(3)(a) on page 3 of Addendum A of the CJ using the required Related Service protocol. Please refer to page 4 of the LDOE

monitoring report for Livingston Collegiate Academy in the Appendix for a list of items that were reviewed to complete the Related Service protocol for the sample of students. A review of student records revealed that eight (8) of ten (10) student files reviewed (80% of the sample) were judged to be in noncompliance regarding Related Service provisions. Specific IDEA systemic violations are reported on pages 4-5 of the LDOE monitoring report and pages 2-3 of the 2017-2018 IDEA monitoring results summary located in the Appendix. In relation, student-specific findings of noncompliance are listed on pages 4-5 of the 2017-2018 IDEA monitoring results summary. Overall, systemic noncompliance was identified for this LEA under IDEA, Part B in three areas. Specifically, eight (8) of ten (10) student files reviewed (80% of the sample) were judged to reflect noncompliance in the provision of FAPE which reflects systemic noncompliance for *IDEA §300.17(a.-d.)- Free Appropriate Public Education (FAPE)*. Similarly, eight of ten (10) applicable student files reviewed (80% of the sample) indicated systemic noncompliance regarding appropriate and meaningful statements of students' present levels of academic achievement and functional performance as required under *IDEA §300.320(a)(1)(i)(2)(i) - Definition of Individualized Education Program*. Finally, seven (7) of ten (10) student files reviewed (70% of the sample) failed to include the required components of standards-based measurable annual goals and objectives indicating systemic noncompliance regarding this requirement under *IDEA §300.320(a)(2) - Definition of Individualized Education Program*.

   *c. James M. Singleton Charter School*

   The on-site targeted monitoring visit occurred on December 7, 2017. One LDOE representative and one IM were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard

bank of questions with staff members consistent with requirements outlined in sections B(4)(a) and B(4)(b) on page 4-5 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. Faculty at James M. Singleton Charter clearly articulated the LEA's process for related services provisions for students with disabilities. Staff described using a variety of sources including teacher and parent referrals, classroom observations, and assessment data to determine the need for related services on student's individual needs. To prevent the loss of instructional time, staff reported reviewing student schedules and collaborating with service providers to schedule service provisions during non-instructional periods to the maximum extent possible. A summary of staff responses is presented on pages 3-4 of the LDOE monitoring report.

A representative sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(2)(a) and B(2)(b) on page 3 of Addendum A of the CJ. The sample of ten students reviewed included eight students with an exceptionality of Intellectually Disabled, one student with an exceptionality of Autism and one student with an exceptionality of Multiple Disabilities. Related Service provisions included Speech Therapy (8 students), Adaptive PE (2 students), Orientation-Mobility Services (1 student), Social Work Services (4 students), Physical Therapy (1 student) and Occupational Therapy (4 students).

Targeted file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(3)(a) on page 3 of Addendum A of the CJ using the required Related Service protocol. Please refer to page 4 of the LDOE monitoring report for James M. Singleton Charter School in the Appendix for a list of items

23

that were reviewed to complete the Related Service protocol for the sample of students. A review of student records revealed that ten of ten student files reviewed (100% of the sample) were judged to be in noncompliance regarding Related Service provisions. Specific IDEA systemic violations are reported on pages 4-5 of the LDOE monitoring report and pages 2-4 of the 2017-2018 IDEA monitoring results summary located in the Appendix. In relation, student- specific findings of noncompliance are listed on pages 5-8 of the 2017-2018 IDEA monitoring results summary. Overall, systemic noncompliance was identified for this LEA under IDEA, Part B in five areas. Specifically, ten (10) of ten (10) applicable student files reviewed (100% of the sample) were judged to reflect noncompliance for failure to provide FAPE and reflects systemic concerns under *IDEA §300.17(a.-d.) Free Appropriate Public Education (FAPE).* Similarly, ten (10) of ten (10) applicable student files reviewed (100% of the sample) were judged to reflect concerns related to the LEA's appropriately and meaningfully describing students' present levels of academic and functional performance. This reflects systemic noncompliance under *IDEA 300.320(a)(1)(i)(2)(i)- Definition of Individualized Education Program.* Ten of ten (10) applicable student files reviewed (100% of the sample) were also judged to reflect noncompliance in the area of developing meaningful and measurable standards-based annual goals and objectives. As such, this reflects systemic noncompliance under *IDEA§300.320(a)(2) and 300.160(5a)(b2ii)(c-9) Definition of Individualized Education Program.* Three (3) of ten (10) applicable student files reviewed (30% of the sample of students receiving related services) were judged to reflect concerns for failing to accurately document and maintain updated service provision logs. This reflects systemic noncompliance under *IDEA §300.320(a)(4) and (7) - Definition of an Individualized*

*Education Program.* Similarly, four of ten (10) applicable student files reviewed (40% of the sample of students receiving related services) were judged to reflect concerns related to the LEA's failure to ensure that all appropriate team members participated in IEP meetings. As such, this reflects systemic noncompliance under *IDEA §300.321(a)-(b)-IEP Team*. Finally, with regard to providing an explanation regarding student non-participation with non-disabled peers to the maximum extent possible, one of five (5) applicable student files reviewed (20% of the sample) was judged to reflect noncompliance for this IDEA requirement. This reflects student-specific noncompliance rather than systemic concerns for this requirement under *IDEA §300.320(a)(5). – Definition of an Individualized Education Program.*

2. Corrective Actions to Address Identified Areas of Noncompliance

Overall, systemic noncompliance was consistently identified in three areas across all LEA's targeted in the area of Related Services. (i.e. FAPE provisions, development of appropriate and meaningful description of students' present levels of academic and functional performance and development of meaningful and measurable annual goals and objectives).  One LEA, James M. Singleton Charter School, also demonstrated additional systemic noncompliance with IDEA requirements related to (a) maintaining accurate and updated related service provision logs and (b) ensuring that all appropriate team members participated in IEP meetings.

Given the identified systemic and student-specific findings of noncompliance under IDEA, Part B, all three charter schools (100% of the sample) required a formal CAP to address identified concerns.  As required by the CJ, the LDOE developed a CAP to address each area of identified systemic noncompliance or student-specific noncompliance listed in

the LDOE monitoring reports and 2016-2017 IDEA monitoring summaries for Cypress Academy, Livingston Collegiate Academy and James M. Singleton Academy. Specifically, the revised CAPs for all LEAs targeted in the area of Related Services included five activities for corrective action (e.g., 1.1 immediate correction of all student specific IDEA citations identified in the Results Summary Report; 1.2 mandated training for special education staff (special education teachers and related service providers) on writing compliant IEPs; 1.3/1.4 ongoing training conducted by LEA in the following areas: IEP writing, provision and documentation of accommodations, documenting special education services and progress monitoring of student data; 1.4/1.5 mandated monthly consistency checks by the Special Education Coordinator or Lead Teacher to ensure IEP fidelity and 1.5/1.7 mandated completion of LDOE IEP Training Modules with particular focus on Module 2 (Data-Driven Present Levels of Performance) and Module 3 (Measurable Goals). In addition, the revised CAP for James M. Singleton includes three additional activities for corrective action. These activities include the following activities and related action steps: 1.3 mandated training(s) for all related service providers on how to properly document provision of services to students; 1.6 required monthly consistency checks conducted by the Director of Special Education and/or Lead Teacher to ensure related service provider logs are completed with fidelity and 1.8 provision of  compensatory education (i.e. related service minutes) to students whose files did not include documentation verifying they had received the required related services outlined in student IEPs).

A copy of the revised CAPs to address areas of noncompliance for Related Service provisions for Cypress Academy, Livingston Collegiate Academy and James M. Singleton Charter School are available in the Appendix for review by the parties. A review of the

revised CAPs by the IMs revealed that the documents include corrective actions consistent with requirements outlined on page 2 of *Bulletin 1922 (Louisiana Administrative Code March 2017 Part XCI. Compliance Monitoring Procedures)* and in section IV(C)(5) on pages 8-9 of the CJ.

3. <u>Status of Compliance</u>

After participating in the on-site monitoring visits for the charter schools selected for targeted monitoring and reviewing documentation submitted by the LDOE monitoring personnel (e.g., monitoring notifications, LDOE monitoring reports, 2017-2018 IDEA monitoring results summaries, corrective action plans, technical assistance notifications) and discussing the targeted monitoring activities with LDOE legal counsel and monitoring personnel during conference calls and on-site meetings during throughout the fall 2017 semester and spring 2018 semester, the LDOE is judged to be in **Substantial Compliance** with Section IV(B)(2)(a-b) of the CJ and Sections B(1)(a-c) through 5(a) of Addendum A of the CJ for the fall 2017 semester of the 2017-2018 school year. Additional evaluations of compliance in the area of Related Services will be summarized in forthcoming IM status reports. Specifically, these updates will discuss the follow-up, on-site targeted monitoring activities and findings for charter schools that have been undergoing corrective actions and/or intensive corrective actions during the 2016-2017 and 2017-2018 school terms.

**C. DISCIPLINE**

1. <u>Targeted Monitoring Activities for the Discipline Provisions</u>

Three schools were selected for targeted monitoring during the fall 2017 school semester based on an analysis of 2016-2017 discipline data. The IMs reviewed the documentation and calculations performed by LDOE monitoring personnel and confirmed

that the schools were selected for targeted monitoring in a manner consistent with the requirements outlined on page 11 of the CJ and pages 4-5 of Addendum A of the CJ. The schools selected for targeted monitoring during the fall 2017 semester included McDonogh 42 Charter School, Joseph. S. Clark Preparatory High School, and Langston Hughes Charter Academy. A review of findings for each school is presented below.

a. *McDonogh 42 Charter School*

The on-site targeted monitoring visit occurred on December 4, 2017. One LDOE representative and one IM were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections 4(a) and 4(b) on pages 4-5 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on pages 3-4 of the LDOE monitoring report. Faculty at McDonogh Charter School clearly articulated their responses regarding the policies, procedures, and practices related to the provision of tiered behavioral supports and disciplinary actions for students. In relation, the staff provided thorough and detailed answers to all interview questions. A detailed summary of staff responses is presented on pages 3- 4 of the LDOE monitoring report located in the Appendix.

A representative sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 5 (a-b) on page 11 of the CJ and section 2(a-b) on page 5 of Addendum A of the CJ. Specifically, the sample consisted of three students diagnosed with Emotional Disability (ED), three students diagnosed with Other Health Impairment (OHI), two students diagnosed with Specific Learning Disability (SLD) as their primary eligibility and

Language/Speech as a secondary eligibility, and two students diagnosed with Intellectual Disability (ID). A review of student records revealed that five students experienced in-school or out-of-school suspension; however, no students met the criteria for a change in placement or required a Manifestation Determination Review (MDR). Student file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 3(a) on page 5 of Addendum A of the CJ using the required Discipline protocol. Please refer to page 4 of the LDOE monitoring report for McDonogh 42 Charter School in the Appendix for a list of items that were reviewed to complete the Discipline protocol for the sample of students. Overall, systemic noncompliance was not observed for this LEA under IDEA, Part B program. However, a review of student records revealed student-specific concerns were identified for six students. In relation, the student specific findings of noncompliance are listed on pages 2 of the 2017-2018 IDEA monitoring results summary.

b. *Joseph. S. Clark Preparatory High School*

The on-site targeted monitoring visit occurred on December 6, 2017. One LDOE representative and one IM were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections 4(a) and 4(b) on pages 4-5 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. Faculty at Joseph S. Clark Preparatory High School provided comprehensive information regarding the policies, procedures, and practices related to the provision of tiered behavioral supports and disciplinary actions for students. In relation, the staff provided thorough and

detailed answers to all interview questions. A detailed summary of staff responses is presented on pages 3- 4 of the LDOE monitoring report located in the Appendix.

A representative sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 5(a-b) on page 11 of the CJ and section 2(a-b) on page 5 of Addendum A of the CJ. Specifically, the sample consisted of three students diagnosed with Specific Learning Disability (SLD), three students diagnosed as Gifted or Talented, one student diagnosed with Emotional Disability (ED), one student diagnosed with Other Health Impairment (OHI), one student diagnosed with ED and OHI, and one student diagnosed with a Language Impairment. Eight of ten student (80% of the sample) experienced in-school suspension (ISS) and/or out-of-school suspension (OSS). One student (10% of the sample) required a Manifestation Determination Review (MDR) as the result of a change in placement. Student file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 3(a) on page 5 of Addendum A of the CJ using the required Discipline protocol. Please refer to page 4 of the LDOE monitoring report for Joseph S. Clark Preparatory High School in the Appendix for a list of items that were reviewed to complete the Discipline protocol for the sample of students. A review of student records revealed that eight of ten applicable student files (80% of the sample) were judged to be in noncompliance regarding the provision of disciplinary procedures and/or other IDEA requirements. Specific IDEA systemic violations are reported on pages 4-6 of the LDOE monitoring report and pages 2-5 of the 2017-2018 IDEA monitoring results summary located in the Appendix. In relation, student specific findings of noncompliance are listed on pages 6-7 of the 2017-2018 IDEA monitoring results summary. Overall, systemic

noncompliance was identified for this LEA under IDEA, Part B program in seven areas as reflected on pages 2-5 of the 2017-2018 IDEA Monitoring Results Summary. Specifically, one of one applicable student files (100% of the sample experiencing a change in placement) were found to be in noncompliance with the requirement that the LEA, the parent, and relevant IEP team members conduct a Manifestation Determination Review (MDR) within 10 school days of any decision to change the placement of a child with a disability because of a violation of the code of conduct (*IDEA*-§300.530E and E(1). One of one applicable student files (100% of the sample experiencing a change in placement) was judged to be in noncompliance with the requirement that the LEA notify the parents of the decision to make a removal that constitutes a change of placement of a child with a disability because of a violation of the code of conduct on the date of the removal (*IDEA*-§300.530H). One of one applicable student files (100% of the sample experiencing a change in placement) were found to be in noncompliance with the IEP team conduct an FBA, unless the LEA had conducted an FBA before the behavior that resulted in a change of placement occurred, and implemented a BIP; or if the BIP already has been developed, review and modify the BIP, as necessary, to address the behavior (*IDEA*-§300.530 (f) and (g). Three of seven applicable student files (43% of the sample) were found to be noncompliance with the requirement that the IEP team consider the use of positive behavior interventions, supports, and other strategies for a child who behavior impedes his or her learning or the learning of others (*IDEA*-§300.324(2)(i). One of one applicable student files (100% of the sample experiencing a change in placement) was judged to reflect noncompliance for the requirement that the behavior plan be reviewed or modified as necessary to address student behavior (*IDEA*-§300.530(f)(1)(ii). One of one applicable

student files (100% of the sample experiencing a change in placement) was judged to reflect noncompliance with the requirement that the student continue to receive services so as to enable the student to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in the student's IEP if the IEP team determined that the behavior was not a manifestation of the student's disability and suspension/expulsion was applied (*IDEA*-§300.530(d). One of one applicable student files (100% of the sample experiencing a change in placement) was judged to reflect noncompliance with the requirement that that the IEP team conduct an FBA unless the LEA had conducted an FBA prior to the occurrence of the behavior that led to a change in placement and develop or modify the BIP (*IDEA*-§300.530(d) and f(1)(i).

    *c.   Langston Hughes Charter Academy*

The on-site targeted monitoring visit occurred on December 7, 2017. Two LDOE representatives and two IMs were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections 4(a) and 4(b) on pages 4-5 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. Faculty at Langston Hughes Charter Academy clearly articulated their responses regarding the policies, procedures, and practices related to the provision of tiered behavioral supports and disciplinary actions for students. The staff provided satisfactory answers to all interview questions with the exception of clearly defining the methods for measuring and documenting the effectiveness of behavior intervention plans. A detailed summary of staff responses is presented on page 3 of the LDOE monitoring report located in the Appendix.

A representative sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 5 (a-b) on page 11 of the CJ and section 2(a-b) on page 5 of Addendum A of the CJ. Specifically, the sample consisted of three students diagnosed with Specific Learning Disability (SLD), four students diagnosed with Other Health Impairment (OHI), two students diagnosed with Emotional Disability (ED), and one student diagnosed with Intellectual Disability (ID). Two of the ten students (20% of the sample) required a Manifestation Determination Review (MDR) as the result of a change in placement. Student file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 3(a) on page 5 of Addendum A of the CJ using the required Discipline protocol. Please refer to pages 4 of the LDOE monitoring report for Langston Hughes Charter Academy in the Appendix for a list of items that were reviewed to complete the Discipline protocol for the sample of students. A review of student records revealed that seven of ten applicable student files (70% of the sample) were judged to be in noncompliance regarding the provision of disciplinary procedures and/or other IDEA requirements. Specific IDEA systemic violations are reported on pages 4-5 of the LDOE monitoring report and page 2 of the 2017-2018 IDEA monitoring results summary located in the Appendix. In relation, student specific findings of noncompliance are listed on pages 3-6 of the 2017-2018 IDEA monitoring results summary. Overall, systemic noncompliance was identified for this LEA under IDEA, Part B program in three areas. Specifically, seven of ten applicable student files (70% of the sample) were found to be noncompliance with the requirement that the IEP team consider the use of positive behavior interventions, supports, and other strategies for a child who behavior impedes his or her learning or the learning of others (*IDEA-*

§300.324(2)(i).  One of two applicable student files (50% of the sample receiving a change in placement) were judged to be in noncompliance with the requirement that the LEA notify the parents of the decision to make a removal that constitutes a change of placement of a child with a disability because of a violation of the code of conduct on the date of the removal (*IDEA*-§300.530H). One of two applicable student files (50% of the sample experiencing a change in placement) was judged to reflect noncompliance with the requirement that that the IEP team conduct an FBA unless the LEA had conducted an FBA prior to the occurrence of the behavior that led to a change in placement and develop or modify the BIP (*IDEA*-§300.530(d) and f(1)(i).

2.   Corrective Actions to Address Identified Areas of Noncompliance

Overall, systemic noncompliance was identified across three common areas (e.g., use of positive behavior supports for a student whose behavior impedes his or her learning of the learning of others; notification and provision of procedural safeguards, completion of a Functional Behavior Assessment and Behavior Intervention Plan or revision of the BIP) for two of three charter schools targeted for monitoring during the fall 2017 semester. Given the identified systemic and student-specific findings of noncompliance under IDEA, Part B, two of three charter schools (66% of the sample) required a formal CAP. As required by the CJ, the LDOE developed a CAP to address each area of identified systemic noncompliance and student-specific noncompliance listed in the LDOE monitoring report and 2017-2018 IDEA monitoring summary for each LEA. Specifically, the revised CAPs for Joseph S. Clark Preparatory High School and Langston Hughes Charter Academy included eight activities of corrective action (e.g., 1.1 correction of student-specific findings of noncompliance; 1.2 provision of professional development to school staff on the completion of data collection and

writing appropriate FBAs; 1.3 provision of professional development to school staff on writing, implementing, and documenting appropriate BIPs and completing Daily Behavior Report Cards; 1.4 internal monitoring FBAs and BIPs on a bi-monthly basis using FBA/BIP checklist from LDOE; 1.5 development of a formal written process on how conduct FBAs, develop BIPs, use data collection methods, and evaluate integrity within the mandated MDR process; 1.6 provide professional development to school staff on the MDR process; 1.7 utilize the MDR checklist form the LDOE to ensure required procedures are followed; 1.8 monthly tracking of student discipline data). A copy of the revised CAP for each charter school is located in the Appendix for review by the parties. A review of the revised CAPs by the IMs revealed that the documents include corrective actions consistent with requirements outlined on page 2 of *Bulletin 1922 (Louisiana Administrative Code March 2017 Part XCI. Compliance Monitoring Procedures)* and in section IV(C)(5) on page 11 of the CJ.

      3.  <u>Status of Compliance</u>

After participating in the on-site monitoring visits for the charter schools selected for targeted monitoring and reviewing documentation submitted by the LDOE monitoring personnel (e.g., monitoring notifications, LDOE monitoring reports, 2017-2018 IDEA monitoring results summaries, corrective action plans, technical assistance notifications) and discussing the targeted monitoring activities with LDOE legal counsel and monitoring personnel during conference calls and on-site meetings during throughout the fall 2017 semester and spring 2018 semester, the LDOE is judged to be in **Substantial Compliance** with Section IV(C)(5)(a-b) and Sections C(1)(a-c) through 5(a) of Addendum A of the CJ for the fall 2017 semester of the 2017-2018 school year. Additional evaluations of compliance in the area of Discipline will be summarized in forthcoming IM status reports. These updates will

specifically discuss the follow-up, on-site targeted monitoring activities and findings for charter schools that have been undergoing corrective actions and/or intensive corrective actions during the 2016-2017 and 2017-2018 school years.

**D. ENROLLMENT**

1.   <u>Targeted Monitoring Activities for the Enrollment Stability Provisions</u>

Three schools were selected for targeted monitoring during the fall 2017 semester based on an analysis of 2016-2017 enrollment rates for NOLA Type 2 and Type 5 Charter schools and OPSB LEAs. The IMs reviewed the documentation and calculations performed by LDOE monitoring personnel and confirmed that the schools were selected for targeted monitoring in a manner consistent with the requirements outlined on page 14-15 of the CJ and page 6 of Addendum A of the CJ. The schools selected for targeted monitoring during the fall 2016 semester included Encore Academy, Edgar P. Harney Spirit of Excellence Academy and Einstein Charter Middle School. A review of findings for each school is presented below.

*a.   Encore Academy*

The on-site targeted monitoring visit occurred on December 5. 2017.  One LDOE representative and one IM were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections B(4)(a) and B(4)(b) on pages 3-4 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. Due to scheduling difficulties, the staff interview was conducted with each staff member separately. Reportedly, service providers utilize both "push-in" and "pull-out" methods of service delivery.  School personnel also reported that students are not isolated to

one particular classroom to receive services. In relation, staff noted that every effort is made to minimize removing students from Core instruction to receive services.  During the interview, school staff reported that Adaptive PE, Physical Therapy or Occupational Therapy services were not provided to students  at the beginning of the school year due to delays in securing service providers. School personnel reported meeting weekly to review student progress. However, sufficient information was not provided regarding the LEA's procedures for affording students with compensatory related services (e.g., PT, OT, APE) when service provisions are not provided and/or delayed.  Additional concern was observed related to the LEA's difficulty clearly articulating the process for determining a student's need for related services and informing staff when a student transferring into the school requires related service provisions. A summary of staff responses is presented on pages 3-4 of the LDOE monitoring report located in the Appendix.

A representative sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(2)(a) on and B(2)(b) on page 3 of Addendum A of the CJ. -The sample of students reviewed included the following exceptionalities: three students with an exceptionality of Autism, one student with an exceptionality of Other Health Impaired, four students with an exceptionality of Intellectual Disability and two students with an exceptionality of Hearing Impaired.  A wide range of Related Services were provided including Adaptive PE (4 students), Speech Therapy (10 students), Social Work Services (2 students), Occupational Therapy (2 students), School Health and Nursing Services (1 student) and Audiological Services (1 student).

Student file reviews were conducted by LDOE monitoring personnel and IMs in a

manner consistent with the requirements outlined in section B(3)(a) on page 3 of Addendum A and section D(2)(a-c) on page 6 of Addendum A using the required Related Service protocol. Please refer to page 4 of the LDOE monitoring report for Encore Academy in the Appendix for a list of items that were reviewed to complete the Related Service protocol for the sample of students. A review of student records revealed that ten of ten applicable student files reviewed (100% of the sample) were judged to be in noncompliance regarding Related Service provisions. Specific IDEA systemic violations are reported on pages 4-5 of the LDOE monitoring report and pages 2-4 of the 2017-2018 IDEA monitoring results summary located in the Appendix. In relation, student-specific findings of noncompliance are listed on pages 5-10 of the 2017-2018 IDEA monitoring results summary. Overall, systemic noncompliance was identified for this LEA under IDEA, Part B in six areas. Specifically, ten (10) of ten (10) applicable student files reviewed   (100% of the sample) were judged to reflect overall concerns related to the provision of FAPE. As such, this reflects systemic noncompliance under IDEA *§300.17(a.-d.) Free Appropriate Public Education (FAPE).* Similarly, ten (10) of ten (10)  applicable student files (100% of the sample) reviewed lacked pertinent information regarding the development of appropriate and meaningful descriptions of student's current academic and functional performance. This reflects systemic noncompliance regarding statements of present levels of academic achievement and functional performance under *IDEA §300.320(a) (1)(i)(2)(i)- Definition of Individualized Education Program.* Ten (10) of ten (10)  applicable student files reviewed (100% of the sample) also lacked required components of a standards-based IEP (measurable goals and objectives). This reflects systemic noncompliance regarding standards-based IEP goals under *IDEA §300.320(a)(2) Definition of Individualized*

*Education Program.* Five (5) of ten (10) applicable student files reviewed (50% of the sample) contained inadequate data to monitor student progress. This reflects systemic noncompliance regarding reporting progress under IDEA *§300.320 (a)(3)(i-ii)-Definition of an Individualized Education Program.* Eight (8) of ten (10) applicable student files reviewed (80% of the sample) indicated appropriate staff members were not involved in IEP decisions. This reflects systemic noncompliance regarding staff participation under *IDEA §300.321(a)-(b)-IEP Team.* In addition, two (2) of four (4) applicable student files reviewed (50% of the sample) indicated that students did not participate with non-disabled peers to the maximum extent appropriate. This reflects systemic noncompliance regarding LRE under *IDEA §300.320(a)(5)–Definition of an Individualized Education Program.* Finally, one (1) of ten (10) applicable student files reviewed (10% of the sample) contained missing information to document services were provided according to the type and frequency indicated on the student's IEP. This reflects only a student-specific finding of noncompliance and does not reflect systemic concerns under *IDEA §300.320(a)(4) and (7) - Definition of an Individualized Education Program.*

   *b. Einstein Charter Middle School*

   The on-site targeted monitoring visit occurred on December 5, 2017. One LDOE representatives and one IM were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections B(4)(a) and B(4)(b) on pages 3-4 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. Faculty at Einstein Middle Charter School at Sarah Towles Reed reportedly utilize

teacher referrals, classroom assessments, and SAT team recommendations to determine if related services are required. Faculty reported using a "check-in, check-out" model of related service delivery. The school team also reported that all related service providers were available to provide services to all students. However, staff failed to clearly articulate a plan for addressing the provision of related services in the absence of regular service providers. Reportedly, faculty at Einstein Middle Charter School at Sarah Towles Reed meet weekly to review and discuss the results of assessment outcomes (e.g., MAP 360, 300 R. Achieve 3000) and classroom progress monitoring data to evaluate student progress and make any changes to interventions or related service provisions, as needed. A summary of staff responses is presented on page 3 of the LDOE monitoring report located in the Appendix.

A representative sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(2)(a) and B(2)b on page 3 of Addendum A of the CJ. The sample of ten students reviewed included the following exceptionalities: two students with an exceptionality of Emotionally Disabled, three students with an exceptionality of Other Health Impaired/Language/Speech Impaired, one student with an exceptionality of Specific Learning Disabled/ Language/Speech Impaired, one student with an exceptionality of Specific Learning Disabled, one student with exceptionality of Autism and two students with an exceptionality of Autism/Language/Speech Impaired. Related Service provisions reviewed included Counseling Services (2 students), Speech Therapy Services (7 students), Social Work Services (4 students) and Adaptive PE (2 students).

Targeted file reviews were conducted by LDOE monitoring personnel and IMs in a

manner consistent with the requirements outlined in section B(3)(a) on page 3 of Addendum A and section D(2)(a-c) on page 6 of Addendum A of the CJ using the required Related Service protocol. Please refer to page 4 of the LDOE monitoring report for the Einstein Charter Middle School in the Appendix for a list of items that were reviewed to complete the Related Service protocol for the sample of students. A review of student records revealed that nine of nine applicable student files reviewed (100% of the sample) were judged to be in noncompliance regarding Related Service provisions. Specific IDEA systemic violations are reported on pages 4-5 of the LDOE monitoring report and pages 2-4 of the 2017-2018 IDEA monitoring results summary located in the Appendix. In relation, student-specific findings of noncompliance are listed on pages 5-8 of the 2017-2018 IDEA monitoring results summary. Overall, systemic noncompliance was identified for this LEA under IDEA, Part B in seven areas. Specifically, ten (10) of ten (10) applicable student files reviewed (100% of the sample) were judged to reflect overall concerns related to the provision of FAPE. As such, this reflects systemic noncompliance under *IDEA §300.17(a.-d.) Free Appropriate Public Education (FAPE).* Ten of ten (10) applicable student files reviewed (90% of the sample) failed to appropriately describe students' present academic and functional performance. This reflects systemic noncompliance regarding statements of present levels of academic achievement and functional performance under *IDEA §300.320(a)(1)(i)(2)(i)- Definition of Individualized Education Program.* Similarly, nine (9) of ten (10) applicable student files reviewed (90% of the sample) failed to include the required components of a standards-based IEP (measurable goals and objectives). This reflects systemic noncompliance regarding standards-based IEP goals under *IDEA §300.320(a)(2) Definition of Individualized Education Program.* Five (5) of ten (10)

applicable student files reviewed (50%) of the sample) lacked evidence that the related services were being provided in the types and frequency specified in the IEP. This also reflects systemic noncompliance for *IDEA §300.320(a)(4) and (7).* Five (5) of ten (10) applicable student files reviewed (50% of the sample) indicated that parents were not involved in the IEP development or IEP meeting. This reflects systemic noncompliance regarding parent participation for IDEA §300.322(a). IDEA-Parent Participation. Four (4) of seven (7) applicable student files reviewed (57% of the sample) indicated parents were not provided with other methods/opportunities to participate in the IEP process. This reflects systemic noncompliance for provision of other methods of parent participation *for IDEA §300.501(b)-Parent Participation.* Finally, nine (9) of ten (10) applicable student files reviewed (90% of the sample) indicated that appropriate staff members were not involved in making IEP decisions. This reflects noncompliance regarding staff participation for *IDEA §300.321(a)-(b)-IEP Team.*

In addition to identified systemic concerns, two student-specific findings of noncompliance were observed. Specifically, one (1) of ten (10) applicable student files reviewed (10% of the sample) lacked appropriate documentation to verify that related services were reasonably calculated to address the related services needs of the student as required under *IDEA §300.320(a)(4).* Similarly, one (1) of five (5) applicable student files reviewed (20% of the sample) failed to include an explanation of the extent to which the student would not participate with nondisabled students to the maximum extent appropriate as required under ***IDEA §300.320(a)(5).*** Again, these observed concerns reflect only student-specific noncompliance rather than systemic concerns at this time.

*c. Edgar P. Harney Spirit of Excellence Academy*

The on-site targeted monitoring visit occurred on December 7, 2017.  One LDOE representative and one IM were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections B4 (a) and B4 (b) on page 3-4 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. In general, results of the staff interview indicated systemic and student-specific non-compliance in the area of Enrollment Stability (Related Service provisions). During the interview, staff described the SBLC referral process with sufficient detail. However, one concern was noted related to requesting that parents obtain external evaluations. Specifically, school personnel reported that parents are advised to pursue a psychiatric evaluation when students exhibit social and emotional problems. In relation, staff also reported that related services in the areas of Occupational Therapy and Social Work Services were not currently being provided as the result of the LEA's inability to secure service providers. School officials did describe a variety of current efforts to secure credentialed service providers as soon as possible. Staff also discussed the school's routine of facilitating collaboration between current service providers. However, routinely scheduled meetings were not evident in this regard. Sufficient information regarding the school's attempts to facilitate student services in the Least Restrictive Environment (LRE), while also minimizing missed instructional time, was provided during the interview process. A summary of staff responses is presented on pages 3-4 of the LDOE monitoring report located in the Appendix.

A representative sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(2)(a) and B(2)(b) on page 3 of Addendum A of the CJ. The sample of ten students reviewed included the following exceptionalities: eight students with an exceptionality of Intellectually Disabled and two students with an exceptionality of Multiple Disabilities. Related Service provisions included Occupational Therapy (6 students), Physical Therapy (1 student), Speech Therapy (10 students), Social Work Services (2 students) and Adaptive PE (3 students).

Targeted file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B3(a) on page 3 of Addendum A of the CJ and section D(2)(a-c) on page 6 of Addendum A using the required Related Service protocol. Please refer to page 4 of the LDOE monitoring report for Edgar P. Harney Spirit of Excellence Academy in the Appendix for a list of items that were reviewed to complete the Related Services protocol for the sample of students. A review of student records revealed that ten of ten student files reviewed (100% of the sample) were judged to reflect noncompliance regarding Related Service provisions. Specific IDEA systemic violations are reported on pages 4-5 of the LDOE monitoring report and pages 2-4 of the 2017-2018 IDEA monitoring results summary located in the Appendix. In relation, student-specific findings of noncompliance are listed on pages 5-9 of the 2017-2018 IDEA monitoring results summary.

Overall, systemic noncompliance was identified for this LEA under IDEA, Part B in seven areas. Specifically, ten (10) of ten (10) applicable student files reviewed (100% of the sample) lacked pertinent information regarding the students' present levels of performance.

This reflects systemic noncompliance regarding statements of present levels of academic achievement and functional performance under *IDEA §300.320(a)(1)(i)(2)(i)- Definition of Individualized Education Program.* Nine (9) of ten (10) applicable student files reviewed (90% of the sample) lacked required components of a standards-based IEP. This reflects systemic noncompliance regarding standards-based IEP goals under *IDEA §300.320 (a)(2) and 300.160(5a)(b2ii)(c-9) – Definition of Individualized Education Program.* Six (6) of six (6) applicable student files reviewed (100% of the sample) indicated that students did not participate with non-disabled peers to the maximum extent appropriate. This reflects systemic noncompliance regarding student participation under *IDEA §300.320(a)(5). IDEA – Definition of an Individualized Education Program.* Six (6) of ten (10) applicable student files reviewed (60% of the sample) contained missing information to document services were provided according to the type and frequency indicated on the student's IEP.  This reflects systemic noncompliance regarding the provision of services under *IDEA §300.320(a)(5). IDEA – Definition of an Individualized Education Program.* Two (2) of two (2) applicable student files reviewed (100% of the sample) indicated parents were not provided other methods to participate in the IEP. However, this does not reflect systemic noncompliance for provision of other methods of parent participation *under IDEA §300.501(b) – IDEA Parent Participation.* Four (4) of ten (10) applicable student files reviewed (40% of the sample) indicated that the staff were not involved in IEP decisions. This reflects systemic noncompliance regarding staff participation under *IDEA §300.321(a)-(b) – IEP Team.* Finally, ten (10) of ten (10) applicable student files (100% of the sample receiving related services) were observed to reflect systemic noncompliance with the requirement that the student receive a Free Appropriate Public Education (FAPE)

as outlined under (*IDEA-§300.17(a.-d.)*.

In addition to systemic concerns, a single student-specific finding of noncompliance was observed during on site monitoring. Specifically, one (1) of ten (10) applicable student files reviewed (10% of the sample) contained inadequate data to document progress toward meeting annual goals. Again, this reflects a student-specific finding under *IDEA §300.320(a)(3)(i-ii) – Definition of an Individualized Education Program* as no systemic concerns were observed in this regard.

*2.* Corrective Actions to Address Identified Areas of Noncompliance

Overall, systemic noncompliance was consistently identified in areas four across all LEAs targeted in the area of Enrollment. (i.e. provision of FAPE, development of appropriate and meaningful description of students' present levels of academic and functional performance, development of meaningful and measurable annual goals and objectives and appropriately documenting that related services are provided with the types and frequency as specified in student IEP's). Two LEA's (Encore Academy and Edgar P. Harney Spirit of Excellence Academy) also demonstrated additional systemic noncompliance with IDEA requirements related to (a) ensuring that students with disabilities participate with non-disabled peers to the maximum extent appropriate and (b) ensuring that all appropriate staff participate in IEP meetings. In addition, two LEA's (Einstein Charter Middle School and Edgar P. Harney Spirit of Excellence Academy) demonstrated systemic noncompliance related to ensuring that parents who are unable to attend IEP meetings are afforded with options to allow for participation. One LEA (Encore Academy) also demonstrated additional systemic concerns related to appropriately describing how student progress will be frequently monitored to assess progress toward

46

achieving annual goals. Finally, one LEA (Einstein Charter Middle School) demonstrated additional systemic concerns related to ensuring that parents are invited to participate in IEP meetings.

Given the identified systemic and student-specific findings of noncompliance under IDEA, Part B, all three charter schools (100% of the sample) required a formal CAP to address identified concerns.  As required by the CJ, the LDOE developed a CAP to address each area of identified systemic noncompliance or student-specific noncompliance listed in the LDOE monitoring reports and 2017-2018 IDEA monitoring summaries for Encore Academy, Einstein Charter Middle School and Edgar P. Harney Spirit of Excellence Academy. Specifically, the CAPs for all LEAs targeted in the area of Enrollment included eight activities for corrective action (e.g., 1.1 immediately correct all student specific citations identified in the Results Summary report; 1.2 provide training for special education staff (special education teachers and related service providers) on writing compliant IEPs; 1.3 provide training to related service providers on how to properly document provision of services to students, including completing services logs and appropriately documenting student progress and delivery of services; 1.4 ongoing training provided by the LEA in the following areas: IEP writing, provision and documentation of accommodations, documenting special education services, progress monitoring of student data; 1.5 conduct monthly consistency checks completed by the Special Education Director to ensure IEP fidelity; 1.6 monthly consistency checks completed by the Special Education Director to ensure related service provider logs are completed with fidelity and accurately reflect provision of services per the time/frequency specified on the students IEP; 1.7 mandated staff completion of the IEP Training Modules on the LDOE website provided by

the Human Development Center – LSUHSC group with a particular focus on Module 2 (Data Driven Present Levels of Performance) and Module 3 (Measurable Goals); 1.8 provisions for compensatory education (related service minutes) to students whose files did not include documentation verifying they received related services as outlined on student IEPs).

A copy of the revised CAPs to address areas of noncompliance for Related Service provisions for Encore Academy, Edgar P. Harney Spirit of Excellence Academy and Einstein Charter Middle School are available in the Appendix for review by the parties. A review of the revised CAPs by the IMs revealed that the documents include corrective actions consistent with requirements outlined on page 2 of *Bulletin 1922 (Louisiana Administrative Code March 2017 Part XCI. Compliance Monitoring Procedures)* and in section IV(D)(7) on page 14 of the CJ.

3. <u>Status of Compliance</u>

After participating in the on-site monitoring visits for the charter schools selected for targeted monitoring and reviewing documentation submitted by the LDOE monitoring personnel (e.g., monitoring notifications, LDOE monitoring reports, 2017-2018 IDEA monitoring results summaries, corrective action plans, technical assistance notifications) and discussing the targeted monitoring activities with LDOE legal counsel and monitoring personnel during conference calls and on-site meetings during throughout the fall 2017 semester and spring 2018 semester, the LDOE is judged to be in **Substantial Compliance** with Section IV(D)(7)(a-b) of the CJ and Sections D(1)(a-c) and D(2)(a-c) of Addendum A of the CJ for the fall 2017 semester of the 2017- 2018 school year. Additional evaluations of compliance in the area of Enrollment will be summarized in forthcoming IM status reports.

Specifically, these updates will discuss the follow-up, on-site targeted monitoring activities and findings for charter schools that have been undergoing corrective actions and/or intensive corrective actions during the 2016-2017 and 2017-2018 school terms.

**RECOMMENDATIONS**

1.      As noted in previous IM status reports and this status report, the CJ specifies that the State Defendants shall be released from the terms of the CJ when they have 1) achieved Substantial Compliance with each provision of the Agreement for which they are assigned responsibility; 2) maintained Substantial Compliance for a period of two years; and 3) subject to Court approval (p. 18 of the CJ). As reported in previous IMs status reports, the LDOE was judged to <u>establish</u> "Substantial Compliance" with all targeted monitoring activities during the fall 2016 and spring 2017 school terms which represented the initial, full year of required compliance.  In relation, based on the findings reported here summarizing the findings of the fall 2017 targeted monitoring activities, the IMs suggest to the Court that LDOE has successfully achieved "Substantial Compliance" for the fall 2017 school term of the <u>first year</u> of the <u>required two years</u> of <u>maintained compliance</u>. As such, the IMs recommend that the LDOE shall continue to follow the targeted monitoring procedures as outlined in each substantive section of the CJ and on pages 1-12 of Addendum A of the CJ (i.e. continue to review charter school selection and verify LDOE calculations, select LEAs for targeted monitoring, perform staff interviews and student file reviews using the protocols as outlined in the CJ and Addendum A) until such time the LDOE achieves a <u>second, full consecutive year</u> of <u>sustained</u> "Substantial Compliance."  In relation, the IMs recommend to the Court that the LDOE shall continue to conduct initial and follow-up on-site targeted monitoring visits collaboratively with the

IMs to obtain information from faculty and review student files to make compliance determinations in each area of the CJ.

2.       As noted previously on page 3 of this report, based on the feedback received from the Parties to the draft IM status report dated May 5, 2018, the Counsel for the Plaintiff Class continues to express disagreement with the IM's interpretation of the CJ in terms of how "Substantial Compliance" is determined as related to the targeted monitoring activities and/or the adequacy of corrective actions developed to remedy any findings of noncompliance as required by the CJ. In relation, the Counsel for the Plaintiff Class also asserts a relevant impact of the recent Supreme Court decision (i.e., *Endrew F. ex rel. Joseph F. v. Douglas Cty Sch Dist. RE-1*, 137 S. Ct. 988, 1001, 197 L. Ed. 2d 335 (2017) on the CJ as it relates to "Substantial Compliance" determinations with regard to the development of appropriate corrective actions. As such, to provide additional insight to this matter, it is recommended that the Counsel for the Plaintiff Class follow the appropriate procedures for requesting that a formal brief be filed with the Court in this regard.

3.       As noted previously on page 3 of this status report, there also continues to be disagreement among the Parties with the IM's interpretation of the CJ in terms of the duration of time required for initial achievement of "Substantial Compliance" and the maintenance of required compliance.  Therefore, following the filing of this IM status report and the forthcoming IM status reports, the IMs recommend a status conference be scheduled for the Counsel for the Plaintiff Class, State Defendants, Defendant-Intervenor, and IMs to meet with Judge Zainey in chambers to discuss each of the issues and concerns expressed by the Parties. The IMs intend to file two additional draft status reports with the

Court in mid-July 2018 summarizing the findings of targeted follow-up monitoring visits conducted in March 2018. Therefore, the IMs recommend consideration of a status conference in August 2018 with the Court and all Parties to discuss the information presented in the IM status reports and address each of the aforementioned issues and concerns presented by the Parties.

4.     The IMs recommend to the Court that the LDOE monitoring personnel and relevant OPSB personnel shall continue to provide ongoing technical assistance and professional development to ensure that the LEAs are able to engage in the activities listed on the CAPs with adequate levels of fidelity to correct the identified areas of systemic and student-specific noncompliance. In relation, the IMs continue to recommend that LDOE monitoring personnel and/or relevant OPSB personnel provide written updates of the status of compliance and progress for each activity specified in each LEA's CAP to the IMs on a quarterly basis. The IMs agree to be available as requested by the LDOE to further assist in evaluating the status of compliance with the CAPs. Because of the transition of LEAs to the OPSB effective July 1, 2018, the IMs also recommend that the provision of specific professional development and technical assistance activities by the LDOE and OPSB be discussed during the status conference recommended for August 2018.

5.     The content of the revised CAPs developed for the ten schools identified in need of corrective actions for the 2018-2019 school year are consistent with the requirements described in *La. Bulletin 1922 §107(A-E)*. However, it is important to note that LEAs who successfully exited their Corrective Action Plans or intensive Corrective Action Plans during the 2017-2018 school year employed a variety of strategies to assist them in the

completion of activities and action steps for compliance with their respective CAPs and/or ICAPs. For example, some of the LEAs employed professional consultants to provide professional development and/or ongoing technical assistance throughout the school year to school personnel. In addition, some LEAs hired additional onsite administrative and/or educational personnel to ensure that academic, behavioral, and/or social/emotional services were provided with adequate levels of fidelity. Some Charter Management Organizations adopted the corrective actions as part of their policies across all LEAs in the CMO. In relation, some LEAs were required to present ongoing status updates regarding their compliance with their CAPs and/or ICAPs to their CMO Boards of Education. Finally, LEAs frequently contacted the LDOE monitoring personnel throughout the school year to obtain technical assistance and guidance for the activities required by their CAPs and/or ICAPs. As such, the IMs recommend that the LEAs identified in need of corrective actions during the fall 2017 semester consider adoption of some of these formal strategies to assist them in effectively implementing the activities and action steps required by their CAPs for the 2018-2019 school year.

6.      As noted in previous IM status updates, a consistent pattern with regard to findings of systemic noncompliance for LEAs identified for <u>initial</u>, on-site targeted monitoring continues to be observed. Specifically, 100% of the schools identified for targeted monitoring during the spring 2016 school term and fall 2016 school term required corrective actions to address findings of systemic noncompliance. In relation, 83% of the LEAs identified for targeted monitoring during the fall 2017 school term required formal corrective actions to address findings of systemic noncompliance. Therefore, considering the ongoing concerns regarding systemic noncompliance identified in LEAs selected for

<u>initial</u> onsite targeted monitoring since the formal initiation of targeted monitoring activities under the CJ, the IMs continue to recommend that the LDOE and OPSB work together in a collaborative manner to develop a strategic and proactive action plan to address each of the recommendations outlined by the IMs on pages 57-62 of the IM status reported submitted to the Court on February 22, 2018 and pages 20-23 of the IM status report submitted to the Court on February 23, 2018. Given the fact that NOLA Charter LEAs are transitioning OPSB's jurisdiction on July 1, 2018, the IMs believe such collaboration and planning is critical to ensure a smooth transition as related to establishing and/or sustaining compliance with IDEA mandates for students with disabilities across all LEAs. The IMs recommend that discussion of these transition activities should also occur during the status conference recommended for August 2018. The IMs agree to be available if requested by the LDOE and/or OPSB to further assist in the development of this strategic plan of action. Finally, the IMs recommend that a draft of the strategic plan be submitted to the Plaintiffs' counsel and IMs for comment prior to final submission to the Court for approval and adoption.