**Office of the Independent Monitors**
**P.B., et al., v. John White, et al. (Civil Case No. 2:10-cv-04049)**
**Status Report to the Court**
**Draft Report Date: April 29, 2019**
**Final Report Date: June 16, 2020**

## A. INTRODUCTION

Pursuant to Section V(9) on page 16 of the Consent Judgment (CJ) filed with the Court on March 25, 2015, the Independent Monitors shall file with the Court and provide the Parties with reports describing the steps taken by the State Defendants and the Defendant-Intervenor to implement the Agreement and evaluate the extent to which the State Defendants and the Defendant-Intervenor have complied with each substantive provision of the Agreement. In relation, these reports shall be written with due regard for the privacy interests of the students. The Monitor shall consider the Parties' responses and make appropriate changes, if any, before issuing the report. Pursuant to Section V(9)(b) of the CJ, the Independent Monitors shall evaluate the state of compliance for each relevant provision of the Agreement using the following standards: (1) Substantial Compliance and (2) Noncompliance. To assess compliance, the Monitor shall review a sufficient number of pertinent documents to accurately assess compliance and interview any necessary staff or personnel. The Monitor shall also be responsible for independently verifying representations from the State Defendants or Defendant-Intervenor regarding progress toward compliance and examining supporting documentation. Each Monitor report shall describe the steps taken by the Monitor to assess compliance, including documents reviewed and individuals interviewed, and the factual basis for each of the Monitor's findings. Pursuant to Section V(10) of the CJ, reports issued by the Monitor shall not be admissible against the State Defendants and the Defendant- Intervenor in any proceeding other than a proceeding related to the enforcement of this Agreement initiated

1

and handled exclusively by the State Defendants, the Defendant- Intervenor, or the Plaintiff's counsel. The State Defendants shall be released from the terms of the CJ when they have 1) achieved Substantial Compliance with each provision of the Agreement for which they are assigned responsibility; 2) maintained Substantial Compliance for a period of two years; and 3) subject to Court approval (p. 18 of the CJ).

The current IM status report addresses activities completed by the State Defendants during the 2018-2019 school year as required by the CJ. The IMs provide a summary of the targeted monitoring activities completed during the fall 2018 semester along with an overview of the specific findings observed across LEAs selected for targeted monitoring in the areas of Child Find, Related Services, Discipline and Enrollment Stability with regard to specific areas of IDEA compliance. In addition, the IMs also provide a summary "Substantial Compliance" or "Noncompliance" decisions as related to specific monitoring activities undertaken by the LDOE (e.g., appropriate selection of schools, completion of staff interviews and student file reviews, development and dissemination of LEA targeted monitoring reports, development, and dissemination of corrective action plans). The sequence of information in this IM status report follows the general structure of the CJ. Language from each substantive provision of the Agreement or Addendum A (i.e., monitoring protocols) outlined in the CJ is incorporated into the IM status report, when appropriate.

<u>Status of Monitoring Activities and Supports provided by the LDOE and OPSB</u>

The IMs, Plaintiffs and Defendants counsel participated in a phone conference with Judge Zainey on October 1, 2018 regarding the Court's and Plaintiff's concerns related to the trend of noncompliance observed among Charter LEAs targeted for an initial monitoring

review.  After discussion, Judge Zainey issued an order on October 2, 2018 (document 390) directing the counsel for the LDOE and the OPSB to provide the Court with documentation describing the proactive monitoring activities and related support systems routinely provided NOLA LEAs to ensure compliance with all IDEA policy mandates.

Legal Counsel for the OPSB and the LDOE submitted a summary of ongoing monitoring and support activities to the Court on December 20, 2018 and January 28, 2019, respectively. To ensure support for special education programs, the Orleans Parrish School Board (OPSB) reported developing an *Equity and Accountability Team* which conducts annual visits to all LEAs under its jurisdiction. The team's reported mission is to verify that all NOLA LEAs are providing all exceptional student populations with appropriate services and supports that are in compliance with IDEA and Section 504 mandates. After annual review, LEAs are notified of specific issues related to IDEA and/or Section 504 noncompliance and the corrective actions required to ensure compliance. In relation, the OPSB also reported establishing a *School Support and Improvement Team* at the beginning of the 2018-2019 school term to assist all parish school staff and administration by providing resources for the development of tiered systems of student supports. In addition, an *Exceptional Children's Services Team* also provides an additional level of special education oversight and direct support for LEAs by focusing issues related to enrollment stability, child find practices, least restrictive environment requirements, delivery of services as outline in student IEPs, related service provisions, and discipline provisions.

The LDOE reported adopting a risk-based monitoring system that evaluates all Louisiana school districts (Charter and direct-run LEAs) annually based on a series of predetermined performance criterion and a required two-year comparison of performance data

3

for students with disabilities. A performance rubric was developed based on the selected criteria (primarily performance on statewide assessments, graduation rates, discipline and dropout rates) that provides quartile rankings for each performance area to describe each school system's annual monitoring outcomes and ranking. School districts may be placed in a low, moderate-low, moderate-high, or high-risk category based on their performance data outcomes. Monitoring activities range from self-monitoring assessments using an LDOE evaluation tool to on-site monitoring, depending on the risk status achieved during annual performance reviews. The LDOE monitoring staff also assist the LEA and/or district officials to develop Corrective Action Plans (CAPs) to remedy any areas of noncompliance identified. A copy of monitoring and support activity summaries conducted for LEAs by the LDOE and OPSB is located in the Appendix for review by all Parties.

## B. TARGETED MONITORING ACTIVITIES FOR THE FALL 2018 SEMESTER OF THE 2018-2019 SCHOOL YEAR

Overview of Targeted Monitoring Activities for the Fall 2018 Semester

The CJ requires that the LDOE engage in specific monitoring activities for LEAs selected for targeted monitoring annually. As such, the IMs report the activities and decisions made by the LDOE as related to the required monitoring activities for schools identified for targeted monitoring during the fall 2018 school term for each relevant provision of the CJ. An overview of the monitoring procedures used by the LDOE is provided here to assist readers in understanding the process that was used to complete targeted monitoring as required by the CJ. Additional information is also included in each relevant section of the status report.

School selection for each area of targeted monitoring was completed by LDOE monitoring personnel using calculation rates outlined in Addendum A of the CJ (p. 1 for Child Find, p. 3 for Related Services, p. 4 for Discipline, p. 6 for Enrollment Stability) on November 6, 2018. Each LEA was selected for targeted monitoring by the LDOE based on an analysis of relevant data (i.e., initial IDEA evaluations, rates of related service provisions, discipline outcomes, and enrollment stability rates) from the 2017-18 school year. These LEAs were sent a notification email from LDOE Director of State-wide Monitoring on September 25-26, 2018 (see the Appendix for a copy of each email). This notification also provided an outline and rational for monitoring, notification that monitoring will be on conducted on-site, the area in which the LEA would be monitoring, LDOE contact personnel, format of and criteria for monitoring, notation of conference call to discuss monitoring activity, and copy the staff intervention questions and file review protocol. Planning phone calls were conducted by LDOE monitoring personnel on October 4, 2018 for charter LEAs with school leaders from each LEA to assist school personnel in understanding the CJ requirements for targeted monitoring and to answer any questions or address any concerns.

The protocols along with the relevant IDEA or Bulletin 1508 legal citation are provided in the Appendix for review. LDOE monitoring personnel submitted the targeted monitoring schedule and contact information for LEAs selected for the fall 2018 school term to the IMs on October 12, 2018. In addition, the LDOE also submitted the rosters of randomly-selected students from each LEA targeted for monitoring on November 8 and 27, 2018.  LDOE monitoring personnel and the IMs conducted on-site staff interviews and student file reviews from December 3-6, 2018 using documents required by the CJ (see staff interview questionnaires and student file review protocols in the Appendix). The IMs and

LDOE monitoring personnel scored student file review protocols independently during the on-site visits and reconciled any scoring differences during the monitoring visits or during conference calls held on February 6, 2019. Based on agreements among all parties during a meeting held on September 22, 2016, compliance determinations for individual students shall be consistent with the 100% compliance standard outlined in the IDEA. That is, during all targeted monitoring activities, any single finding of noncompliance for any specific IDEA regulation being assessed for an individual student was judged to reflect noncompliance and required immediate individual corrective action (i.e., student-specific areas of noncompliance outlined in the IDEA Monitoring Summary and individual corrective actions as part of the LEA Corrective Action Plan). Similarly, all parties agreed that systemic noncompliance would be determined when less than 80% of the student sample failed to meet the 100% individual student compliance standard for any IDEA requirement evaluated on the CJ protocol and would result in mandatory systemic corrective actions (i.e., Corrective Action Plan or Intensive Corrective Action Plan) for the LEA.

The LDOE monitoring personnel completed the monitoring reports for each targeted LEA during the months of December 2018 and January 2019 and submitted draft reports to the IMs on January 15, 2019. The IMs reviewed the monitoring reports and provided feedback regarding specific findings of noncompliance in relation to IDEA regulations and student-specific findings of noncompliance on February 6-13, 2019. In relation, the LODE monitoring personnel developed corrective action plans (and enclosed CAPS) for each LEA and submitted to IMs on March 7, 2020.

The IMs reviewed and provided feedback focused on ensuring the corrective strategies outlined in the CAPS were reasonably sufficient, presuming adequate levels of

6

implementation fidelity, to lead to overall sustained improvements and compliance with IDEA and/or Bulletin 1508 practices in the areas of Child Find, Related Services, Discipline and Enrollment Stability across targeted LEAs. Specifically, the IMs reviewed all submitted CAPs to ensure that the professional development and technical assistance activities strategically addressed each finding of systemic or student-specific noncompliance. In relation, the IMs evaluated the CAPs to ensure that on-going corrective and supportive feedback would be provided by LDOE monitoring personnel to assist in promoting skill development of faculty in a developmental nature across time. Finally, the IMs reviewed the CAPs to ensure that the LEAs would be providing appropriate documentation to assist LDOE monitoring personnel in evaluating both the compliance and quality of their practices in relation to federal and state regulations as well as requirements outlined in the CJ.

The LDOE submitted cover letters, final monitoring reports with recommendations for improvement, and specific findings of noncompliance in relation to IDEA violations to the LEAs on February 28, 2019, and the IMs received these documents on March 7, 2019. Final monitoring reports and specific finding of non-compliance of IDEA regulations are in the Appendix for review by all parties. The LDOE submitted notification emails for technical assistance meetings with the LEAs to review the results of the monitoring reports, results summaries, and corrective action plans on March 12 & 20, 2019. Finally, LDOE monitoring personnel held on-site technical assistance meetings with the targeted LEAs to review the findings of systemic noncompliance and student-specific noncompliance and to discuss the structure and activities of the CAPs from March 27 through April 11, 2019. These notifications were submitted to the IMs for review on April 25, 2019 and are also located in the Appendix for review by the parties. Revisions were made to the CAPs following these

required meetings to identify the persons responsible for completing the CAP activities and action steps for compliance, including specify the required documentation to be submitted to statewide monitoring personnel, documentation due dates, and revision to corrective activities and/or action steps, if appropriate. The revised CAPs were submitted to the IMs by statewide monitoring personnel on March 23, 2019 and are included in the Appendix for review by the parties.

The IMs review of compliance with the targeted monitoring provisions of the CJ for the fall semester of the 2018-2019 school year consisted of an evaluation of three components of the LDOE's monitoring activities. Specifically, the components being assessed for compliance included: (1) Correct identification of the charter schools selected for targeted monitoring (e.g., determination of the annual new identification rate for each LEA, and evaluation of the LDOE calculations); (2) Completion of targeted monitoring activities by the LDOE as required by the CJ and Addendum A to the CJ (e.g., completion of appropriate monitoring activities by the LDOE, completion of staff interviews, appropriate selection of student files, appropriate completion of the monitoring protocols, and correct identification of systemic or individual compliance and/or noncompliance) and (3) Development of appropriate corrective actions "sufficient to remedy the noncompliance and to reasonably ensure that such noncompliance does not reoccur." (pp. 7, 9, 11, 14 of CJ). As such, the IM status report provides a review of these monitoring activities for each LEA selected for targeted monitoring under each area of the CJ (e.g., Child Find, Related Services, Discipline, and Enrollment Stability) along with IM determinations regarding compliance with the monitoring provisions of the CJ. An overall summary regarding targeted monitoring activities and professional recommendations are provided at the conclusion of this report in addition to

a brief update regarding targeted monitoring activities that occurred during the fall semester of 2018.

## A.  CHILD FIND

1. <u>Targeted Monitoring Activities for the Child Find Provisions</u>

Three schools were selected for targeted monitoring during the fall 2018 school semester based on an analysis of the 2017-2018 Child Find data across all NOLA and OPSB Charter LEAs. The IMs review of the documentation and alculations performed by LDOE monitoring personnel indicated that the schools were selected for targeted monitoring in a manner consistent with the requirements outlined on page 7 of the CJ and page 1 of Addendum A of the CJ. The schools selected for targeted monitoring during the fall 2018 semester included Lake Forest Charter School, Edward Hynes Charter School and Walter L. Cohen College Preparatory High School. A review of target monitoring findings for each school is presented below.

*a.*        *Lake Forest Charter School*

The on-site targeted monitoring visit occurred on December 3, 2018. One LDOE representative and one IM were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections 4(a) and 4(b) on page 2 of Addendum A of the CJ. The specific staff members participating in the interview process are reported on page 3 of the LDOE monitoring report. Throughout the interview, there were no specific areas of concern identified as the faculty at Lake Forest Charter School clearly articulated an accurate understanding and working knowledge of mandated Child Find, RTI and Section 504 policies and

9

procedures. A detailed summary of staff responses is presented on pages 3-4 of the LDOE monitoring report located in the Appendix.

A representative sample of eleven files for students enrolled in sixth-eighth grades were reviewed by the LDOE monitoring personnel and the IM in a manner consistent with the requirements outlined in section 2 (a) on page 1 of Addendum A of the CJ. Specifically, the sample consisted of seven students (64% of the sample) who were participating in the Response to Intervention (RTI process), two students (18% of the sample) who had current Section 504 plans, and two students (18% of the sample) who were currently being reviewed and considered by the School Building Level Committee (SBLC) as the result of their poor response to interventions (RTI) and/or failing two or more core academic subjects. Student file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 3(a) on page 2 of Addendum A of the CJ using the required Child Find protocol. Please refer to page 4 of the LDOE monitoring report for Lake Forest Charter School in the Appendix for a list of items that were reviewed to complete the Child Find protocol for the selected sample of students.

A review of student records revealed that all eleven student files reviewed (100% of the sample) were judged to be in <u>compliance</u> regarding mandated Child Find activities. No systemic or student-specific noncompliance was identified for this LEA under IDEA, Part B during the fall 2018 on-site targeted monitoring visit.

b.      *Edward Hynes Charter School*

The on-site targeted monitoring visit occurred on December 3, 2018. One LDOE representative and one IM were present during the entire on-site visit to conduct staff

10

interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections 4(a) and 4(b) on page 2 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. Faculty at Edward Hynes Charter School clearly articulated their responses regarding the LEA's current Child Find policies and procedures and provided appropriate answers to all interview questions. No specific areas of concern were identified from the interview as school staff demonstrated a thorough knowledge of federal and state mandates, policies and procedures as related to IDEA Child Find activities, RTI and Section 504. A detailed summary of staff responses is presented on pages 3-4 of the LDOE monitoring report located in the Appendix.

A representative sample of eleven student files for students enrolled in kindergarten-fifth grade were reviewed by LDOE monitoring personnel and the IM in a manner consistent with the requirements outlined in section 2(a) on page 1 of Addendum A of the CJ. Specifically, the sample consisted of three students (27% of the sample) who had Section 504 plans, five students (46% of the sample) who were participating in the Response to Intervention (RTI process) and three students (27% of the sample) who were under consideration by the School Building Level Committee (SBLC) as the result of their failing two or more core subjects and/or demonstrating a poor response to interventions (RTI).

Student file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 3(a) on page 2 of Addendum A of the CJ using the required Child Find protocol. Please refer to page 4 of the LDOE

11

monitoring report for Edward Hynes Charter School in the Appendix for a list of items that were reviewed to complete the Child Find protocol for the sample of students.

A review of student records revealed that all eleven student files reviewed (100%) of the sample were judged to reflect <u>compliance</u> with all Child Find regulations reviewed. No systemic or student-specific noncompliance was identified for this LEA under IDEA, Part B program during the fall 2018 on-site targeted monitoring visit.

c.      *Walter L. Cohen College Preparatory High School*

The on-site targeted monitoring visit occurred on December 3, 2018. One LDOE representative and one IM were present during the entire on-site visit to conduct staff interviews and review student files. The interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections 4(a) and 4(b) on page 2 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. Staff responses during the structured interview revealed concerns of <u>noncompliance</u> in the area of Child Find in relation to the inconsistent implementation of federal and state policies and practices mandated for School Building Level Committees (SBLC), Response to Intervention (RTI) and Section 504. A detailed summary of staff responses is presented on pages 3-4 of the LDOE monitoring report located in the Appendix.

A representative sample of twelve student files for students in grades nine-twelve were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 2(a) on page 1 of Addendum A of the CJ. Specifically, the sample consisted of four students (33% of the sample) who had Section 504 plans, four students (25% of the sample) who experienced two or greater academic

course failures, three students (25% of the sample) who were participating in the RTI process, and one student (9% of the sample) who was under consideration by the SBLC as the result of academic course failure. Student file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 3(a) on page 2 of Addendum A of the CJ using the required Child Find protocol. Please refer to page 4 of the LDOE monitoring report in the Appendix for a list of items that were reviewed to complete the Child Find protocol for the sample of students who were selected from Walter L. Cohen College Preparatory High School.

A review of student records revealed that twelve of twelve student files reviewed (100% of the sample) were judged to reflect some measure of noncompliance for mandated Child Find activities. Specific IDEA, Bulletin 1508 and/or Section 504 systemic violations are reported on page 5 of the LDOE monitoring report and pages 1-3 of the 2018-2019 IDEA monitoring results summary located in the Appendix. In relation, student-specific findings of noncompliance are listed on pages 4-6 of the 2018-2019 IDEA monitoring results summary.

Overall, systemic noncompliance was identified for this LEA under IDEA, Part B program and/or Bulletin 1508 (Pupil Appraisal Handbook) in four areas:

- Eight of eight applicable files (100% of the sample) were judged to reflect noncompliance with the policy mandating that all required members of the School Building Level Committee (SBLC) provide a signature to indicate their active participation in SBLC data review and decision-making process for determining the most beneficial educational options for addressing student needs (*Bulletin 1508-§303 School Building Level Committee*).

- Seven of eight applicable student files (88% of the sample) were judged to indicate noncompliance with the requirement that the SBLC coordinate and document the results of all required screening activities completed by general education personnel with the assistance from other school personnel (*Bulletin 1508-§305 Screening Activities*).

- Four of four applicable student files (100% of the sample) were found to be in noncompliance with the requirement of fully implementing a three-tier model of instruction (i.e. RTI) that incorporates an integrated data collection or assessment system to make inform decisions regarding student response to intervention at each tier of instruction or intervention (*Bulletin 1508-§301* Response to Intervention; *IDEA-§300.306(a)(1)* and §300.308).

- Four of four applicable student files reviewed for students with Section 504 plans (100% of the sample) were judged to reflect noncompliance with the requirement that the SBLC consider whether the students would potentially profit from receiving specially designed instruction, when indicated by the student's educational records (*Section 504-§104.35(b)*).

2. <u>Corrective Actions to Address Identified Areas of Noncompliance</u>

Overall, systemic noncompliance was identified for one of three Charter Schools selected for targeted review during the fall 2018 school term in the area of Child Find. As previously noted, systemic noncompliance for IDEA and/or Bulletin 1508 mandates was observed for Walter L. Cohen College Preparatory High School across four areas (i.e., Response to Intervention Activities, SBLC representation, SBLC Screening Activities, and SBLC consideration of whether a student may potentially require specialized instruction,

14

when indicated). Given the identified systemic and student-specific findings of noncompliance under IDEA, Part B, and Bulletin 1508, this LEA required a formal Corrective Action Plan (CAP) to address all findings of noncompliance. Therefore, as required by the CJ, the LDOE developed a CAP to address each area of identified systemic and student-specific noncompliance listed in the LDOE monitoring report and 2018-2019 IDEA monitoring summary for Walter L. Cohen College Preparatory High School. Specifically, the CAP for this LEA includes the following activities for corrective action:

- 1.0 Correct all student specific citations identified in the LDOE Results Summary report;

- 1.1. School-based team (e.g., SBLC Coordinator, 504 Chairperson, SPED Director or Supervisor, School Administrator/Leader/Principal, and school intervention team) will attend a mandated professional development provided by OPSB on appropriate SBLC practices;

- 1.2. School-based teams will monitor regular education students (not currently ruled eligible for Section 504, IDEA, or participating in the RTI process) to identify potential academic or behavioral concerns;

- 1.3. Develop a documentation log to record all Child Find activities;

- 1.4. Develop strategies for appropriately documenting all SBLC referral activities;

- 1.5. Develop a procedure for ensuring that all SBLC forms are completed and include all required components;

- 1.6. Mandated staff trainings on appropriate RTI procedures;

- 1.7. Develop procedures for ensuring that all students participating in RTI are consistently and frequently assessed (progress monitoring);

15

- 1.8. Mandated scheduled SPLC follow-up meetings to review data for all students participating in the RTI process to assess ongoing student progress and documenting the team's recommendations;

- 1.9. Develop a system for academic and behavioral progress monitoring to document student progress and response to intervention(s);

- 1.10. Conduct mandated staff trainings on all required 504 procedures;

- 1.11. Develop procedures to ensure that SBLC consistently adheres to all mandated eligibility criteria to determine if an identified student qualifies for Section 504 services and/or whether the potential need for specialized instruction is indicated;

- 1.12. Develop and follow mandated Section 504 procedures and guidelines, consistent with federal and state policies;

- 1.13. Adopt/develop and consistently utilize appropriate forms for documenting the Section 504 referral process;

- 1.14. Mandated procedure and requirement that SBLC and/or Section 504 Coordinator consistently monitor grades of all Section 504 students and all students participating in RTI every grading period to determine which students are failing two or more core subject areas and/or students failing to respond to research-based academic and/or behavioral interventions at any tier to determine the potential need for specialized instruction;

- 1.15. Develop procedures to ensure the SBLC and/or Section 504 Coordinator actively monitors behavior data for students participating in the RTI process, Section 504 students with behavior concerns, and students identified through universal behavior screening at Tier 1 to determine which students are displaying a pattern of

behavior (as determined by the LEA) who may require additional services and/or supports.

Please refer to the Appendix for a detailed description of CAP activities required by Walter L. Cohen College Preparatory High School for addressing all areas of identified student-specific and systemic noncompliance with federal and state Child Find mandates. A review of the CAPs by the IMs revealed that the documents include corrective actions consistent with requirements outlined on page 2 of *Bulletin 1922 (Louisiana Administrative Code March 2017 Part XCI. Compliance Monitoring Procedures)* and in section IV(A)(3) on page 7 of the CJ and are sufficient for addressing all IDEA violations observed during the fall 2018 targeted monitoring review.

3. <u>Status of Compliance</u>

After participating in the on-site monitoring visits for the charter schools selected for targeted monitoring and reviewing documentation submitted by the LDOE monitoring personnel (e.g., monitoring notifications, LDOE monitoring reports, 2018-2019 IDEA monitoring results summaries, corrective action plans, technical assistance notifications) and discussing the targeted monitoring activities with LDOE legal counsel and monitoring personnel during conference calls and on-site meetings throughout the fall 2018 and spring 2019 semester, the LDOE is judged to be in **Substantial Compliance** with Section IV(A)(3)(a-b) and Sections A(1)(a-c) through 5(a) of Addendum A of the CJ for the fall 2018 semester of the 2017-2018 school year. Additional evaluations of compliance in the area of Child Find will be summarized again in forthcoming IM status reports. These updates will specifically discuss the spring 2019 follow-up, on-site targeted monitoring activities and

17

findings for charter schools that have been undergoing corrective actions and/or intensive corrective actions during the 2017-2018 and 2018-2019 school terms.

## B. RELATED SERVICES

1. Targeted Monitoring Activities for the Related Services Provisions

Three schools were selected for targeted monitoring during the fall 2018 semester based on an analysis of 2017-2018 related service provision rates for NOLA and OPSB Charter LEAs. The IMs initial review of the documentation and calculations performed by LDOE monitoring personnel indicated that the schools were selected for targeted monitoring in a manner consistent with the requirements outlined on page 8-9 of the CJ and pages 2-3 of Addendum A of the CJ. However, after the fall 2018 targeted monitoring had been completed, a follow-up inquiry of the school's selected for targeted monitoring revealed potential errors in the selection process for the area of Related Services. More specifically, the IMs observed that the data metrics (i.e., average related services minutes) used for school selection were calculated based on total school enrollment rather than enrollment counts for students with disabilities across all NOLA and OPSB schools.

Based on a review of the updated (corrected) LDOE 2017-2018 Related Services database and follow-up communications with LDOE monitoring staff and legal counsel, the IMs confirmed that two charter schools (Robert Moton Charter School and Lusher Charter School) were incorrectly chosen for targeted monitoring for the fall, 2018 targeted monitoring cycle (See IMs inquiry summary in the Appendix for more information). The NOLA/OPSB charter schools that should have been selected for targeted (Related Service) monitoring visits during the fall, 2018 term included New Orleans Charter Math and Science High School and ReNew Accelerated High School. It should be reported here that

18

these charter schools subsequently participated in targeted (on-site) monitoring in September 2019 and represent an additional (supplementary) fall targeted (Related Service) monitoring cycle. A summary of supplementary targeted monitoring findings will be provided in forthcoming IM updates.

The schools participating in monitoring during the fall 2018 semester included Edna Karr Charter High School, Robert Russa Moton Charter School, and Lusher Charter School. A review of findings for each school is presented below.

a.        *Edna Karr Charter High School*

The on-site targeted monitoring visit occurred on December 4, 2018. Two LDOE representatives and one IM were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections B(4)(a) and B (4)(b) on page 3-4 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. The staff at Edna Karr High School clearly articulated the LEAs procedures for determining if a student requires related services, including securing appropriate service providers, options for service delivery and procedures for documenting and frequently monitoring student progress. A summary of staff responses is presented on page 3 of the LDOE monitoring report.

A representative sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(2)(a) and B(2)(b) on page 3 of Addendum A of the CJ. The sample of ten students reviewed included the following exceptionalities: seven students with an

19

exceptionality of Autism, one student with a classification of Orthopedic Impairment and two students with an exceptionality of Intellectual Disabled (Mild). Related Service provisions included Speech/ Language Therapy (eight students), Adaptive Physical Education (two students), Physical Therapy (two students) and School Social Work Services (one student).

Student file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(3)(a) on page 3 of Addendum A of the CJ using the required Related Service protocol. Refer to page 4 of the LDOE monitoring report for Edna Karr Charter High School in the Appendix for a list of items that were reviewed to complete the Related Service protocol for the sample of students.

A review of student records revealed that ten of ten student files (100% of the sample) were judged to reflect compliance for all applicable Related Services provisions assessed. There was no measure of student-specific or systemic noncompliance observed for this LEA under IDEA, Part B during the fall 2018 on-site targeted monitoring visit.

b.        *Robert Russa Moten Charter School*

The on-site targeted monitoring visit occurred on December 5, 2018. One LDOE representative and one IM were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in section B(4)(a) and B(4)(b) of page 3 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. Faculty at Robert Russa Moten Charter School clearly articulated the LEAs

procedures for appropriately determining the related services needs of students, including options for service delivery, service documentation, staff/parent collaboration, and frequent monitoring of student progress.

A sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(2)(a) and B(2)(b) on page 3 of Addendum A of the CJ. The sample of ten students reviewed included the following exceptionalities: Autism (three students), Intellectually Disabled (one student), Other Health Impaired (one student), Developmental Delay (one student), Speech/Language Impaired (two students), Emotional Disability (one student) and Specific Learning Disability (one student).  Related Services provided included Adaptive PE (three students), Occupational Therapy (four students), Language/Speech Therapy (eight students) and Social Work Services (two students). Targeted file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(3)(a) on page 3 of Addendum A of the CJ using the required Related Service protocol. Please refer to page 4 of the LDOE monitoring report for Robert Russa Moten Charter School in the Appendix for a list of items that were reviewed to complete the Related Service protocol for the sample of students. A review of student records revealed that two of ten student files reviewed (20% of the sample) were judged to reflect some measure of noncompliance regarding Related Service provisions. These findings reflect only student-specific concerns as there was no systemic noncompliance for this LEA under IDEA, Part B observed during the fall 2018 targeting monitoring visit. The findings of the on-site targeted monitoring revealed student-specific IDEA violations in two areas:

21

- One of ten student files reviewed (10% of the sample) indicated student-specific noncompliance regarding appropriate and meaningful statements of the students' present levels of academic achievement and functional performance as required under *IDEA §300.320(a)(1)(i)(2)(i) - Definition of Individualized Education Program.*

- Two of ten student files reviewed (20% of the sample) indicated student-specific findings of noncompliance for *IDEA §300.320(a)(2) - Definition of Individualized Education Program (*i.e., standards-based measurable annual goals and objectives).

All student-specific findings of noncompliance are listed on page 2 of the 2018-2019 IDEA monitoring results summary for Robert Russa Moten Charter School located in the Appendix for review by the Parties.

c.      *Lusher Charter School*

The on-site targeted monitoring visit occurred on December 4, 2018. One LDOE representative and one IM were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections B(4)(a) and B(4)(b) on page 4-5 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. Faculty at Lusher Charter School clearly articulated the LEA's process for related services provisions for students with disabilities as no concerns with regard to potential noncompliance was observed based on staff responses.

A representative sample of ten student files were reviewed by the LDOE

22

monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(2)(a) and B(2)(b) on page 3 of Addendum A of the CJ. The sample of ten students reviewed included the following exceptionalities: Other Health Impaired (3 students), Autism (six students) and Emotionally Disabled (one student). Related Service provisions included Language/Speech Therapy (six students), Social Work Services (seven students), Occupational Therapy (one student) and Counseling Services (one student).

Targeted file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(3)(a) on page 3 of Addendum A of the CJ using the required Related Service protocol. Please refer to page 4 of the LDOE monitoring report for Lusher Charter School in the Appendix for a list of items that were reviewed to complete the Related Service protocol for the sample of students.

As noted previously, Lusher Charter School staff participating in the on-site interview clearly described the LEAs process for identifying students requiring related services and other relevant details regarding the actual delivery and documentation of services. However, a review of student records revealed that eight of ten student files reviewed (80% of the sample) were judged to be in noncompliance regarding Related Service provisions. Specific IDEA systemic violations are reported on page 5 of the LDOE monitoring report and pages 2-4 of the 2017-2018 IDEA monitoring results summary located in the Appendix. In relation, student-specific findings of noncompliance are listed on pages 5-9 of the 2018-2019 IDEA monitoring results summary.

Overall, systemic noncompliance was identified for this LEA under IDEA, Part B

23

in four areas:

- Eight of ten applicable student files reviewed (80% of the sample) were judged to reflect noncompliance in relation to the LEAs failure to provide FAPE as under *IDEA §300.17(a.-d.) Free Appropriate Public Education (FAPE).*

- Six of ten student files reviewed (60% of the sample) were judged to reflect concerns related to the LEA's appropriately and meaningfully describing students' present levels of academic and functional performance. This reflects systemic noncompliance under *IDEA 300.320(a)(1)(i)(2)(i) – Definition of Individualized Education Program.*

- Seven of ten student files reviewed (70% of the sample) were judged to reflect noncompliance in the area of developing meaningful and measurable standards-based annual goals and objectives. As such, this reflects systemic noncompliance under *IDEA§300.320(a)(2) and 300.160(5a)(b2ii)(c-9) Definition of Individualized Education Program.*

- Three of ten student files reviewed (30% of the sample of students receiving related services) were judged to reflect related service delivery concerns related to failing to accurately document and maintain updated service provision logs. This reflects systemic noncompliance under *IDEA §300.320(a)(4) and (7) - Definition of an Individualized Education Program.*

In addition to systemic concerns, the findings of the on-site targeted monitoring also revealed student-specific IDEA violations in two areas:

- Two of ten student files (20% of the sample reviewed) were judged to reflect

24

noncompliance for failing to reasonably calculate related services provisions necessary for adequately addressing student needs. This finding reflects student-specific noncompliance for IDEA §300.320(a)(4) and (7).

- Two of ten student files reviewed (20% of the sample) failed to include documentation indicating that all appropriate IEP team members were present and participated in the student's IEP meetings. Again, this finding reflects only student-specific noncompliance for IDEA §300.321(a)-(b)-IEP Team.

2. Corrective Actions to Address Identified Areas of Noncompliance

Overall, systemic noncompliance was identified in one of three Charter LEAs reviewed during the fall 2018 targeted monitoring. As previously noted, Lusher Charter School demonstrated systemic noncompliance for IDEA Related Service regulations in four areas. In relation, this LEA also demonstrated two additional findings of student-specific noncompliance.

Given the identified systemic and student-specific findings of noncompliance under IDEA, Part B, Lusher Charter School required a formal Corrective Action Plan (CAP) to address identified concerns. Therefore, as required by the CJ, the LDOE developed a CAP to address each area of identified systemic noncompliance and student-specific noncompliance listed in the LDOE 2018-2019 Monitoring Report and the LDOE IDEA monitoring summaries for Lusher Charter School. Specifically, the CAPs for this LEA targeted in the area of Related Services include the following activities for corrective remedies:

- 1.1. Correct all student specific citations identified in the Results Summary report. NOTE: This activity represents an individual corrective action plan for

25

providing remedies for all student specific IDEA citations;

- 1.2. Provide training to special education staff (e.g., special education teachers and related service providers) on measurable goals, data driven PLAFFPs, objectives linked to goals, documenting student progress, ensuring participation and signatures of required team members, and how to document waivers for attendance using excusal forms.

- 1.3. Mandated training for related service providers on how to properly document provision of services to students;

- 1.4. Provision of ongoing mandated trainings in the following areas: IEP writing (e.g., measurable goals and PLAAFP statements), provision and documentation of accommodations, documenting special education services, progress monitoring of student data;

- 1.5. Required monthly consistency checks by special education administrative staff to ensure IEP fidelity by internally monitoring all IEPs before the IEP is submitted to SER;

- 1.6. Required monthly consistency checks conducted by special education administrative staff to ensure related service provider logs are completed with fidelity;

- 1.7. Mandated staff completion of the IEP Training Modules on the LDOE website provided by the Human Development Center – LSUHSC group with a particular focus on Module 2 (Data Driven Present Levels of Performance) and Module 3 (Measurable Goals)

- 1.8. Provision of compensatory education to students whose files did not include

documentation verifying they received related services.

A copy of the CAP to address areas of noncompliance for Related Service provisions for Lusher Charter School is available in the Appendix for review by the parties. The IMs review of the CAP for this LEA revealed that the document includes corrective actions that are consistent with requirements outlined on page 2 of *Bulletin 1922 (Louisiana Administrative Code March 2017 Part XCI. Compliance Monitoring Procedures)* and in section IV(C)(5) on pages 8-9 of the CJ and sufficiently addresses all findings of student-specific and systemic noncompliance observed during the on-site targeted monitoring visit.

3.       Status of Compliance

As noted previously, two NOLA/OPSB charter schools (Robert Russa Moton and Lusher Charter School) were incorrectly selected for targeted monitoring in the area of Related Services. However, as outlined in Section III (32) of the CJ, "Noncompliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, shall not constitute failure to maintain substantial compliance. Temporary compliance during a period of otherwise sustained noncompliance shall not constitute substantial compliance." After a thorough inquiry, the IMs judge this targeted (Related Services) school selection error to be an inadvertent technicality and does not significantly compromise the overall objectives of the CJ. Instead, the LDOE's remedy for providing increased oversight by conducting an additional (supplemental) fall monitoring cycle resulted in additional NOLA/OPSB charter schools undergoing targeted monitoring, which only broadens the scope of the CJ.

After participating in the on-site monitoring visits for the charter schools selected for

27

targeted monitoring and reviewing documentation submitted by the LDOE monitoring personnel (e.g., monitoring notifications, LDOE monitoring reports, 2018-2019 IDEA monitoring results summaries, corrective action plans, technical assistance notifications) and discussing the targeted monitoring activities with LDOE legal counsel and monitoring personnel during conference calls and on-site meetings during throughout the fall 2018 and spring 2019 school terms, the LDOE is judged to be in **Substantial Compliance** with Section IV(B)(2)(a-b) of the CJ and Sections B(1)(a-c) through 5(a) of Addendum A of the CJ for the fall semester of the 2016-2017 school year. Additional evaluations of compliance in the area of Related Services will be summarized in forthcoming IM status reports. Specifically, these updates will review and discuss the spring 2019 follow-up, on-site targeted monitoring activities and findings for charter schools that have completed corrective actions and/or intensive corrective actions during the 2017-2018 and/or 2018-2019 school terms. In addition, the IMs will summarize the findings of supplemental and regular on-site targeted monitoring visits conducted in September and December 2019.

## C. DISCIPLINE

1. Targeted Monitoring Activities for the Discipline Provisions

Three schools were selected for targeted monitoring during the fall 2018 school term based on an analysis of 2017-2018 discipline data across NOLA and OPSB Charter LEAs. The IMs reviewed the documentation and calculations performed by LDOE monitoring personnel and confirmed that the schools were selected for targeted monitoring in a manner consistent with the requirements outlined on page 11 of the CJ and pages 4-5 of Addendum A of the CJ. The schools selected for targeted monitoring during the fall 2018 semester included New Orleans Charter Math and Science High

School, New Orleans Marine/Maritime Academy, and Einstein Charter High School. A review of findings for each school is presented below.

a.        *New Orleans Charter Math and Science High School*

The on-site targeted monitoring visit occurred on December 6, 2018. One LDOE representative and one IM were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections 4(a) and 4(b) on pages 4-5 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on pages 3 of the LDOE monitoring report. Faculty at New Orleans Charter Math and Science High School clearly described the LEAs universal (Tier) one primary prevention program, including restorative justice practices. In addition, staff members clearly articulated the LEAs policies and procedures for the provision of tiered behavioral supports, including conducting Functional Behavioral Assessments (FBAs) and developing/implementing Behavior Intervention Plans (BIPs). Finally, the team provided information related to the LEAs policies and procedures for monitoring exclusionary discipline outcomes and conducting Manifestation Determination Reviews (MDRs), as required. Based on the staff responses during the on-site interview, there were no potential concerns for noncompliance with IDEA Discipline regulations noted for this LEA.

A detailed summary of staff responses is presented on pages 3- 4 of the LDOE monitoring report located in the Appendix. A representative sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 5 (a-b) on page 11 of the CJ and section 2(a-b) on

page 5 of Addendum A of the CJ. Specifically, the sample consisted of students with the following exceptionalities: Emotional Disability (four students), Other Health Impairment (three students), Specific Learning Disability (two students), Intellectual Disability-Mild (one student). A review of student records revealed that two students (20% of the sample) experienced exclusionary discipline removals that constituted a change in placement and required a formal Manifestation Determination Review MDR).

Student file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 3(a) on page 5 of Addendum A of the CJ using the required Discipline protocol. Please refer to page 4 of the LDOE monitoring report for New Orleans Charter Math and Science High School in the Appendix for a list of items that were reviewed to complete the Discipline protocol for the sample of students. Based on a thorough file review, ten of ten student files reviewed (100% of the sample) revealed no issues of systemic or student-specific noncompliance observed for this LEA under IDEA, Part B program.

b.        *New Orleans Marine/Maritime Academy*

The on-site targeted monitoring visit occurred on December 6, 2018. One LDOE representative and one IM were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections 4(a) and 4(b) on pages 4-5 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. Faculty at New Orleans Marine/Maritime Academy provided comprehensive information regarding the policies, procedures, and practices related to the provision of

tiered behavioral supports and disciplinary actions for students. In relation, the staff provided thorough and detailed answers to all interview questions. No potential concerns related to noncompliance for IDEA discipline practices were noted for this LEA during the interview. A detailed summary of staff responses is presented on pages 3- 4 of the LDOE monitoring report located in the Appendix.

A representative sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in Section 5(a-b) on page 11 of the CJ and section 2(a-b) on page 5 of Addendum A of the CJ. Specifically, the sample consisted of students with the following exceptionalities: Emotional Disability (three students), Other Health Impaired (six students) and Specific Learning Disability (one student). It should be reported that only one of ten students reviewed (10% of the sample) experienced greater than ten days of exclusionary discipline removals constituting a change in placement and required Manifestation Determination Review (MDR).

Student file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 3(a) on page 5 of Addendum A of the CJ using the required Discipline protocol. Please refer to page 4 of the LDOE monitoring report for New Orleans Marine/Maritime Academy in the Appendix for a list of items that were reviewed to complete the Discipline protocol for the sample of students. A thorough review of student records indicated that ten of ten student files reviewed (100% of the sample) revealed no issues of systemic or student-specific noncompliance for this LEA under IDEA, Part B program during the fall 2018 targeted monitoring visit.

*c.*        *Einstein Charter High School*

The on-site targeted monitoring visit occurred on December 6, 2018. One LDOE representative and one IM were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections 4(a) and 4(b) on pages 4-5 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. The staff at Einstein Charter High School provided a comprehensive synopsis of their discipline  program for students with disabilities, including an overview of the LEAs Positive Behavior  Interventions and supports (PBIS) initiative, description of behavioral support provisions (FBAs  and BIPs), monitoring of discipline data and conducting of timely MDRs, when appropriate. No potential concerns related to noncompliance for IDEA discipline practices were noted for this LEA during the interview. A detailed summary of staff responses is presented on page 3 of the LDOE monitoring report located in the Appendix.

A representative sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 5 (a-b) on page 11 of the CJ and section 2(a-b) on page 5 of Addendum A of the CJ. Specifically, the sample reviewed consisted of students with the following exceptionalities: Emotional Disability (four students), Other Health Impairment (one student), and Specific Learning Disability (five students). It should be noted that two of the ten students (20% of the sample) experienced greater than ten days of exclusionary discipline constituting a change in placement and a required a Manifestation

Determination Review (MDR).

Student file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section 3(a) on page 5 of Addendum A of the CJ using the required Discipline protocol. Please refer to pages 4 of the LDOE monitoring report for Einstein Charter High School in the Appendix for a list of items that were reviewed to complete the Discipline protocol for the sample of students. A thorough review of student records indicated that ten of ten student files reviewed (100% of the sample) revealed no issues of systemic or student-specific noncompliance for this LEA under IDEA, Part B program during the fall 2018 targeted monitoring visit.

2. Corrective Actions to Address Identified Areas of Noncompliance

Overall, systemic compliance for all IDEA Discipline regulations and practices was identified for all Charter LEAs reviewed during the fall 2018 targeted monitoring in the area of Discipline. As such, no corrective actions are warranted.

3. Status of Compliance

After participating in the on-site monitoring visits for the charter schools selected for targeted monitoring and reviewing documentation submitted by the LDOE monitoring personnel (e.g., monitoring notifications, LDOE monitoring reports, 2018-2019 IDEA monitoring results summaries, corrective action plans, technical assistance notifications) and discussing the targeted monitoring activities with LDOE legal counsel and monitoring personnel during conference calls and on-site meetings during throughout the fall 2018 semester and spring 2019 semester, the LDOE is judged to be in **Substantial Compliance** with Section IV(C)(5)(a-b) and Sections C(1)(a-c) through 5(a) of Addendum A of the CJ

for the fall 2018 semester of the 2018-2018 school year. Additional evaluations of compliance in the area of Discipline will be summarized in forthcoming IM status reports. These updates will specifically discuss the spring 2019 follow-up, on-site targeted monitoring activities and findings for charter schools that have been undergoing corrective actions and/or intensive corrective actions during the 2017-2018 and 2018-2019 school terms.

## D. ENROLLMENT STABILITY

1. Targeted Monitoring Activities for the Enrollment Stability Provisions

Three schools were selected for targeted monitoring during the fall 2018 semester based on an analysis of 2017-2018 enrollment rates for NOLA and OPSB Charter LEAs. The IMs initial review of the documentation and calculations performed by LDOE monitoring personnel indicated that the schools were selected for targeted monitoring in a manner consistent with the requirements outlined on page 14-15 of the CJ and page 6 of Addendum A of the CJ. However, after the fall, 2018 targeted monitoring was completed, the IMs discovered that Audubon (Lower) Charter school was incorrectly selected to undergo targeted monitoring. After collaborating with LDOE monitoring staff to conduct a thorough investigation into this matter, the school selection error was determined to be the result of a change in the school's site identification code assigned to Audubon (Lower) Charter school. During the transfer of data from the two site codes, there was an inadvertent error with accurately transferring the enrollment figures for students with disabilities to the charter school's updated site identification code, thus directly affecting the re-enrollment rates for students with disabilities from the 2016-2017 to 2017-2018 school terms (see IMs inquiry summary in

34

the Appendix for more information). The charter school that should have been selected

for targeted (Enrollment Stability) monitoring visits during the fall, 2018 term was

Martin Luther King Charter for Science and Technology.  This charter school

subsequently participated in targeted (on-site) monitoring in September 2019 and

represents a supplementary fall targeted (Related Service, which utilizes the same

protocol) monitoring visit.  A summary of the supplementary targeted monitoring

findings for Martin Luther King Charter for Science and Technology will be provided in

forthcoming IM updates.

The schools participating in targeted monitoring during the fall 2018 semester

included William J. Fischer Accelerated Academy, Audubon (Lower) Charter School

(incorrectly selected) and Medard H. Nelson Elementary School. A review of findings for

each school is presented below.

a.        *William J. Fisher Accelerated Academy*

The on-site targeted monitoring visit occurred on December 5, 2018.  Two LDOE

representatives and one IM were present during the entire on-site visit to conduct staff

interviews and review student files. The staff interviews were conducted using a standard

bank of questions with staff members consistent with requirements outlined in sections

B(4)(a) and B(4)(b) on pages 3-4 of Addendum A of the CJ. The specific staff members

who participated in the interview process are reported on page 3 of the LDOE monitoring

report. Results of this interview process indicated general compliance in the area of

Enrollment Stability. School staff were able to clearly articulate LEAs processes and

procedures for determining a student's need for related service provisions, including

procedures for ensuring timely service delivery, collaboration among staff and related

service providers, student progress monitoring and documentation of services. There were no concerns for potential systemic noncompliance noted during the interview. A summary of staff responses is presented on pages 3-4 of the LDOE monitoring report located in the Appendix.

A representative sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(2)(a) on and B(2)(b) on page 3 of Addendum A of the CJ. The sample of students reviewed included the students with the following exceptionalities: Traumatic Brain Injury (one student), Intellectual Disability-Mild (five students), Autism (one student), Developmental Delay (one student) and Other Health Impaired (two students). Related Service provisions included Adaptive PE (four students), Language/Speech Therapy (nine students) and Social Work Services (four students).

Student file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(3)(a) on page 3 of Addendum A and section D(2)(a-c) on page 6 of Addendum A using the required Related Service protocol. Please refer to page 4 of the LDOE monitoring report for William J. Fischer Accelerated Academy in the Appendix for a list of items that were reviewed to complete the Related Service protocol for the sample of students.

A review of student records revealed that four of ten student files reviewed (40% of the sample) were judged to reflect some measure of noncompliance regarding Related Service provisions. However, all findings of noncompliance reflected only student-specific concerns as there were no systemic violations observed for this LEA under IDEA, Part B during the fall 2018 on-site targeted monitoring visit.

With regard to student-specific findings, noncompliance was observed for three students regarding minor concerns related to the development of appropriate and meaningful statements of the students' present levels of academic achievement and functional performance as required under *IDEA §300.320(a)(1)(i)(2)(i) - Definition of Individualized Education Program*. In relation, minor student-specific findings of noncompliance were observed for two students in relation to *IDEA §300.320(a)(2) - Definition of Individualized Education Program (*i.e., standards-based measurable annual goals and objectives). Finally, a single instance of student-specific noncompliance was observed in relation to the LEAs failure to provide related services in terms of frequency and duration as indicated on the IEP as required by IDEA §300.320(a)(4) and (7). All student-specific findings of noncompliance are listed on page 2 of the 2018-2019 IDEA monitoring results summary for William J. Fischer Accelerated Academy located in the Appendix.

b.        *Audubon (Lower) Charter School*

The on-site targeted monitoring visit occurred on December 5, 2017. One LDOE representatives and one IM were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections B(4)(a) and B(4)(b) on pages 3-4 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. Results of the interview revealed general compliance with mandated IDEA related services requirements in relation to the LEAs multi-disciplinary referral and identification process, IEP development, securing service providers and methods of service delivery.

However, staff responses during the interview process did reveal some concerns with regard to the LEAs processes for determining the specific related service needs of students as well as procedures for ensuring parent participation in the related service process. A summary of staff responses is presented on page 3 of the LDOE monitoring report located in the Appendix.

A representative sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(2)(a) and B(2)b on page 3 of Addendum A of the CJ. The sample of students reviewed included the following exceptionalities: Autism (two students), Other Health Impaired (two students), Orthopedic Impairment (one student), Visually Impaired (one student) and Developmental Delay (four students). Related Service provisions reviewed included Language/Speech Therapy Services (eight students), Adaptive Physical Education (five students), Occupational Therapy (five students), Physical Therapy (one student) and Psychological Services (one student).

Targeted file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(3)(a) on page 3 of Addendum A and section D(2)(a-c) on page 6 of Addendum A of the CJ using the required Related Service protocol. Please refer to page 4 of the LDOE monitoring report for the Audubon (Lower) Charter School in the Appendix for a list of items that were reviewed to complete the Related Service protocol for the sample of students. A review of student records revealed that ten of ten student files reviewed (100% of the sample) were judged to reflect some measure of noncompliance regarding Related Service provisions. Specific IDEA systemic violations are reported on pages 4-5 of the LDOE monitoring

38

report and pages 1-4 of the 2018-2019 IDEA monitoring results summary located in the
Appendix. In relation, student-specific findings of noncompliance are listed on pages 5-7
of the 2018-2019 IDEA monitoring results summary.

Overall, systemic noncompliance was identified for this LEA under IDEA, Part B
in the following areas:

- Ten of ten student files reviewed (100% of the sample) were judged to reflect overall concerns related to the provision of FAPE and reflects systemic noncompliance under *IDEA §300.17(a.-d.) Free Appropriate Public Education (FAPE).*

- Three of ten student files reviewed (30% of the sample) were judged to reflect noncompliance for the IDEA mandate requiring the LEA to document reasonable attempts to ensure other methods of parental participation when one or more parents are unable to attend the IEP team meeting. *This reflects systemic noncompliance for IDEA §300.501(b) – Parent Participation.*

- Eight of ten student files reviewed (80% of the sample) were judged to reflect noncompliance for the IDEA mandate requiring that all appropriate team members actively participate in the IEP meeting. This reflects systemic noncompliance for *IDEA §300.501(b) – Team Participation.*

- Ten of ten student IEPs reviewed (100% of the sample) revealed concerns related to the LEAs failure to appropriately described students' present academic and functional performance in the IEP.  This reflects systemic noncompliance regarding *IDEA §300.320(a)(1)(i)(2)(i)- Definition of Individualized Education Program.*

- Eight of ten student IEPs reviewed (80% of the sample) failed to include the

required components of a standards-based IEP (measurable goals and objectives). This reflects systemic noncompliance regarding standards-based IEP goals under *IDEA §300.320(a)(2) Definition of Individualized Education Program.*

- Five of ten student files reviewed (50% of the sample) were judged to reflect noncompliance for the IDEA mandate requiring the LEA to ensure that parents are afforded the opportunity to activity participate in the IEP meeting. This reflects systemic noncompliance for IDEA §300.322(a). IDEA - Parent Participation.

In addition to systemic concerns, the findings of the on-site targeted monitoring review also revealed student-specific IDEA violations in the following areas:

- Two of ten student files reviewed (20% percent of the sample) were judged to reflect noncompliance for the IDEA mandate requiring the LEA to include a statement of the special education and related services required that will enable the student to advance toward IEP goals and meaningfully participate in school activities with disabled and non-disabled peers. This reflects student-specific rather than systemic noncompliance for IDEA §300.320(a)(4) and (7) – Definition Individualized Education Program.

- One of ten student files reviewed (10% of the sample) was judged to reflect noncompliance for the IDEA mandate requiring the LEAs to ensure the students' IEP contains a statement describing the extent to which the student will not participate with non-disabled peers that indicates the student was afforded the opportunity to participate with non-disabled peers to the maximum extent appropriate. This reflects student-specific rather than systemic noncompliance for

40

IDEA §300.320(a)(5) – Definition of Individualized Education Program.

- Two of ten student files reviewed (20% of the sample) revealed noncompliance in relation to the LEAs failure to ensure the students' IEPs included data for beginning of services, modifications, and anticipated frequency, location, and duration of services and modifications in related service deliver. Again, this reflects student-specific rather than systemic noncompliance for IDEA §300.320(a)(4) and (7) – Definition of Individualized Education Program.

c.    *Medard H. Nelson Elementary School*

The on-site targeted monitoring visit occurred on December 5, 2018.  One LDOE representative and one IM were present during the entire on-site visit to conduct staff interviews and review student files. The staff interviews were conducted using a standard bank of questions with staff members consistent with requirements outlined in sections B4 (a) and B4 (b) on page 3-4 of Addendum A of the CJ. The specific staff members who participated in the interview process are reported on page 3 of the LDOE monitoring report. In general, school staff were able to provide a detailed explanation outlining how students are determined eligible for related services to ensure all students with disabilities receive a Free and Appropriate Public Education (FAPE), including the LEAs procedures for ensuring timely service provisions for transfer students. School staff also clearly articulated the LEAs policies and procedures securing related service providers, methods for service delivery that limits missed instructional time, staff collaboration, frequent progress monitoring reviews and provision of compensatory services, as needed. A summary of staff responses is presented on pages 3-4 of the LDOE monitoring report located in the Appendix.

A representative sample of ten student files were reviewed by the LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B(2)(a) and B(2)(b) on page 3 of Addendum A of the CJ. The sample of ten students reviewed included the following exceptionalities: Autism (three students), Other Health Impaired (six students) and Intellectual Disability (one student). Related Service provisions included Adaptive Physical Education (two students), Occupational Therapy (two students), Physical Therapy (one student), Language/Speech Therapy (nine students) and Counseling Services (seven students).  It should be reported here that one of the students selected for targeted monitoring was a recent transfer from another LEA. As such, although this students' file was reviewed by the monitoring team to identify potential areas of student-specific noncompliance, these data were not included in the overall compliance analysis for this LEA.

Targeted file reviews were conducted by LDOE monitoring personnel and IMs in a manner consistent with the requirements outlined in section B3(a) on page 3 of Addendum A of the CJ and section D(2)(a-c) on page 6 of Addendum A using the required Related Service protocol. Please refer to page 4 of the LDOE monitoring report for Medard H. Nelson Elementary School in the Appendix for a list of items that were reviewed to complete the Related Services protocol for the sample of students. In contrast with staff responses during the on-site interview concerning the LEAs ongoing practices for related services provisions, a review of student records revealed that nine of nine applicable student files reviewed (100% of the sample) were judged to reflect some measure of noncompliance regarding Related Service provisions. Specific IDEA systemic violations are reported on pages 5 of the LDOE monitoring report and

42

pages 1-2 of the 2018-2019 IDEA monitoring results summary located in the Appendix. In relation, student-specific findings of noncompliance are listed on pages 3-7 of the 2018-2019 IDEA monitoring results summary.

Overall, systemic noncompliance was identified for this LEA under IDEA, Part B in five areas:

- Nine of nine applicable student files reviewed (100% of the sample) were judged to reflect overall concerns related to the provision of FAPE and reflects systemic noncompliance under *IDEA §300.17(a.-d.) Free Appropriate Public Education.*

- Nine of nine applicable student IEPs reviewed (100% of the sample) revealed concerns related to the LEAs failure to appropriately described students' present academic and functional performance in the IEP.  This reflects systemic noncompliance regarding *IDEA §300.320(a)(1)(i)(2)(i)- Definition of Individualized Education Program.*

- Eight of nine applicable student IEPs reviewed (89% of the sample) failed to include the required components of a standards-based IEP (measurable goals and objectives). This reflects systemic noncompliance regarding standards-based IEP goals under *IDEA §300.320(a)(2) Definition of Individualized Education Program.*

- Two of nine applicable student files reviewed (20% of the sample) revealed noncompliance in relation to the LEAs failure to ensure the students' IEPs included data for beginning of services, modifications, and anticipated frequency, location, and duration of services and modifications in related service deliver. This systemic noncompliance for IDEA §300.320(a)(4) and (7) – Definition of Individualized

Education Program.

- Two of nine applicable student files reviewed (22% of the sample) were judged to reflect noncompliance for the IDEA mandate requiring that all appropriate team members actively participate in the IEP meeting. This reflects systemic noncompliance for *IDEA §300.501(b) – Team Participation.*

*2.* Corrective Actions to Address Identified Areas of Noncompliance

Systemic noncompliance was identified for two of three LEAs (i.e. Audubon Charter and Medard H. Nelson Elementary School) selected for targeted monitoring in the area of Enrollment for the fall 2018 school term. Consistent systemic IDEA violations were observed across both of these LEAs in relation to the (a) provision of FAPE, development of appropriate and meaningful description of students' present levels of academic and functional performance, development of meaningful and measurable annual goals and objectives and appropriately documenting that related services are provided with the types and frequency as specified in student IEP's). Two additional systemic IDEA violations were observed for Audubon (Lower) Charter School (i.e. failure to ensure that all appropriate staff participated in IEP meetings and failure to ensure that parents who are unable to attend IEP meetings are afforded with options to allow for participation in the IEP process).

Given the identified systemic and student-specific findings of noncompliance under the IDEA, Part B, two of three charter schools (66% of the sample) required a formal CAP to address identified concerns. As required by the CJ, the LDOE developed a CAP to address each area of identified systemic or student-specific noncompliance

listed in the 2018-2019 LDOE monitoring reports and 2018-2019 IDEA monitoring summaries for Audubon (Lower) Charter School and Medard H. Nelson Elementary School.

Specifically, the CAP developed for Audubon (Lower) Charter School includes the following activities and corrective remedies for addressing identified concerns in the area of related service provisions:

- 1.1. Correct all student specific citations identified in the Results Summary report. Note: This activity represents an individual corrective action plan for providing remedies for all student specific IDEA citations.

- 1.2. Mandated staff trainings for special education staff (e.g., special education teachers and related service providers) on writing compliant IEPs.

- 1.3. Provide training to related service providers on how to properly document provision of services to students.

- 1.4. Mandated ongoing training in the following areas: IEP writing (e.g., measurable goals and PLAAFP statements), provision and documentation of accommodations, documenting special education services, progress monitoring of student data.

- 1.5. Mandated monthly consistency checks conducted by special education administrative staff to ensure IEP fidelity by internally monitoring all IEPs before the IEP is submitted to SER.

- 1.6. Mandated consistency checks conducted by the special education administrative staff to ensure related service provider logs are completed with fidelity and 1.7. Mandated staff completion of the IEP Training Modules on the

45

LDOE website provided by the Human Development Center – LSUHSC group with a particular focus on Module 2 (Data Driven Present Levels of Performance) and Module 3 (Measurable Goals).

With regard to the CAP developed to address identified IDEA violations observed for Medard H. Nelson Elementary School, it should be noted that this LEA closed at the end of the 2018-2019 school term. As such, although this LEA demonstrated numerous systemic IDEA violations, the CAP for this Charter LEA only includes activities for addressing identified student-specific violations as outlined on pages 3-7 in the LDOE IDEA Results Summary for this LEA. The CAP for this Medard H. Nelson Elementary school includes the following activities:

- 1.1. Correct all student specific citations identified in the Results Summary report. NOTE: This activity represents an individual corrective action plan for providing remedies for all student specific IDEA citations.
- 1.2. Provide compensatory education to students whose files did not include documentation verifying they received related services.

A copy of the CAPs to address areas of noncompliance for Related Service provisions for Audubon (Lower) Charter School and Medard H. Nelson are available in the Appendix for review by the parties. A review of the CAPs by the IMs revealed that the documents include corrective actions consistent with requirements outlined on page 2 of *Bulletin 1922 (Louisiana Administrative Code March 2017 Part XCI. Compliance Monitoring Procedures)* and in section IV(C)(7) on page 14 of the CJ and sufficiently address all findings of student-specific and systemic noncompliance observed during the fall

46

2018-2019 targeted monitoring reviews.

 3. <u>Status of Compliance</u>

As noted previously, a single NOLA/OPSB charter school (Audubon (Lower) Charter) was incorrectly selected for targeted monitoring in the area of Enrollment Stability. However, after a thorough inquiry, the IMs judge this school selection error to be inadvertent and does not significantly compromise the overall objectives of the CJ. Instead, the LDOE's remedy for providing increased oversight by conducting supplemental fall monitoring resulted in an additional NOLA/OPSB charter schools undergoing targeted (Enrollment <u>Stability</u>) monitoring, which only broadens the scope of the CJ. Again, the selection errors reported above are believed to be clerical in nature, inadvertent, and are judged to represent a "mere technicality" as outlined in Section III (32) of the CJ rather than noncompliance in this regard.

After participating in the on-site monitoring visits for the charter schools selected for targeted monitoring and reviewing documentation submitted by the LDOE monitoring personnel (e.g., monitoring notifications, LDOE monitoring reports, 2017-2018 IDEA monitoring results summaries, corrective action plans, technical assistance notifications) and discussing the targeted monitoring activities with LDOE legal counsel and monitoring personnel during conference calls and on-site meetings during throughout the fall 2018 semester and spring 2019 semester, the LDOE is judged to be in **Substantial Compliance** with Section IV(D)(7)(a-b) of the CJ and Sections D(1)(a-c) and D(2)(a-c) of Addendum A of the CJ for the fall semester of the 2018- 2019 school year. Additional evaluations of compliance in the area of Enrollment will be summarized in forthcoming IM status reports. Specifically, these updates will review and discuss the spring 2019 follow-up, on-site targeted

47

monitoring activities and findings for charter schools that have completed corrective actions and/or intensive corrective actions during the 2017-2018 and/or 2018-2019 school terms as well as the supplemental and regular fall monitoring visits conducted in September and December, 2019.

**SUMMARY AND RECOMMENDATIONS**

As previously noted in this report, the CJ specifies that the State Defendants shall be released from the terms of the CJ when they have (a) achieved Substantial Compliance with each provision of the Agreement for which they are assigned responsibility; (b) maintained Substantial Compliance for a period of two years, and (c) subject to Court approval (p. 18 of the CJ). As such, as reported in previous IMs status updates the LDOE has been judged by the IMs to have established Substantial Compliance with all targeted monitoring activities during the fall 2016 school term.  In relation, based on the findings reported in the IMs status update dated May 5, 2018 summarizing the findings of the fall 2017 targeted monitoring activities, the LDOE was judged to have successfully achieved the first year of the required two years of maintained Substantial Compliance in this regard. Finally, based on the current findings indicating substantial compliance for all of the CJ targeted monitoring requirements for the fall 2018 school term, the LDOE is currently judged to have successfully achieved and maintained a second year of Substantial Compliance as required by the CJ.

However, in relation to the IMs substantial compliance determinations, it should be reported here that SPLC legal counsel continues to object to the IMs parameters for making such determinations. That is, the SPLC counsel asserts that the IMs judgement of the

48

LDOE's and OPSB's Substantial Compliance with the requirements of the CJ are premature and should be delayed until such time the individual charter schools that have undergone on-site targeted monitoring have resolved any findings of noncompliance. Again, as noted in previous IM updates, the objections made by the plaintiff's counsel are certainly important and related to the overall objective(s) of the CJ in terms of improving the identification of students with suspected disabilities and proper delivery of instructional and related services. However, the IMs interpretation of the provisions outlined in the CJ do not, unfortunately, specifically make a judgement of "substantial compliance" contingent upon an individual charter school's demonstration of compliance during an on-site targeted monitoring visit. Instead, the IMs interpretation of the provisions of the CJ detail a series of "actions" or "procedures", rather than specific data-based performance outcomes, that must be completed to achieve a judgement of "substantial compliance" for each substantive provision outlined in the CJ. In relation, the IMs interpretation is also shared by the Court (See Case 2:10-cv-04049-JCZ-KWR Document 387 Civil Action No. 10-4049 Order-Filed 7/2018 in the Appendix). All parties should be reminded that all parents of students with known and/or suspected disabilities have rights, procedural safeguards, including due process as well as the opportunity to file a formal complaint at the local and/or state level to remedy any concerns.

However, regardless of the IMs judgement of the LDOE and/or OPSB's achievement of "substantial compliance", as reported in previous IM status updates, a consistent pattern of systemic noncompliance for LEAs identified for initial, on-site targeted monitoring continues to be observed. Specifically, 100% of the schools identified for targeted monitoring during the spring 2016 school term and fall 2016 school term required

49

corrective action to address findings of systemic noncompliance. In relation, 83% of the LEAs identified for initial targeted monitoring during the fall 2017 school term required formal corrective actions (CAPs) to address findings of systemic noncompliance. However, it should be noted here that four of twelve (33%) LEAs selected for targeted monitoring during the fall 2018 school term demonstrated systemic noncompliance for IDEA mandates related to Child Find (one LEA), Related Services (one LEA) and Enrollment (two LEAs). No systemic noncompliance was observed for Charter LEAs targeted for initial monitoring in the area of Discipline. These findings clearly indicate a meaningful reduction in the trend for Charter LEAs demonstrating observed systemic noncompliance upon an initial, targeted monitoring review. Although much improved, when considering that one of three LEAs demonstrated systemic noncompliance in the areas of both Child Find and Related Services and two of three Charter LEAs demonstrated systemic noncompliance in the area of Enrollment Stability (i.e. related service provisions), this trend of observed systemic IDEA violations upon initial review continues to be concerning.

As such, it is recommended the LDOE and OPSB are encouraged to continue ongoing proactive efforts to provide all NOLA Charter LEAs with focused training, technical assistant and oversight required for ensuring compliance for all IDEA mandates and regulations related to Child Find, Related Services, and Discipline provisions. Further, OPSB/LDOE personnel should continue to provide relevant, ongoing technical assistance and professional development to ensure that the identified NOLA/OPSB charter schools are successful in completing all CAP and/or ICAP activities with adequate levels of fidelity to correct the identified areas of systemic and student-specific noncompliance. In relation, the IMs continue to recommend the LDOE provide written updates of the status of compliance

50

and progress for each activity specified in each charter school's CAP and/or ICAP resulting from observed systemic and/or student-specific noncompliance under the provisions outlined in the CJ to the IMs on a quarterly basis.