### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| P.B., by and through his next friend, | * | |
| Cassandra Berry, et al., Plaintiffs; | * | Civil Case No. 2:10-cv-04049 |
| | * | Section A |
| v. | * | Judge Jay C. Zainey |
| | * | Magistrate Judge Karen Wells Roby |
| CADE BRUMLEY, et al., Defendants | * | |
| | * | |

*******************************************************************************

### MEMORANDUM IN SUPPORT OF JOINT MOTION FOR RELEASE
### OF STATE DEFENDANTS AND DEFENDANT-INTERVENOR
### FROM OBLIGATIONS OF CONSENT JUDGMENT

State Defendants ("State Superintendent, Louisiana Department of Education and Louisiana Department of Education") and Defendant-Intervenor ("Orleans Parish School Board") (collectively "the Parties") respectively file, pursuant to Local Rule 7.4, this Memorandum in support of their Joint Motion for Release of State Defendants and Defendant-Intervenor from Obligations of Consent Judgment. As grounds for this motion, the Parties state the following:

#### Procedural Background

As discussed below, on October 26, 2010, the Southern Poverty Law Center ("SPLC") filed a class action lawsuit on behalf of students who reside in New Orleans, alleging that the State Superintendent, Louisiana Department of Education ("LDOE") and the Louisiana Board of Elementary and Secondary Education ("BESE") were violating the Individual with Disabilities Education Improvement Act of 2004 ("IDEA"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), and Title II of the Americans with Disabilities Act and ("Title II"). On March 8, 2012, the OPSB sought to intervene in this case, claiming that the OPSB had significant interests in the pending litigation and the Court granted intervention on March 12, 2012. After extensive negotiations, the SPLC, the LDOE and the OPSB entered a Consent Judgment, which the Court

approved on March 25, 2015. As required by the Consent Judgment, the Court-appointed Independent Monitors who began monitoring the compliance of LDOE and the OPSB with the Consent Judgment during the 2015-16 school year and continue to monitor compliance presently.

### The Complaint

On October 26, 2010, the SPLC on behalf of 10 students, through their parents/guardians, sued the State Superintendent of Education, the LDOE, and BESE in a class action lawsuit. In the lawsuit, the plaintiffs alleged violations of the IDEA, Section 504 and Title II. The Complaint was filed five years after Hurricane Katrina. According to the Complaint, "[i]mmediately following Hurricane Katrina, the Recovery School District ("RSD"), a division of the LDOE that is overseen by BESE, became responsible for operating low performing schools that were previously run by the Orleans Parish School Board ("OPSB")."

This Complaint states that the new structure resulted in OPSB having control of 18 schools, including 12 charter schools, and RSD operating 23 schools and overseeing 49 charter schools. The 49 charter schools each operated as a Local Education Agency ("LEA"), and as a result, LDOE was responsible for supervising each of these individual LEAs to ensure that each LEA met the requirements of IDEA, 504 and Title II. At the time of the Complaint, over 70% of the public school students in New Orleans attended a charter school.

The Complaint asserts, for example, that in the five years since the New Orleans public schools were under the new structure, the State Defendants conducted "only two targeted monitoring visits" and "assessed IDEA compliance in only 10 of the LEAs operating in New Orleans." The Complaint also claims that State Defendants found "substantive IDEA violations," but the State Defendants did not "compel New Orleans public schools to comply with federal law."

The Complaint also alleges that State Defendants failed effectively to coordinate, monitor and oversee the delivery of special education services in the LEAs and public schools in New Orleans. As a result of these failures, the lawsuit claims systematic violations in the following areas:

- students with disabilities ("SWD") are subject to discrimination or are otherwise excluded from schools;

- mandatory evaluations for special education are not conducted;

- SWD are disciplined without the procedural safeguards required by law; and

- SWD are denied the free appropriate public education and related services to which they are entitled.

The lawsuit seeks declaratory judgment and preliminary and permanent injunctions requiring the Defendants to make facilities and programs accessible to all SWD; adequately evaluate SWD; implement appropriate education accommodations; and provide SWD a free and appropriate public education "("FAPE")

### Intervention by Orleans Parish School Board

On March 8, 2012, the OPSB sought to intervene in the case, claiming that the OPSB had significant interests in the pending litigation. For example, according to the OPSB, the plaintiffs sought remedies, such as "a centralized admission process" that would have a direct impact on the OPSB carrying out its obligations to parents/guardians choosing schools within its geographical boundaries. On March 12, 2012, the Court granted the OPSB's motion to intervene.

### The Consent Judgment

Over the course of many months and with the assistance of a court-appointed mediator, the Parties engaged in extensive negotiations to attempt to resolve the lawsuit. After many months,

numerous negotiation sessions and many status conferences, the parties agreed to a Consent Judgment. The Court held a fairness hearing on the Consent Judgment on February 9, 2015, and the Court approved the Consent Judgment on March 25, 2015.

The Consent Judgment includes substantive provisions in four key areas: Child Find, Related Services, Discipline and Enrollment. The provisions are:

- requiring the State Defendants, "after conferring with the Defendant-Intervenor," to "develop a schedule identifying the assignment of Child Find responsibilities in New Orleans." The schedule should allocate responsibility for identifying, locating and evaluating children suspected of having a disability as well as children not currently enrolled in a school;

- ensuring that charter applications and renewal processes require schools to provide a description of the school's plan's for offering a wide array of related service for SWD who are or who may come to be enrolled. The applications and renewals for charters also should include a description for staff responsible for providing related services and pupil appraisal;

- providing New Orleans schools with annual written guidance on Child Find responsibilities, including obligations when parents/guardians request evaluations for special education and annual written guidance on the legal obligation to enroll and serve SWD;

- providing New Orleans schools with technical assistance regarding the prohibited practice of undocumented suspensions and professional development on disciplinary procedural protections for SWD and best practices to reduce suspensions and expulsions for SWD;

- reviewing discipline policies of each New Orleans school to ensure compliance with state and federal law;

- requiring New Orleans schools to develop written descriptions of special education programs offered in each school and making these descriptions available to parents/guardians of SWD;

- requiring New Orleans schools to develop a written complaint investigation process describing the process for investigating allegations of disability discrimination; and

- implementing a rigorous and comprehensive monitoring process in which the State Defendants annually select 10-12 local education agencies in New Orleans for targeted monitoring and corrective action.

The Consent Judgment includes an Addendum, which includes monitoring protocols related to the four substantive provisions of the Consent Judgment. The Addendum details specific monitoring requirements for the LDOE and OPSB.

The Consent Judgment also requires the appointment of an Independent Monitor to oversee the implementation of the Consent Judgment. The Consent Judgment mandates that the Independent Monitor have professional experience in the administration and monitoring of IDEA, Section 504, and ADA/Title II. Also, the Independent Monitor must file with the Court and provide the Parties with reports describing the steps taken by the State Defendants and Defendant-Intervenor to implement the Consent Judgment and evaluate the extent to which the State Defendants and Defendant-Intervenor complied with each substantive provision of the Consent Judgment.

The Consent Judgment mandates that the Independent Monitor file an initial report 60 days after the implementation date of the Consent Judgment and then every 60 days thereafter for the remainder of the first year and every 120 days thereafter following the end of the first year. The

Consent Judgment requires the Independent Monitor to provide the reports to the Parties in draft form for comments by the Parties at least 14 days before the reports are issued.

The Consent Judgment requires the Independent Monitor to "evaluate the state of compliance of each of the relevant provisions using the following standards: (1) Substantial Compliance and (2) Noncompliance." In determining compliance, the Independent Monitor must "review a sufficient number of pertinent documents to accurately assess compliance and interview necessary staff or personnel."

Significantly, the Consent Judgment has a provision for how and when the State Defendants and OPSB may be released from their Consent Judgment obligations.

- The State Defendants "shall be released . . . when they have achieved Substantial Compliance with each provision of the [Consent Judgment] for which they are assigned responsibility; have maintained Substantial Compliance for a period of two consecutive years; and subject to Court approval."

- The Defendant-Intervenor "shall be released . . . when they have achieved Substantial Compliance with each provision of the [Consent Judgment] for which they are assigned responsibility; have maintained Substantial Compliance for a period of two consecutive years; and subject to Court approval."

In a July 17, 2018 Order, the Court made clear that it would interpret Substantial Compliance regarding compliance with the Consent Judgment itself, not individual compliance with IDEA.

**The Independent Monitors**

On January 16, 2016, after an extensive search for qualified professionals to monitor the Consent Judgment, the Court appointed Dr. Dale Bailey, Mr. Ken Swindol, and Mr. William

Swindol as Independent Monitors ("IMs").  See Appendix A for background information on these professionals.  The IMs have performed exemplary work throughout their tenure monitoring the Consent Judgment.

**ARGUMENT**

## I.    The Independent Monitors Have Conducted Extensive Compliance Monitoring of LDOE and OPSB for Nine Years

The IMs have issued four types of reports since they began monitoring the LDOE and OPSB.  These reports are model document reports, initial targeted monitoring reports, follow-up target reports, and status reports requested by the Court.

- The IMs submitted eight model document reports to the Parties and the Court.  The IMs completed these reports annually, beginning with the 2016-17 school year through the 2023-24 school year.  (The reports for the 2015-16 and 2016-17 school years regarding compliance with the model document requirements were included in the 2015-16 and 2016-17 initial targeted monitoring reports.)  In the model document reports, the IMs reported whether the LDOE was in substantial compliance with the development and dissemination of model documents required by the Consent Judgment and made findings regarding whether the LDOE and the OPSB met their Consent Judgment obligations in disseminating model documents.  Examples of the model documents include a Child Find Written Guidance model template, a Special Education Program Description model template, an Undocumented Suspension Guidance model template and a Disability Discrimination Complaint procedures model template.

- The IMs issued nine initial targeted monitoring reports.  In the initial targeted monitoring reports, the IMs reported on the results of targeted monitoring for 12 schools that were

identified for targeted monitoring. The Consent Judgment requires that three schools be identified in each of the four substantive areas — Child Find, Related Services, Discipline and Enrollment — for targeted monitoring. Specifically, the Consent Judgment requires the LDOE to conduct specific monitoring activities for LEAs selected for specific targeted monitoring and mandates that the IMs report on LDOE's targeted monitoring for the identified schools. For initial targeted monitoring reports, the IMs and the LDOE conducted on-site interviews and reviewed student files. The IMs conducted the initial targeted monitoring reports in each school year, beginning in the Fall of 2015 for the 2015-16 school year through the Fall of 2023 for the 2023-24 school year. For the requirements of each of the substantive areas, the IMs made findings, a determination of substantial compliance or non-compliance and recommendations.

- In addition to the initial targeted monitoring reports, the IMs did eight follow-up targeted monitoring reports. These reports, which are not required by the Consent Judgment, include follow-up monitoring for the schools that were identified for corrective action in the initial target monitoring reports for each school year. These follow-up targeted monitoring reports were done each school year, beginning in the Spring of 2017 for the 2016-17 school year through the Spring of 2024 for the 2023-24 school year. For the follow-up targeted monitoring, the IMs and the LDOE conducted on-site interviews and reviewed student files. On September 22, 2016, for the follow-up targeted monitoring reports, the Parties agreed that "compliance determination for individual students shall be consistent with the 100% compliance standard outlined in IDEA" and "any single finding of noncompliance for any specific IDEA regulation being assessed for an individual student was judged to reflect non-compliance," requiring "immediate corrective action." In

addition, the Parties agreed that "systematic noncompliance would be determined <u>when less than 80% of the student sample failed to meet the 100% individual student compliance standard for any IDEA requirement</u>" of the Consent Judgment protocol and "would result in mandatory systemic corrective actions" — a Corrective Action Plan. *See* July 13, 2017 IMs Draft Status Report to the Parties at 4.

- Finally, the IMs issued three summary reports at the request of the Court. Specifically, the Court asked the IMs to follow up with four parents/guardians who filed comments in response to the Notice for the Fairness Hearing on the Consent Judgment. The comments by all four parents/guardians raised issues regarding their children receiving services pursuant to IDEA. The IMs filed the initial summary report regarding the four parent/guardian concerns on February 6, 2015 and two follow-up reports on October 7, 2016; and on July 5, 2017.

II. **Based on the Monitoring Conducted by the Independent Monitors, LDOE and OPSB Are, and Have Been, in Compliance with Consent Judgment Requirements**

   A. **The Independent Monitors Found the LDOE to Be in Substantial Compliance with Its Consent Judgment Requirements for Eight Consecutive Years, and Based on These Findings, LDOE and OPSB Believes It Should Be Released from Court Jurisdiction**

Attached as Appendix B is a summary of the requirements of the Consent Judgment and the findings of the IMs from the initial targeted monitoring reports and the model document reports for the LDOE. The attached Summary Compliance Status report lists each of the provisions for the four substantive requirements of the Consent Judgment that apply to the LDOE and indicates whether the IMs found the LDOE in Substantial Compliance or Non-Compliance for each school

year that the IMs monitored LDOE – the 2015-16 school year through the 2023-24 school year. The determination of Compliance or Non-Compliance for LDOE is based on the findings of the IMs in each of their initial targeted reports.

As discussed below and as shown on Appendix B, the IMs have reported on the LDOE's implementation the Consent Judgment for nine years – 2015-16 through 2023-24. Except for the 2015-16 school year – the first year of implementation of the Consent Judgment – the IMs have found that the LDOE to be in substantial compliance for all the provisions of the Consent Judgment for the last eight years – 2016-17 through 2023-24. This means that the LDOE has maintained substantial compliance for eight consecutive years, which is well beyond the Consent Judgment requirement that the LDOE be in substantial compliance for two consecutive years to be released from Court jurisdiction. Thus, the Court should release the LDOE for its Consent Judgment obligations.

**IM Monitoring of LDOE from 2015-16 through 2023-24.** The July 3, 2016 initial targeted monitoring report — which was the first initial targeted monitoring report and was for the 2015-16 school year — included findings of substantial compliance or non-compliance on the model document requirements in the Consent Judgment and findings of compliance for the schools identified for target monitoring. For the 2015-16 school year, the IMs found that the LDOE was in substantial compliance for 12 of the 20 requirements of the Consent Judgment requirements. These findings included substantial compliance for: seven of the eight Child Find requirements; all three of the related services requirements; zero of the four discipline requirements; and two of the five enrollment requirements.

In addition, in the 2015-16 initial target monitoring report, the IMs found that six of the 12 schools selected for targeted monitoring were in substantial compliance with the Consent

Judgment requirements and six of the twelve schools were out of compliance with the Consent Judgment requirements.  These findings included that:

- three of the targeted monitoring school were determined to be in substantial compliance for the related services requirements;

- three of the targeted monitoring schools were found to be in substantial compliance for the enrollment requirements;

- three of the targeted monitoring schools were determined to be out of compliance with the Child Find requirements; and

- three of the targeted monitoring schools targeted were found to be out of compliance for the discipline requirements.

The six targeted monitoring schools that were found out of compliance in the 2015-16 initial target monitoring report were required to develop Corrective Action Plans ("CAPs") to correct the non-compliance found by the IMs.  In the November 7, 2016 follow-up targeted monitoring report, the IMs found that the six schools that were required to develop and implement CAPs to address non-compliance had developed and implemented the required CAPs and that all six schools were in substantial compliance.

Significantly, in the second initial targeted monitoring report – the May 17, 2017 report, which included reporting on substantial compliance for the model document reports — the IMs found that the State Defendants were in substantial compliance for the 2016-17 school year for all model documents in all four areas – Child Find, related services, discipline and enrollment.

Beginning with the 2017-18 school year through the 2023-24 school year, the IMs completed additional monitoring reports — five model documents reports and seven targeted monitoring reports.  The model document reports were issued on: May 18, 2017; February 23,

2018; August 20, 2020; October 20, 2020; and December 22, 2023. The targeted monitoring reports were issued on May 17, 2017; July 3, 2018; June 16, 2020; January 27, 2022; August 23, 2022; June 29, 2023; and July 2, 2024. In all these reports — the model document reports and the initial targeted monitoring reports — the IMs found the LDOE to be in substantial compliance for all requirements in the Consent Judgment for every year from the 2016-17 school year through the 2023-24 school year.

One of the allegations in the Complaint was that SWD were being denied enrollment in the schools in New Orleans. As a result, one of the model documents that the LDOE agreed to develop and disseminate were complaint procedures to allow parents/guardians to complete if they believed that their child was being discriminated in enrolling in a school in New Orleans. In addition, the LDOE was required annually to attest to whether they had received any allegations of enrollment discrimination.

As a result, the LDOE developed and disseminated the complaint procedures and annually attests to whether there have been any allegations of enrollment discrimination. The LDOE has submitted the annual Attestation for Enrollment Discrimination Investigation form to the IMs. Significantly, from 2015-16 to the present, there have been no allegations of enrollment discrimination filed by parents/guardians of children in New Orleans.

In addition, in the most recent initial targeted monitoring report, the IMs found that only one of the twelve schools — 8% — identified for initial targeted monitoring were not in substantial compliance. This is a significant improvement from the July 3, 2016 initial targeted monitoring report in which the IMs found 6 of 12 schools — 50% — were not in substantial compliance.

As a result, given that the IMs first found the LDOE in substantial compliance for all the Consent Judgment requirements for the 2016-17 report and that the IMs conducted targeted

12

monitoring for eight additional years and found LDOE in substantial compliance for all seven of those years, the LDOE has been in substantial compliance with the requirements of the Consent Judgment for a total of eight consecutive years, beginning in the 2016-17 school year through the 2023-24 school year.

This eight-year consecutive compliance record is significantly beyond the two consecutive year requirement in Section VIII.2. of the Consent Judgment for LDOE to be released from its obligations under the Consent Judgment.  The Consent Judgment states that the State Defendants "shall be released . . . when they have achieved Substantial Compliance with each provision of the [Consent Judgment] for which they are assigned responsibility; have maintained Substantial Compliance for a period of two consecutive years; and subject to Court approval."  Because the State Defendants have more than met the Consent Judgment requirement for release from the Consent Judgment, the Court should release the State Defendants from the requirements of the Consent Judgment and the jurisdiction of the Court.

> **B. The Independent Monitors Found the OPSB to Be in Substantial Compliance with Its Consent Judgment Requirements for Eight Consecutive Years, and Based on These Findings, OPSB Believes It Should Be Released from Court Jurisdiction**

Attached as Appendix C is a summary of the requirements of the Consent Judgment and the findings of the IMs from the initial targeted monitoring reports and the model document reports that apply to OPSB.  The attached Summary Compliance Status report lists each of the requirements that apply to OPSB for the four substantive requirements of the Consent Judgment and indicates whether the IMs found the OPSB in Substantive Compliance or Non-Compliance for each school year that the IMs monitored OPSB – the 2015-16 school year through the 2023-24

school year.  The determination of Compliance or Non-Compliance is based on the findings of the IMs in each of their initial targeted reports.

As discussed below and as shown on Appendix C, the IMs have reported on the OPSB's implementation the Consent Judgment for eight years – 2015-16 through 2023-24.  Like the LDOE compliance record – except for the 2015-16 school year – the first year of implementation of the Consent Judgment, the IMs have found that the OPSB has been in substantial compliance for all the provisions of the Consent Judgment for the last eight years – 2016-17 through 2023-24.  This means that the OPSB has maintained substantial compliance for eight consecutive years, which is well beyond the Consent Judgment requirement that the OPSB be in substantial compliance for two consecutive years to be released from Court jurisdiction.  Therefore, the Court should release the OPSB for its Consent Judgment obligations.

**IM Monitoring of OPSB from 2015-16 through 2023-24.**  The July 3, 2016 initial targeted monitoring report – which was the first initial targeted report and for the 2015-16 school year – included findings of substantial compliance or non-compliance on the model document requirements in the Consent Judgment and findings of substantial compliance for the schools identified for targeted monitoring.  For the 2015-16 school year, the IMs found that the OPSB was in substantial compliance for six of its 12 Consent Judgment requirements.  The findings included substantial compliance for:  all four of the Child Find requirements; the one Related Services requirement: neither of the two Discipline requirements; and one of the five Enrollment requirements.

By the second year of monitoring by the IMs – the 2016-17 report – the OPSB was in substantial compliance for all four of the Child Find requirements, the one Related Service requirement, both the Discipline requirements and all five of the Enrollment Requirements.  In

addition, OPSB – like LDOE – maintained substantial compliance for all its Consent Judgment requirements for eight consecutive years – the 2016-17 school year through the 2023-24 school year.

In addition, as discussed in II.A. above, the OPSB developed and implemented CAPs for the schools that the IMs found out of compliance as part of their monitoring. In subsequent monitoring by the IMs for the schools found to be out of compliance, the IMs found the schools to be in substantial compliance. Significantly, the number of OPSB schools found in non-compliance by the IMs has decreased over the years that the IMs have monitored the OPSB schools.

The eight-year consecutive compliance record is significantly beyond the two consecutive year requirement in Section VIII.3. of the Consent Judgment for OPSB to be released from its Consent Judgment obligations. The Consent Judgment states that the OPSB "shall be released . . . when they have achieved Substantial Compliance with each provision of the [Consent Judgment] for which they are assigned responsibility; have maintained Substantial Compliance for a period of two consecutive years; and subject to Court approval." Because the OPSB has more than met the Consent Judgment requirement for release from the Consent Judgment, the Court should release the OPSB from the requirements of the Consent Judgment and the jurisdiction of the Court.

III.    **If the Court Releases the LDOE and OPSB from Court Jurisdiction, the LDOE and the OPSB Will Continue to Meet Their IDEA, 504 and Title II Obligations**

As discussed below, the Court can trust the LDOE and the OPSB to continue to meet their obligations pursuant to IDEA, 504 and Title II when they are released from Court jurisdiction for multiple reasons. For example, one of the key reasons that the Court can trust the LDOE and OPSB to comply with their IDEA, 504 and Title II obligations is because of the LDOE and OPSB have demonstrated track records for many years – well beyond what is required by the Consent

Judgment -- in carrying out their Consent Judgment obligations, and LDOE and OPSB have developed protocols and systems to ensure that they continue to carry out these obligations.

Another key reason that the LDOE and OPSB can be trusted to continue to carry out their IDEA, 504 and Title II obligations is that there have been significant educational changes and improvements in schools and the governance structure for the schools in New Orleans. The Complaint was filed in the aftermath of Hurricane Katrina, which devastated the New Orleans community and its schools, and it is now more than 19 years since Hurricane Katrina and the more than nine years since the LDOE and OPSB began implementing the Consent Judgment.

At the time that the Consent Judgment was approved in 2015, 107 of the 117 schools in New Orleans were considered low performing and were labeled with "Academic Warning." As a result of the 107 schools in New Orleans being low performing, the LDOE transferred these 107 schools to the RSD, and RSD became responsible for the operation of these 107 low-performing schools. That left the OPSB with only 10 high-performing schools under its jurisdiction. From 2005 until the summer of 2018, the RSD governed most of the public schools in New Orleans.

On July 1, 2018, the New Orleans public schools that had been under the jurisdiction of the RSD were returned to the oversight of the OPSB. This unification of almost all the New Orleans school to the OPSB was the result of extensive efforts that began in 2016, when the Louisiana Legislature passed Act 91, providing for unification. With the passage of Act 91, New Orleans educators and community stakeholders began working together to develop and implement a transition plan. The Act 91 transition plan included many of the strategies that led to the improvements in the schools in New Orleans – family choice, equity, school-based autonomy, and charter school accountability.

Since 2018, the New Orleans schools have continued to make significant improvements. For example, for the 2023-24 school year:

- the District Performance score improved by over three points;

- 81% of the schools earned a progress index letter grade of A or B;

- 50 schools increased their School Performance Scores;

- 16 schools were recognized by LDOE as Top Gains Honorees;

- seven schools were recognized by LDOE as Opportunity Honorees; and

- LDOE recognized the NOLA Public Schools (NOLA-PS) for tying in sixth place in Year-over-Year Percent of Mastery and Above change, which was a three percent growth over the previous school year.

Still another reason why the Court can trust that the LDOE and OPSB will continue to comply with IDEA, 504 and Title II is because of the knowledge, experience and commitment of the leadership of the LDOE and OPSB in ensuring that they meet the needs of SWDs and carry out their legal obligations pursuant to IDEA, 504 and Title II. For LDOE, for example, the LDOE has been under the leadership of Dr. Cade Brumley since June 2020, when he was appointed the Louisiana State Superintendent of Education. Since becoming State Superintendent, one of Dr. Brumley's top priorities has been ensuring that LDOE and OPSB meet their obligations under the Consent Judgment.

Dr. Brumley has spent his entire professional career in Louisiana, serving as a teacher, coach, assistant principal, principal, district leader, and superintendent. Before becoming State Superintendent, Dr. Brumley served as Superintendent of Jefferson Parish Public Schools ("JPPS"), the largest school system in Louisiana. In JPPS, Dr. Brumley created a Special Education advisory council comprised of community leaders, teachers, parents, and advocates, and he used

that council to drive decision-making for SWD. The advisory council in Jefferson Parish was a precursor to the current state law, which requires all LEAs in Louisiana to create similar councils. Prior to being Superintendent of JPPS, Dr. Brumley was Superintendent of DeSoto Parish Public Schools ("DPPS"). In DPPS, he led the school system out of a corrective action plan that was developed and implemented to address the needs of SWD and enacted changes that resulted in moving the educational outcomes of SWD in DPPS to being in the top 10 of school systems in Louisiana.

Under Dr. Brumley's leadership, the LDOE has continued to have a dedicated unit within the Division of Statewide Monitoring ("Division") responsible for IDEA compliance monitoring and implementation of the requirements of the Consent Judgment, and it will continue to have this Division after the Court releases the LDOE from the jurisdiction of the Court. The Director, Angela Randall, leads the Division. She has an advanced degree in special education and her responsibilities include working closely with the IMs in carrying out the LDOE's obligations, including targeted monitoring, in the Consent Judgment. In addition, she is responsible for implementation of risk-based monitoring, consolidated monitoring of federal and state programs, and competitive and discretionary grants. The Director supervises an IDEA compliance monitoring team that includes an IDEA Supervisor, and Administrative Program Specialist, an ombudsman, two complaint investigators and five full-time Education Program Consultants/Team Leaders. Beginning in the Fall of 2024, the Division hired six new staff and a supervisor to assist with the compliance monitoring of OPSB and other school systems in Louisiana.

The OPSB appointed Dr. Fateama Fulmore as Interim Superintendent, effective December 2, 2024. Before the appointment, Dr. Fulmore served as Deputy Superintendent for NOLA-PS for over two years, directly supporting Dr. Hilaire, Chief of Student Support, and NOLA-PS special

education division. This support included advising diverse learner programming, reviewing documents prepared for the Consent Judgment, and meeting with Dr. Hilaire regarding implementing the Consent Judgment requirements and adhering to obligations under IDEA, 504, and Title II.  As interim superintendent, Dr. Fulmore will continue to require her staff, including the special education team, to conduct annual site monitoring at schools and one of her top priorities is to ensure continued compliance with the Consent Judgment and NOLA-PS's IDEA obligations.

Dr. Fulmore has extensive experience as an educational leader, broad knowledge of and experience with special education programs and has a demonstrated commitment to ensuring that NOLA Public Schools met its Consent Judgment obligations.  As Deputy Superintendent, Dr. Fulmore ensured staff, including her special education and accountability teams, conducted annual monitoring site visits of all the schools and this monitoring included determining whether each of the schools was meeting the Consent Judgment requirements.  This annual site-based monitoring is in addition to targeted monitoring by the LDOE and the IMs.

Dr. Fulmore previously served as Principal Supervisor and Chief of Strategy, Accountability, and Schools for the Omaha Public Schools ("OPS"). In these roles, she supported schools and ensured funding was appropriately allocated under the Educational Service Unit to implement professional learning for special and general education staff related to inclusive practices, reading and math interventions, the least restrictive environment, and behavior intervention plans.  Prior to working in OPS, Dr. Fulmore was the Executive Director of High Schools in the School District of Philadelphia, where she served under the Office of Academics, which supported school leaders who ensured students with disabilities received appropriate supports in ninth grade academies.  In addition, Dr. Fulmore has held school-based leadership

19

positions in North Carolina as principal and assistant principal, where she supervised special education programming and served as the LEA representative for IEP meetings and 504 plans.

Like LDOE, OPSB has a special education division that is responsible for ensuring that NOLA Public Schools carry out the Consent Judgment requirements and its IDEA, 504 and Title II obligations. The special education division, which has 85 staff members, is led by Dr. Shayla Guidry Hilaire, who is the Chief Student Support Officer and who reports directly to Dr. Fulmore. Dr. Hilaire started her work in OPSB in 2013, and, as a result, has been in a leadership role in implementing the Consent Judgment requirements since it was approved by the Court in 2015. Dr. Hilaire's responsibilities include ensuring that the model documents and protocols required by the Consent Judgment are implemented in each of the schools, providing professional development and technical assistance for all the schools, and participating in and following up on the annual on-site monitoring.

A further key reason why the Court can trust the LDOE and OPSB to continue to comply with the requirements of the Consent Judgment is because the LDOE and OPSB have developed and will implement plans that address the four key areas of the Consent Judgment – Child Find, Related Services, Discipline and Enrollment. These plans are discussed in the section below.

## IV. LDOE and OPSB Will Implement Plans if Released from Court Jurisdiction that Will Ensure Their Continued Compliance with IDEA, 504 and Title II Obligations for SWD

As discussed below, LDOE and OPSB have developed plans that ensure that they will continue to address the four areas of the Consent Judgment – Child Find, Related Services, Discipline and Enrollment – and that they will continue to meet their IDEA, 504 and Title II obligations. If the Court releases the LDOE and OPSB from the requirements of the Consent

20

Judgment, the LDOE and OPSB will implement these plans and will continue to meet their IDEA, 504, and Title II obligations.

### A.  LDOE's Plan if Released from Court Jurisdiction

If the Court releases the LDOE from jurisdiction, LDOE will implement four key strategies to ensure that the LDOE and the OPSB continue to comply with IDEA, 504, and Title II.  The implementation of these four strategies will ensure that the four areas of the Consent Judgment — Child Find, related services, discipline and enrollment — continue to be addressed and monitored. Each of these strategies, which are discussed below, are based on the experience of LDOE in implementing the requirements of the Consent Judgment.

**Additional LDOE Staff to Conduct Monitoring.**  In the Fall of 2024, hired six full-time employees and a supervisor to conduct increased monitoring.  The six full-time employees and the supervisor form a full-time IDEA unit dedicated to monitoring and employees in the new unit began working on December 9, 2024.

**Continued Dissemination and Monitoring of Implementation of Model Documents.** Annually, the LDOE will continue to disseminate to the OPSB the model documents developed pursuant to the Consent Judgment and to require the schools to follow the requirements in these documents. Annually, the LDOE will monitor the OPSB's implementation of these documents to determine if they are disseminating the model documents and implementing the model documents.

**Implementation of Risk-Based Management System.**  The second key strategy is that annually LDOE will continue implementing its risk-based monitoring system for the schools in New Orleans.  As required by the Consent Judgment, the LDOE does targeted monitoring for 12 OPSB schools per year.  In implementing its risk-based management system, LDOE will continue to monitor at least 12 schools per year.  The risk-based monitoring model allows for data-driven

decision-making to evaluate every school system every year for monitoring support through a ranking process. Risk-based monitoring does not preclude the LDOE from conducting additional random and/or targeted monitoring in addition to the risk-based selection process. Complaints regarding the LDOE's dispute resolution procedures are a consideration for monitoring regardless of a risk ranking.

The LDOE developed its risk-based monitoring system to ensure that all statutory and regulatory requirements for federal education programs, including IDEA 504 and Title II, are followed and that supports and services are achieving intended student growth and achievement outcomes. Risk-based monitoring incorporates more data and indicators than does Consent Judgment targeted monitoring, but it also includes the four areas – Child Find, related services, discipline and enrollment -- that are included in targeted monitoring. As a result, the LDOE will continue to monitor the four areas required by targeted monitoring as part of risk-based monitoring.

The LDOE utilizes a standard monitoring protocol document that encompasses the core components of special education and that is aligned to IDEA requirements. Any findings of violations result in a corrective action plan and follow-up support. The LDOE also is increasing its on-site monitoring support through additional staff hired in the Fall of 2024. Additionally, every school system is audited every year for fiscal monitoring as well as for over 18 required indicators as part of the Annual Performance Report and State Performance Plan.

The risk-based monitoring system allows the LDOE to evaluate every LEA every year for federal against a set of pre-determined risk indicators. These risk indicators are determined through annual consultation with stakeholders, experts, and LDE staff. The monitoring process addresses compliance, academic performance growth (overall and by subgroup), and fiscal risks over a two-

year period. Quartiles are used for ranking and assigning points to distribute a set of data into four equal groups. Risk indicators are weighted, assigned points, and ranked on a rubric.

The application of the rubric yields a monitoring report card for each LEA that displays data and other relevant information used to make monitoring determinations. The rubric explains how risk indicators are weighted, displays points assigned based on the data and information analyzed, and concludes with rankings that place the LEA in low-risk, moderate-low, moderate-high, and high-risk categories for monitoring. Monitoring is conducted and differentiated according to the level of risk, ranging from low intensity to high intensity. The rubric is shared with LDOE network teams to support coordination in program compliance and effectiveness in increasing student achievement.

The indicators used in risk-based monitoring include performance growth for the students with disabilities subgroup in ELA and Math, graduation rates, dropout rates, Child Find, related services, and discipline, child identification, transition and early childhood transition, and disproportionality. Each of these factors are evaluated annually for every school system, including OPSB schools.

The LDOE utilizes state-developed review protocols and self-assessment tools to ensure monitoring processes at every level are targeted, reliable, and consistent. Self-assessment results are submitted to the LDOE for review and follow-up. The LDOE may incorporate LEA staff interviews at any level of monitoring based on the discretion of the monitoring team leader. The LDOE also reserves the right to adjust the level of monitoring if concerns are elevated aside from this process. In some instances, cyclical monitoring may be necessary to monitor programs by which funding is provisional, competitive or discretionary.

If there are findings of LEA non-compliance based on risk-based monitoring, the LEA must develop and submit for LDOE approval a corrective action plan ("CAP") to address findings of non-compliance and implement the approved CAP. While an LEA is implementing a CAP, the LEA remains under the supervision of the LDOE monitoring team, which regularly engages in conversations and collection of evidence to determine progress in addressing the findings of non-compliance. During implementation of a CAP, the LDOE network teams to the LEAs receive copies of CAPs so that they can support and monitor progress, not only for compliance purposes, but also to ensure that all programs implemented by LEA are achieving their student outcome goals. When a LEA receives the results of the monitoring process, LDOE encourages the LEA to make those results available to the public, including at meetings of the school board.

**B. OPSB's Plan if Released from Court Jurisdiction**

If the Court releases the OPSB from jurisdiction, OPSB will cooperate with the LDOE in implementing its two key strategies to ensure continued to compliance with IDEA, 504, and Title II. In addition, the OPSB will implement three important strategies to ensure that the four areas of the Consent Judgment — Child Find, related services, discipline and enrollment — continue to be addressed. Each of these strategies are based on the experience of OPSB in implementing the requirements of the Consent Judgment. As part of its supervisory responsibilities under IDEA, 504, Title II and Louisiana law, the LDOE has reviewed the OPSB strategies and concurs with OPSB that implementation of the strategies that are part of the OPSB plan address OPSB obligations pursuant to IDEA, 504, Title II, and Louisiana law.

**Continued Implementation and Monitoring of Implementation of Model Documents.**

The first strategy is that OPSB annually will continue to disseminate to its schools and to comply with the model documents developed pursuant to the Consent Judgment. Each year, the OPSB

will monitor each school through its annual accountability site visits to ensure that they have implemented the requirements of the Model Documents.

**Participation in LDOE Risk-Based Management System.**  The second key strategy is that, as required by the LDOE, the OPSB annually shall participate in LDOE risk-based monitoring, including developing and implementing corrective action plans to address any findings resulting from LDOE's Risk-Based monitoring.

**Continued Monitoring by OPSB of its Schools**.  The OPSB currently monitors each of its schools on a range of factors, including its Consent Judgment, IDEA, 504, and Title II obligations.  The third key strategy is that the OPSB annually shall continue to monitor its schools on the four areas of the Consent Judgment and its IDEA, 504, and Title II obligations through its annual accountability site visits.

## CONCLUSION

For the foregoing reasons, the Parties, the Defendants here, respectively request that the Court grant the Parties' Joint Motion for Release of State Defendants and Defendant-Intervenor from the Obligations of Consent Judgment.

Respectfully submitted,

 s/Wayne T. Stewart
**WAYNE T. STEWART** (La. Bar No. 30964)
HAMMONDS, SILLS, ADKINS, GUICE,
NOAH, & PERKINS, LLP
2431 S. Acadian Thruway, Suite 600
Baton Rouge, Louisiana 70808
Telephone: (225) 923-3462
Facsimile: (225) 923-0315
Email: wstewart@hamsil.com
*Attorney for Defendant-Intervenor,*
*Orleans Parish School Board*

  *s/Christopher Fruge*
_____
**R. CHRISTOPHER FRUGE** (La. Bar No. 25056)
Louisiana Department of Education
1201 North Third Street
Baton Rouge, LA 70802
Telephone: 225-342-3572
Facsimile:  225-342-1197
E-mail: chris.fruge@la.gov
*Attorney for State Defendants*


  *s/Maree Sneed*
_____
**MAREE SNEED**
Education Lawyer LLC
7405 River Falls Dr.
Potomac, MD 20854
202-256-6417
Email: mareesneed@comsast.net
*Attorney for State Defendants*
*Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I do hereby certify that a true and correct copy of the above and foregoing **MEMORANDUM** was filed electronically with the Clerk of Court by use of the CM/ECF system, which will serve parties' attorneys registered with the Court for receipt of pleadings by email.


**BATON ROUGE, LOUISIANA**, this the 12th day of February 2025.


 _s/ Wayne T. Stewart_
WAYNE T. STEWART

27