**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| _____ ) | |
| P.B., by and through his next friend, ) | Civil Case No. 2:10-cv-04049 |
| Cassandra Berry, *et al.*, Plaintiffs; ) | Section A |
| ) | Judge Jay C. Zainey |
| v. ) | Magistrate Judge Karen Wells Roby |
| ) | |
| CADE BRUMLEY, *et al.*, ) | |
| Defendants. ) | |
| _____ ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' JOINT MOTION**
**FOR RELEASE OF STATE DEFENDANTS AND DEFENDANT-INTERVENOR**
**FROM THE OBLIGATIONS OF CONSENT JUDGMENT**

**Introduction**

This case is about a class of students with disabilities who have been neglected by the New Orleans school system and the State of Louisiana Department of Education for nearly twenty years. In 2005, Hurricane Katrina devastated southeast Louisiana and, in particular, New Orleans. Louisianians' homes, communities, and lives were destroyed, and the entire city of New Orleans had to rebuild. The New Orleans' school system, which had been a traditional, centralized school district, was dismantled into a fragmented patchwork of charter schools and charter networks. What was once one local educational agency ("LEA"), with centralized special education evaluations, services, and enrollment for the entire district, became what is now a decentralized system of about 30 LEAs and 67 schools.[1]

---

[1] Cowen Institute, Publications and Research, "New Orleans Public Schools Governance Chart, 2024-2025, available at https://www.coweninstitute.org/publications-resources/governance-chart-24-25 (last visited 3/25/25).

For families in New Orleans public schools, the system remains woefully unable to address the needs of students with disabilities today. The Louisiana Department of Education ("LDOE") and Orleans Parish Public School Board ("OPSB") have yet to oversee and monitor the provision of special education services for the system of charter schools they created in New Orleans in accordance with federal law. Plaintiffs are not alone in their view. In May 2024, the independent Louisiana Legislative Auditor issued a report showing that LDOE's statewide special education monitoring system is fundamentally broken, leaving most schools and school districts to self-report on their obligations with no oversight or onsite monitoring.[2] This neglect is most pronounced in New Orleans' all-charter system.[3] Now, Defendants seek termination of the Consent Judgment (Docs. 295-96) without citing to any law and relying on little more than the assurances of current high-ranking officials and their resumes. There is good reason to doubt the promises they make to this Court. For one, LDOE did not meaningfully participate in the development of proposals to terminate the Consent Judgment as encouraged by the Court, and even more telling, LDOE's leadership has publicly espoused policies that would put student with disabilities at risk. The State Superintendent's vision for education includes the abolishment of the federal Department of Education[4]; removing "disruptive" students from the classroom without regard to protections for students with disabilities; and discontinuing the collection of disciplinary data.[5] None of these

---

[2] *See* Louisiana Legislative Auditor, Risk-Based Monitoring of Special Education Services, Louisiana Department of Education (May 15, 2024), attached as Ex. 1 (hereinafter "LLA Report on Monitoring").

[3] *See* Center for Public Research and Leadership, Improving Educational Access, Performance, and Outcomes for Students with Disabilities: Monitoring and Support for Continuous Improvement in the New Orleans Public Charter Schools at 37 (2024), attached as Ex. 2 (hereinafter "CPRL Report").

[4] Even prior to President Trump signing the Executive Order dismantling the federal Department of Education on March 20, 2025, the Council of Parent Attorneys and Advocates sued the Department of Education for its failure to investigate civil rights complaints, a key tool for parents to protect the rights of students with disabilities. *See* Complaint, *Carter v. U.S. Dep't of Educ.*, No. 1:25-cv-744 (D.D.C. Mar. 14, 2015), available at https://youthlaw.org/sites/default/files/attachments/2025-03/Carter%20v.%20USDOE.pdf (last visited 3/25/25).

[5] Louisiana Dep't of Educ., Louisiana State Superintendent Urges System Leaders to "Recommit to Assertive Discipline Action" (July 31, 2024), attached as Ex. 3, available at https://doe.louisiana.gov/about/newsroom/news-releases/release/2024/07/31/louisiana-state-superintendent-urges-system-leaders-to--recommit-to-assertive-

policies are consistent with a robust and proactive system of special education monitoring and oversight.

The Defendants argue that they should be released from the Consent Judgment based on findings from Independent Monitor reports ("IM Reports") despite substantial noncompliance with the Parties' Agreement due to the persistent need for Corrective Action Plans ("CAPs") and Intensive Corrective Action Plans ("ICAPs"). Notably, there has not been a single two-year period in which Defendants avoided receiving an ICAP[6] in Related Services or Enrollment. The State's own dismal account of its special education and oversight systems in the Louisiana Legislative Auditor reports corroborates what the IM Reports have found.[7] Defendants now seek release on insufficient and premature legal conclusions. Indeed, Defendants' brief lacks a single legal citation. Only this Court can determine whether Defendants have achieved substantial compliance by fulfilling the terms of the Consent Judgment and its purpose. For all the foregoing reasons, Defendants have failed to do so. Accordingly, Defendants' Joint Motion for Release from the Consent Judgment ("Motion") should be denied.

## I. Background

In October 2010, Plaintiffs filed a complaint against Defendant LDOE for failure to implement the Individuals with Disabilities Education Act ("IDEA") in Orleans Parish Schools. Docs. 1-2. On January 25, 2011, Plaintiffs filed a Renewed Motion for Class Certification. Doc.

---

discipline-action (last visited 3/25/25); Louisiana Department of Education, "Let Teachers Teach: Recommendations", (May 2024), attached as Ex. 4, available at https://doe.louisiana.gov/docs/default-source/newsroom/let-teachers-teach-recommendations.pdf?sfvrsn=bbfd6e18_3/ (last visited 3/25/25); *see also* Patrick Wall, *Some La. School leaders back Trump plan to close Education Dept*, NOLA.COM (Mar. 8, 2025), attached as Ex. 5, available at https://www.nola.com/news/education/louisiana-trump-us-education-department-close/article_bdfe2a3e-fb98-11ef-a6fc-7fa56773ae8c.html (last visited 3/25/25).

[6] *See* Ex. 7, PB Analysis on Monitoring; *see also* Ex. 8, 9 (Ranu and Winkler Declarations regarding PB Analysis on Monitoring).

[7] Louisiana Legislative Auditor, Complaint Process for Students with Disabilities Receiving Special Education Services (Sept. 20, 2023), attached as Ex. 6 (hereinafter "LLA Report on Complaints").

64. Defendant OPSB filed a motion to intervene on March 8, 2012, and it was added as a defendant in the case on March 20, 2012. Docs. 133 & 140. Plaintiffs filed another Renewed Motion for Class Certification on August 8, 2013. Doc. 220. On February 9, 2015, this Court held a Fairness Hearing. Doc. 322.  The Court entered the Consent Judgment on March 25, 2015 (Docs. 295-296), providing that the Defendants are entitled to be released from the Consent Judgment when they have achieved "substantial compliance" with its terms for at least two consecutive years and this Court exercises its discretion to approve their release. Doc. 296 §VIII(2-3). Under the Consent Judgment, "substantial compliance" means:

> [A] level of compliance that does not significantly deviate from the terms of this Agreement. Noncompliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, shall not constitute failure to maintain substantial compliance. Temporary compliance during a period of otherwise sustained noncompliance shall not constitute substantial compliance.

*Id*. § III(32). Noncompliance means "the failure to act in accordance with the requirements of the IDEA and its implementing regulations." *Id*. § III(14).

## A.  Independent Monitoring

Under the Consent Judgment, the Independent Monitors ("IMs") submit reports to this Court. The IMs have filed five different types of reports: (1) initial targeted monitoring reports; (2) follow-up targeted monitoring reports; (3) model document reports; (4) summary reports at the Court's request; and (5) reports regarding school selection. Exhibit 10 offers a chart that identifies the types of IM reports and their corresponding docket numbers.

According to Plaintiffs' records and review of the IM Reports, the IMs have filed eight[8] initial targeted monitoring reports; six follow-up monitoring reports; eight model document reports; two summary reports per the Court's request; and two reports regarding school selection.[9] *Cf.* Doc. 466-1 at 7-9. Initial targeted monitoring reports are the first review of a school selected for monitoring based on school selection criteria in any of the four categories of the Consent Judgment: Child Find, Related Services, Discipline, and Enrollment. Doc. 296-1. If the IMs observe issues of systemic noncompliance for a school, the school is issued a CAP. *Id.* § G(2). The IMs review CAPs in the Follow-up Monitoring Reports to determine whether those CAPs have been followed. If they have not, the school is found to be noncompliant with the CAP and receives an ICAP. *Id.* § G(2)(e).

The independent monitoring began in the 2015-2016 school year, with the first report issued in December 2016. *See* Doc. 354. The IMs filed the most recent report on November 14, 2024, which was the initial targeted monitoring for Spring 2023. Doc. 464. On March 6, 2025, the Parties received a draft IM report for the Spring 2024 Initial Targeted Monitoring, but as of the date of this filing, this report has not been filed.

### B. Proactive Proposals

In October 2020, this Court ordered that the Plaintiffs develop "some suggestions for their view of what having solid, strong, internal monitoring in place would look like" and that the Parties meet regarding these proposals. Doc. 412 at 2. On January 8, 2021, Plaintiffs sent Defendants their proactive proposals, which were based on data and consultations with class members, as well as

---

[8] One of the eight initial targeted monitoring reports is a supplemental monitoring report that was conducted due to the school selection errors. *See* Doc. 427. Additionally, the IMs circulated a draft initial monitoring report for the Spring 2021 but never filed it. *See* Ex. 11. Plaintiffs' analysis of targeted monitoring includes the data reported in Ex. 11.

[9] Plaintiffs' account of the IM Reports in this case differs from Defendants'; however, Defendants did not cite the record in their brief, so Plaintiffs cannot compare the Parties' accounts.

local and national experts in the fields of law, disability, special education, and charter school organization and governance. *See* Doc. 432. Those proposals emphasized that, to ensure future compliance with IDEA, Defendants must alter their risk-based monitoring ("RBM") system for special education compliance.

The Parties met in July 2021, and Plaintiffs explained their proposals to Defendants. Defendants expressed they understood Plaintiffs' proposals and recommendations and would respond to them in writing. Then, in October 2021, OPSB provided, as a response to Plaintiffs' proposals, a "Special Education Authorization Monitoring and Support Summary." Doc. 434. The summary did not address any of the Plaintiffs' suggested recommendations or indicate whether any of the recommendations would be adopted. LDOE similarly provided a summary of their *existing* policies and practices. Doc. 433.

In November 2021, Plaintiffs sent OPSB and LDOE requests for additional information regarding these summaries, including the following: "(1) What new policies or practices are included in the LDOE [OPSB] proposal that LDOE [OPSB] has not already implemented in the past two years?"; and "(2) What specifically is in your proposal that you incorporated from Plaintiffs' Proposal?"[10] LDOE never responded to Plaintiffs' questions.

On February 7, 2022, this Court held a status conference. The Parties reported that they could not find common ground regarding the proposals. The Court suggested the following next steps:

1. The IMs would continue current monitoring activities through Spring 2022.

2. During Fall 2022, instead of independent monitoring, LDOE and OPSB would be permitted to self-monitor using the programs they described in their summaries to the

---

[10] Letter from Plaintiffs to Defendants & Defendant OPSB's Response (Nov. 10, 2022), attached as Ex. 12.

Court. *See* Docs. 433-34. The IMs would evaluate how well LDOE and OPSB were complying with their own programs, and this would act as a "probationary period" for Defendants. Doc. 440 at 2.

Both Defendant LDOE[11] and Plaintiffs[12] objected to this procedure.

### C. The Parties' Negotiations

Between Fall 2022 and early 2024, the Court facilitated efforts by the Parties to develop a joint plan to ensure future compliance. Repeatedly, the Court encouraged the Parties to engage in ongoing dialogue about the Parties' proposals. Docs. 451-52. In ensuing meetings between the Parties, Defendants repeatedly represented that reforms were being implemented or considered to ensure future compliance with federal disability law.[13] Plaintiffs carefully considered these developments. Then, in January 2024, Defendants abruptly stopped engaging in negotiations. Specifically, on January 30, 2024, Defendants failed to respond to Plaintiffs' request to schedule a status conference with the Court. As a result, negotiations halted. *See* Ex. 15.

### II. Legal Standard

Under Federal Rule of Civil Procedure 60(b)(5), a party may vacate a consent judgement if one of the following factors is met: (1) the judgment has been satisfied; (2) it is based on an earlier judgment that has been reversed or vacated; or (3) applying it prospectively is no longer equitable. A court may also consider "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). Defendants do not cite under which factor(s) they seek relief. Most cases concerning the

---

[11] Defendant LDOE made its objection in an email to the Court on February 17, 2022. Email from Defendant LDOE to U.S. District Court, Status Conference (Feb. 17, 2022), attached as Ex. 13. Defendant OPSB did not make an objection.

[12] Plaintiffs made their objections in writing to the Court on February 17, 2022. Mem. from Pls. to Judge Zainey, Objection to Min. Entry (Feb. 17, 2022), attached as Ex. 14.

[13] To assess these proposals, Plaintiffs partnered with the Center for Public Research and Leadership at Columbia University ("CPRL") to conduct a supplemental analysis of Defendants' special education monitoring system—including reforms Defendants claimed were being implemented or considered in earlier negotiations—in the spring of 2024. *See* Ex. 2.

termination of a consent judgment invoke the third factor of Rule 60(b)(5), especially in institutional reform cases like this one. *Frew v. Janek*, 780 F.3d. 320, 327 (5th Cir. 2015) (noting that the first clause of Rule 60(b)(5) is "almost never applied to consent decrees"). Under the third clause, a party seeking relief from a Consent Judgment must establish: one, that a significant change with respect to the facts of the case or a change in the law warrants revision of the decree; and two, that the proposed modification is suitably tailored to the issue the change is intended to address. *See Anderson v. City of New Orleans*, 38 F.4th 472, 478 (5th Cir. 2022) (citing *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384-85 (1992)).

Defendants have the burden of showing that they have met the standard for release from judgment under Rule 60(b)(5). *Chisom v. Louisiana*, 116 F.4th 309, 318 (5th Cir. 2024) (citing *Frew v. Janek*, 820 F.3d 715, 721 (5th Cir. 2016)).

### III. Argument: Defendants should not be released from the Consent Judgment because they have not established a legal basis for their release nor have they achieved substantial compliance.

Plaintiffs acknowledge that institutional consent decrees are "not intended to operate in perpetuity." *Chisom*, 116 F.4th at 316. Moreover, in this case, the Consent Judgment provides that Defendants shall be released when Defendants have achieved substantial compliance with its terms for at least two years and the Court approves their release.Doc. 296 at §VIII(2-3). As the party seeking termination, Defendants "bear[] a heavy burden of persuasion," yet they have failed meet it. *Peery v. City of Miami*, 977 F.3d 1061, 1069 (11th Cir. 2020) (citing *Johnson v. Florida*, 348 F.3d 1334, 1341 (11th Cir. 2003)).

### A. Defendants cite no legal authority in support of their release, and therefore they have necessarily failed to carry their burden to terminate the Consent Judgment.

Defendants' Motion does not include a single citation to legal authority, let alone the standard they are invoking for termination of the Consent Judgment. Doc. 466-1. As the Parties

seeking relief, Defendants carry the burden of establishing that the Consent Judgment should be terminated. *Anderson*, 38 F.4th at 479. They have failed to carry that burden, as their Motion is devoid of any legal citations. On that basis alone, this Court can deny Defendants' Motion. *See United States v. Knezek*, 212 F. App'x 321, 321 (5th Cir. 2007) (deeming argument "abandoned" where party, represented by counsel, "fails [] to provide any legal authority for his assertion [or] cite the applicable standard of review"); *see also SC Shine PLLC v. Aetna Dental, Inc.*, No. SA-22-CV-0834-JKP, 2023 WL 4216989, at *8 (W.D. Tex. June 26, 2023) ("When a party fails to argue or identify the relevant legal standard, it forfeits arguments under such standard.").

To the extent this Court excuses Defendants' wholly "inadequate briefing," *see Knezek*, 212 F. App'x at 321, Plaintiffs will argue the remainder of this memorandum as if Defendants had cited the third prong of Rule 60(b)(5), which requires the movant to show that applying the Consent Judgment prospectively is no longer equitable. This is the appropriate standard for motions to terminate institutional reform consent decrees. *Janek*, 780 F.3d. at 327. To the extent Defendants attempt to argue a different standard is applicable in their reply, their argument is waived.[14] *See Miller v. Louisiana Dep't of Corr.*, No. CV 21-390-JWD-RLB, 2022 WL 2080308, at *1 (M.D. La. June 9, 2022) (stating that, "[t]o avoid waiver, a party must identify relevant legal standards and 'any relevant Fifth Circuit cases'" and because the party "fail[ed] to do either with regard to its underlying claims, . . . those claims [were] inadequately briefed and therefore waived" (citing *JTB Tools & Oilfield Servs., L.L.C. v. United States*, 831 F.3d 597, 601 (5th Cir. 2016)).

---

[14] Notably, the recent *Chisom* decision from the Fifth Circuit arose under the first prong of Rule 60(b)(5). *See Chisom*, 116 F.4th at 320 terminating the Consent Judgment based on the "first prong of Rule 60(b)(5)"). Even were such an argument not waived, *Chisom* is distinguishable as a voting rights consent decree lasting thirty (30) years, with unambiguous contractual provisions. *See id.* at 319 (noting that "cases involving voting rights are unique" as compared to "institutional reform decree in a public school system"). Further, Plaintiffs do not agree or concede that Defendants have achieved substantial compliance. *Cf. id.* at 320. Finally, Plaintiffs maintain that the Judgment has not been satisfied, even under the first prong of Rule 60(b)(5), if it is applicable, for all of the reasons stated in this memorandum. *Infra* § III.B.

**B. Defendants have failed to achieve substantial compliance with the Consent Judgment because they have not created compliant monitoring, oversight, and complaint systems.**

Defendants should not be released from the Consent Judgment as they have neither met their obligation to maintain substantial compliance for two years nor have they shown a significant change either in factual conditions or in law that renders the Consent Judgment's continued enforcement detrimental to public interest, as required under Rule 60(b)(5).[15] See *Anderson*, 38 F.4th at 478.

**1. The purpose of the Consent Judgment is to achieve substantial and substantive compliance with the oversight and monitoring requirements of the IDEA, Section 504, and the ADA, and "substantial compliance" should be interpreted consistently with this purpose.**

Throughout this case, Defendants have repeatedly argued that "substantial compliance" in the Consent Judgment means paper compliance with the administrative requirements of the Agreement as interpreted by the IMs. They repeat those same arguments in their brief. However, this interpretation of the Consent Judgment ignores basic principles of Louisiana contract law requiring the Consent Judgment to be interpreted according to the Parties' intent at the time of execution: To change the State and OPSB's monitoring and oversight protocols to protect the rights of students with disabilities, as required by federal law.

Under Louisiana law, "[t]he primary concern of a court in construing a written contract is to ascertain the true intentions of the parties as expressed in the instrument." *Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006). "[C]ourts seek the parties' common intent starting with the contract's words, which control if they are clear and lead to no absurdities." *Allen v. Louisiana*, 14 F.4th 366, 371 (5th Cir. 2021). Where the contract has words "susceptible of different meanings,"

---

[15] Even if this Court disagrees and applies the first clause of Rule 60(b)(5), despite Defendants' waiver and failure to raise that standard, termination is inappropriate for all of the reasons stated in this section. *See supra* note 14.

the document "must be interpreted as having the meaning that best conforms to the object of the contract." La. Civ. Code art. 2048. In other words, the Court must read the Consent Judgment "in light of the [ ] lawsuit it settled." *Allen*, 14 F.4th at 372 (citing, *inter alia*, La. Civ. Code arts. 3073, 3076).

Defendants do not contest that the term "substantial compliance" in the Consent Judgment is susceptible to different meanings and therefore is ambiguous. *See Dean v. City of Shreveport*, 438 F.3d 448, 460-61 (holding that an "ambiguous" provision is "reasonably susceptible to more than one meaning, in the light of the surrounding circumstances and established rules of construction"). The definition of substantial compliance in the Consent Judgment—which uses the same term to define itself—does little to resolve this ambiguity.[16]

Defendants' position focuses so narrowly on the targeted monitoring provisions of the Consent Judgment as to render "meaningless" explicit provisions stating the purpose of the Agreement: to create a monitoring and oversight system that ensures substantive compliance with the IDEA, Section 504, and the ADA. *Janek*, 780 F.3d at 328. Defendants' argument ignores that the Consent Judgment, through the integration clause,[17] incorporates several addenda with explicit statements of the Parties' intent at the time the contract was formed. Specifically, Exhibit B (Doc. 285-2), a Notice of Proposed Class Settlement, and Exhibit C (Doc. 294-6), a Legal Notice to class members' parents and guardians, both contain clear statements of the Parties' intent. In a section describing the proposed settlement, Exhibit B states, "[t]he Consent Decree *addresses monitoring and oversight activities performed by the State Defendants and OPSB* with regard to the education

---

[16] The Agreement does state that noncompliance (failure to act in accordance with the requirements of the IDEA) in the form of mere "technicalities" or a "temporary" failure to comply will not prevent a finding of overall "substantial compliance" with the Consent Judgment. It also states the converse: that if Defendants temporarily comply during a period when they sustain noncompliance, substantial compliance has not been met. Doc. 296 § III(32).

[17] Doc. 296 § VIII(5).

of students with disabilities in New Orleans schools." Doc. 285-2 ¶ 2 (emphasis added). Similarly, paragraph 4(h) describes the requirement for the State Defendants to "*[i]mplement a rigorous and comprehensive monitoring protocol* . . . for targeted monitoring, and potentially corrective action." *Id.* ¶ 4(h) (emphasis added). Exhibit C reiterates that the Plaintiffs did not seek money damages and "only sought to *change the State Defendants' practices* with regard to the delivery of special education services for students with disabilities in New Orleans' schools." Doc. 294-6 at 2 (emphasis added). From these attachments, the intent of the Parties is clear: to change the State and OPSB's monitoring and oversight protocols to protect the rights of students with disabilities, as required by federal law.[18]

> a. **Every independent assessment of Defendants' special education monitoring, oversight, and complaint protocols confirms that Defendants have failed to develop a system that would be sufficient to achieve "substantial compliance" under the Consent Judgment, including reports by the Louisiana Legislative Auditor.**

A recent report from the Louisiana Legislative Auditor ("LLA") reveals that the most basic goal of the Consent Judgment—the reform of special education monitoring and oversight systems in New Orleans to bring state and local procedures into conformity with federal law—has not been

---

[18] To the extent these addenda do not elucidate the Parties' intent, this Court also may look to extrinsic evidence. *U.S. v. ITT Continental Baking Co.*, 420 U.S. 223 (1975). This is so even where the agreement contains a merger or integration clause. *Chinook USA, LLC v. Duck Commander, Inc.*, 721 Fed. App'x 361, 366-67 (5th Cir. 2018) (unpublished decision); *see also Brock Servs., L.L.C. v. Rogillio*, 936 F.3d 290, 298 (5th Cir. 2019) (citing *Chinook* with approval). The Joint Memorandum of Law in Support of the Consent Judgment (Doc. 279-1) makes clear that through settlement, the Parties sought "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs"; "to ensure that the rights of children with disabilities are protected," and Section 504 and the ADA's objective to "protect qualified individuals from discrimination based on their disability." *Id*. at 6. The Parties explained that the Consent Judgment "is fully consistent with" these objectives because: "[i]t contains provisions for comprehensive monitoring and oversight, professional development, and technical assistance for New Orleans' schools—all designed to ensure that students with disabilities in New Orleans are offered a free appropriate public education and to ensure that the rights of children with disabilities and their parents are protected. It also contains provisions to ensure that violations of Section 504 and the ADA do not occur." *Id*. at 7. This passage directly links the Consent Judgment's monitoring protocol to ensuring delivery of FAPE and protection from discrimination to the class members. Clearly, the Parties intended more than mere paper or administrative compliance.

achieved.[19] According to the LLA Report on Monitoring, LDOE did not conduct a desk or on-site review for a full 43% of school systems for at least seven years, relying on school systems completing self-assessments 76% of the time. Ex. 1 at 9-11. When a school system conducts a self-assessment under RBM system, it is responsible for "selecting which files to review, reviewing the files to determine if there are any IDEA violations, reporting results to LDOE and determining if a corrective action plan is needed." *Id*. at 12. According to the LLA, "without receiving an on-site or desk review, LDOE cannot be sure the school system is providing special education students with required services." *Id*. at 11.

The report includes other disturbing findings, as relevant to this lawsuit: (1) "LDOE decreased the number of employees dedicated to special education from fiscal years 2012 through 2019"; (2) "LDOE's process to select students during a desk or on-site review does not ensure it monitors all applicable federal and state law requirements listed in its monitoring protocol," which prevents LDOE from evaluating all applicable federal and state requirements; (3) "LDOE has not developed policies and procedures or guidance for school systems to follow regarding informal [disciplinary] removals, including how to document informal [disciplinary] removals," an issue for which this case was filed; and (4) "LDOE is not following federal regulations when calculating significant disproportionality relating to discipline," meaning that "LDOE may fail to identify school systems who disproportionately discipline minority students receiving special education services." Ex. 1 at 8.

These findings demonstrate that most school districts, or LEAs, operate with essentially no oversight from the State's RBM system, and nowhere is the effect of this neglect more acutely felt

---

[19] *See generally* Patrick Wall, "What they're doing is not oversight": Louisiana fails to closely monitor schools special education, audit finds, NOLA.com (May 22, 2024), https://www.nola.com/news/education/louisiana-special-education-audit/article_b5d57368-17bd-11ef-b2cc-1f4d56d260d7.html (last visited 3/25/25).

than in New Orleans. Ex. 2 at 6. As explained in Plaintiffs' proposals to this Court, *see* Doc. 432, and confirmed by a later report issued by the Southern Poverty Law Center in partnership with the Center for Public Research and Leadership, *see* Ex. 2 at 6, independent or small aggregates of LEAs like New Orleans charters are, simply, too small to reliably appear as requiring intervention by LDOE's current RBM system. Meanwhile, since the start of this litigation, LDOE has done nothing to change the policies and procedures of its risk-based special education monitoring system.

Defendants' brief suggests they have hired more staff since the LLA Report on Monitoring was issued. Doc. 466-1 at 6, 37-38. However, those staff members are not identified or otherwise represented to be responsible for special education monitoring and compliance in New Orleans public schools. Moreover, even with more staff, the RBM system remains flawed by design in detecting systemic noncompliance in small LEAs including charter schools. Ex. 2 at 37. Defendants have not offered any information to the contrary, and therefore have failed to meet their burden. *Janek*, 780 F.3d at 327 ("As the party seeking relief, Defendants must bear the burden of showing that Rule 60(b)(5) applies.").

The LLA Report on Monitoring does state that, since the Consent Judgment has been in place, most of the LDOE's desk and on-site reviews have occurred in Orleans Parish.[20] Defendant LDOE will argue, citing the LLA Report on Monitoring, that the Consent Judgment has hindered its ability to conduct desk reviews and on-site reviews throughout the rest of the state by forcing it to focus on New Orleans public schools. But it is LDOE's responsibility by law to ensure that school systems are implementing and following federal and state law regarding special education

---

[20] Between 2015-2016 and 2021-2022, LDOE conducted a total of 262 desk or on-site reviews, with 166 (63.4%) reviews in Orleans Parish. Ex. 1 at 8. Plaintiffs contest LLA's portrayal of the impact the PB Consent Judgment has had on LDOE's ability to monitor special education statewide. *See* Ex. 16.

throughout the state, including LEAs in New Orleans pursuant to the Consent Judgment. It must do both, under federal law and under the terms of the Consent Judgment itself. *See* Doc. 296 §§ IV.A.3.b, IV.B.2.b, IV.C.5.b, IV.D.7.b (requiring that "targeted monitoring activities described [in this Consent Judgment] shall supplement, not supplant, the annual monitoring activities undertaken by LDOE"); *see also* 20 U.S.C. § 1412(11)(A); 34 C.F.R. § 300.600. If the Consent Judgment were not in place, students with disabilities in New Orleans' unique all-charter school system would only be worse off than before—fewer desk reviews and on-site reviews would occur, resulting in an even less transparent and accessible system of special education for families of students with disabilities. Further, any LDOE diversion of statewide monitoring resources to comply with its Independent Monitoring obligations is a violation of the Parties' Agreement. *See* Ex. 16 at 2-3.[21]

Meanwhile, LDOE and OPSB also maintain inadequate complaint systems, preventing parents from holding school districts accountable directly when the state monitoring system fails. First, the state level complaint system is essentially futile. A separate LLA Report from 2023 (hereafter "LLA Report on Complaints") revealed that LDOE received 61 formal complaints in the 2021-22 school year. In addition to these formal complaints, LDOE received "42 emails that were submitted with an allegation but LDOE did not address these allegations." Ex. 6 at 10. Of these e-mailed allegations, the LLA found that "LDOE responded by email to nine (21.4%) of the emails, did not respond to 13 (31.0%) of these emails, and could not provide evidence of how they responded to 20 (47.6%) of these emails." *Id.* The LLA's findings were supported by yet another report from the Council of Parent Attorneys and Advocates ("COPAA") on IDEA Written State Complaints. Ex. 17. This report reviewed state complaints on a state-by-state basis, and found that

---

[21] Plaintiffs have excluded the Appendices cited in Ex. 16 as they are already cited in this memorandum: Appendix 1 is the Consent Judgment (Doc. 296), and Appendix 2 is the CPRL Report (Ex. 2).

"Louisiana was the only state that appeared in the bottom decile for each of the four metrics analyzed for both the most recent year as well as the three-year period." *Id*. at 14. COPAA describes the complaint process as "the most powerful and accessible option for parents[,]" and more must be expected from LDOE to ensure the rights of students with disabilities are protected, especially in New Orleans' all-charter system with at least some charters authorized by the state. *Id*. at 2.

Perhaps most frustratingly to parents seeking relief, the OPSB complaint system offers no alternative recourse. Parents who seek to file with the OPSB disability discrimination complaint system, as outlined in the attached declarations, *see, e.g.*, Exs. 18, 19, are referred back to the charter school or otherwise informed that OPSB has no jurisdiction to resolve their complaints, despite clear provisions in the Consent Judgment requiring OPSB to develop, for "all schools within its jurisdiction", "a written complaint investigation protocol . . for investigating allegations of discrimination on the basis of disability." Doc. 296 § IV.D.6. From a technical perspective, the IMs have determined, despite Plaintiffs' objections, that OPSB has complied based on the District's "Disability Discrimination Complaint Procedures." *See, e.g.*, Doc. 465 at 12-13. These procedures also appear to be available on OPSB's website.[22] However, the link[23] to these procedures states that the discrimination complaint process is *only* available for specific schools: the five charter schools within the NOLA-PS LEA, which constitute a mere fraction (7%) of all OPSB charter schools.[24] This is not a mere website design flaw. As demonstrated by the attached declarations, *see, e.g.*, Exs. 18, 19, 24, disability discrimination procedures are in fact not available

---

[22] *See* Orleans Parish School Board, Section 504 Grievance Procedures, available at https://nolapublicschools.com/documents/grievance-procedures-under-section-504-and-title-ii-of-the-american-with-disabilities-act-ada/download (last visited 3/25/25).
[23] New Orleans Public Schools, Special Education (last visited Mar. 25, 2025), https://nolapublicschools.com/families/parents-resources/special-education. A printout of the current version of the website is also available at Ex. 20.
[24] *Id*.

to all students and parents. This Court has no obligation to reward such gamesmanship. *See Gulf Coast Bank & Tr. Co. v. Warren*, 125 So. 3d 1211, 1219 (La. App. 4 Cir. 9/18/13) ("[A]ll contracts in Louisiana must be performed in good faith." (citing La. Civ. Code arts. 1759, 1983)).

### b. Even under Defendants' inappropriate and excessively technical reading of the Consent Judgment, the repeated issuance of CAPs and ICAPs constitute substantial noncompliance and preclude Defendants' release.

Even if this Court adopts Defendants' position that the Consent Judgment requires paper compliance rather than substantive reforms, Plaintiffs do *not* agree that Defendants have substantially complied with the Consent Judgment because they have repeatedly demonstrated substantial noncompliance based on the repeated and persistent issuance of CAPs and ICAPs.[25] Defendants argue that "substantial compliance" requires the absolute minimum under the Consent Judgment: that they are merely required to identify LEAs for targeted monitoring, conduct file reviews of a representative sample, and complete other targeted monitoring activities for two years to be in substantial compliance. Doc. 466-1. Defendants' interpretation of substantial compliance would allow substantial numbers of charter schools in targeted monitoring to receive CAPs (be noncompliant with federal law)—and even ICAPs—for two consecutive years, and yet Defendants could be released from the Consent Judgment. This position clearly conflicts with the purpose of the Consent Judgment.

Even on a narrow reading of the purpose of the Consent Judgment, Defendants have not maintained substantial compliance for two consecutive years. In the most recent initial targeted monitoring report that has been filed, a full 50% of the schools monitored demonstrated substantial

---

[25] *Cf. Chisom*, 116 F.4th at 320, and *Janek*, 780 F.3d at 331 ("Plaintiffs have conceded that Defendants completed all but two of the bullet points in CAO 637-8").

noncompliance in Related Services and Enrollment Stability.[26] These results are not isolated. In nine years of initial targeted monitoring, Defendants have been substantially noncompliant with federal law 56% of the time. *See* Ex. 7. Such repeated noncompliance is insufficient to meet the standards of "substantial compliance" as defined in the Consent Judgment and required to dissolve a federal court order, *see U.S. v. Chromalloy Am. Corp.*, 158 F.3d 345, 349 (1998) (noting a consent decree "functions as an enforceable judicial order" (internal citation omitted)), or even the minimal standard of "substantial performance" under Louisiana law, to the extent it is applicable in these circumstances,[27] *see Walter Lafargue Real Est., Inc. v. Raines*, 420 So. 2d 1309, 1311 (La. Ct. App. 1982) (describing "factors to be considered in determining whether substantial performance exists" including "the degree to which the purpose of the contract is defeated").

Defendants appear to recognize that the purpose of the Consent Judgment is to prevent future substantial noncompliance, arguing that this Court can rest assured that Defendants "will ensure their continued compliance" after the Consent Judgment terminates. Doc. 466-1 at 20. For reasons that follow in Section III.C, *infra*, that assertion is not credible.

Moreover, the Consent Judgment states: "If the State Defendants' targeted monitoring results in the identification of noncompliance, the State Defendants shall require each LEA with validated noncompliance to undertake corrective actions sufficient to remedy the noncompliance and to *reasonably ensure that such noncompliance does not reoccur*." *Id.* §§ IV.A.3, IV.B.2, IV.C.5, IV.D.7 (emphasis added). When an LEA is noncompliant with the CAP, an ICAP is issued.

---

[26] The latest draft report that the IMs have shared with the Parties shows that one school received a CAP for Child Find. Ex. 21. Further, the report showed student-specific findings of noncompliance for three schools. *Id.* at 15, 20, 25. While the draft report for the Spring of 2024 shows improvement, this is one instance out of eleven rounds of monitoring and does not demonstrate sustained improvement.

[27] *See supra* note 14 (discussing *Chisom*). Plaintiffs further note that, outside the voting rights context, with its unique federalism concerns, using state law principles of "substantial performance" to evaluate "substantial compliance" with a court order undermines the authority of federal courts to issue equitable and injunctive relief, at least where no damages are available to remedy the portion of performance not achieved as in the contract context.

Doc. 296-1 § F(2)(e). The follow-up IM results show that substantial noncompliance in the initial targeted monitoring is not a "mere technicalit[y]" or "temporary," *see* Doc. 296 § III(32)—and, in fact, has repeatedly reoccurred. Since the Consent Judgment has been in place, LEAs have received ICAPs at the rate of 42% in Child Find, 39% in Related Services, and 37% in Enrollment. *See* Ex 7. **Moreover, Defendants have _never_ gone two consecutive years without receiving an ICAP in Related Services or Enrollment.** *See id.* These ICAPs demonstrate that Defendants have not reasonably ensured that noncompliance would not reoccur and have not maintained substantial compliance.

Similarly, Defendants have not complied with the Consent Judgment where subsequent noncompliance has been monitored for the same school in separate rounds of monitoring. On two occasions, LEAs have received two CAPs in the same area (Child Find, Related Services, Discipline, or Enrollment). G.W. Carver Collegiate Academy received a CAP in Enrollment during Spring 2016 monitoring (Doc. 377-1 at 53-55) and again received a CAP in Enrollment in Spring 2021 monitoring (Ex. 11 at 32). Landry-Walker High School/L.B. Landry received a CAP in Related Services in Spring 2016 (Doc. 354 at 42-44) and again received a CAP in Related Services in Spring 2021 (Ex. 11 at 17-19). For these reasons, Defendants have not maintained substantial compliance even based on the Independent Monitoring results alone.

**C. Apart from the question of "substantial compliance," the Court can and should use its discretion to deny Defendants' motion to be released from the Consent Judgment.**

Even if this Court determines the IMs' reports are sufficient to show substantial compliance for two consecutive years, that is not enough to release Defendants under the Agreement. The Consent Judgment provides that "[Defendants] shall be released from the terms of this Agreement . . . *subject to Court approval*." Doc. 296 §§ VIII(2)-(3) (emphasis added). Under this

provision, the Court can and should use its discretion to deny Defendants' Motion because Defendants' claims of ensuring future compliance are not credible at this time.

Factors demonstrating Defendants' lack of credibility and inability to ensure future compliance include: (1) high levels of noncompliance under the Consent Judgment; (2) findings in the LLA Report on Monitoring that Defendant LDOE's Risk Based Monitoring system for special education is inadequate; (3) explicit statements by current high-ranking LDOE officials expressing support for removing statewide school discipline metrics and removing "disruptive" students with disabilities from the classroom, without regard to IDEA, 504, and ADA protections; (4) Defendants' abrupt decision to end good faith negotiations to terminate the Consent Judgment; and (5) continued and widespread experience of systemic issues by families in New Orleans public schools that were meant to be addressed by the Consent Judgment.

> **1. Over ten years, Defendant LDOE has exhibited high levels of noncompliance with the Consent Judgment, the validity of which are confirmed by recent LLA reports.**

As discussed above in Section III.B.1.b., Defendants have consistently maintained high levels of noncompliance under the Consent Judgment, evidenced by CAPs and ICAPs. When considering all schools that have received targeted monitored over ten years of the Consent Judgment (106), an astounding 56% (59) of them have received CAPs.[28] Ex. 7. Further, of the total number of schools that have received follow-up monitoring for CAPs (62), 34% of them have received ICAPs. *See id*. The Court should use its discretion to deny Defendants' Motion based on these high levels of noncompliance. Doc. 296 §§ VIII(2)-(3). This is especially so where the high levels of noncompliance are corroborated by the LLA Reports on Monitoring and Complaints. Exs. 1 & 6; *see also supra* Section III.B.1.a. (describing LLA report results).

---

[28] This total includes the most recent IM draft report for Spring 2024. *See* Ex. 7.

## 2. The Louisiana Legislative Auditor found that LDOE's Risk-Based Monitoring for special education is inadequate.

In its 2021 proposal to the Court, Defendant LDOE represented that the "LDOE RBM model has the key components that a model of statewide special education monitoring needs to provide all LEAs and parents of students with disabilities the level of scrutiny and support necessary to uphold IDEA compliant practices." Doc. 433 at 4. Defendant LDOE continues to rely on this monitoring system to convince the Court that it will follow federal disability law if the Consent Judgment is terminated. Doc. 466-1 at 21-24. Yet, the LLA Report on Monitoring from May 2024 finds that this RBM system is inadequate. Prior to the publication of the LLA Report on Monitoring, Plaintiffs explained their concerns with the RBM system and how it is insufficient to ensure that the systemic issues of noncompliance with federal disability law at issue in this lawsuit will not endure post-Consent Judgment. *See* Ex. 22 at 3-4. The LLA Report on Monitoring echoes many of Plaintiffs' concerns with Defendants' monitoring system.

## 3. Superintendent Dr. Cade Brumley has explicitly expressed support for removing state data collection related to monitoring and oversight of special education.

Defendants spend a large portion of their Motion arguing that they should be released from the Consent Judgment because the Court can trust them to "continue comply[ing] with IDEA, 504 and Title II because of the knowledge, experience and commitment of the leadership of LDOE." Doc. 466-1 at 17. The leader for LDOE is Dr. Cade Brumley, who is described extensively in Defendants' Motion. What Defendants neglect to mention is that Dr. Brumley has explicitly expressed support for removing oversight of data collection for monitoring and oversight of programs for students with disabilities. Indeed, the day after the Legislative Auditor released its report on the systemic flaws in special education monitoring, Dr. Brumley and LDOE issued a report titled "Let Teachers Teach." Ex. 4. In this report, Dr. Brumley supports removing

disciplinary metrics from school accountability models; removing students from the classroom who are "excessively disruptive to the learning environment"; and placing "ungovernable students" at alternative sites for behavior support. *Id*. at 5. These recommendations give no consideration to the procedural rights of students with disabilities not to be excluded for behaviors related to their disability, which is an area of monitoring addressed by this lawsuit. Further, the recommendations in the "Let Teachers Teach" report directly contradict the Legislative Auditor's recommendation to address significant disproportionality in school discipline of students with disabilities, as required under federal law. *See* Ex. 1 at 28-31. Despite calls from advocates of students with disabilities for LDOE to adopt a different approach,[29] Dr. Brumley has continued to endorse the recommendations of the "Let Teachers Teach" report.[30] He has also explicitly endorsed the closure of the U.S. Department of Education, which would remove additional measures of federal oversight over disability discrimination claims investigated by the Office for Civil Rights.[31]

### 4. Defendants have failed to consistently engage in good faith negotiations.

This Court has repeatedly recognized that termination of the Consent Judgment is appropriate if—and only if—Defendants ensure that "changes effected by the Consent Judgment remain in place going forward[.]" Doc. 451. In response to this Court's direction, the Parties met on a regular basis to attempt to achieve that goal collaboratively, rather than through litigation, for approximately three years between December 2021 and January 2024. Abruptly, and after failing to respond to Plaintiffs for over almost a year, Defendants filed this Motion without any notice to Plaintiffs or the Court—and, more problematically, without developing any meaningful proposal

---

[29] Louisiana Health Equity Letter to Dr. Cade Brumley (Aug. 19, 2024), https://www.louisianafirstnews.com/wp-content/uploads/sites/80/2024/08/Letter-to-Dr.-Cade-Brumley-LDOE.pdf, attached as Ex. 23.
[30] Ex. 3.
[31] Ex. 5; *see also supra* note 4.

for altering their oversight and monitoring systems to prevent noncompliance after the Consent Judgment ends.

**5. Students with disabilities continue to experience barriers to accessing special education and lack an adequate complaint system to resolve their grievances.**

Students with disabilities continue to suffer in the New Orleans public school system due to Defendants' failures. Plaintiffs acknowledge that no school system can implement the IDEA and other federal disability laws with a perfect record—such an expectation is unrealistic. However, students with disabilities in New Orleans and their families deserve better than the current situation.

The SPLC works alongside other advocates in the community to assist families who seek protection of their right to FAPE. *See* Exs. 24, 25, 26. The Loyola Law Clinic is one of the few legal services providers offering individual representation to indigent and low-income families on matters of special education in the metro area. Based on its years of representing families, Loyola has found that "charter schools continuously fail in their child find obligation"; "fail to respond to parent requests for evaluations as required by law"; "fail to follow the proper procedures in disciplining students with disabilities"; and fail to provide related services. Ex. 24 ¶¶ 9-12. A private practitioner, Christopher Edmunds, confirms this account. Ex. 25. As a Tulane Law graduate working in several Louisiana school districts, and a parent of a child with a disability, he finds "charter schools in New Orleans are unusually resistant to placing students into special education" and lack a "uniform set of policies and procedures when it comes to evaluating children, noticing and conducting IEP meetings, implementing the IEPs, and other procedures under the IDEA." *Id*. ¶¶ 26-27.

The same issues are evident when speaking directly to families. For example, one parent-declarant's child attended school at New Harmony High and was ignored when she requested a special education evaluation for her child. She did not receive an evaluation even after calling the New Orleans special education hotline. Ex. 18. Even for parents who can obtain attorneys, evaluations are excessively delayed, and IEPs are not implemented. Ex. 28 ¶¶ 6-12; Ex 29 ¶¶ 5-11; Ex. 30 ¶¶ 11-12. Parents of children with disabilities report transferring—sometimes multiple times—to different charter schools to address the issue, but without relief. *See, e.g.*, Ex. 30 ¶¶ 11-12; Ex. 26 ¶ 8.

Meanwhile, the complaint systems at the state and local level fail to ensure accountability. For example, one parent-declarant was escorted out of an IEP meeting by a resource officer, when he simply requested training for staff. Despite filing a complaint with the New Orleans system, no one ever responded to the complaint or incident. Ex. 19. Other parents confirm a similar lack of responsiveness with available complaint systems. *See, e.g.*, Ex. at 18 ¶¶ 3-5. At the state level, one parent reached out to LDOE in December 2023 for help with one of her multiple children with disabilities. Ex. 27 ¶¶ 11-12. Even after the LLA Report on Monitoring, she did not receive a response for three months, despite her willingness to speak to the Ombudsman. *Id*. ¶¶ 34.

For these parents and families, premature termination of the Consent Judgment will have dire consequences. One declarant, who has been an education advocate for over twenty (20) years in New Orleans, explains that, while there may be less outright abuse of students with disabilities in OPSB since this lawsuit was brought, there is still no "accountability for children's disability and special education rights at the district or state level." Ex. 26 ¶ 6. She continues to see significant numbers of informal and undocumented suspensions, without due process or Manifestation

Determination Review meetings. *Id*. ¶ 10. In the current system, she explains, the "Consent Judgment is one of the few protections we have left." *Id*. ¶ 14.

## IV.     Conclusion

For the above reasons, termination of the Consent Judgment is premature and improper, as Defendants have failed to meet substantial compliance and are not prepared to adopt appropriate reforms to ensure students with disabilities have access to redress and that their rights are protected. Accordingly, this Court should deny Defendants' Motion.


Respectfully submitted,


/s/ Lauren A. Winkler
Lauren A. Winkler, LA Bar No. 39062
(T.A.)
Sophia Mire Hill, LA Bar No. 36912
Ashley Dalton, LA Bar No.
**Southern Poverty Law Center**
201 St. Charles Avenue, Suite 2000
New Orleans, LA 70170
Phone: (504) 486-8982
Facsimile: (504) 486-8947
lauren.winkler@splcenter.org
sophia.mire.hill@splcenter.org
ashley.dalton@splcenter.org

Neil S. Ranu, LA Bar No. 34873
111 Veterans Boulevard, Suite 1620
Metairie, LA 70005
Phone: (504) 327-5300
nranu@hotmail.com

Maya Brodziak (admitted *pro hac vice*)
**Lawyers' Committee for Civil Rights Under Law**
1500 K St. NW, Suite 900
Washington, DC 20005
Phone: (202) 662-8600
mbrodziak@lawyerscommittee.org


*Counsel for Plaintiffs and Settlement Class*