UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


CASSANDRA BERRY, ET AL.

CIVIL ACTION


VERSUS                                                              NO. 10-4049


CADE BRUMLEY, ET AL.                                    SECTION "A" (4)


**ORDER AND REASONS**

The following motion is before the Court: **Joint Motion for Release of State Defendants and Defendant-Intervenor From the Obligations of Consent Judgment (Rec. Doc. 466)** filed by the State Defendants ("State Superintendent, Louisiana Department of Education and Louisiana Department of Education" or "LDOE") and Defendant-Intervenor ("Orleans Parish School Board" or "OPSB") (collectively "Defendants").

**I.**

Defendants seek to be released from the obligations imposed by the Consent Judgment entered on March 25, 2015, (Rec. Doc. 296), to amicably resolve a class action lawsuit filed by the Southern Poverty Law Center ("SPLC") on behalf of ten named individuals who sought to represent a class of approximately 4500 New Orleans public school children with disabilities.[1]  The plaintiff class had alleged that the post-Hurricane

---

[1] The original defendants were the Louisiana Department of Education, through its

Katrina structure of public education in New Orleans, a structure dependent almost entirely on charter schools, was fraught with widespread systemic failures of IDEA[2] compliance, which were causing class members to be denied a free appropriate public education. As of this writing Defendants have been subject to the requirements of the Consent Judgment for over eleven years, during which time they have funded the expense of court-appointed Independent Monitors who were charged with evaluating Defendants' compliance with the terms of the Consent Judgment.[3]

The Consent Judgment was the product of many months of extensive negotiations, which included the assistance of a court-appointed mediator. The negotiated agreement was never intended to operate in perpetuity so the parties negotiated express termination criteria to determine when and how Defendants would be released from their Consent Judgment obligations. The Consent Judgment states:

> The [Defendants] shall be released from the terms of this Agreement when they have achieved Substantial Compliance with each provision of the Agreement for which they are assigned responsibility; have maintained Substantial Compliance for a period of two consecutive years; and subject to Court approval.

(Rec. Doc. 285, Consent Judgment at 18, VIII (2) & (3)).

Defendants point out that they have satisfied the foregoing requirements of the

---

superintendent, and the Louisiana Board of Elementary and Secondary Education. OPSB subsequently intervened in the action as a defendant.

[2] **I**ndividuals with **D**isabilities **E**ducation **A**ct, 20 U.S.C. § 1400, *et seq.*

[3] The court-appointed Independent Monitors are Dr. Dale Bailey, co-founder of Fluency Plus, LLC, Mr. Ken Swindol, and Mr. William Swindol. Dr. Bailey and his team have performed exemplary work throughout their tenure of monitoring compliance with the Consent Judgment, which as of this writing has been well over a decade.

Consent Judgment for many years beyond the criterion of two years of substantial compliance, specifically eight consecutive years of substantial compliance as of the date that they filed their motion. Having met that threshold requirement for release, all that remains is Court approval. Defendants therefore assure the Court that they have and continue to implement robust approaches to monitoring, accountability, and support of schools and their students, and that the time has come to end the Consent Judgment.

Between the fall of 2022 and early 2024, which was prior to Defendants filing the instant motion to be released from the Consent Judgment, the Court attempted to facilitate efforts by the parties to confect a joint motion to terminate the Consent Judgment that would be presented on behalf of all parties. The parties' efforts, while productive, were not successful. On February 12, 2025, Defendants filed their motion.

Defendants' motion was met with fierce opposition from the SPLC on behalf of the plaintiff class, and quite candidly this surprised the Court given how close the parties had come to agreeing on a joint motion to terminate. On June 23, 2025, the Court held a status conference at the objected-to request of the defendants, (Rec. Doc. 471, SPLC's Letter to the Court), to discuss the logistics of acting on Defendants' Joint Motion for Release of State Defendants and Defendant-Intervenor From the Obligations of Consent Judgment. (Rec. Doc. 476, Minute Entry 6/23/25). The Court informed counsel that it anticipated granting the motion to terminate in short order, and with that understanding the parties were able to agree to the steps necessary to sunset the tasks that the Independent Monitors were performing pursuant to the Consent Judgment. The Court explained that it required neither an evidentiary hearing nor oral argument to assist it in

exercising its discretion to approve termination of the Consent Judgment. But given that the Consent Judgment was entered in favor of a class of potentially vulnerable persons the Court offered to hold an "informal hearing" so that any parents with children in the Orleans Parish charter school system could voice their concerns directly to the Court, whether those concerns relate to their child's specific situation or to the Consent Judgment or special education in the Orleans Parish charter schools generally. That informal hearing was held over the course of three days from November 12, 2025, through November 14, 2025. (Rec. Docs. 481, 482, & 483, Minute Entries). The LDOE Ombudsman was present at the hearing and every class member who spoke was given her contact information.[4] Consistent with what had become their standard method of operation, Defendants and their counsel were extraordinarily responsive when specific problems being experienced by individual class members were brought to their attention. In the aftermath of the informal hearing the SPLC continued to bring individual concerns to the Court's attention and Defendants' promptly investigated those situations without questioning why those concerns had not been raised via the formal complaint process. And Defendants did this even though most if not all of the individual problems raised could not plausibly be traced to a systemic failure, and some problems, while causing palpable frustration to class members, did not necessarily constitute a violation of federal

---

[4] Only nine parents of students with disabilities actually contacted the LDOE Ombudsman following the informal hearing. In a letter to the Court dated January 23, 2026, the SPLC explained that it was plaintiffs' understanding that LDOE and OPSB would proactively reach out to parents and not wait for them to independently contact the LDOE Ombudsman. The Court specifically instructed each class member who spoke at the November 2025 informal hearing to take a card with the Ombudsman's contact information and to follow-up with the Ombudsman, if they chose to do so.

law. The Court requested that counsel for the parties meet to discuss any follow up to the issues and concerns raised by class members at the November 2025 informal hearing. All parties followed up with the Court in writing.

II.

### A. Substantial Compliance

Defendants have met the threshold termination requirements of §§ VIII (2) & (3)) of the Consent Judgment by being in Substantial Compliance with their Consent Judgment obligations for a period of two consecutive years. The Independent Monitors have reported on LDOE's implementation of the Consent Judgment for nearly a decade. As of the time that Defendants filed their motion, the Independent Monitors had found Defendants to be in Substantial Compliance for all of the provisions of the Consent Judgment for the last eight years.

The plaintiffs refuse to acknowledge that Substantial Compliance has been attained for a period of two consecutive years because they no longer agree that the Consent Judgment's express definition of Substantial Compliance—a definition that they negotiated and agreed to in 2015—should govern. For years, the plaintiffs have pushed for a more onerous definition for Substantial Compliance, a definition more tethered to compliance with the IDEA as opposed to compliance with the Consent Judgment itself. The plaintiffs take this position because individual concerns continue to be raised, and some schools continue to require CAPs/ ICAPs.[5]  Now the plaintiffs go so far as to argue in their opposition that the Consent Judgment's textual definition of Substantial

---

[5] **C**orrective **A**ction **P**lan/**I**ntensive **C**orrection **A**ction **P**lan.

Compliance is ambiguous so the Court should eschew it and interpret the Consent Judgment under principles of state contract law to reflect what the parties really intended.[6]

The Consent Judgment's definition of Substantial Compliance is clear and unambiguous. And the Court is persuaded that the Consent Judgment's definition of Substantial Compliance reflects exactly what the parties intended. The Consent Judgment targets systemic changes, which the Court is persuaded have reduced both individual or non-systemic problems. That individual problems may continue to occur at times or that specific schools may require corrective action at times is neither indicative of a failed Consent Judgment nor necessarily of an IDEA violation by Defendants. No consent judgment can completely eliminate all individual or all local problems. But the proper recourse for those problems lies in due process complaints and perhaps in other formal remedies under the IDEA.[7] Rewriting the Consent Judgment to maintain federal judicial oversight is not a proper remedy.[8]

---

[6] This is not the plaintiffs' first attempt to revisit the Consent Judgment's definition of Substantial Compliance. In 2018 the Court was called upon to resolve objections that the plaintiffs had made to the manner in which the Independent Monitors were interpreting Substantial Compliance, which was strictly adhering to the Consent Judgment's express textual definition. The Court issued an Order explaining that the Consent Judgment's terms must govern, including its textual definition of Substantial Compliance. (Rec. Doc. 387, Order).

[7] Nothing in this opinion diminishes the right of any aggrieved class member to seek relief via the formal complaint process or even in court if appropriate.

[8] To be clear, the Consent Judgment's definition for Substantial Compliance is not the result of short-sightedness on behalf of the specific SPLC attorneys who represented the plaintiff class at the time. The attorneys who negotiated the Consent Judgment on behalf of the plaintiff class understood the precarious and tenuous legal footing that they were on by

In sum, Defendants have met the threshold termination requirements of §§ VIII (2) & (3)) of the Consent Judgment by being in Substantial Compliance with their Consent Judgment obligations for a period of two consecutive years.

### B.  Subject to Court Approval

The Consent Judgment itself offers no parameters to guide the Court's decision on whether to approve Defendants' request to be released from the Consent Judgment. Defendants would have been able to move to have the Consent Judgment terminated many years ago—as they point out they are now well past the threshold of two consecutive years of substantial compliance. Defendants did not wait for six more years simply because they enjoyed remaining subject to federal oversight. They waited because through the years the Court was very clear about the assurances it would need and the comfort level it would have to attain before terminating the Consent Judgment. It is not by happenstance that the Court has held Defendants' Motion for Release of State Defendants and Defendant-Intervenor From the Obligations of Consent Judgment under advisement for more than a year. The Court needed to know that the positive changes that have occurred as a result of the Consent Judgment would not be eroded and the system returned to its prior state once federal oversight was terminated.

---

pursuing class-based systemic relief against the State to remedy violations of the IDEA, which contains a mandatory exhaustion requirement. The Court's denial of LDOE's motion to dismiss was not subject to interlocutory appellate jurisdiction but had the plaintiffs been forced to obtain class certification over LDOE's objection then LDOE could have sought an appeal under Federal Rule of Civil Procedure 23(f). And to be sure, LDOE had raised potentially meritorious legal arguments as to why class treatment was not available for the claims being asserted. Thus, the plaintiffs' attorneys were willing to compromise and agreed to terms such as the "Substantial Compliance" criteria because obtaining the Consent Judgment, for all of its shortcomings, was better than risking a dismissal with prejudice by the Fifth Circuit which would have meant no relief whatsoever.

On November 10, 2025, Defendants assured the Court in writing that they were committed to implementing the Independent Monitors' recommendations from the final reports filed in October 2025. Those specific commitments are:

- Defendants will continue to disseminate the model documents that were required by the Consent Judgment. These documents are: *Child Find Written Guidance* model template; *Special Education Program Descriptions* model template; *Procedural Safeguards Checklist—Disciplinary Removal of Students with Disabilities* template; model *Discipline Policy for Students and Disabilities*; *Undocumented Suspension Guidance model template; Parent FAQs: Special Education in Charter Schools* model template; *Enrollment Discrimination Policy Guidance* model template; *Disability Discrimination Complaint Procedures* model template.

- Annually, Defendants will continue to send and solicit school leaders and principals to submit signed attestations for review of model documents, annual updates to all sections of *Special Education Program Descriptions* model template, website links to verify placement of required documents on charter school websites, updates to model positive behavior support and discipline policies, including Codes of Conduct and Student Handbooks.

- LDOE will continue to provide technical assistance and annual professional development to each Type 2 charter school in New Orleans regarding disciplinary procedures for students with disabilities and best practices to reduce suspensions for students with disabilities.

- LDOE will continue to follow up on complaints related to enrollment practices of Type 2 charter schools. This follow-up will include providing the complainant in writing the contact information for the Office of Civil Rights and low-cost legal service providers, and where required under the IDEA, initiate an investigation of the complaint.

- Defendants will continue to collaborate to provide training for staff in all NOLA-PS charter schools regarding IDEA regulations.

(Defendants' 11/10/2025 Letter to the Court, attached as Exhibit A).

Moreover, based on the issues and concerns raised by parents of students with disabilities at the informal hearing in November 2025, LDOE and OPSB implemented the following staff changes:

- LDOE has created the position of supervisory attorney for its SPED team commitment and has filled that position effective January 5, 2026. As a result of this new position, the LDOE will have three attorneys to investigate special education complaints, handle other special education issues and cases, and to assist with providing advice and support to the LDOE special education staff.

- The OPSB has hired its own Student Support Ombudsman as a resource for families with children in the Orleans Parish public schools.

In their attempt to persuade the Court that the Consent Judgment should remain in place, the plaintiffs emphasize the findings of the Louisiana Legislative Auditor in his report issued on May 15, 2024. (Rec. Doc. 467, Plaintiffs' Opposition Exhibit 1). The

Auditor evaluated LDOE's oversight of students with disabilities who receive special education services. The report was not specific to Orleans Parish but rather to LDOE's risk-based monitoring of special education services across the entire state. The Auditor was critical of LDOE's monitoring practices particularly LDOE's use of risk-based monitoring. But interestingly, the Auditor thought that the Consent Judgment might be contributing to LDOE's inability to conduct on-site and desk reviews in a timely manner and to provide support to school systems *in the rest of the state*, which are staff-intensive functions. The Auditor noted that from 2015 through 2022 (during the life of the Consent Judgment), LDOE conducted a total of 262 desk or on-site reviews, with 166 of those reviews (63.4%) being in Orleans Parish even though Orleans Parish had only 7.2 % (6,427 of 89,681) of the students with disabilities in Louisiana. In other words, the Consent Judgment could very well be taxing LDOE's limited resources by forcing the agency to focus on Orleans Parish to the detriment of the rest of the state. Whether that is correct or not is beside the point. The point is that the Auditor's report is not a persuasive basis to keep the Consent Judgment in place.

At the November 2025 informal hearing numerous class members spoke about their specific negative experiences in certain Orleans Parish charter schools. Some of those negative experiences were disturbing and potentially unlawful. Many class members who spoke urged the Court to keep the Consent Judgment in place given those disturbing experiences. Class counsel likewise point to those experiences (which continue to be received even now) as a reason that Orleans Parish schools must remain subject to the Consent Judgment.

Not surprisingly, the Court's reluctance over the last few years to terminate the Consent Judgment even though the threshold requirements for Substantial Compliance had been satisfied has been in large part because individual families continue to report negative experiences with certain charter schools in Orleans Parish. And if a school is going to engage in disturbing and potentially unlawful conduct with the Consent Judgment in place, naturally the Court has been concerned with what would happen at the local level once federal judicial oversight is removed.

This Court is well aware of the challenges and frustrations of having a special needs child in the public school system. But as the Court has previously pointed out, this lawsuit and the Consent Judgment that grew out of it were directed at systemic deficiencies at the state level, not with the individual issues that cannot be addressed on a class-wide basis both practically and legally. (Rec. Doc. 480, Order and Reasons at 3 n.1). That individual problems at the local level may continue to arise in Orleans Parish does not ipso facto imply that Defendants are not in compliance with their obligations under federal law, which for LDOE includes far more than just Orleans Parish. The individual problems that have been brought to the Court's attention have arisen while the Consent Judgment has been in place. It has not prevented them from occurring and the fact that they do occur is not an indicator that the Consent Judgment has failed. But the fact that individual or local problems do arise with the Consent Judgment in place, serves to demonstrate the fallacy of the argument that the Consent Judgment should remain in place as a means of preventing similar problems.

In sum, the Court concurs with Defendants that the time is now right to terminate

the Consent Judgment. The Court is persuaded that Defendants' Joint Motion for Release of State Defendants and Defendant-Intervenor From the Obligations of Consent Judgment should be granted.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Joint Motion for Release of State Defendants and Defendant-Intervenor From the Obligations of Consent Judgment (Rec. Doc. 466)** filed by the State Defendants ("State Superintendent, Louisiana Department of Education and Louisiana Department of Education") and Defendant-Intervenor ("Orleans Parish School Board") should be and is hereby **GRANTED**. The Defendants' obligations under the Consent Judgment are deemed fulfilled and they are released from any further obligations in conjunction with the Consent Judgment.

March 31, 2026

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE